**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

___Eastern___ District of ___Virginia___
                    (State)

Case number (*If known*): _____  Chapter __11__

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| 1.  **Debtor's name** | Alpha Media Holdings LLC |
| 2.  **All other names debtor used in the last 8 years** <br> Include any assumed names, trade names, and *doing business as* names | L&L Broadcast Holdings LLC |
| 3.  **Debtor's federal Employer Identification Number** (EIN) | 4 6 – 2 5 9 3 6 3 4 |

4.  **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 1211   SW 5th Avenue <br> Number      Street <br> Suite 750 <br> Portland              OR    97204 <br> City              State    ZIP Code <br><br> _____ <br> County | Number      Street <br><br> P.O. Box <br><br> City              State    ZIP Code <br><br> **Location of principal assets, if different from principal place of business** <br><br> Number      Street <br><br> City              State    ZIP Code |

5.  **Debtor's website** (URL)    https://www.alphamediausa.com/

| Debtor | Alpha Media Holdings LLC | Case number (if known) |
|---|---|---|
| | Name | |

**6. Type of debtor**

- ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other. Specify: _____

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

5   1   5   1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check **all** that apply:*

  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  - ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  - ☑ A plan is being filed with this petition.

  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

- ☐ Chapter 12

Debtor    Alpha Media Holdings LLC
_____        Case number (if known)_____
Name

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

☑ No

If more than 2 cases, attach a separate list.

☐ Yes.  District _____ When _____ Case number _____
MM / DD / YYYY

District _____ When _____ Case number _____
MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No

☑ Yes.  Debtor  See Schedule 1 Attached    Relationship _____
_____

List all cases. If more than 1, attach a separate list.

District _____    When _____
MM  /  DD  / YYYY

Case number, if known _____

**11. Why is the case filed in this district?**

Check all that apply:

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☑ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (Check all that apply.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**_____
Number        Street

_____
City                                      State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name    _____

Phone    _____

---

**Statistical and administrative information**

| Debtor | Alpha Media Holdings LLC | | Case number (if known) |
|---|---|---|---|
| | Name | | |

**13. Debtor's estimation of available funds**

Check one:

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☑ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☑ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☑ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

### Request for Relief, Declaration, and Signatures

**WARNING –** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    01/24/2021
                MM / DD / YYYY

✖ /s/ John Grossi                                      John Grossi

Signature of authorized representative of debtor       Printed name

Title   Chief Financial Officer

---

Debtor    Alpha Media Holdings LLC
_____
Name

Case number *(if known)* _____

**18. Signature of attorney**

✖    /s/ Jeremy S. Williams
_____
Signature of attorney for debtor

Date    ___01/24/2021___
MM    / DD  / YYYY

Jeremy S. Williams
_____
Printed name
Kutak Rock LLP
_____
Firm name
901        East Byrd Street, Suite 1000
_____
Number        Street
Richmond                                        VA        23219-4071
_____
City                                            State        ZIP Code

(804) 644-1700                                  jeremy.williams@kutakrock.com
_____
Contact phone                                   Email address

77469                                            Virginia
_____
Bar number                                       State

<table>
<tr><td>
**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Eastern District of Virginia

Case number *(if known)*: _____    Chapter 11
</td></tr>
</table>

## Rider 1
## Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Eastern District of Virginia for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Alpha Media Holdings LLC.

| CHAPTER 11 DEBTORS |
|---|
| Alpha Media Holdings LLC |
| Alpha Media USA LLC |
| Alpha 3E Corporation |
| Alpha Media LLC |
| Alpha 3E Holding Corporation |
| Alpha Media Licensee LLC |
| Alpha Media Communications Inc. |
| Alpha Media Communications LLC |
| Alpha 3E Licensee LLC |
| Alpha Media of Brookings Inc. |
| Alpha Media of Columbus Inc. |
| Alpha Media of Fort Dodge Inc. |
| Alpha Media of Joliet Inc. |
| Alpha Media of Lincoln Inc. |
| Alpha Media of Luverne Inc. |
| Alpha Media of Mason City Inc. |

**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALPHA MEDIA HOLDINGS LLC, | ) Case No. 21-_____ (___) |
| | ) |
| Debtor. | ) |
| | ) |

## LIST OF EQUITY SECURITY HOLDERS[1]

| Debtor | Equity Holders | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|---|
| Alpha Media Holdings LLC | Stephens Radio LLC | 111 CENTER STREET SUITE 1600 LITTLE ROCK, AR 72201 | 25.91% |
| Alpha Media Holdings LLC | Endeavour Capital Fund V AIV, L.P. | 720 SW NINTH AVE SUITE 2300 PORTLAND, OR  97205 | 18.61% |
| Alpha Media Holdings LLC | Endeavour Associates Fund V, L.P | 720 SW NINTH AVE SUITE 2300 PORTLAND, OR  97205 | 0.33% |
| Alpha Media Holdings LLC | Morris Radio LLC | 725 BROAD STREET AUGUSTA, GA 30901 | 11.95% |
| Alpha Media Holdings LLC | The Brenda M. Shapiro Legacy Trust | 400 N. MICHIGAN AVE. SUITE 250 CHICAGO, IL 60611 | 6.94% |
| Alpha Media Holdings LLC | Breakwater Broadcasting Funding, LLC | 1999 AVENUE OF THE STARS SUITE 3430 LOS ANGELES, CA 90067 | 10.27% |
| Alpha Media Holdings LLC | Paul Stone | Address On File | 2.09% |
| Alpha Media Holdings LLC | Steve Bertholf | Address On File | 1.74% |
| Alpha Media Holdings LLC | Robert F. Fuller | Address On File | 0.78% |
| Alpha Media Holdings LLC | TLS Holdings, LLC | PO BOX 3295 | 1.17% |

---

[1]   This list serves as the disclosure required to be made by the debtor pursuant to rule 1007 of the Federal Rules of Bankruptcy Procedure. All equity positions listed are as of the date of commencement of the chapter 11 case.

| | | | |
|---|---|---|---|
| | | LITTLE ROCK, AR 72203-3295 | |
| Alpha Media Holdings LLC | Revocable Living Trust of Ricki Salsburg | 8071 SPENDTHRIFT LANE PORT ST. LUCIE, FL 34986 | 0.49% |
| Alpha Media Holdings LLC | Mary Lynn Moffitt Revocable Trust | 1015 EASTMAN DRIVE BIGFORK, MT 59911 | 0.63% |
| Alpha Media Holdings LLC | Julie A. Moffitt Living Trust | 14096 RAINBOW DRIVE BIGFORK, MT 59911 | 0.78% |
| Alpha Media Holdings LLC | John H. Moffitt Jr. Trust U/A Dated 8/7/10 | 14096 RAINBOW DRIVE BIGFORK, MT 59911 | 0.60% |
| Alpha Media Holdings LLC | John H. Moffitt & Co., Inc. | 5300 COLLEGE BLVD OVERLAND PARK, KS 66211 | 0.09% |
| Alpha Media Holdings LLC | Rio Bravo Enterprise Associates, L.P. | 1015 EASTMAN DRIVE BIGFORK, MT 59911 | 2.19% |
| Alpha Media Holdings LLC | Lawrence R. Wilson | Address On File | 4.16% |
| Alpha Media Holdings LLC | D. Robert Proffitt | Address On File | 0.78% |
| Alpha Media Holdings LLC | Scott G. Mahalick | Address On File | 0.77% |
| Alpha Media Holdings LLC | Donna L. Heffner | Address On File | 1.03% |
| Alpha Media Holdings LLC | ICG North America Holdings AIV L.P. | 1209 Orange Street Wilmington, DE 19801 | 3.54% |
| Alpha Media Holdings LLC | ICG Carbon Funding Limited | Juxon House 100 St Paul's Churchyard London, EC4M 8BU | 0.30% |
| Alpha Media Holdings LLC | Phoenix Life Insurance Company | 1 American Row PO Box 5056 Hartford, CT 06102 | 0.39% |
| Alpha Media Holdings LLC | PHL Variable Life Insurance Company | P.O. Box 5056 Hartford, CT 06103 | 0.19% |
| Alpha Media Holdings LLC | Metlife Private Equity Holdings, LLC | PO Box 80446 Kansas City, MO 64180-4466 | 2.14% |
| Alpha Media Holdings LLC | Florida Growth Fund LLC | 200 SW 1st Avenue Suite 880 Fort Lauderdale, FL 33101 | 0.71% |
| Alpha Media Holdings LLC | Hamilton Lane Strategic Opportunities 2016 Fund LP | 200 SW 1st Avenue Suite 880 Fort Lauderdale, FL 33101 | 0.71% |
| Alpha Media Holdings LLC | Big Sur Capital Partners Three Corp. | 1441 Brickell Avenue Suite 1410 | 0.57% |

SMRH:4825-0726-6005.3
012321

59ZT-318353

|  |  | Miami, FL 33131 |  |
|---|---|---|---|
| Alpha Media Holdings LLC | Michael Everhart | Address On File | 0.04% |
| Alpha Media Holdings LLC | Ricky Mitchell | Address On File | 0.02% |
| Alpha Media Holdings LLC | Jesse Alvarez Jr. | Address On File | 0.01% |
| Alpha Media Holdings LLC | Torden Wall | Address On File | 0.01% |
| Alpha Media Holdings LLC | Randi P'Pool | Address On File | 0.03% |

**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| ALPHA MEDIA HOLDINGS LLC, | )  Case No. 21-_____ (___) |
| Debtor. | ) ) ) |

## CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly owns 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| Stephens Radio LLC | 25.91% |
| Endeavour Capital Fund V AIV, L.P. | 18.61% |
| Morris Radio LLC | 11.95% |
| Breakwater Broadcasting Funding, LLC | 10.27% |

**Fill in this information to identify the case:**

Debtor name___Alpha Media Holdings LLC, *et al.*___

United States Bankruptcy Court for the:   _Eastern_  District of _Virginia_
(State)

Case number (If known):   _____

❑ Check if this is an
amended filing

Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | ICG North America Holdings Ltd. 600 Lexington Ave 24th Floor New York, NY 10022 | Brian Spenner Email: brian.spenner@icgplc.com | Unsecured Notes | | | | $103,974,381.40 |
| 2 | Nielsen Audio, Inc 85 Broad St New York, NY 10004 | Eric J. Dale, Chief Legal Officer Email: brad.kelly@nielsen.com | Sales & Marketing | | | | $2,366,735.81 |
| 3 | Broadcast Music, Inc. 10 Music Square East 5th Floor Credit Nashville, TN 37203 | Linda Hugen Phone: 615-401-2000 Email: NASHVILLE@BMI.COM | Royalties & Licensing | Contingent, Unliquidated, & Disputed | | | $823,829.43 |
| 4 | Crown Castle Towers 05 LLC 2000 Corporate Drive Canonsburg, PA 15317 | Kelsey O'Connor Phone: 724-416-9186 Email: kelsey.oconnor@crowncastle.com | Landlord | | | | $748,597.53 |
| 5 | American Society of Composers, Authors, and Publishers 250 West 57th St New York, NY 10107 | Pamela Blank Phone: 212-621-6406 Email: pblank@ascap.com | Royalties & Licensing | | | | $216,688.00 |
| 6 | American Tower Corporation 10 Presidential Way Woburn, MA 01801 | Leslie Corbin Phone: 781-926-7106 Email: leslie.corbin@americantower.com | Landlord | | | | $209,139.89 |
| 7 | Internal Revenue Service P.O. Box 932700 Louisville, KY 40293-2700 | Attn Legal Department | Tax | Contingent, Unliquidated, & Disputed | | | $158,163.51 |
| 8 | SBA Towers LLC 8051 Congress Ave Boca Raton, FL 33487 | Sharon S Schwartz Phone: 561-995-7670 Email: sschwartz@sbasite.com | Landlord | | | | $149,616.56 |
| 9 | Pesto, Inc. 725 Broad Street Augusta, GA 30901 | David Myer Phone: 785-823-8111 Email: craig.mitchell@morris.com | Landlord | | | | $126,085.79 |

Debtor _____Alpha Media Holdings LLC, *et al.*_____   Case number *(if known)*_____
         Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 10 | Pinnacle Towers, LLC 2000 Corporate Drive Canonsburg, PA 15317 | Kelsey O'Connor Phone: 724-416-9186 Email: kelsey.oconnor@crowncastle.com | Landlord | | | | $104,689.49 |
| 11 | Sound Exchange Inc 733 10th Street NW 10th Floor Washington, DC 20001 | Brie Jackson Phone: 202-696-1847 Email: info@soundexchange.com | Estimated Royalty Fees | | | | $91,335.96 |
| 12 | Albert Uresti, MPA, PCC Bear County Tax Assessor P O Box 2903 San Antonio, TX 78299-2903 | Phone: 210-335-2251 Email: taxoffice@bexar.org | Tax | | | | $77,936.08 |
| 13 | TR Pacwest LLC 1211 SW Fifth Ave Suite 700 Portland, OR 97204 | DeAnna L Amende Phone: 503-468-5501 Email: damende@lpc.com | Landlord | | | | $72,129.86 |
| 14 | Global Music Rights 1100 Glendon Ave Suite 2000 Los Angeles, CA 90024 | Spencer Kelly Phone: 310-209-6437 Email: spencer@globalmusicrights.com | Royalties & Licensing | | | | $70,101.20 |
| 15 | Radio Music License Committee 1616 Westgate Circle Brentwood, TN 37027 | Bill Velez Phone: 615-844-6260 Email: bill@radiomlc.org | Royalties & Licensing | Contingent, Unliquidated, & Disputed | | | $69,667.00 |
| 16 | Premiere Networks 15260 Ventura Blvd Suite 400 Sherman Oaks, CA 91403 | Michael Kindhart Phone: 818-461-5408 Email: mkindhart@premierenetworks.com | Programming | | | | $63,498.00 |
| 17 | Insite Towers, LLC 1199 North Fairfax St Suite 700 Alexandria, VA 22314 | David Denton Phone: 813-334-8833 Email: david.denton@insitewireless.com | Landlord | | | | $49,500.33 |
| 18 | Bohn Broadcast Services 169 Chelsea Station Dr. Chelsea, AL 35043 | Heather Phone: 844-549-2646 Email: heather@bohnbroadcast.com | Utility | | | | $47,304.52 |
| 19 | Marketron Broadcast Solutions Dept 225 PO Box 30015 Salt Lake City, UT 84130-0015 | Phone: 800-476-7226 Email: sales@marketron.com | Software | | | | $42,312.78 |
| 20 | Lancaster County Treasurer 555 South 10th Street, RM 102 Lincoln, NE 68508 | Rachel Garver Phone: 402-441-7425 Email: cotreas@lancaster.ne.gov | Tax | | | | $37,903.96 |
| 21 | DMR Interactive 20 W. 11th Street Covington, KY 41011 | Phone: 513-403-3066 Email: tbannon@dmrinteractive.com | Sales & Marketing | | | | $36,100.00 |
| 22 | SBA Towers IV, LLC 8051 Congress Ave Boca Raton, FL 33487 | Sharon S Schwartz Phone: 561-995-7670 Email: sschwartz@sbasite.com | Landlord | | | | $32,804.01 |
| 23 | Riverside County Treasurer PO Box 12005 Riverside, CA 92501 | Jon Christensen Phone: 951-955-3900 Email: rcttc@rivco.org | Tax | | | | $32,072.42 |

Debtor     Alpha Media Holdings LLC, *et al.*          Case number (*if known*)_____
           Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 24 | RCS Sound Software 445 Hamilton Ave, 7th Floor White Plains, NY 10601 | Jason Ramsey Phone: 914-259-4709 Email: jramsey@rcsworks.com | Software | | | | $18,188.00 |
| 25 | Platte County Treasurer 2610 14th St Columbus, NE 68601 | Phone: 402-563-4913 Email: treasurer@plattene.us | Tax | | | | $16,970.06 |
| 26 | Denali Media Holdings Corp. 2550 Denali St. Ste 100 Anchorage, AK 99503 | Phone: 907-274-1111 Email: rboots@denalimediaalaska.com | Landlord | | | | $16,860.00 |
| 27 | Brookings County Finance Office 520 3rd St Suite #100 Brookings, SD 57006 | Phone: 605-696-8250 Email: finance@brookingscountysd.gov | Tax | | | | $11,902.36 |
| 28 | Radio Advertising Bureau Inc P.O Box 972036 Dallas, TX 75397-2036 | Erica Farber Phone: 310-779-1274 Email: efarber@rab.com | Dues and Subscriptions | | | | $11,425.00 |
| 29 | Kilowatt Inc P.O Box 77 Humboldt, SD 57035 | Attn Director or Officer Phone: 605-681-4961 Email: ethan@kilowattinc.com | Engineering | | | | $11,342.00 |
| 30 | Efficio Solutions 90 Eastgate Rd Washington, IL 61571-9202 | Phone: 877-333-4246 Email: sstraub@efficiosolutions.com | Sales & Marketing | | | | $10,161.20 |

**Alpha Media Holdings LLC**

**January 24, 2021**

I, John Grossi, Secretary of the above-referenced entity (the "Company"), do hereby certify the following:

1. I am duly qualified and appointed Secretary of the Company.

2. Attached hereto as **Exhibit A** is a true, correct, and complete copy of the resolutions (the "Resolutions") duly adopted by the board of directors of the Company, acting in accordance with the limited liability company agreement of the Company (as amended, amended and restated, modified, supplemented, or replaced from time to time, the "Organizational Documents").

3. The Resolutions are not inconsistent with the Organizational Documents.

4. The Resolutions have not been amended, modified, repealed, or rescinded since adopted, and are in full force and effect on and as of the date hereof.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the date first written hereof.

:

Name:                        John Grossi
Title:                         Secretary

# EXHIBIT A

**RESOLUTIONS ADOPTED**
**BY THE BOARD OF DIRECTORS OF**
**ALPHA MEDIA HOLDINGS LLC**
**AT THE MEETING OF THE BOARD HELD ON**

**JANUARY 24, 2021**

**WHEREAS**, the Board of Directors (the "Board") of Alpha Media Holdings LLC, a Delaware limited liability company (the "Company"), has previously reviewed, considered, and discussed certain materials presented by the management of the Company ("Management") and the Company's financial, legal and other advisors (the "Advisors"), including, but not limited to, materials regarding the liabilities and obligations of the Company, its liquidity, strategic alternatives available to it, and the effect of the foregoing on the Company's business, and has had adequate opportunity to consult such persons regarding the materials presented, obtain additional information, and to fully consider each of the strategic alternatives available to the Company; and

**WHEREAS**, the Board has determined to seek the protections provided under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code").

**1.      CHAPTER 11 FILING**

**NOW THEREFORE, BE IT RESOLVED**, that in the judgment of the Board, it is desirable and in the best interest of the Company, its interest holders, its creditors, and other parties in interest, that the Company file or cause to be filed a voluntary petition for relief (the "Bankruptcy Petition") under the provisions of chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court");

**RESOLVED FURTHER**, that Bob Proffitt, John Grossi, and any other duly appointed officer of the Company as well as any designee and delegate of any duly appointed officer of the Company (each, an "Authorized Person," and collectively, the "Authorized Persons") is hereby authorized and appointed to act as signatory on behalf of the Company in respect of the matters contemplated by these resolutions, and each Authorized Person acting alone or with one or more other Authorized Persons be, and each of them hereby is, authorized, empowered, and directed to execute and file on behalf of the Company all agreements, certificates, petitions, schedules, lists, and other motions, papers, or documents (including the filing of financing statements), and to take any and all actions that they deem necessary, appropriate, or desirable to obtain such relief, including, without limitation, any action necessary, appropriate, or desirable to maintain the ordinary course operation of the Company's businesses;

**2.      CASH COLLATERAL, DEBTOR-IN-POSSESSION FINANCING, AND ADEQUATE PROTECTION**

**WHEREAS**, the Company will obtain benefits from (a) the use of collateral, including cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), which is security for certain prepetition second lien secured lenders (collectively, the "Secured Lenders") and (b) the incurrence of debtor-in-possession financing obligations (the "DIP Financing");

**WHEREAS**, in order to use and obtain the benefits of (a) the DIP Financing and (b) the Cash Collateral, and in accordance with section 363 of the Bankruptcy Code, it is contemplated that the Company will provide certain liens, claims, and other adequate protection to the Secured Lenders (the "DIP Obligations"), as documented in proposed interim and final orders (collectively, the "DIP Orders") to be submitted for approval to the Bankruptcy Court; and

**WHEREAS**, it is contemplated that the Company and certain subsidiaries of the Company will enter into (a) that certain $20,000,000 Senior Secured Priming Superpriority Debtor-In-Possession Note Purchase Agreement, in substantially the form attached hereto as **Exhibit A** (the "DIP NPA"), (b) that certain DIP Facility Guaranty and Security Agreement, in substantially the form attached hereto as **Exhibit B** (the "DIP Guaranty Agreement"), (c) that certain DIP Note, in substantially the form attached hereto as **Exhibit C** (the "DIP Note").

**NOW THEREFORE, BE IT RESOLVED**, that the Authorized Persons be, and each of them individually hereby is, authorized and empowered to execute and deliver for and on behalf of the Company and the applicable subsidiaries of the Company, the DIP NPA, the DIP Guaranty Agreement, and the DIP Note, with any changes or modifications as may be approved by the Authorized Person executing the same, the authority of such Authorized Person so to act to be conclusively evidenced by such Authorized Person's execution thereof, and that any action heretofore taken in connection therewith by any Authorized Person is hereby approved, adopted, ratified and confirmed;

**RESOLVED FURTHER**, that the form, terms, and provisions of the DIP Orders to which the Company is or will be subject, and the actions and transactions contemplated thereby be, and hereby are, authorized, adopted, and approved, and each of the Authorized Persons be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to take such actions and negotiate or cause to be prepared and negotiated and to execute, deliver, perform, and cause the performance of, the DIP Orders, the DIP NPA, the DIP Guaranty Agreement, the DIP Note, and such other agreements, certificates, instruments, receipts, petitions, motions, or other papers or documents to which the Company or any subsidiary thereof will be a party, including, but not limited to, any security and pledge agreement or guaranty agreement (collectively with the DIP Orders, the "DIP Documents"), incur and pay or cause to be paid all fees and expenses and engage such persons as the Authorized Persons shall approve, such approval to be conclusively evidenced by such Authorized Person's execution and delivery thereof;

**RESOLVED FURTHER**, that the Company, as a debtor and debtor-in-possession under the Bankruptcy Code be, and hereby is, authorized to incur the DIP Obligations and certain obligations related to the DIP Financing and to undertake any and all related transactions on substantially the same terms as contemplated under the DIP Documents (collectively, the "DIP Transactions"), including granting liens on its assets to secure such obligations;

**RESOLVED FURTHER**, that the Authorized Persons be and the hereby are, authorized, directed and empowered, and each of them acting alone hereby is authorized, directed, and empowered in the name of and on behalf of the Company to take such actions as in their discretion determined to be necessary, desirable or appropriate and execute the DIP Transactions, including delivery of the DIP Documents, and all other instruments, certificates, notices, assignments and documents related thereto;

**RESOLVED FURTHER**, that each of the Authorized Persons be, and hereby are, authorized, directed and empowered in the name of and on behalf of the Company to file, or cause to be filed, any Uniform Commercial Code (the "UCC") financing statements, any other equivalent filings, any intellectual property filings and recordation and any necessary assignments for security or other documents in the name of the Company that may be necessary or appropriate to perfect any lien or security interest granted under the DIP Orders, including any such UCC financing statement containing a generic description of collateral, such as "all assets," "all property now or hereafter acquired," and other similar descriptions of like import, and to execute and deliver, and to record or authorize the recording of, such mortgages and deeds of trust in respect of real property of the Company and such other filings in respect of intellectual and other property of the Company;

**RESOLVED FURTHER**, that each of the Authorized Persons be, and hereby is, authorized, directed and empowered in the name of and on behalf of the Company to take any of the following actions from time to time:

1.     Grant security interests and liens in any real, personal or other property belonging to or under the control of the Company as security for the DIP Documents; and to execute and deliver any and all security agreements, pledges, mortgages, deeds of trust and other security instruments and other documents to effectuate the grant of such security interests and liens, which security instruments and other documents shall be in such form and content as an Authorized Person executing such security instruments and other documents shall approve (which approval shall be evidenced by the execution and delivery of such security instruments and other documents);

2.     Waive on behalf of the Company, and in any agreement, instrument or document executed by the Company, any and all rights of the Company to require any lenders or agents under the DIP Documents to adhere to certain processes, including, without limitation, the right to a jury trial in an action or suit against such agents and/or lenders; and

3.     Transact any other business with such agents and/or lenders incidental to the powers hereinabove granted; and

**RESOLVED FURTHER**, that each of the Authorized Persons be, and hereby is, authorized, directed and empowered in the name of and on behalf of the Company to take all such further actions, including, without limitation, to pay or approve the payment of all fees and expenses payable in connection with the DIP Transactions and all fees and expenses incurred by or on behalf of the Company in connection with the foregoing resolutions, in accordance with the terms of the DIP Documents, which shall, in their sole judgement be necessary, desirable, proper or advisable to perform any of the Company's obligations under or in connection with the DIP Orders or any of the other DIP Documents and the transactions contemplated therein and to carry out fully the intent of the foregoing resolutions.

## 3.     RESTRUCTURING SUPPORT AGREEMENT AND THE CHAPTER 11 PLAN

**WHEREAS**, the Board has considered presentations by Management and the Advisors regarding a restructuring support agreement in substantially the form attached hereto as **Exhibit D** (including all exhibits thereto, the "Restructuring Support Agreement");

**WHEREAS**, the Company has negotiated the Restructuring Support Agreement in good faith and at arm's-length; and

**WHEREAS**, the Board has reviewed and considered presentations by Management and the Advisors regarding the advantages and disadvantages of the Company soliciting acceptances of the chapter 11 plan of reorganization (as may be amended, modified or supplemented from time to time, the "Plan") contemplated in the Restructuring Support Agreement and the related disclosures (as may be amended, modified or supplemented from time to time, the "Disclosure Statement").

**NOW THEREFORE, BE IT RESOLVED**, that the Authorized Persons be, and each of them individually hereby is, authorized and empowered to execute and deliver for and on behalf of the Company and the applicable subsidiaries of the Company, the Restructuring Support Agreement, with any changes or modifications as may be approved by the Authorized Person executing the same, the authority of such Authorized Person so to act to be conclusively evidenced by such Authorized Person's execution thereof, and that any action heretofore taken in connection therewith by any Authorized Person is hereby approved, adopted, ratified and confirmed;

**RESOLVED FURTHER**, that the Board has determined in its business judgment that it is desirable and in the best interests of the Company, its creditors, and other stakeholders to enter into the Restructuring Support Agreement and to commence solicitation of the Plan, as attached to the Disclosure Statement, pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code and rule 3018(b) of the Federal Rules of Bankruptcy Procedure, and that the Company's performance of its obligations under the Restructuring Support Agreement and the solicitation of votes in favor of the Plan be and hereby is, in all respects, authorized, ratified, and approved;

**RESOLVED FURTHER**, that each of the Authorized Persons be, and hereby is, authorized to take all actions (including, without limitation, to negotiate and execute any agreements, documents, or certificates) necessary to enter into the Restructuring Support Agreement and to consummate the transactions contemplated thereby in connection with the Bankruptcy Petition and that the Company's performance of its obligations under the Restructuring Support Agreement hereby is, in all respects, authorized, ratified, and approved;

**RESOLVED FURTHER**, that the Board and each Authorized Person has determined in its business judgment that it is desirable and in the best interests of the Company, its creditors, and other stakeholders that the Authorized Persons file, or cause to be filed with the Bankrtupcy Court, the Plan, the Disclosure Statement, and all other papers, instruments, documents, or other writings (including any amendments) related thereto and to take any and all actions that they deem necessary or appropriate to pursue confirmation and consummation of a plan of reorganization materially consistent with the Plan;

**RESOLVED FURTHER**, that each of the Authorized Persons, be, and hereby are, authorized, empowered and directed, together with the Advisors, to file with the Bankruptcy Court and any other applicable governmental authorities all other documents deemed necessary to confirm a plan of reorganization materially consistent with the Plan, including, but not limited to, any amendments to and modifications of the Plan and Disclosure Statement;

**RESOLVED FURTHER**, that each of the Authorized Persons, be, and hereby are, authorized, empowered and directed, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver and file any and all such instruments as each, in his or her discretion, may deem necessary or advisable in order to consummate the Plan if confirmed by the Bankruptcy Court;

## 4.      RETENTION OF PROFESSIONALS

**RESOLVED FURTHER**, that each of the Authorized Persons, acting alone or with one or more other Authorized Persons be, and hereby are, authorized, empowered and directed to employ: (i) Sheppard Mullin, Richter & Hampton LLP, as general bankruptcy counsel; (ii) Kutak Rock LLP, as local bankruptcy counsel; (iii) Moelis & Company, as financial advisor; (iv) Ernst & Young LLP, as restructuring advisor; (v) Bankruptcy Management Solutions, Inc. d/b/a Stretto, as the Company's notice, claims, and ballot agent; and (vi) any other legal counsel, accountants, financial advisors, restructuring advisors or other professionals the Authorized Persons deem necessary, appropriate or advisable; each to represent and assist the Company in carrying out its duties and responsibilities and exercising its rights under the Bankruptcy Code and any other applicable law; and in connection therewith, the Authorized Persons, acting alone or with one or more other Authorized Persons be, and hereby are authorized, empowered and directed, in accordance with the terms and conditions hereof, to execute (under the common seal of the Company, if appropriate) appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain such services;

**RESOLVED FURTHER**, that each of the Authorized Persons, acting alone or with one or more other Authorized Persons be, and hereby are, authorized, empowered and directed to execute and file all agreements, certificates, petitions, schedules, motions, lists, applications, pleadings, and other papers, and to perform such further actions and execute such further documentation that the Authorized Persons in their absolute discretion deem necessary, appropriate or desirable in accordance with these resolutions;

## 5.      GENERAL RESOLUTIONS

**RESOLVED FURTHER**, that the Company hereby authorizes any direct or indirect subsidiary of the Company or any affiliate of the Company or any entity of which the Company or any subsidiary of such Company is the sole member, general partner, managing member, or equivalent manager, as applicable, to take each of the actions described in these resolutions or any of the actions authorized in these resolutions, and none of the resolutions contained herein, or action taken in furtherance hereto, shall have or cause an adverse effect on any such subsidiary, affiliate, or the Company's interest therein (including without limitation, any automatic dissolution, divestiture, dissociation, or like event under applicable law);

**RESOLVED FURTHER**, that in addition to the specific authorizations heretofore conferred upon the Authorized Persons, each of the Authorized Persons be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such Authorized Person's judgment, shall be necessary,

appropriate, or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

**RESOLVED FURTHER**, that the Board has received sufficient notice of the actions and transactions relating to the matters contemplated by the resolutions, as may be required by the organizational documents of the Company, or hereby waives any right to have received such notice;

**RESOLVED FURTHER**, that all acts, actions, and transactions relating to the matters contemplated by these resolutions done in the name of and on behalf of the Company, which acts would have been approved by the resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved, confirmed and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of the Board;

**RESOLVED FURTHER**, that each of the Authorized Persons be and hereby is, authorized and empowered to take all actions or to not take any action in the name of and on behalf of the Company with respect to the transactions contemplated by these resolutions as such Authorized Person shall deem necessary, appropriate, or desirable in such Authorized Person's reasonable business judgment as may be necessary, appropriate, or desirable to effectuate the purposes of the transactions contemplated in these resolutions.

**<u>Exhibit A</u>**

**DIP NPA**

*SUBJECT TO FRE 408 AND SIMILAR RULES*
*ALPHA DRAFT*
*JANUARY 22, 2021*

**$20,000,000 SENIOR SECURED PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT**

**dated as of January [__], 2021**

**by and among**

**ALPHA MEDIA LLC and ALPHA 3E CORPORATION,**
**as the Issuers,**

**THE OTHER PERSONS PARTY HERETO THAT ARE
DESIGNATED AS CREDIT PARTIES,**

**ICG DEBT ADMINISTRATION LLC,**
**as the Agent for all DIP Noteholders,**

**and**

**THE OTHER FINANCIAL INSTITUTIONS AND PERSONS PARTY HERETO,**
**as DIP Noteholders**

# TABLE OF CONTENTS

**Page**

ARTICLE I THE DIP NOTES ................................................................................................ 2

    1.1    Amounts and Terms of DIP Commitments ...................................................... 2
    1.2    Evidence of Notes ............................................................................................ 3
    1.3    Interest............................................................................................................. 3
    1.4    Note Accounts; Register ................................................................................. 4
    1.5    Conversion and Continuation Elections............................................................ 5
    1.6    [Reserved] ........................................................................................................ 6
    1.7    Required Payment at Maturity ......................................................................... 6
    1.8    Mandatory Prepayments .................................................................................. 6
    1.9    [Reserved] ........................................................................................................ 7
    1.10    Payments by the Issuers .................................................................................. 7
    1.11    Issuer Representative ....................................................................................... 9

ARTICLE II CONDITIONS PRECEDENT ............................................................................ 9

    2.1    Conditions to Occurrence of Effective Date .................................................. 9
    2.2    Conditions to Subsequent Purchases of DIP Notes Before Plan Effective
          Date ................................................................................................................ 13
    2.3    Conditions to Purchase of DIP Notes on the Plan Effective Date ...................... 13

ARTICLE III REPRESENTATIONS AND WARRANTIES.................................................... 14

    3.1    Corporate Existence and Power...................................................................... 14
    3.2    Corporate Authorization; No Contravention ................................................. 15
    3.3    Governmental Authorization .......................................................................... 15
    3.4    Binding Effect ................................................................................................ 15
    3.5    Litigation........................................................................................................ 16
    3.6    No Default ...................................................................................................... 16
    3.7    ERISA Compliance ........................................................................................ 16
    3.8    Use of Proceeds; Margin Regulations; Securities Activities ............................. 17
    3.9    Ownership of Property; Liens......................................................................... 17
    3.10    Taxes ............................................................................................................. 17
    3.11    Financial Condition........................................................................................ 18
    3.12    Environmental Matters.................................................................................... 18
    3.13    Regulated Entities .......................................................................................... 19
    3.14    [Reserved] ...................................................................................................... 19
    3.15    Labor Relations .............................................................................................. 19
    3.16    Intellectual Property ....................................................................................... 19
    3.17    Brokers' Fees; Transaction Fees; Management Fees........................................ 20
    3.18    Insurance ........................................................................................................ 20
    3.19    Ventures, Subsidiaries and Affiliates; Outstanding Stock ............................. 20
    3.20    Jurisdiction of Organization; Chief Executive Office .................................... 20
    3.21    Deposit Accounts and Other Accounts .......................................................... 21
    3.22    Bonding.......................................................................................................... 21
    3.24    Status of Parent .............................................................................................. 21

-i-

# TABLE OF CONTENTS
(continued)

Page

3.25    Full Disclosure .................................................................................. 21
3.26    Validity and Priority of DIP Liens .................................................. 21
3.27    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices ........................................................................ 23
3.28    Patriot Act ......................................................................................... 24
3.29    FCC Licenses ..................................................................................... 24
3.30    FCC Matters ....................................................................................... 24
3.31    Authorized Officers ........................................................................... 25
3.32    [Reserved] .......................................................................................... 25
ARTICLE IV AFFIRMATIVE COVENANTS ............................................... 26

4.1     Financial Statements .......................................................................... 26
4.2     Certificates; Other Information ........................................................ 27
4.3     Notices ............................................................................................... 30
4.4     Preservation of Corporate Existence, Etc ...................................... 31
4.5     Maintenance of Property ................................................................... 32
4.6     Insurance ............................................................................................ 32
4.7     Payment of Obligations .................................................................... 33
4.8     Compliance with Laws ...................................................................... 33
4.9     Inspection of Property and Books and Records .............................. 34
4.10    Use of Proceeds ................................................................................. 34
4.11    [Reserved] .......................................................................................... 34
4.12    FCC Requirement re Availability of Agreement ............................ 34
4.13    [Reserved] .......................................................................................... 34
4.14    Further Assurances ............................................................................ 35
4.15    Environmental Matters ...................................................................... 36
4.16    [Reserved] .......................................................................................... 36
4.17    License Subsidiaries .......................................................................... 36
ARTICLE V NEGATIVE COVENANTS ........................................................ 39

5.1     Limitation on Liens ........................................................................... 39
5.2     Disposition of Assets ........................................................................ 41
5.3     Consolidations and Mergers ............................................................. 42
5.4     Loans and Investments ...................................................................... 42
5.5     Limitation on Indebtedness .............................................................. 43
5.6     Transactions with Affiliates .............................................................. 44
5.7     Management Fees and Compensation ............................................... 44
5.8     Use of Proceeds – No Margin Stock ............................................... 44
5.9     Contingent Obligations ..................................................................... 45
5.10    Compliance with ERISA .................................................................. 46
5.11    Restricted Payments .......................................................................... 46
5.12    Cessation of Business; Change in Business ..................................... 46
5.13    Change in Organizational Documents .............................................. 47
5.14    Changes in Accounting, Name and Jurisdiction of Organization ...... 47

# TABLE OF CONTENTS

(continued)

**Page**

5.15 Payments of Indebtedness, Amendments, Etc ...... 47
5.16 No Negative Pledges ...... 47
5.17 OFAC; USA Patriot Act; Anti-Corruption Laws ...... 48
5.18 Sale-Leasebacks ...... 48
5.19 Hazardous Materials ...... 48
5.20 Operation of License Subsidiaries ...... 48
5.21 Communications Authorizations ...... 49
5.22 Local Marketing Agreements and SSAs ...... 49
5.23 Budget Permitted Variance ...... 49
ARTICLE VI [RESERVED] ...... 50

ARTICLE VII EVENTS OF DEFAULT ...... 50
7.1 Event of Default ...... 50
7.2 Remedies ...... 56
7.3 Rights Not Exclusive ...... 56
7.4 Governmental ...... 56
ARTICLE VIII THE AGENT ...... 57
8.1 Appointment and Duties ...... 57
8.2 Binding Effect ...... 58
8.3 Use of Discretion ...... 58
8.4 Delegation of Rights and Duties ...... 59
8.5 Reliance and Liability ...... 59
8.6 The Agent Individually ...... 60
8.7 DIP Noteholder Credit Decision ...... 61
8.8 Expenses; Indemnities; Withholding ...... 61
8.9 Resignation of the Agent ...... 62
8.10 Release of Collateral or Guarantors ...... 63
8.11 Additional Secured Parties ...... 63
ARTICLE IX MISCELLANEOUS ...... 64
9.1 Amendments and Waivers ...... 64
9.2 Notices ...... 66
9.3 Electronic Transmissions ...... 67
9.4 No Waiver; Cumulative Remedies ...... 68
9.5 Costs and Expenses ...... 68
9.6 Indemnity ...... 69
9.7 Marshaling; Payments Set Aside ...... 71
9.8 Successors and Assigns ...... 71
9.9 Binding Effect; Assignments and Participations ...... 71
9.10 Non-Public Information; Confidentiality ...... 74
9.11 Set-off; Sharing of Payments ...... 75
9.12 Counterparts; Electronic Transmission ...... 76
9.13 Severability ...... 76

# TABLE OF CONTENTS

(continued)

**Page**

| | | |
|---|---|---|
| 9.14 | Captions | 77 |
| 9.15 | Independence of Provisions | 77 |
| 9.16 | Interpretation | 77 |
| 9.17 | No Third Parties Benefited | 77 |
| 9.18 | Governing Law and Jurisdiction | 77 |
| 9.19 | Waiver of Jury Trial | 78 |
| 9.20 | Entire Agreement; Release; Survival | 78 |
| 9.21 | Patriot Act | 79 |
| 9.22 | Inconsistency | 79 |
| 9.23 | Joint and Several | 79 |
| 9.24 | Creditor-Debtor Relationship | 79 |
| ARTICLE X | TAXES, YIELD PROTECTION AND ILLEGALITY | 80 |
| 10.1 | Taxes | 80 |
| 10.2 | Illegality | 83 |
| 10.3 | Increased Costs and Reduction of Return | 83 |
| 10.4 | Funding Losses | 85 |
| 10.5 | Inability to Determine Rates | 85 |
| 10.6 | Reserves on LIBOR Rate DIP Notes | 86 |
| 10.7 | Certificates of DIP Noteholders | 87 |
| ARTICLE XI | DEFINITIONS | 87 |
| 11.1 | Defined Terms | 87 |
| 11.2 | Other Interpretive Provisions | 114 |
| 11.3 | Accounting Terms and Principles | 115 |
| 11.4 | Payments | 116 |
| 11.5 | Divisions | 116 |
| 11.6 | Bail-In | 116 |
| 11.7 | Certain Representations of the DIP Noteholders | 117 |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 3.5 | Litigation |
| Schedule 3.7 | ERISA |
| Schedule 3.8 | Margin Stock |
| Schedule 3.9 | Real Estate |
| Schedule 3.10 | Taxes |
| Schedule 3.12 | Environmental |
| Schedule 3.15 | Labor Relations |
| Schedule 3.17 | Brokers' and Transaction Fees |
| Schedule 3.19 | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.20 | Jurisdiction of Organization; Principal Place of Business |
| Schedule 3.21 | Deposit Accounts and Other Accounts |
| Schedule 3.22 | Bonding |
| Schedule 3.29 | FCC Licenses |
| Schedule 3.30 | Stations |
| Schedule 3.31 | Authorized Officers |
| Schedule 5.1 | Liens |
| Schedule 5.4 | Investments |
| Schedule 5.5 | Indebtedness |
| Schedule 5.9 | Contingent Obligations |
| Schedule 5.11 | Restricted Payments |

## EXHIBITS

| | |
|---|---|
| Exhibit 1.2(a) | Form of Note |
| Exhibit 1.5 | Form of Notice of Issuance |
| Exhibit 1.5 | Form of Notice of Conversion/Continuation |
| Exhibit 2.1(g)(i) | Form of DIP Budget |
| Exhibit 2.1(g)(ii) | Form of Business Plan |
| Exhibit 4.2(b) | Form of Compliance Certificate |
| Exhibit 4.2(j) | Form of CFO Certificate |
| Exhibit 9.9 | Form of Assignment |
| Exhibit 11.1(a) | Form of DIP Interim Order |

KL2 3199266.14

## SENIOR SECURED PRIMING SUPERPRIORITY
## DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT

This SENIOR SECURED PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "Agreement") is entered into as of January [__], 2021, by and among Alpha Media LLC, a Delaware limited liability company ("Alpha LLC"), Alpha 3E Corporation, a Delaware corporation ("Alpha 3E" and, together with Alpha LLC, collectively, the "Issuers" and each, an "Issuer"), the Issuer Representative, the other Persons party hereto that are designated as a "Credit Party", ICG Debt Administration LLC, a Delaware limited liability company ("ICG Debt Admin"), as the Agent for the several financial institutions and the Persons from time to time party to this Agreement as a DIP Noteholder (collectively, the "DIP Noteholders" and individually each a "DIP Noteholder") and the DIP Noteholders.

### W I T N E S E T H:

WHEREAS, on [_____] (the "Petition Date"), Alpha Media Holdings LLC, a Delaware limited liability company ("TopCo"), Alpha Media USA LLC, a Delaware limited liability company (the "Parent"), the Issuers and their Subsidiaries (as defined below) listed in Schedule 3.19 (the foregoing, collectively, the "Debtors") each commenced a voluntary case (each a "Chapter 11 Case", and collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") under Chapter 11 of Title 11 of the Bankruptcy Code, and the Chapter 11 Cases are being jointly administered under Case No. 20-_____ (___);

WHEREAS, as of the date hereof, each Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Issuers have requested that the DIP Noteholders provide the Issuers with a debtor-in-possession, superpriority, senior secured priming debtor-in-possession note purchase agreement in an aggregate principal amount of $20,000,000 in DIP Commitments and DIP Notes from the DIP Noteholders on the terms and conditions provided for herein (including the extensions of credit made hereunder, the "DIP Facility");

WHEREAS, the DIP Facility shall be afforded the liens and priority set forth in the DIP Interim Order and, when applicable, the DIP Final Order and as set forth in the other DIP Note Documents and shall be used during the Chapter 11 Cases for the purposes set forth in Section 4.10, subject in all respects to the terms set out herein and in the other DIP Note Documents;

WHEREAS, TopCo owns all of the Stock and Stock Equivalents of the Parent and will guaranty all of the Obligations and pledge to the Agent, for the benefit of the Secured Parties, all of the Stock and Stock Equivalents of the Parent and substantially all of its other Property to secure the Obligations;

WHEREAS, the Parent owns all of the Stock and Stock Equivalents of each of Alpha LLC and Alpha 3E and will guaranty all of the Obligations and pledge to the Agent, for the benefit of the Secured Parties, all of the Stock and Stock Equivalents of the applicable Issuer and substantially all of its other Property to secure the Obligations; and

WHEREAS, subject to the terms hereof, each Subsidiary of the Parent (other than the Issuers) is willing to guaranty all of the Obligations of the Issuers and to grant to the Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its Property; and

WHEREAS, the DIP Noteholders are willing to extend such credit to the Issuers on the terms and subject to the conditions set forth herein, including (without limitation) entry of the DIP Interim Order, and when applicable, the DIP Final Order.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

THE DIP NOTES

1.1    <u>Amounts and Terms of DIP Commitments</u>.

(a)    Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Credit Parties contained herein, each DIP Noteholder severally and not jointly agrees to purchase notes co-issued by the Issuers evidencing debt securities from time to time on any Business Day during the period from the Effective Date through the DIP Facility Termination Date, in an aggregate amount not to exceed at any time outstanding (i) the amount set forth opposite such  DIP Noteholder's name in <u>Schedule 1.1(a)</u> under the heading "<u>DIP Commitment</u>" (such amount being referred to herein as such DIP Noteholder's "<u>DIP Commitment</u>") and (ii) for all DIP Noteholders, the Aggregate DIP Commitment.  Each note purchased under this <u>Section 1.1</u> shall be referred to as a "<u>DIP Note</u>". Upon the funding of any purchase of DIP Notes by a DIP Noteholder hereunder, the DIP Commitment of such DIP Noteholder shall be reduced permanently by the amount of the DIP Notes so purchased and funded.

(b)    Subject to the terms and conditions of this Agreement, each DIP Noteholder shall purchase such DIP Noteholder's Commitment Percentage of

(i)    on the Effective Date, an aggregate of $[_____][1] of DIP Notes (the "<u>Initial DIP Notes</u>");

(ii)    upon the occurrence of any Cash Shortfall Trigger on any DIP Note Purchase Date that occurs during the period beginning on the date the DIP Final Order is entered and ending on the day prior to the Plan Effective Date

---

[1] NTD: we will follow with Initial DIP Note amount asap.

(such period, the "<u>Subsequent Funding Period</u>"), an aggregate amount of DIP Notes equal to the greater of (x) $1,000,000 (or, if less, the remaining amount of the DIP Commitments) and (y) the amount of the Cash Shortfall existing on such DIP Note Purchase Date, <u>provided</u> that during the Subsequent Funding Period the aggregate amount of DIP Notes purchased pursuant to this <u>Section 1.1(b)(ii)</u> shall not exceed $17,500,000 (less the aggregate amount of DIP Notes previously purchased pursuant to <u>Section 1.1(b)(i)</u>); and

(iii)     on the Plan Effective Date, an aggregate of $20,000,000 (less the aggregate amount of DIP Notes previously purchased pursuant to <u>Sections 1.1(b)(i)</u> and <u>(b)(ii)</u>) of DIP Notes to fund the Credit Parties' payment of all costs and expenses necessary to consummate the Plan of Reorganization as set forth in <u>Section 4.10(b)</u>, <u>provided</u> that all such costs and expenses shall be detailed in a certificate of an Authorized Officer reasonably satisfactory to the Agent delivered to the Agent at the time the applicable Notice of Issuance is delivered.

(c)     Whenever the Issuers desire the DIP Noteholders to purchase DIP Notes pursuant to <u>Section 1.1(b)</u>, the Issuer Representative shall give the Agent a Notice of Issuance prior to 1:00 p.m. (Eastern Standard time) at least four (4) Business Days (or in the case of the Initial DIP Notes, at least three (3) Business Days) prior to the date of any purchase of DIP Notes. The Notice of Issuance shall be signed by an Authorized Officer and shall specify (i) the date on which the DIP Notes are to be purchased, which shall be a Business Day (the "<u>DIP Note Purchase Date</u>"), (ii) the aggregate principal amount of the DIP Notes to be purchased on the DIP Note Purchase Date which, in the case of any DIP Notes purchased during the Subsequent Funding Period, shall be the amount determined pursuant to <u>Section 1.1(b)(ii)</u>, (iii) whether the DIP Notes to be purchased are Base Rate DIP Notes (in which case all then outstanding LIBOR Rate DIP Notes shall be converted to Base Rate DIP Notes subject to <u>Section 10.4</u> if such conversion is made prior to the expiration of the Interest Period applicable thereto) or LIBOR Rate DIP Notes (in which case all then outstanding Base Rate DIP Notes shall be converted to LIBOR Rate DIP Notes), and (iv) the wire instructions for the account of the Issuers to which the purchase price of the DIP Notes is to be sent.  The Agent shall promptly give each DIP Noteholder written notice of each proposed purchase of DIP Notes, of such DIP Noteholder's Commitment Percentage thereof and of the other matters covered by the related Notice of Issuance.

(d)     Any amounts advanced as DIP Notes which are repaid or prepaid may not be re-advanced.

1.2     <u>Evidence of Notes</u>.  All Obligations owed to each DIP Noteholder are and shall be evidenced by this Agreement and a DIP Note payable to such DIP Noteholder.

1.3     <u>Interest</u>.

(a)     Subject to <u>Sections 1.3(c)</u> and <u>1.3(d)</u>, the advances evidenced by the DIP Notes shall bear interest from the date made, and all interest which is not paid when due shall bear interest, at a rate per annum equal to LIBOR or the Base Rate, as the case

may be, plus the Applicable Margin therefor and all other Obligations shall bear interest at a rate per annum equal to the sum of the Base Rate and the Applicable Margin, each as in effect from time to time. Each determination of an interest rate by the Agent shall be conclusive and binding on each Issuer and the DIP Noteholders in the absence of manifest error. All computations of interest (other than interest accruing on Base Rate DIP Notes or other Obligations bearing interest by reference to the Base Rate) payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. All computations of interest accruing on Base Rate DIP Notes and other Obligations bearing interest by reference to the Base Rate payable under this Agreement shall be made on the basis of a 365-day year (366 days in the case of a leap year) and actual days elapsed. Interest shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)     Interest on each DIP Note shall be paid in cash in arrears on each Interest Payment Date. Interest shall also be paid in cash on the date of any prepayment of the Notes and on the maturity date of the Notes.

(c)     If any Event of Default has occurred and is continuing, interest shall automatically accrue on all amounts of principal and accrued and unpaid interest on the DIP Notes, and all other Obligations that are outstanding, at a rate per annum which is determined by adding two percent (2.0%) per annum to the Applicable Margin then in effect for such DIP Notes (plus LIBOR or Base Rate, as the case may be).

(d)     Anything herein to the contrary notwithstanding, the obligations of the Issuers hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective DIP Noteholder would be contrary to the provisions of any law applicable to such DIP Noteholder limiting the highest rate of interest which may be lawfully contracted for, charged or received by such DIP Noteholder, and in such event the Issuers shall pay such DIP Noteholder interest at the highest rate permitted by applicable law ("Maximum Lawful Rate"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Issuers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by DIP Noteholders is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Effective Date as otherwise provided in this Agreement.

1.4     Note Accounts; Register.

(a)     The Agent, on behalf of the DIP Noteholders, shall record on its books and records the amount of each DIP Note purchased, the interest rate applicable thereto, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding. Such record shall, absent manifest error, be conclusive evidence of the amount of the DIP Notes made by the DIP Noteholders to the Issuers and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such statement shall not, however, limit or otherwise affect the obligation

of the Issuers hereunder (and under any DIP Note) to pay any amount owing with respect to the DIP Notes or provide the basis for any claim against the Agent.

(b)     The Agent, acting as a non-fiduciary agent of the Issuers, solely for tax purposes and solely with respect to the actions described in this <u>Section 1.4(b)</u>, shall establish and maintain at its address referred to in <u>Section 9.2</u> (or at such other address as the Agent may notify the Issuer Representative) (A) a record of ownership (the "<u>Register</u>") in which the Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of the Agent and each DIP Noteholder in the DIP Notes and any assignment of any such interest and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the DIP Noteholders (and each change thereto pursuant to <u>Section 9.9</u>), (2) the DIP Commitments of each DIP Noteholder, (3) the amount of each DIP Note and for LIBOR Rate DIP Notes, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid with respect to Notes recorded in the Register, and (5) any other payment received by the Agent from an Issuer and its application to the Obligations.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the DIP Notes are registered obligations, the right, title and interest of the DIP Noteholders and their assignees in and to such DIP Notes shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein.  This <u>Section 1.4</u> and <u>Section 9.9</u> shall be construed so that the DIP Notes are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     The Credit Parties, the Agent and the DIP Noteholders shall treat each Person whose name is recorded in the Register as a DIP Noteholder for all purposes of this Agreement. Information contained in the Register with respect to any DIP Noteholder shall be available for access by the Issuers, the Issuer Representative, the Agent and such DIP Noteholder during normal business hours and from time to time upon at least one (1) Business Day's prior notice.  No DIP Noteholder shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such DIP Noteholder unless otherwise agreed by the Agent.

1.5     <u>Conversion and Continuation Elections</u>.

(a)     The Issuers shall have the option to (i) convert at any time all outstanding Base Rate DIP Notes to LIBOR Rate DIP Notes, (ii) convert all outstanding LIBOR Rate DIP Notes to Base Rate DIP Notes, subject to <u>Section 10.4</u> if such conversion is made prior to the expiration of the Interest Period applicable thereto, or (iii) continue all of the outstanding LIBOR Rate DIP Notes as LIBOR Rate DIP Notes upon the expiration of the applicable Interest Period. Any such election must be made by the Issuer Representative by 2:00 p.m. (Eastern Standard time) at least four (4) Business Days prior to (1) the end of each Interest Period with respect to the LIBOR Rate DIP Notes to be continued as such, or (2) the date on which the Issuers wish to convert (x) all Base Rate DIP Notes to LIBOR Rate DIP Notes for an Interest Period designated by the Issuer Representative in such election or (y) all LIBOR Rate DIP Notes to Base Rate DIP Notes.

5

If no election is received with respect to any outstanding LIBOR Rate DIP Notes by 2:00 p.m. (Eastern Standard time) at least four (4) Business Days prior to the end of the Interest Period with respect thereto, then the LIBOR Rate DIP Notes shall be converted to Base Rate DIP Notes at the end of its Interest Period. The Issuer Representative must make such election by notice to the Agent and each DIP Noteholder pursuant to a written Notice of Conversion/Continuation, including by Electronic Transmission. The DIP Notes shall not be converted into or continued as LIBOR Rate DIP Notes if an Event of Default has occurred and is continuing and the Required DIP Noteholders have determined not to continue any DIP Note as a LIBOR Rate DIP Note as a result thereof.

(b)     Following its receipt of a Notice of Conversion/Continuation, the Agent will, with reasonable promptness, notify the Issuer Representative and the DIP Noteholders of the determination of LIBOR, if applicable; provided that any failure to do so shall not relieve the Issuers or any other Credit Party of any liability hereunder or provide the basis for any claim against the Agent.

(c)     Notwithstanding any other provision contained in this Agreement, after giving effect to any Issuance, or to any continuation or conversion of the DIP Notes, there shall not be more than one (1) Interest Period in effect.

1.6     [Reserved].

1.7     Required Payment at Maturity.  Subject to the DIP Interim Order, and when applicable, the DIP Final Order, the Issuers shall repay to each DIP Noteholder an amount equal to the entire remaining outstanding principal amount of such DIP Noteholder's Notes on the DIP Facility Termination Date.

1.8     Mandatory Prepayments.  Subject to the DIP Interim Order, and when applicable, the DIP Final Order:

(a)     Excess Outstandings.  If at any time the aggregate amount of all DIP Notes exceeds the Aggregate DIP Commitment, or the amount of DIP Notes of any DIP Noteholder exceeds such DIP Noteholder's DIP Commitment, the Issuers shall promptly and in any case (within one (1) Business Day) prepay without premium or penalty, the principal amount of the DIP Notes, ratably among the DIP Noteholders in accordance with their respective DIP Commitments in an aggregate principal amount sufficient to cause the aggregate amount of all DIP Notes to be less than or equal to the Aggregate DIP Commitment and the aggregate amount of the DIP Notes of any DIP Noteholder to be less than or equal to such DIP Noteholder's DIP Commitment.

(b)     Asset Dispositions; Events of Loss.  If a Credit Party or any Subsidiary of a Credit Party shall at any time or from time to time:

(i)     make or agree to make a Disposition; or

(ii)     suffer an Event of Loss;

then (A) the Issuer Representative shall promptly notify the Agent and DIP Noteholders of such proposed Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party and/or such Subsidiary in respect thereof) and (B) within three (3) Business Days following receipt by a Credit Party and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Issuers shall deliver, or cause to be delivered, such Net Proceeds to the DIP Noteholders as a prepayment of the DIP Notes, which prepayment shall be applied in accordance with Section 1.8(d) hereof.

(c)      Incurrence of Debt.  Within three (3) Business Days after receipt by any Credit Party or any Subsidiary of any Credit Party of the Net Proceeds of the incurrence of Indebtedness not permitted hereunder, the Issuers shall deliver, or cause to be delivered, to the DIP Noteholders an amount equal to such Net Issuance Proceeds, in each instance, for application to the DIP Notes in accordance with Section 1.8(d).

(d)      Application of Prepayments.   Subject to Section 1.11(c), any prepayments pursuant to Sections 1.8(a), (b), and (c) shall be applied pro rata to the DIP Notes based upon the respective then outstanding principal balances thereof.  Together with each prepayment under this Section 1.8, the Issuers shall pay any amounts required pursuant to Section 1.3 and Section 10.4.

(e)      No Implied Consent.  Provisions contained in this Section 1.8 for application of proceeds of certain transactions shall not be deemed to constitute consent of the DIP Noteholders to transactions that are not otherwise permitted by the terms hereof or the other DIP Note Documents.

1.9    [Reserved].

1.10    Payments by the Issuers.

(a)      All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, and shall, except as otherwise expressly provided herein, be made to each DIP Noteholder (for the ratable account of each DIP Noteholder) at the address for payment specified in the signature page hereof in relation to each such DIP Noteholder (or such other address as each DIP Noteholder may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds which shall be the exclusive means of payment hereunder (in accordance with the wire instructions specified for each DIP Noteholder in the signature page hereof or as otherwise may be specified by a DIP Noteholder for its payments pursuant to written notice to the Issuer Representative), no later than 1:00 p.m. (Eastern Standard time) on the date due.  Any payment which is received by any DIP Noteholder later than 1:00 p.m. (Eastern Standard time) may in such DIP Noteholder's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  Each Issuer and each other Credit Party hereby irrevocably waives the right to direct the

7

application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.

(b)      Subject to the provisions set forth in the definition of "Interest Period" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be excluded in the computation, and if applicable, payment, of interest or fees, as the case may be, on such next succeeding Business Day; provided that such extension of time shall be included in the next succeeding computation and payment of interest and fees; provided, further, that if the scheduled payment date is the DIP Facility Termination Date, such extension of time shall include such interest and fees, which shall be payable on the next succeeding Business Day.

(c)      Notwithstanding any other provisions of this Agreement to the contrary, after the exercise of remedies (other than the application of default interest pursuant to Section 1.3(c)) by the Agent or the DIP Noteholders pursuant to Section 7.2 (or after the DIP Commitments shall automatically terminate and the DIP Notes (with accrued interest thereon) and all other amounts under the DIP Note Documents shall automatically become due and payable in accordance with the terms of such Section), all amounts collected or received by the Agent or any DIP Noteholder on account of the Obligations or any other amounts outstanding under any of the DIP Note Documents or in respect of the Collateral shall be paid over or delivered as follows (irrespective of whether the following costs, expenses, fees, interest, premiums, scheduled periodic payments or Obligations are allowed, permitted or recognized as a claim in any proceeding resulting from the occurrence of an Insolvency Proceeding):

FIRST, to the payment of all reasonable out of pocket costs and expenses (including, without limitation the DIP Noteholder Professionals' fees and Attorney Costs) of the Agent in connection with the DIP Note Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of the DIP Collateral Documents;

SECOND, to the payment of any fees owed to the Agent;

THIRD, to the payment of all reasonable out of pocket costs and expenses (including, without limitation, the DIP Noteholder Professionals' fees and Attorney Costs) of each of the DIP Noteholders in connection with the DIP Note Documents or otherwise with respect to the Obligations owing to such DIP Noteholder;

FOURTH, to the payment of the outstanding principal amount of the Obligations and any interest accrued thereon;

FIFTH, to the payment of all other Obligations and other obligations which shall have become due and payable under the DIP Note Documents or otherwise and not repaid pursuant to clauses "FIRST" through "FOURTH" above; and

SIXTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; and (ii) each of the DIP Noteholders shall receive an amount equal to its pro rata share (based on the proportion that then outstanding DIP Notes held by such DIP Noteholder bears to the aggregate then outstanding DIP Notes) of amounts available to be applied pursuant to clauses "THIRD", "FOURTH" and "FIFTH" above.

1.11    Issuer Representative.  Alpha LLC hereby (a) is designated and appointed by each Issuer as its representative and agent on its behalf (the "Issuer Representative") and (b) accepts such appointment as the Issuer Representative, in each case, for the purposes of issuing Notices of Issuance, and Notices of Conversion/Continuation, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the DIP Notes, selecting interest rate options, giving and receiving all other notices, requests and consents hereunder or under any of the other DIP Note Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Issuer or Issuers under the DIP Note Documents.  The Agent and each DIP Noteholder may regard any notice or other communication pursuant to any DIP Note Document from the Issuer Representative as a notice or communication from all Issuers.  Each warranty, covenant, agreement and undertaking made on behalf of an Issuer by the Issuer Representative shall be deemed for all purposes to have been made by such Issuer and shall be binding upon and enforceable against such Issuer to the same extent as if the same had been made directly by such Issuer.

## ARTICLE II

## CONDITIONS PRECEDENT

2.1    Conditions to Occurrence of Effective Date.  The effectiveness of this Agreement and the obligation of the DIP Noteholders to purchase the Initial DIP Notes on the Effective Date pursuant to Section 1.1(b)(i) is subject to satisfaction (or waiver by the Agent and the Required DIP Noteholders) of the following conditions in a manner reasonably satisfactory to the Agent and the DIP Noteholders:

(a)    DIP Note Documents.  The Agent and DIP Noteholders shall have received (i) counterparts of this Agreement, executed by a duly authorized officer of each party hereto, (ii) for the account of each DIP Noteholder, a duly executed DIP Note, (iii) counterparts of the Guaranty and Security Agreement, executed by duly authorized officers of the Credit Parties, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against each Credit Party as debtor in favor of the Agent for the benefit of the Agent, the DIP Noteholders and the other Secured Parties, as secured party, as applicable, and (iv) counterparts of any other DIP Note Document reasonably requested by the Agent, executed by the duly authorized officers of the parties thereto.

(b)      <u>Authority Documents</u>. The Agent and DIP Noteholders shall have received the following:

(i)      <u>Certificate of Formation/Charter Documents</u>. Original certified certificates of formation or other charter documents, as applicable, of each Credit Party certified (A) by an officer of such Credit Party (pursuant to an officer's certificate in form and substance reasonably satisfactory to the Agent) as of the Effective Date to be true and correct and in force and effect as of such date, and (B) to be true and complete as of a recent date (not older than ten (10) Business Days) by the appropriate Governmental Authority of the state of its incorporation or organization, as applicable.

(ii)      <u>Resolutions</u>. Copies of resolutions of the board of directors or comparable managing body of each Credit Party approving and adopting the applicable DIP Note Documents and authorizing execution and delivery thereof, certified by an officer of such Credit Party (pursuant to an officer's certificate in form and substance reasonably satisfactory to the Agent) as of the Effective Date to be true and correct and in force and effect as of such date.

(iii)      <u>LLC Agreement/Operating Agreement</u>. A copy of the limited liability company agreement, bylaws, or comparable operating agreement of each Credit Party certified by an officer of such Credit Party (pursuant to an officer's certificate in form and substance reasonably satisfactory to the Agent) as of the Effective Date to be true and correct and in force and effect as of such date.

(iv)      <u>Good Standing</u>. Certificates of good standing, existence or its equivalent with respect to each Credit Party certified as of a recent date (not older than twenty (20) Business Days) by the appropriate Governmental Authority of the state of incorporation or organization of each such Credit Party.

(v)      <u>Incumbency</u>. An incumbency certificate of each Authorized Officer of each Credit Party certified by an officer (pursuant to an officer's certificate in form and substance reasonably satisfactory to the Agent) to be true and correct as of the Effective Date.

(c)      <u>Restructuring Support Agreement</u>. The Restructuring Support Agreement shall be in full force and effect according to its terms and the "Termination Date" under, and as defined in, the Restructuring Support Agreement shall not have occurred.

(d)      <u>DIP Interim Order</u>. The Agent and the DIP Noteholders shall have received a signed copy of the DIP Interim Order which shall have been entered by the Bankruptcy Court on or before the third (3rd) Business Day after the Petition Date, and such DIP Interim Order shall not have been vacated, reversed, modified, amended, stayed, or appealed.

(e)      <u>Chapter 11 Cases</u>. (i) The Chapter 11 Cases shall have been commenced; (ii) the Agent shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance satisfactory to the Agent in its reasonable discretion prior to the Petition Date; and (iii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents filed with and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Agent and consistent with the Restructuring Support Agreement in all respects, and the Bankruptcy Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(f)      <u>No Trustee Appointment</u>.  No trustee, examiner, or receiver having expanded powers (beyond those set forth under section 1106(a)(3) and (4) of the Bankruptcy Code) shall have been appointed or designated with respect to any of the Debtors, their businesses, properties or assets.

(g)      <u>Initial Approved Budget; Business Plan</u>.  The Agent shall have received (i) a DIP Budget, in substantially the form attached hereto as <u>Exhibit 2.1(g)(i)</u>, covering the period beginning from the Petition Date through and including the end of thirteenth calendar week following the Petition Date (the "<u>Initial Approved Budget</u>"), and (ii) a business plan of the Debtors, in form and substance substantially similar to the business plans previously provided by the Debtors to the Second Lien Noteholders, reflecting projected income statements, capital expenditures, and assets for the next four fiscal quarters following the fiscal quarter during which the Effective Date occurs, reflecting such statements, expenditures and assets on quarterly basis, in substantially the form attached hereto as <u>Exhibit 2.1(g)(ii)</u>.

(h)      [Reserved].

(i)      <u>Security Interests</u>.  The Agent, for the benefit of the Secured Parties, shall have a valid and perfected security interest in the Collateral pursuant to the DIP Interim Order with the priorities set forth in <u>Section 3.26</u>.

(j)      <u>Insurance</u>.  The Agent and the DIP Noteholders shall have received certificates in customary form naming the Agent as an additional insured for all liability policies maintained by the Credit Parties;

(k)      <u>Absence of Litigation</u>.  There shall not exist (i) any order, injunction or decree of any Governmental Authority restraining or prohibiting the purchase of the DIP Notes hereunder or (ii) any action, suit, investigation, litigation or proceeding pending or threatened in any court or before any Governmental Authority, including, without limitation, the FCC, that challenges or seeks to enjoin the purchase of the DIP Notes hereunder or any of the other transactions contemplated hereby.

(l)      <u>FCC Licenses</u>.  Each FCC License that is material to the business of the Credit Parties shall be in full force and effect.

(m)      [reserved].

KL2 3199266.14

(n)    <u>Financial Statements</u>.  The Agent and the DIP Noteholders shall have received (i) a pro forma consolidated balance sheet and a related pro forma consolidated statement of income of  TopCo and its Subsidiaries as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 30 Business Days before the Effective Date and (ii) a pro forma consolidated balance sheet and a related pro forma consolidated statement of income of TopCo and its Subsidiaries as of and for the twelve-month period ending on the last day of the most recently completed calendar month ended before the Effective Date (in each case of (i) and (ii), (x) prepared consistently with past practice pursuant to the Second Lien Note Purchase Agreement and (y) supplemented by a schedule separating and reconciling the corresponding financial information as to the Issuers on the one hand and TopCo on the other hand).  The pro forma financial statements referred to in this <u>Section 2.1(n)</u> are referred to herein as the "<u>Most Recent Pro Forma Financial Statements</u>".

(o)    <u>KYC</u>.  To the extent reasonably requested by the Agent or any DIP Noteholder not less than three (3) Business Days prior to the Effective Date, the Agent and the DIP Noteholders shall have received background checks and all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

(p)    <u>Fee and Expenses</u>.  There shall have been paid to the Agent, for the account of the Agent and its Related Persons, all fees and all reimbursements of costs or expenses (including those of the DIP Noteholder Professionals), in each case due and payable under any DIP Note Documents on or before the Effective Date.

(q)    <u>Representations and Warranties</u>.  No representation or warranty by any Credit Party contained herein or in any other DIP Note Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were not untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date).

(r)    <u>No Default</u>.  No Default or Event of Default has occurred and is continuing after giving effect to the execution and delivery of the DIP Note Documents.

(s)    <u>Closing Certificate</u>.  The Agent and the DIP Noteholders shall have received a certificate from the chief financial officer of the Issuers, certifying to compliance with the requirements of clauses (k), (q), and (r).

(t)    <u>Notice of Issuance</u>.  The Agent and the DIP Noteholders shall have received a duly executed Notice of Issuance with respect to the DIP Notes to be purchased on the Effective Date.

For the purpose of determining satisfaction with the conditions specified in this <u>Section 2.1</u>, each DIP Noteholder that has signed and delivered this Agreement shall be deemed to have accepted,

and to be satisfied with, each document or other matter required under this <u>Section 2.1</u> unless the Agent shall have received written notice from such DIP Noteholder prior to the Effective Date specifying its objection thereto.

2.2    <u>Conditions to Subsequent Purchases of DIP Notes Before Plan Effective Date</u>.  The obligations of the DIP Noteholders to purchase DIP Notes (other than the Initial DIP Notes and the DIP Notes to be purchased on the Plan Effective Date) on any DIP Note Purchase occurring after the Effective Date pursuant to <u>Section 1.1(b)(ii)</u> is subject to satisfaction (or waiver by the Agent and the Required DIP Noteholders) of the following conditions on such DIP Note Purchase Date:

(a)    there exists a Cash Shortfall Trigger;

(b)    (i) the DIP Final Order shall have been entered by the Bankruptcy Court; (ii) none of the DIP Interim Order or the DIP Final Order shall have been vacated, stayed, reversed, modified, or amended without the Agent's consent and each shall be in full force and effect; and (iii) no motion for reconsideration of the DIP Interim Order or the DIP Final Order shall have been filed;

(c)    the Restructuring Support Agreement shall be in full force and effect according to its terms and the "Termination Date" under, and as defined in, the Restructuring Support Agreement shall not have occurred;

(d)    no representation or warranty by any Credit Party contained herein or in any other DIP Note Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date);

(e)    no Default or Event of Default has occurred and is continuing;

(f)    the Agent and the DIP Noteholders shall have received a duly executed Notice of Issuance with respect to such DIP Notes; and

(g)    the Credit Parties shall have paid all fees and expenses then due and payable under this Agreement.

2.3    <u>Conditions to Purchase of DIP Notes on the Plan Effective Date</u>.  The obligations of the DIP Noteholders to purchase DIP Notes on the Plan Effective Date pursuant to <u>Section 1.1(b)(iii)</u> is subject to satisfaction (or waiver by the Agent and the Required DIP Noteholders) of the following conditions on such date:

(a)    All conditions precedent to the effectiveness of the Plan of Reorganization have been satisfied or waived pursuant to the terms thereof including receipt of FCC approval of the FCC Interim Long Form Application;

13

(b)    (i) the Confirmation Order and the DIP Final Order shall have been entered by the Bankruptcy Court; (ii) none of the DIP Interim Order, the DIP Final Order, or the Confirmation Order, shall have been vacated, stayed, reversed, modified, or amended without the Agent's consent, and each shall be in full force and effect; and (iii) no motion for reconsideration of the DIP Interim Order, the DIP Final Order, or the Confirmation Order shall have been filed;

(c)    the Restructuring Support Agreement shall be in full force and effect according to its terms and the "Termination Date" under, and as defined in, the Restructuring Support Agreement shall not have occurred;

(d)    all conditions precedent to the effectiveness of the Exit Note Purchase Agreement and the conversion of all outstanding DIP Notes (including those to be purchased on the Plan Effective Date) to notes issued and outstanding under the Exit Note Purchase Agreement shall have been satisfied

(e)    the Agent and the DIP Noteholders shall have received a duly executed Notice of Issuance with respect to such DIP Notes together with the Officer's Certificate referred to in <u>Section 1.1(b)(iii)</u>; and

(f)    the Credit Parties shall have paid all fees and expenses then due and payable under this Agreement.

The request by the Issuer Representative and acceptance by the Issuers of the proceeds of any DIP Note shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by the Issuers that all conditions in the applicable section of this <u>Article II</u> have been satisfied (or waived) and (ii) a reaffirmation by each Credit Party of the guarantees and Liens provided by it pursuant to the DIP Collateral Documents.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to the Agent and each DIP Noteholder that the following are, and, before and after giving effect to each purchase of DIP Notes hereunder, will be, true, correct and complete:

3.1    <u>Corporate Existence and Power</u>.  Each Credit Party and each of their respective Subsidiaries:

(a)    is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)    subject to the entry of the DIP Interim Order (and DIP Final Order, when applicable), has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its Business and,

14

execute, deliver, and perform its obligations under, the DIP Note Documents to which it is a party;

        (c)     is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its Business requires such qualification or license; and

        (d)     is in compliance with all Requirements of Law;

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

      3.2    <u>Corporate Authorization; No Contravention</u>.  Subject to the entry of the DIP Interim Order (and DIP Final Order, when applicable), the execution, delivery and performance by each of the Credit Parties of each DIP Note Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

        (a)     contravene the terms of any of that Person's Organization Documents;

        (b)     conflict with or result in any breach or contravention of, or result in the creation of any Lien (other than Liens in favor of the Agent created under the DIP Note Documents) under, any document evidencing any material Contractual Obligation to which such Person is a party or any material order, injunction, writ or decree of any Governmental Authority, including, without limitation, the FCC, to which such Person or its Property is subject; or

        (c)     violate, in any material respect, any Requirement of Law.

      3.3    <u>Governmental Authorization</u>.  Subject to the  entry of the DIP Interim Order (and DIP Final Order, when applicable), no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority (collectively, "<u>Filings</u>"), including, without limitation, the FCC, is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement or any other DIP Note Document except (a) for recordings and filings in connection with the Liens granted to the Agent under the DIP Collateral Documents, (b) those Filings obtained or made on or prior to the Effective Date, (c) any required approval of, or Filings with, the FCC prior to any assignment or transfer of control pursuant to an exercise of remedies by the Agent or any other Secured Party, (d) any Filings required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder, and (e) the Filings contemplated in <u>Sections 4.19(b)</u> and <u>(d)</u>.

      3.4    <u>Binding Effect</u>.  Subject to the entry of the DIP Interim Order (and DIP Final Order, when applicable), this Agreement and each other DIP Note Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations

15

of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.5     Litigation.    Except for the Bankruptcy Events and as otherwise specifically disclosed in Schedule 3.5, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, including, without limitation, the FCC, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

> (a)     purport to affect or pertain to any DIP Note Document or any of the transactions contemplated hereby or thereby;

> (b)     would reasonably be expected to result in monetary judgment(s) or relief, individually or in the aggregate, in excess of $100,000; or

> (c)     seek an injunction or other equitable relief which would reasonably be expected to have a Material Adverse Effect.

As of the Effective Date, no Credit Party or any Subsidiary of any Credit Party is the subject of an audit or, to each Credit Party's knowledge, any review or investigation by any Governmental Authority (including, without limitation, the FCC) concerning the violation or possible violation of any Requirement of Law.

3.6     No Default.    No Default or Event of Default has occurred and is continuing.  No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation  in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect, except for defaults (x) resulting from obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply or (y) the remedies for which are stayed or enjoined as a result of the filing of the Chapter 11 Cases.

3.7     ERISA Compliance.    Schedule 3.7 sets forth, as of the Effective Date, a complete and correct list of, and that separately identifies, (a) all Title IV Plans, (b) all Multiemployer Plans and (c) all material Benefit Plans.  Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies.  Except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect, (x) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Credit Party incurs or otherwise has or could have an obligation or any Liability and (z) no ERISA Event is reasonably expected to occur.  On the Effective Date, no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding.

3.8    <u>Use of Proceeds; Margin Regulations; Securities Activities</u>.  The proceeds of the DIP Notes shall be used solely for the purposes set forth in and permitted by <u>Section 4.10</u>, and are intended to be and shall be used in compliance with <u>Section 5.8</u>.  No Credit Party and no Subsidiary of any Credit Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.  Proceeds of the DIP Notes shall not be used for the purpose of purchasing or carrying Margin Stock.  As of the Effective Date, except as set forth on <u>Schedule 3.8</u>, no Credit Party and no Subsidiary of any Credit Party owns any Margin Stock.  No Credit Party nor any agent acting on its behalf has, directly or indirectly, offered any DIP Note or any similar security for sale to, or solicited any offers to buy any DIP Note or any similar security from, or otherwise approached or negotiated with respect thereto with, (x) any Person other than financial institutions or investors which are an institutional "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act or (y) more than ten Persons in the aggregate, and no Credit Party nor any agent acting on its behalf has taken or will take any action which would subject the issuance of the DIP Notes to the provisions of Section 5 of the Securities Act or to the provisions of any securities or blue sky law of any applicable jurisdiction.  The DIP Notes are not of the same class as securities of the Issuers listed on a national securities exchange, registered under Section 6 of the Exchange Act or quoted in a U.S. automated inter-dealer quotation system.

3.9    <u>Ownership of Property; Liens</u>.  As of the Effective Date, the Real Estate listed in <u>Schedule 3.9</u> constitutes all Real Estate of each Credit Party and each of their respective Subsidiaries having a value in excess of $100,000.  Each of the Credit Parties and each of their respective Subsidiaries has, subject to Permitted Liens and, with respect to any leases, Bankruptcy Events, good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, necessary or used in the ordinary conduct of their respective Businesses.  None of the Property of any Credit Party or any Subsidiary of any Credit Party is subject to any Liens other than Permitted Liens.  As of the Effective Date, <u>Schedule 3.9</u> also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate.

3.10    <u>Taxes</u>.  Except as set forth in <u>Schedule 3.10</u>, all federal, state, local and foreign income and franchise and other material Tax returns, reports and statements (collectively, the "<u>Tax Returns</u>") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes reflected therein or otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP.  As of the Effective Date, no Tax Return or Tax Liability of any Tax Affiliate is under audit or examination by any Governmental Authority and no notice of any audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority.  Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in full and complete compliance with the Tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.  No Tax Affiliate has participated in a "reportable

transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent.

3.11    Financial Condition.

(a)    Each of (i) the audited consolidated balance sheet of TopCo and its Subsidiaries dated December 31, 2019, and the related audited consolidated statements of income or operations and cash flows for the Fiscal Year ended on that date and (ii) the unaudited interim consolidated balance sheet of TopCo and its Subsidiaries dated September 30, 2020 and the related unaudited consolidated statements of income and cash flows for the fiscal quarter then ended:

(i)    were prepared in accordance with GAAP consistently applied throughout the respective periods covered thereby, except as otherwise expressly noted therein, subject to normal year-end adjustments and the lack of footnote disclosures; and

(ii)    when taken with the schedule separating and reconciling the corresponding financial information as to the Issuers on the one hand and TopCo on the other hand, present fairly in all material respects the consolidated financial condition of the Parent and its Subsidiaries as of the dates thereof and consolidated results of operations for the periods covered thereby.

(b)    The Most Recent Pro Forma Financial Statements were prepared by the Issuers in good faith giving pro forma effect to the funding of the DIP Notes, and in accordance with GAAP, with only such adjustments thereto as would be required in a manner consistent with GAAP.

(c)    Since September 30, 2020, there has been no Material Adverse Effect.

(d)    The Credit Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to Section 5.5 and have no Contingent Obligations other than Contingent Obligations permitted pursuant to Section 5.9.

(e)    All financial performance projections delivered by the Issuers to the Agent and the DIP Noteholders, including the financial performance projections delivered on or prior to the Effective Date, have been prepared in good faith based upon assumptions believed by the Issuers to be reasonable at the time made and delivered, it being acknowledged and agreed by the Agent and DIP Noteholders that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material.

3.12    Environmental Matters.  Except as set forth in Schedule 3.12 and except where any failures to comply would not reasonably be expected to result in, either individually or in the aggregate, Material Environmental Liabilities to the Credit Parties and their Subsidiaries, (a) the

18

operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice or, to the knowledge of any Credit Party, any investigation, in each case, relating in any manner to any Environmental Law, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any Property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such Property, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate, (e) all Real Estate currently owned by any Credit Party or any Subsidiary of a Credit Party is free of contamination by any Hazardous Materials and (f) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations in violation of any Environmental Law or (ii) knows of any facts, circumstances or conditions reasonably constituting notice of a violation of any Environmental Law, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act or similar Environmental Laws.

3.13    <u>Regulated Entities</u>.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its obligations under the DIP Note Documents; <u>provided</u>, <u>however</u>, that the ability to pledge the FCC Licenses of a Credit Party may be limited by the Communications Laws.

3.14    <u>[Reserved]</u>.

3.15    <u>Labor Relations</u>.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 3.15</u>, as of the Effective Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16    <u>Intellectual Property</u>.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its Business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

To the knowledge of each Credit Party, (a) the conduct and operations of the Businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the DIP Note Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.17    Brokers' Fees; Transaction Fees; Management Fees.    Except as disclosed on Schedule 3.17 and except for fees payable to the Agent and DIP Noteholders, none of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.  As of the Effective Date, none of the Parent, the Credit Parties or any of their respective Subsidiaries are obligated to pay any management, consulting or similar fee.

3.18    Insurance.    Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Issuers, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses of the same size and character as the business of the Credit Parties and, to the extent relevant, owning similar Properties in localities where such Person operates.

3.19    Ventures, Subsidiaries and Affiliates; Outstanding Stock.    Except as set forth in Schedule 3.19, as of the Effective Date, no Credit Party and no Subsidiary of any Credit Party (a) has any Subsidiaries, or (b) is engaged in any joint venture or partnership with any other Person. All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than Permitted Liens, with respect to the Stock and Stock Equivalents of the Issuers and Subsidiaries of the Issuers, those in favor of the Agent, for the benefit of the Secured Parties.  All such securities were issued in compliance in all material respects with all applicable state and federal laws concerning the issuance of securities.  All of the issued and outstanding Stock of each Credit Party, each  Subsidiary of each Credit Party and, as of the Effective Date, the Parent is owned by each of the Persons and in the amounts set forth in Schedule 3.19.  Except as set forth in Schedule 3.19, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries.  Set forth in Schedule 3.19 is a true and complete organizational chart of the Parent and all of its Subsidiaries, which the Credit Parties shall update upon notice to the Agent and the DIP Noteholders promptly following the acquisition, incorporation, organization or formation of any Subsidiary.

3.20    Jurisdiction of Organization; Chief Executive Office.    Schedule 3.20 lists each Credit Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Credit Party's chief executive office or sole place of business, in each case as of the date hereof, and such Schedule 3.20 also lists all jurisdictions of organization and legal names of such Credit Party for the five years preceding the Effective Date.

3.21    Deposit Accounts and Other Accounts.  Schedule 3.21 lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Effective Date, and such Schedule correctly identifies the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.22    Bonding.  Except as set forth in Schedule 3.22, as of the Effective Date, no Credit Party is a party to or bound by any surety bond agreement, indemnification agreement therefor or bonding requirement with respect to products or services sold by it.

3.23    [Reserved].

3.24    Status of Parent. The Parent has not engaged in any business activities and does not own any Property other than (a) ownership of the Stock and Stock Equivalents of the Issuers, (b) activities and contractual rights incidental to maintenance of its corporate existence and (c) performance of its obligations under the DIP Note Documents, the First Lien Credit Facility Documents and the Second Lien Note Purchase Documents to which it is a party.

3.25    Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the DIP Note Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the DIP Note Documents (but only to the knowledge of the Credit Parties with respect to any of the foregoing statements to the extent provided by a Person that is neither a Credit Party nor an Affiliate of  a Credit Party), contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements made therein, when taken as a whole, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.26    Validity and Priority of DIP Liens.

(a)    [reserved].

(b)    Subject to the entry of the DIP Interim Order (and when applicable, the DIP Final Order), the DIP Collateral Documents create valid and enforceable security interests in, and Liens on, the Collateral covered thereby.  Except as set forth in the DIP Collateral Documents, but subject to the entry of the DIP Interim Order (and when applicable, the DIP Final Order), such security interests and Liens are currently perfected security interests and Liens in favor of the Agent, for the benefit of the DIP Noteholders.

(c)    Upon entry of the DIP Interim Order (and when applicable, the DIP Final Order), the Obligations under the DIP Note Documents, in each case subject to the DIP Order, as applicable:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim against each of the Debtors on a joint and several basis, which will be payable from and have recourse to all pre- and post-petition property of such Debtors and all proceeds thereof, subject

21

and subordinate only to the Carve Out, and any payments or proceeds on account of such Superpriority Claim shall be distributed in accordance with Section 1.11(c);

(ii)      pursuant to Section 364(c)(2) of the Bankruptcy Code and subject and subordinate only to the Carve Out to the extent provided in the DIP Order, shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority security interest and Lien on all of the assets of the Debtors, whether currently existing or hereafter acquired, of the same nature, scope and type as the Collateral that are not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date, or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code;

(iii)      pursuant to section 364(d)(1) of the Bankruptcy Code and subject and subordinate only to the Carve Out to the extent provided in the DIP Order, shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority security interest and Lien on all of the assets of the Debtors, whether currently existing or hereafter acquired, of the same nature, scope and type as the Collateral that are subject to (x) valid, perfected and non-avoidable liens as of the Petition Date, or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, and such Lien shall be senior to (x) all valid, perfected and non-avoidable liens as of the Petition Date, (y) all valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, and (z) any Adequate Protection Liens (as defined in the applicable DIP Order); and

(iv)      subject to the DIP Interim Order, and when applicable, the DIP Final Order, shall not be subject or subordinate to (x) any Lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (y) unless otherwise provided for in the DIP Note Documents, any Liens arising after the Petition Date including, without limitation, any Liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors.

(d)      Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of Agent and the Required DIP Noteholders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the Agent or the DIP

Noteholders. In no event shall the Agent or the DIP Noteholders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

(e)     Except for the Carve Out or as otherwise provided in the DIP Order, the Superpriority Claims shall at all times be senior to the rights of any Credit Party, any chapter 11 trustee and, subject to Section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code).

3.27    Foreign Assets Control Regulations; Anti-Money Laundering; Anti-Corruption Practices.

(a)     Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations ("Sanctions") as administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") and the U.S. State Department. No Credit Party and no Subsidiary of a Credit Party (i) is a Person on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) is a person who is otherwise the target of U.S. economic sanctions laws such that a U.S. person cannot deal or otherwise engage in business transactions with such person, (iii) is a Person organized or resident in a country or territory subject to comprehensive Sanctions (a "Sanctioned Country"), or (iv) is owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a government of a Sanctioned Country such that the entry into, or performance under, this Agreement or any other DIP Note Document would be prohibited by U.S. law.

(b)     Each Credit Party and each Subsidiary of each Credit Party is in compliance with all laws related to terrorism or money laundering including: (i) all applicable requirements of the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. 5311 et. seq., (the Bank Secrecy Act)), as amended by Title III of the USA Patriot Act, (ii) the Trading with the Enemy Act, (iii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (66 Fed. Reg. 49079), any other enabling legislation, executive order or regulations issued pursuant or relating thereto and (iv) other applicable federal or state laws relating to "know your customer" or anti-money laundering rules and regulations. No action, suit or proceeding by or before any court or Governmental Authority with respect to compliance with such anti-money laundering laws is pending or threatened to the knowledge of each Credit Party and each Subsidiary of each Credit Party.

(c)     Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all applicable anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 ("FCPA") ("Anti-Corruption Laws"). None of the Credit Party or any Subsidiary, nor to the knowledge of the Credit Party, any director, officer, agent, employee, or other person acting on behalf of the Credit Party or any Subsidiary, has taken any action, directly or indirectly, that would result in a violation of

23

applicable Anti-Corruption Laws.   Each Credit Party and each Subsidiary thereof has instituted and will continue to maintain policies and procedures designed to promote compliance with applicable Anti-Corruption Laws.

3.28    <u>Patriot Act</u>.   Each Credit Party and each Subsidiary of each Credit Party is in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "*know your customer*" and anti-money laundering rules and regulations.   No part of the proceeds of any DIP Note will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

3.29    <u>FCC Licenses</u>.   As of the Effective Date, <u>Schedule 3.29</u> lists all main Station FCC Licenses and the Credit Party that is the licensee of each such FCC License.   The FCC Licenses are all of the main Station FCC Licenses, permits, permissions and other authorizations necessary to operate the Credit Parties' Business as currently conducted or proposed to be conducted by the Credit Parties, and all such main station FCC Licenses have been validly issued in the name of an Issuer or one of its Subsidiaries.   Except as set forth on <u>Schedule 3.29</u> and except for the FCC approval to be requested in the FCC Short Form Application, the FCC Licenses that have been issued are in full force and effect, are valid for the balance of the current license term, are unimpaired by any act or omissions of any Issuer, any Subsidiary thereof or any of their respective employees, agents, officers, directors or stockholders and are free and clear of any material restrictions, except restrictions or conditions of general applicability.   Except as set forth on <u>Schedule 3.29</u> and except for those of general applicability, there are no proceedings or complaints pending or, to the best of the Credit Parties' knowledge, threatened with respect to the FCC Licenses or otherwise before the FCC that may have a material adverse effect on the Credit Parties' Business.   The Credit Parties are not aware of any reason why any FCC Licenses subject to expiration might not be renewed in the ordinary course or of any reason why any of the FCC Licenses might be revoked.   No renewal of any FCC License would constitute a major federal action having a significant effect on the human environment under Section 1.1305 or 1.1307(b) of the FCC's rules.   All information provided by the Credit Parties contained in any pending applications for modification, extension or renewal of the FCC Licenses or other applications filed with the FCC by any of the Credit Parties is true, complete and accurate in all material respects. All information provided by the Credit Parties contained in any application for consent to assignment of any FCC License, an application for consent to transfer control of any FCC License or substantially similar applications filed with the FCC in connection with any Acquisition is true, complete and accurate in all material respects.

3.30    <u>FCC Matters</u>.   Except as set forth on <u>Schedule 3.30</u>, to the best of the Credit Parties' knowledge, the operation of the Business of the Issuers and the Credit Parties complies and has complied in all material respects with the Communications Laws.   <u>Schedule 3.30</u> is a list of all Stations (other than booster, translator or auxiliary stations) owned or operated by the Credit Parties as of the Effective Date.

      3.31    <u>Authorized Officers</u>.  Set forth on <u>Schedule 3.31</u> are Responsible Officers that are permitted to sign DIP Note Documents on behalf of the Credit Parties, holding the offices indicated next to their respective names, as of the Effective Date.  Such Authorized Officers are the duly elected and qualified officers of such Credit Party and are duly authorized to execute and deliver, on behalf of the respective Credit Party, this Agreement, the DIP Notes and the other DIP Note Documents.

      3.32    [Reserved].

      3.33    <u>Chapter 11 Cases</u>.

          (a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given, or shall be given within one (1) Business Day following the Petition Date, for (i) the motion seeking approval of the DIP Note Documents and the DIP Interim Order and DIP Final Order and (ii) the hearing for the entry of the DIP Interim Order and the DIP Final Order.  The Debtors shall give, on a timely basis as specified in the DIP Interim Order or the DIP Final Order, as applicable, all notices required to be given to all parties specified in the DIP Interim Order or DIP Final Order, as applicable.

          (b)    Upon the entry of the DIP Interim Order, and pursuant to and to the extent permitted in the DIP Interim Order and the DIP Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the DIP Interim Order or DIP Final Order, as applicable.

          (c)    Upon the entry of the DIP Interim Order and pursuant to and to the extent provided in the DIP Interim Order and the DIP Final Order, the Obligations will be secured by valid and perfected first priority Liens on all of the Collateral subject, as to priority, only to (i) the Carve-Out and (ii) the priorities set forth in the DIP Interim Order or the DIP Final Order.

          (d)    The DIP Interim Order (with respect to the period on and after entry of the DIP Interim Order and prior to entry of the DIP Final Order) or the DIP Final Order (with respect to the period on and after entry of the DIP Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Agent's consent, modified or amended. The Credit Parties are in compliance in all material respects with the DIP Interim Order (with respect to the period on and after entry of the DIP Interim Order and prior to entry of the DIP Final Order) or the DIP Final Order (with respect to the period on and after entry of the DIP Final Order), as the case may be.

(e)      Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the DIP Interim Order or the DIP Final Order, as the case may be, upon the DIP Facility Termination Date (whether by acceleration or otherwise of the Obligations), the Agent and DIP Noteholders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law.

ARTICLE IV

AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that until the DIP Facility Discharge Date:

4.1      <u>Financial Statements</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that unaudited interim financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Issuers shall deliver to the Agent and each DIP Noteholder by Electronic Transmission and in detail reasonably satisfactory to the Required DIP Noteholders:

(a)      as soon as available, but not later than (x) one hundred eighty (180) days after the end of each Fiscal Year, in the case of the Fiscal Year ending December 31, 2020 and (y) one hundred twenty (120) days after the end of each Fiscal Year, in the case of any applicable Fiscal Year ending December 31, 2021 or later, a copy of the audited consolidated balance sheet of TopCo and its Subsidiaries, as at the end of such Fiscal Year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of any "Big Four" or other nationally-recognized independent certified public accounting firm reasonably acceptable to the Agent and the Required DIP Noteholders which report shall (i) contain an unqualified opinion (except for any qualification relating to changes in accounting principles or practices reflecting changes in GAAP or going concern qualification to the extent described below), stating that such consolidated financial statements present fairly in all material respects the consolidated financial position of TopCo and its Subsidiaries for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and (ii) not include any explanatory paragraph expressing substantial doubt as to going concern status (other than (A) a going concern qualification within the twelve month period prior to the occurrence of the DIP Maturity Date solely to the extent that such qualification is the result of the Obligations in respect of the applicable DIP Notes or DIP Commitments (or any portion thereof) being reported as short-term indebtedness, (B) any going concern qualification solely to the extent such qualification results from <u>Article VI</u> of the First Lien Credit Agreement and any foreseeable consequences that may arise in the event the Credit Parties fail to comply with the terms of <u>Article VI</u> and (C) any going concern qualification solely to the extent such qualification results from the Bankruptcy Events);

(b)      as soon as available, but not later than forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year, (i) a copy of the unaudited consolidated balance sheet of TopCo and its Subsidiaries (supplemented by a schedule separating and reconciling the corresponding financial information for the Credit Parties), and the related consolidated statements of income or operations and cash flows for such Fiscal Quarter and for the portion of the Fiscal Year then ended, all certified on behalf of the Issuers by an appropriate Responsible Officer of the Issuer Representative as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of TopCo and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures and (ii) a statement of income for each market (on a consolidated basis for all Stations in each such market) for such Fiscal Quarter and for the portion of the Fiscal Year then ended, certified on behalf of the Issuers by an appropriate Responsible Officer of the Issuer Representative as being complete and correct; and

(c)      commencing with the ending of the fiscal month in which the Effective Date occurs, as soon as available, but not later than thirty (30) days after the end of each fiscal month of each Fiscal Year, (i) a copy of the unaudited consolidated balance sheet of TopCo and its Subsidiaries (supplemented by a schedule separating and reconciling the corresponding financial information for the Credit Parties), and the related consolidated statements of income or operations and cash flows for such fiscal month and for the portion of the Fiscal Year then ended, all certified on behalf of the Issuers by an appropriate Responsible Officer of the Issuer Representative as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of TopCo and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures and (ii) a statement of income for each market (on a consolidated basis for all Stations in each such market) for such fiscal month and for the portion of the Fiscal Year then ended, certified on behalf of the Issuers by an appropriate Responsible Officer of the Issuer Representative as being complete and correct.

4.2    Certificates; Other Information.  The Issuers shall furnish to the Agent and the DIP Noteholders by Electronic Transmission:

(a)      together with each delivery of financial statements pursuant to Section 4.1 above, a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and discussing the reasons for any significant variations;

(b)      together with the delivery of the financial statements referred to in Sections 4.1(a) and 4.1(b) above, (i) a management discussion and analysis report, in reasonable detail, signed by the chief financial officer of the Issuer Representative, describing the operations and financial condition of the Credit Parties and each market for the period covered by such financial statements and (ii) a fully and properly completed certificate in the form of Exhibit 4.2(b) (a "Compliance Certificate"), certified on behalf of the Issuers by a Responsible Officer of the Issuer Representative;

27

(c)      promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which such Person may make to, or file with, the Securities and Exchange Commission or any successor or similar Governmental Authority;

(d)      [reserved];

(e)      promptly upon receipt thereof, copies of any reports submitted by the Issuers' certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants;

(f)      [reserved];

(g)      as soon as practicable, and in any event within ten (10) days after the issuance, filing or receipt thereof, (i) copies of any order or notice of the FCC, any Governmental Authority or a court of competent jurisdiction which designates any FCC License, or any application therefor, for a hearing or which refuses renewal or extension of, or revokes or suspends the authority of any Credit Party pursuant to any FCC License, and (ii) any citation, "Notice of Apparent Liability for Forfeiture", "Notice of Violation" or "Order to Show Cause" issued by the FCC or any petition seeking revocation or the denial of renewal of any main Station FCC License, in each case with respect to any Credit Party;

(h)      notices required to be delivered by the Issuers under the First Lien Credit Facility Documents;

(i)      on the Wednesday of each calendar week beginning with the first Wednesday following the calendar week in which the Effective Date occurs; provided that if Monday, Tuesday, or Wednesday of any applicable week is not a Business Day, then such week's Weekly Reporting Date shall be extended until the first Business Day following the Wednesday of such week (each such date, the "Weekly Reporting Date"), (A) a cash flow forecast, substantially in the form delivered pursuant to the Second Lien Note Purchase Agreement and (B) a reasonably detailed report of bookings in form and substance reasonably acceptable to the Agent, in each case, for the thirteen (13) week period following the Friday immediately preceding the applicable Weekly Reporting Date;

(j)      on each Weekly Reporting Date, a certificate of the Chief Financial Officer of the Issuer Representative in the form of Exhibit 4.2(j) (a "CFO Certificate") setting forth reasonably detailed calculations of Unrestricted Cash for each Business Day of the calendar week immediately preceding the applicable Weekly Reporting Date;

(k)      on the Weekly Reporting Date occurring during the fifth full week after the week in which the Effective Date occurs and on each Weekly Reporting Date occurring every four weeks thereafter, a DIP Budget (each such subsequent DIP Budget delivered after the Initial Approved Budget, a "Budget Update"), covering the subsequent consecutive 13 weeks beginning with the week in which such DIP Budget is delivered, in form and substance consistent with the Initial Approved Budget, and otherwise reasonably

approved by the Agent and the Required DIP Noteholders (it being acknowledged and agreed that if the Agent and the Required DIP Noteholders do not object to any such Budget Update within five (5) Business Days of delivery thereof in accordance with this Section 4.2(k), the Budget Update shall be deemed to be irrevocably approved by the Agent and the Required DIP Noteholders) (any Budget Update approved (or deemed approved), an "Approved Budget Update"); provided, that if a Budget Update is not approved (or deemed approved) by the Agent and the Required DIP Noteholders, the Approved Budget in effect immediately prior to the delivery of the most recent Budget Update shall continue to govern for purposes of the Budget Variance Report (any such Approved Budget Update, together with the Initial Approved Budget, the "Approved Budget" in respect of the periods covered thereby); provided, further, that in the event of an actual conflict between the foregoing budget-related provisions and those in the DIP Order the provisions in the DIP Order shall govern;

(l)     on each Weekly Reporting Date commencing with the Weekly Reporting Date occurring during the second full week after the Effective Date (with copies delivered to the Agent's lead counsel and financial advisor), a weekly cash balance and budget variance report (each, a "Budget Variance Report") for the immediately preceding four-week period (each such four-week period, a "Budget Test Period") (or such applicable shorter period from and after the Effective Date with respect to the first two Budget Variance Reports), (i) showing for such Budget Test Period (or such applicable shorter period from and after the Effective Date with respect to the first two Budget Variance Reports) actual total disbursements on a weekly and cumulative basis and in substantially the same form as the Approved Budget, (ii) noting therein cumulative variances from projected disbursements set forth for such Budget Test Period (or such applicable shorter period from and after the Effective Date with respect to the first two Budget Variance Reports) in the Approved Budget in effect during such Budget Test Period and (iii) explaining all material variances (meaning variances in excess of 10% in aggregate actual disbursements and in excess of 10% in aggregate actual receipts) in reasonable detail for such Budget Test Period; provided that in the event of an actual conflict between the foregoing budget-related provisions and those in the DIP Order the provisions in the DIP Order shall govern;

(m)     commencing with the Weekly Reporting Date of the third full week after the Effective Date and continuing on a bi-weekly basis on every other Weekly Reporting Date occurring thereafter, the Credit Parties' will provide regular reports of the statements of accrued fees and expenses of each Professional Person (as defined in the DIP Order) that are paid or payable by the Credit Parties and that are received from such Professional Persons pursuant to the DIP Order, and the Credit Parties shall use their commercially reasonable efforts in order to cause such Professional Persons to respond in good faith to any inquiries from DIP Noteholders related thereto; and

(n)     promptly, such additional business, financial, corporate affairs, perfection certificates and other information as the Agent or any DIP Noteholder may from time to time reasonably request.

4.3    Notices.  The Issuers shall notify promptly the Agent and the DIP Noteholders of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becomes aware thereof):

(a)    the occurrence or existence of any Default or Event of Default;

(b)    any breach or non-performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, in each case, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c)    any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority, including, without limitation, the FCC, which would reasonably be expected to result, either individually or in the aggregate, in a monetary liability in excess of $300,000 or a Material Adverse Effect;

(d)    the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party or its respective property (i) in which the amount of damages claimed is $300,000 or more or (ii) which would reasonably be expected to have a Material Adverse Effect;

(e)    (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (A), (B) and (C) above, in the aggregate for all such clauses, would reasonably be expected to result in Material Environmental Liabilities, (iii) the receipt by any Credit Party of notification that any Property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease would have a reasonable likelihood of resulting in Material Environmental Liabilities;

(f)    promptly, and in any event within five (5) Business Days after any officer of any ERISA Affiliate knows or has reason to know that an ERISA Event will or has occurred, a notice describing such ERISA Event, and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto;

(g)    [reserved];

(h)    any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(i)    any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(j)    the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent, other than issuances by the Parent of Stock or Stock Equivalents (including, without limitation, issuance of profits units of the Parent) not requiring a mandatory prepayment hereunder;

(k)    the acquisition by any Credit Party of any Margin Stock;

(l)    any event reasonably expected to result in a mandatory prepayment of the Obligations pursuant to Section 1.8; or

(m)    any suspension or interruption of regular broadcast operations by a main Station, or a failure by any such main Station to broadcast with its FCC-licensed facilities, which suspension, interruption or failure persists for three (3) consecutive days, or five (5) days in any twenty (20) consecutive day period, if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Each notice delivered pursuant to this Section 4.3 shall be in electronic form accompanied by a statement by a Responsible Officer of the Issuer Representative, on behalf of the Issuers, setting forth reasonable details of the occurrence referred to therein, and stating what action the Issuers or other Person proposes to take with respect thereto and at what time.

4.4    Preservation of Corporate Existence, Etc.  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)    preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Section 5.3;

(b)    preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the Ordinary Course of Business except as permitted by Sections 5.2 and 5.3 and except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)    use its commercially reasonable efforts, in the Ordinary Course of Business, to preserve its business organization and preserve the goodwill and business of the customers, suppliers and others having material business relations with it; and

(d)    at all times maintain the FCC Licenses and all other licenses, permits, permissions and other authorizations necessary to operate the Business as presently or as proposed to be conducted by the Credit Parties except as would not

31

reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.5    <u>Maintenance of Property</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its Business in good working order and condition, ordinary wear and tear excepted and shall make all reasonably necessary repairs thereto and renewals and replacements thereof except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6    <u>Insurance</u>.

(a)    Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the Property and Businesses of the Credit Parties and such Subsidiaries (including policies of life, fire, theft, product liability, public liability, Flood Insurance, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Issuers) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any Property or Business of any Credit Party to name the Agent as additional insured.  Except as set forth in the DIP Interim Order and, when applicable, the DIP Final Order, each Credit Party shall direct all present and future insurers under its "all risk" policies of property insurance to pay all proceeds payable thereunder directly to the Agent.  If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and the Agent jointly, the Agent may endorse such Credit Party's name thereon and do such other things as the Agent may deem advisable to reduce the same to cash.  The Agent reserves the right at any time, upon review of each Credit Party's risk profile, to require additional forms and limits of insurance.  Notwithstanding the requirement in clause (i) above, Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program or (z) any Real Estate that is not Material Real Property. It is hereby understood and agreed that compliance by the Credit Parties with the requirements set forth in Section 4.6 of the Second Lien Note Purchase Agreement shall constitute compliance with the requirements set forth in this <u>Section 4.6(a)</u>.

(b)    Unless the Credit Parties provide the Agent and the DIP Noteholders with evidence of the insurance coverage required by this Agreement (including Flood Insurance), the Agent may purchase insurance (including Flood Insurance) at the Credit Parties' reasonable expense to protect the Agent's and DIP Noteholders' interests, including interests in the Credit Parties' and their Subsidiaries' properties.  This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests.  The coverage that the Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property.  The Issuers may later cancel any

32

insurance purchased by the Agent, but only after providing the Agent with evidence that there has been obtained insurance as required by this Agreement.  If the Agent purchases insurance, the Credit Parties will be responsible for the costs of that insurance, including interest and any other charges the Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance shall be added to the Obligations.  The costs of the insurance may be more than the cost of insurance the Issuers may be able to obtain on their own.

4.7    <u>Payment of Obligations</u>.  Except to the extent prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court, and subject to compliance with the Approved Budget (subject to the Budget Permitted Variances), each Credit Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective obligations and liabilities (other than obligations and liabilities under the First Lien Credit Facility Documents and Second Lien Note Purchase Documents except to the extent required or permitted under the DIP Interim Order, and when applicable, the DIP Final Order), including:

(a)    all Tax liabilities, assessments and governmental charges or levies upon it or its Property, unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person; provided that, to the extent applicable, TopCo shall make an election pursuant to Tax Code Section 6226 with respect to any audit adjustment made by the Internal Revenue Service;

(b)    all lawful claims which, if unpaid, would by law become a Lien (other than a Permitted Lien) upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c)    all Indebtedness, as and when due and payable, but subject to any subordination provisions contained herein, in any other DIP Note Documents and/or in any instrument or agreement evidencing such Indebtedness, except where the failure to perform would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(d)    all obligations under any Contractual Obligation (other than the First Lien Credit Facility Documents and Second Lien Note Purchase Documents) by which such Credit Party or any of its Subsidiaries is bound, or to which it or any of its Property is subject, except where the failure to perform would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)    payments to the extent necessary to avoid the imposition of a Lien with respect to, or the involuntary termination of, any underfunded Benefit Plan.

4.8    <u>Compliance with Laws</u>.  Except to the extent prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court or the DIP Interim Order (and DIP Final

Order, when applicable), each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its Business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9     Inspection of Property and Books and Records.  Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, upon reasonable advance notice at such reasonable times and intervals as the Agent may reasonably designate, so long as it does not unreasonably interfere with the operation of the Stations or the Business: (a) provide access to such property to the Agent and any of its Related Persons and (b) permit the Agent and any of its Related Persons to conduct audits, inspect, and make extracts and copies (or take duplicate originals if reasonably necessary) from all of such Credit Party's books and records, and evaluate the Collateral in any manner and through any medium that the Agent considers advisable, in each instance, at the Credit Parties' reasonable expense; provided the Credit Parties shall only be obligated to reimburse the Agent if an Event of Default has occurred and is continuing and, then, only for the reasonable out-of-pocket expenses of one such audit and inspection per calendar year.  Any DIP Noteholder may accompany the Agent or its Related Persons in connection with any inspection at such DIP Noteholder's reasonable expense.

4.10     Use of Proceeds.  The Issuers shall use the proceeds of the DIP Notes as follows:

(a)     up to $17,500,000 of the proceeds of the DIP Notes shall be used for the purposes, and subject to the limitations, set forth in Paragraph 10 of the DIP Interim Order (or any corresponding provision in the DIP Final Order); and

(b)     The remaining $2,500,000 of the proceeds of the DIP Notes (together with any unused portion of the $17,500,000 referred to in Section 4.10(a)) shall be used to fund the payment of all costs and expenses necessary to consummate the Plan of Reorganization in accordance with clause (viii) of Paragraph 10 of the DIP Interim Order.  All such costs and expenses shall be detailed in a certificate of an Authorized Officer reasonably satisfactory to the Agent delivered to the Agent at the time of delivery of the Notice of Issuance relating to the purchase of DIP Notes on the Plan Effective Date.

4.11     [Reserved].

4.12     FCC Requirement re Availability of Agreement.  After the Effective Date, the Issuers shall (i) identify this Agreement in each Station's local public inspection file and make redacted copies (as approved by the Agent) available as required by applicable Requirements of Law and (ii) provide a copy of this Agreement to the FCC upon request.

4.13     [Reserved].

4.14    <u>Further Assurances</u>.

(a)    Each Credit Party shall ensure that the written information, exhibits and reports furnished to the Agent or the DIP Noteholders (but only to the knowledge of the Credit Parties with respect to any of the foregoing to the extent provided by a Person that is neither a Credit Party nor an Affiliate of a Credit Party) does not and will not contain any untrue statement of a material fact and does not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading, taken as a whole, in light of the circumstances in which made, and will promptly disclose to the Agent and the DIP Noteholders and correct any defect or error that may be discovered therein or in any DIP Note Document or in the execution, acknowledgement or recordation thereof.

(b)    Promptly upon request by the Agent or the Required DIP Noteholders, the Credit Parties shall (and, subject to the limitations set forth herein and in the DIP Collateral Documents, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as the Agent or Required DIP Noteholders may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement, any other DIP Note Document, or any DIP Order, (ii) to subject to the Liens created by any of the DIP Collateral Documents or any DIP Order any of the Properties, rights or interests covered by any of the DIP Collateral Documents, (iii) to ensure the effectiveness and priority of any of the DIP Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any DIP Note Document or any DIP Order.  Without limiting the generality of the foregoing and except as otherwise approved in writing by the Required DIP Noteholders, the Credit Parties shall cause each of their Domestic Subsidiaries and Foreign Subsidiaries, within thirty (30) days (or such later date as may be agreed by the Agent in its sole discretion) after formation or acquisition thereof, to guaranty the Obligations and to cause each such Subsidiary to grant to the Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations set forth herein and in the DIP Collateral Documents, all of such Subsidiary's Property to secure such guaranty.  Furthermore and except as otherwise approved in writing by the Required DIP Noteholders, each Credit Party shall pledge, and shall cause each of its Domestic Subsidiaries and Foreign Subsidiaries to, pledge and deliver, all of the Stock and Stock Equivalents of each of its Domestic Subsidiaries and Foreign Subsidiaries, in each instance, to the Agent, for the benefit of the Secured Parties (or First Lien Agent as bailee for the Agent for perfection purposes), to secure the Obligations, promptly after formation or acquisition of such Subsidiary.  The Credit Parties shall deliver, or cause to be delivered, to the Agent and the DIP Noteholders, appropriate resolutions, secretary certificates, certified Organization Documents and, if requested by the Agent or the Required DIP Noteholders, legal opinions relating to the matters described in this <u>Section 4.14</u> (which opinions shall be in form and substance reasonably acceptable to the Agent and Required DIP Noteholders and, to the extent applicable, substantially similar to the opinions delivered on the Effective Date), in each instance with respect to each Credit Party formed or acquired after the Effective Date.  In connection with each pledge of Stock and Stock

35

Equivalents, the Credit Parties shall deliver, or cause to be delivered, to the Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank.    Notwithstanding the foregoing, no actions with respect to Collateral located or titled in any jurisdiction outside of the United States shall be required to create or perfect any security interest in such assets.

(c)    Notwithstanding anything to the contrary in this Agreement, the DIP Note Documents or the DIP Order, the Credit Parties shall not be required to file a mortgage or deed of trust on any property.

(d)    Within (i) five (5) Business Days after the delivery of the financial statements referred to in Section 4.1(a) or (b), (ii) five (5) Business Days after the delivery of the cash flow forecast referred to in Section 4.2(i), and (iii) five (5) Business Days after the delivery of the Budget Update referred to in Section 4.2(k) or the Budget Variance Report referred to in Section 4.2(l), the management of the Issuers shall host a conference call for the DIP Noteholders to discuss such financial statements, cash flow forecast, or budget updates or variances, as the case may be, and the overall business operations of the Credit Parties.    No fewer than three (3) days prior to each conference call, the Issuer Representative shall notify the DIP Noteholders of the time and date of such conference call and shall provide each DIP Noteholder with access instructions to the conference call.

4.15    Environmental Matters.    Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance) or that is required by orders and directives of any Governmental Authority except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Environmental Liability.    Without limiting the foregoing, (i) if an Event of Default is continuing or (ii) if the Required DIP Noteholders or the Agent at any other time has a reasonable good faith basis to believe that there exist material violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any material Environmental Liabilities, then each Credit Party shall, promptly upon receipt of request from the Required DIP Noteholders or the Agent, cause the performance of, and allow the Agent and its Related Persons access to such Real Estate for the purpose of conducting, such customary environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such customary reports, in each case as the Required DIP Noteholders or the Agent may from time to time reasonably request.    Such audits, assessments and reports, to the extent not conducted by the Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to the Required DIP Noteholders and the Credit Parties and shall be in form and substance reasonably acceptable to the Required DIP Noteholders.

4.16    [Reserved].

4.17    License Subsidiaries.    Each Credit Party shall cause all FCC Licenses of the Credit Parties and their Subsidiaries, now or hereafter acquired, to be held by one or more License Subsidiaries (and any License Subsidiary may own more than one FCC License).

4.18    Bankruptcy-Related Matters. Each Credit Party shall

(a)    cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the DIP Facility, the Obligations, or the DIP Note Documents, any other financing, any use of cash collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) orders relating to any plan of reorganization and/or any disclosure statement related thereto, and (v) orders approving non-ordinary course transactions, in each case, proposed by the Debtors, to be in accordance with the terms of the DIP Note Documents and in form and substance reasonably satisfactory to the Agent and the Required DIP Noteholders;

(b)    comply in all material respects with (i) each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases including the DIP Orders and the Confirmation Order and (ii) the terms and conditions of the Restructuring Support Agreement applicable to, or binding on, it;

(c)    deliver to the Agent, the DIP Noteholders and the DIP Noteholder Professionals at least three (3) Business Days prior to such filing, copies of all material pleadings and motions to be filed by or on behalf of the Debtors with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases, or to be distributed by or on behalf of the Debtors to any official committee appointed in the Chapter 11 Cases (other than where, despite such Debtor's commercially reasonable efforts, such three (3) Business Day notice is impracticable); provided that copies of pleadings and motions to be so filed by or on behalf of the Debtors to the extent directly relating to any DIP Note Document, including, without limitation, any amendment, modification or supplement to any DIP Note Document (or a waiver of the provisions thereof) or any other matter adversely affecting the liens, claims or rights of the Secured Parties under any DIP Note Document in any material respect shall be delivered to the Agent, the DIP Noteholders and the DIP Noteholder Professionals at least three (3) Business Days prior to such filing (other than where, despite such Debtor's commercially reasonable efforts, such three (3) Business Day notice is impracticable);

(d)    if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Agent, the DIP Noteholders and the DIP Noteholder Professionals promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Credit Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases;

(e)    except as otherwise is permitted by the DIP Orders, the Issuer Representative shall provide prior written notice as soon as reasonably practicable to the Agent, the DIP Noteholders and the DIP Noteholder Professionals prior to any assumption or rejection of any Debtor's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the

37

priority of any such Liens or Superpriority Claims), if the Agent (acting at the direction of the Required DIP Noteholders) or the DIP Noteholder Professionals inform the Issuer Representative in writing within three (3) Business Days of receipt of the notice from the Issuer Representative referenced above that it objects to such assumption or rejection, as applicable; and

(f)     contest, if requested by the Agent or the Required DIP Noteholders, any motion seeking entry of an order, and entry of an order, that could reasonably be expected to be adverse to the interests of the Agent and the DIP Noteholders or their respective rights and remedies in any of the Chapter 11 Cases, in each case except to the extent such motion or order is permitted or otherwise contemplated by the DIP Orders.

4.19     <u>Bankruptcy Milestones</u>. Each Credit Party shall cause the following actions to be taken by the Debtors or the Bankruptcy Court, as applicable, by the following dates (such dates, collectively, the "<u>Milestones</u>"):

(a)     on the Petition Date, the Debtors shall file the Plan of Reorganization, the Disclosure Statement, and motions seeking approval of the DIP Facility on an interim and final basis and requesting a hearing for approval of the DIP Final Order;

(b)     no later than three (3) Business Days after the Petition Date, the Debtors shall file FCC Forms 316 (collectively, the "<u>FCC Short Form Application</u>") seeking approval of transfer of control of the FCC Licenses from the applicable Debtors to the applicable debtor-in-possession;

(c)     no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the DIP Interim Order;

(d)     no later than five (5) Business Days after the later of the date on which (i) the FCC approves the FCC Short Form Application or (ii) the Debtors determine in their discretion that they have received from the Supporting Second Lien Noteholders (as defined in the Restructuring Support Agreement) sufficient information required to file the FCC Interim Long Form Application (as defined below), the Debtors shall file, as appropriate, FCC Forms 314 or 315 (collectively, the "<u>FCC Interim Long Form Application</u>") seeking approval to issue new equity in a manner that complies with the foreign ownership limitations under Section 310(b)(4) of the Communications Act of 1934, as amended, and other applicable rules and regulations of the FCC, without any declaratory ruling, waiver or other form of special relief, other than that which permits the holding of the Reorganized Alpha Warrants (as defined in the Restructuring Support Agreement), under the Plan of Reorganization;

(e)     no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the solicitation materials with respect to the Plan of Reorganization;

(f)      no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the DIP Final Order;

(g)      No later than forty-five (45) days after the Petition Date, the Debtors shall have filed the Plan Supplement (as defined in the Plan of Reorganization);

(h)      no later than eighty (80) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(i)      no later than three (3) Business Days after the FCC approves the FCC Interim Long Form Application the Plan Effective Date shall occur.

ARTICLE V

NEGATIVE COVENANTS

Each Credit Party covenants and agrees that until the DIP Facility Discharge Date:

5.1      <u>Limitation on Liens</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("<u>Permitted Liens</u>"):

(a)      any Lien existing on the Petition Date (including Liens securing the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations) including those listed on <u>Schedule 5.1</u>;

(b)      any Lien created under any DIP Note Document;

(c)      Liens for Taxes (i) which are not past due or remain payable without penalty, or (ii) the non-payment of which is permitted by <u>Section 4.7</u>;

(d)      carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not delinquent for more than ninety (90) days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

(e)      Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits required in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

39

(f)       Liens consisting of judgment or judicial attachment liens (other than for payment of Taxes), provided that the enforcement of such Liens is effectively stayed and all such Liens secure claims in the aggregate at any time outstanding for the Credit Parties and their Subsidiaries not exceeding $100,000;

(g)       easements, rights-of-way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h)       Liens on any Property acquired or held by any Credit Party or any Subsidiary of any Credit Party securing Indebtedness incurred or assumed for the purpose of financing (or refinancing) all or any part of the cost of acquiring such Property and permitted under Section 5.5(d); provided that (i) any such Lien attaches to such Property concurrently with or within ninety (90) days after the acquisition thereof, (ii) such Lien attaches solely to the Property so acquired in such transaction and the proceeds thereof, and (iii) the principal amount of the debt secured thereby does not exceed 100% of the cost of such Property;

(i)       Liens securing Capital Lease Obligations permitted under Section 5.5(d);

(j)       any interest or title of a lessor or sublessor under any lease to which any of the Credit Parties is a party in the Ordinary Course of Business and otherwise in conformance with clauses (g), (h) and (i) above, to the extent applicable;

(k)       Liens arising from the filing of precautionary uniform commercial code financing statements with respect to any lease permitted by this Agreement;

(l)       non-exclusive licenses and sublicenses granted by a Credit Party or any Subsidiary of a Credit Party and leases and subleases (by a Credit Party or any Subsidiary of a Credit Party as lessor or sublessor) to third parties in the Ordinary Course of Business not interfering with the business of the Credit Parties or any of their Subsidiaries;

(m)       Liens in favor of collecting banks arising by operation of law under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC;

(n)       Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(o)       the Carve Out;

(p)       Cash Collateral and other deposits securing obligations arising after the Petition Date required or imposed by the Bankruptcy Code or the DIP Order in all cases

40

to the extent the corresponding secured obligation and provision of cash Collateral or other deposit, is detailed in the Approved Budget;

(q)      any Prepetition Prior Liens including those identified as such on Schedule 5.1,

(r)      Liens securing Rate Contracts entered into prior to the Petition Date and permitted under Section 4.16 of the First Lien Credit Agreement; and

(s)      all Liens permitted to be incurred or exist under the DIP Orders, including the Adequate Protection Liens (as defined in the DIP Orders) to the extent, and subject to the conditions of, set forth in the DIP Orders; and

(t)      other Liens not described above; provided, the aggregate outstanding amount of the obligations secured thereby (calculated at the time of the granting of such Lien and at the time of the incurrence of any such obligation) does not exceed $100,000.

5.2      Disposition of Assets.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except, in each case, as permitted by the Bankruptcy Code or otherwise authorized by the Bankruptcy Court:

(a)      dispositions of inventory, or worn-out or surplus equipment, all in the Ordinary Course of Business;

(b)      dispositions authorized by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the Agent and the Required DIP Noteholders in their sole discretion;

(c)      (i) dispositions of Cash Equivalents in the Ordinary Course of Business made to a Person that is not an Affiliate of any Credit Party and (ii) conversions of Cash Equivalents into cash or other Cash Equivalents;

(d)      transactions permitted under Section 5.1(l);

(e)      the expiration of any contract, contract right or other agreement in accordance with its terms;

(f)      in order to resolve disputes that occur in the Ordinary Course of Business, the Borrowers may discount or otherwise compromise for less than face value thereof, notes or accounts receivable;

(g)      any involuntary condemnation, seizure or taking, by eminent domain or otherwise, or confiscation or requisition of use of property;

(h)    any insured casualty or destruction of any owned or leased real property; and

(i)    dispositions by a Credit Party to another Credit Party.

5.3    <u>Consolidations and Mergers</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except upon not less than five (5) Business Days prior written notice to the Agent and the DIP Noteholders and as permitted by the Bankruptcy Code, (i) any Subsidiary of an Issuer (other than a License Subsidiary) may merge with, dissolve or liquidate into, or transfer all or substantially all of its assets, to an Issuer or a Wholly-Owned Subsidiary of an Issuer which is a Domestic Subsidiary so long as, in the case of any merger, dissolution or liquidation, an Issuer or such Wholly-Owned Subsidiary which is a Domestic Subsidiary shall be the continuing or surviving entity, and (ii) any Foreign Subsidiary may merge with or dissolve or liquidate into another Foreign Subsidiary.

5.4    <u>Loans and Investments</u>.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire, or make any commitment to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make or commit to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including by way of merger, consolidation or other combination or (iii) make, purchase or acquire or commit to make, purchase or acquire, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including an Issuer, any Affiliate of an Issuer or any Subsidiary of an Issuer (the items described in clauses (i), (ii) and (iii) are referred to as "<u>Investments</u>"), except, as permitted by the Bankruptcy Code or otherwise ordered by the Bankruptcy Court for:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments consisting of (i) capital contributions by the Parent in then-existing Credit Parties, and (ii) extensions of credit or capital contributions by any Credit Party to or in any other then-existing Credit Party (other than the Parent); <u>provided</u>, if the Investments described in foregoing clauses (i) and (ii) are evidenced by notes, such notes shall be pledged and delivered to the Agent, for the benefit of the Secured Parties (or First Lien Agent as bailee for the Agent for perfection purposes), and have such terms as the Required DIP Noteholders may reasonably require, and (iii) extensions of credit or capital contributions by a Subsidiary of an Issuer which is not a Credit Party to or in another then-existing Subsidiary of an Issuer which is not a Credit Party;

(c)    loans and cash advances to employees in the Ordinary Course of Business not to exceed $50,000 in the aggregate at any time outstanding;

(d)    travel advances to management personnel and other employees in the Ordinary Course of Business not to exceed $25,000 in the aggregate at any time outstanding;

(e)      Investments received as the non-cash portion of consideration received in connection with transactions permitted pursuant to <u>Section 5.2(b)</u>;

(f)      Investments acquired in connection with the settlement of delinquent accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(g)      Investments consisting of non-cash loans made by the Parent to officers, directors and employees of a Credit Party which are used by such Persons to purchase simultaneously Stock or Stock Equivalents of such Parent;

(h)      Investments existing on the Effective Date including those set forth on <u>Schedule 5.4</u>;

(i)      Investments comprised of Contingent Obligations permitted by <u>Section 5.9</u>; and

(j)      other Investments not described above (calculated at the time of the incurrence of any such Investment) not to exceed $100,000 in the aggregate at any time outstanding.

5.5      <u>Limitation on Indebtedness</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)      the Obligations;

(b)      Indebtedness consisting of Contingent Obligations permitted pursuant to <u>Section 5.9</u>;

(c)      Indebtedness existing on the Petition Date (including the First Lien Prepetition Obligations and the Second Lien Prepetition Obligations) including those set forth in <u>Schedule 5.5</u>;

(d)      Indebtedness not to exceed $100,000 in the aggregate at any time outstanding (other than Indebtedness consisting of Capital Lease Obligations which were reflected in the Most Recent Pro Forma Financial Statements), consisting of Capital Lease Obligations or secured by Liens permitted by <u>Section 5.1(h)</u>, including, without limitation, to finance the purchase of fixed assets or renewals or extensions thereof;

(e)      unsecured intercompany Indebtedness permitted pursuant to <u>Section 5.4(b)</u>;

(f)      Indebtedness consisting of unsecured PPP Loans having terms and conditions reasonably acceptable to the Credit Parties, the Agent, and the Required Noteholders, it being understood that in the event that the Credit Parties qualify for such PPP Loans and there are lenders willing to make PPP Loans available to the Credit Parties

43

all such parties shall use reasonable efforts to negotiate terms and conditions reasonably acceptable to all such parties to enable the Credit Parties to incur such PPP Loans;

(g)    Bank Product Debt (as defined in the First Lien Credit Agreement as in effect on the Effective Date) (excluding any obligations with respect to Rate Contracts required under the First Lien Credit Agreement and hereunder and commercial credit card, purchase card and merchant card services incurred in the ordinary course of business of the Issuers and their Subsidiaries) in an aggregate principal amount at any time outstanding not to exceed $100,000; provided that, such Indebtedness and obligations is subject to the terms of the DIP Orders;

(h)    the Carve Out;

(i)    Indebtedness in respect of the Adequate Protection Claims (as defined in the DIP Order) to the extent, and subject to the conditions, set forth in the DIP Order; and

(j)    other Indebtedness in an aggregate amount not to exceed $100,000 at any time outstanding.

Notwithstanding the foregoing, no Subsidiary that is not a Credit Party will guarantee any Indebtedness for borrowed money of a Credit Party unless such Subsidiary becomes a Guarantor.

5.6    <u>Transactions with Affiliates</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of an Issuer or of any such Subsidiary, except:

(a)    transactions among and between Credit Parties as expressly permitted by this Agreement; or

(b)    those approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the Agent and the Required DIP Noteholders.

5.7    <u>Management Fees and Compensation</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any Affiliate of any Credit Party or pay or reimburse any Permitted Investor or Affiliate thereof (other than a Credit Party) for any costs, expenses and similar items other than (i) payment of reasonable compensation to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business to the extent permitted under the Approved Budget and (ii) payment of reasonable and customary directors' fees and reimbursement of actual out-of-pocket expenses incurred in connection with attending board of director meetings to the extent permitted under the Approved Budget.

5.8    <u>Use of Proceeds – No Margin Stock</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the DIP Note proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of

44

any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.9     <u>Contingent Obligations</u>. No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except, to the extent permitted by the DIP Order, the following:

(a)     endorsements for collection or deposit in the Ordinary Course of Business;

(b)     Rate Contracts entered into prior to the Petition Date in the Ordinary Course of Business for bona fide hedging purposes and not for speculation under <u>Section 4.16</u> of the First Lien Credit Agreement;

(c)     Contingent Obligations of the Credit Parties and their Subsidiaries existing as of the Effective Date including those listed in <u>Schedule 5.9</u>, including extension and renewals thereof which do not increase the amount of such Contingent Obligations or impose materially more restrictive or adverse terms on the Credit Parties or their Subsidiaries as compared to the terms of the Contingent Obligation being renewed or extended;

(d)     Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to the Agent and First Lien Agent title insurance policies;

(e)     Contingent Obligations arising with respect to customary indemnification obligations in favor of (ii) the "Seller(s)" in connection with acquisitions to which a Credit Party is a party that were consummated prior to the Effective Date, and (ii) purchasers in connection with dispositions permitted under <u>Section 5.2(b)</u>;

(f)     Contingent Obligations arising under letters of credit issued under the First Lien Credit Agreement prior to the Petition Date;

(g)     Contingent Obligations arising under guaranties made in the Ordinary Course of Business of obligations of any Credit Party (other than the Parent), which obligations are otherwise permitted hereunder; provided that if such obligation is subordinated to the Obligations, such guaranty shall be subordinated to the same extent;

(h)     Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeals bonds, performance bonds and other similar obligations;

(i)     other Contingent Obligations not exceeding $100,000 in the aggregate at any time outstanding.

Notwithstanding the foregoing, no Subsidiary that is not a Credit Party will guarantee any Indebtedness for borrowed money of a Credit Party unless such Subsidiary becomes a Guarantor.

5.10    <u>Compliance with ERISA</u>.  No ERISA Affiliate shall cause or suffer to exist (a) any event that could result in the imposition of a Lien on any asset of a Credit Party or a Subsidiary of a Credit Party with respect to any Title IV Plan or Multiemployer Plan or (b) any other ERISA Event, that would, in the aggregate, have a Material Adverse Effect.  No Credit Party shall cause or suffer to exist any event that could result in the imposition of a Lien with respect to any Benefit Plan.

5.11    <u>Restricted Payments</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding (the items described in clauses (i) and (ii) above are referred to as "<u>Restricted Payments</u>"); except that (x) any Wholly-Owned Subsidiary of an Issuer may declare and pay dividends to an Issuer or any Wholly-Owned Subsidiary of an Issuer, and except that the Issuers may make distributions, directly or indirectly, to the Parent to the extent necessary to permit the Parent and TopCo to maintain its legal existence and to pay reasonable out-of-pocket general administrative costs and expenses (which may include out-of-pocket legal, accounting and filing costs, and other reasonable and customary corporate overhead expenses incurred in the Ordinary Course of Business); and (y) so long as Alpha LLC and the Parent are treated as a pass-through or disregarded entities for federal and state income tax purposes, the Parent may (i) pay any tax indemnification payments required to be paid under the agreements set forth on <u>Schedule 5.11</u> and (ii) make (and Alpha LLC and any Subsidiaries of Alpha LLC may make distributions to the Parent to permit the Parent to make) tax distributions pursuant to the Parent's Organization Documents as in effect on the Effective Date to TopCo to permit TopCo to make tax distributions to its members to the extent required by TopCo's Organization Documents, as in effect on the Effective Date; <u>provided</u> that all such distributions and indemnity payments shall be made solely for the purpose of enabling any member or former member of any Credit Party to pay, or to reimburse any such member or former member for payments made for, tax liabilities of any such member or former member and only so long as  (x) such distributions and indemnity payments are made only with respect to tax liabilities of such members and former members for the tax year(s) ending December 31, 2020 and/or December 31, 2021; (y) such tax liabilities are attributable solely to such members' or former members' direct or indirect ownership of any Credit Party or its subsidiaries; and (z) the aggregate amount of all such distributions and indemnity payments made to all members or former members of the Credit Parties do not exceed $125,000 with respect to tax liabilities for the tax year ending December 31, 2020 and $125,000 with respect to tax liabilities for the tax year ending December 31, 2021.

5.12    <u>Cessation of Business; Change in Business</u>.  Except as expressly permitted under <u>Section 5.3</u>, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, voluntarily cease to conduct its business in the Ordinary Course of Business.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any line of business substantially different from those lines of business carried on by it on the Effective Date and any business reasonably complementary or ancillary thereto.  The Parent shall not engage in any business activities or own any Property other than (i) ownership of the Stock and Stock Equivalents and the management of the business of the Issuers, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under the DIP

Note Documents, the First Lien Credit Facility Documents, and the Second Lien Note Purchase Documents (as permitted under the Bankruptcy Code or authorized under the DIP Orders) to which it is a party.

5.13    <u>Change in Organizational Documents</u>.  Except as expressly permitted under <u>Section 5.3</u>, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, amend any of its Organization Documents in any respect that is adverse in any respect to the Agent or the DIP Noteholders.

5.14    <u>Changes in Accounting, Name and Jurisdiction of Organization</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (iii) change its name as it appears in official filings in its jurisdiction of organization or (iv) change its jurisdiction of organization, in the case of clauses (iii) and (iv), without at least twenty (20) days' prior written notice to the Agent and the DIP Noteholders and the acknowledgement of the Agent that all actions required by the Agent, including those to continue the perfection of its Liens, have been completed.

5.15    <u>Payments of Indebtedness, Amendments, Etc. to First Lien Credit Facility Documents, Second Lien Note Purchase Documents, Subordinated Debt Documents, and Management Agreements</u>.

(a)    No Credit Party shall, and no Credit Party shall suffer or permit any Subsidiary to make any payment of principal, interest or other amounts on any Prepetition Debt other than as permitted in the DIP Orders.

(b)    No Credit Party shall and no Credit Party shall permit any of its Subsidiaries, to (i) except as agreed by the Agent, amend, supplement, waive or otherwise modify any First Lien Credit Facility Document, Second Lien Note Purchase Document, or TopCo Note Purchase Documents except in accordance with the terms of the DIP Order or the Plan of Reorganization, (ii) amend, supplement, waive or otherwise modify any provision of any document governing or related to Subordinated Indebtedness or (iii) amend, supplement, waive or otherwise modify any provision of any management agreement, consulting agreement or similar agreement.

5.16    <u>No Negative Pledges</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Credit Party or Subsidiary to pay dividends or make any other distribution on any of such Credit Party's or Subsidiary's Stock or Stock Equivalents or to pay fees, including management fees, or make other payments and distributions to an Issuer or any other Credit Party, except for those restrictions imposed pursuant to this Agreement and the other DIP Note Documents and under the First Lien Credit Facility Documents and Second Lien Note Purchase Documents as in effect on the Petition Date.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of the Agent, whether

47

now owned or hereafter acquired except in connection with any document or instrument governing Liens permitted pursuant to Sections 5.1(h) and 5.1(i), provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Liens.

5.17     OFAC; USA Patriot Act; Anti-Corruption Laws.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Section 3.27. No Credit Party or Subsidiary, nor to the knowledge of the Credit Party, any director, officer, agent, employee, or other person acting on behalf of the Credit Party or any Subsidiary, will use the proceeds of any DIP Note, directly or indirectly, for any payments to any Person, including any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, or otherwise take any action, directly or indirectly, that would result in a violation of any Anti-Corruption Laws.  Furthermore, the Credit Parties will not, directly or indirectly, use the proceeds of the transaction, or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person participating in the transaction of any Sanctions.

5.18     Sale-Leasebacks.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets other than (a) any transaction involving any tower or transmitter and any Real Estate associated therewith which is in effect on the date hereof, and (b), with the consent of the Required DIP Noteholders and the Bankruptcy Court, any transaction entered into after the date hereof with respect to any tower or transmitter and any Real Estate associated therewith.

5.19     Hazardous Materials.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any Real Estate that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any Real Estate (whether or not owned by any Credit Party or any Subsidiary of any Credit Party), other than such violations, Environmental Liabilities and effects that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.20     Operation of License Subsidiaries.  No License Subsidiary shall (i) engage in any business (other than (x) the holding of the FCC Licenses, (y) actions required to maintain such FCC Licenses in full force and effect, and (z) actions required to maintain its separate corporate, limited liability company, partnership or other legal existence or to perform its obligations (as permitted by the Bankruptcy Code or otherwise ordered by the Bankruptcy Court) under any of the DIP Note Documents, the First Lien Credit Facility Documents, the Second Lien Note Purchase Documents, or the TopCo Note Purchase Documents to which it is a party), (ii) own any assets (other than the FCC Licenses), (iii) create or permit to exist any Liens on any of its assets except (A) Liens granted in favor of the Agent for the benefit of the Secured Parties and (B) Liens granted in favor of the First Lien Agent and Second Lien Agent, or (iv) incur any obligations or any other Indebtedness (other than (A) the Obligations and (B) obligations and Indebtedness under the First Lien Credit Facility Documents and the Second Lien Note Purchase Documents).  No

48

Credit Party, other than a License Subsidiary, shall hold any FCC License material to the operation of the Business.

    5.21   <u>Communications Authorizations</u>.

        (a)    No Credit Party shall operate its businesses other than in accordance with the Communications Laws in all material respects and the terms and conditions of the FCC Licenses and other permits under Communications Laws.  Except for any such failure that would not have a Material Adverse Effect, no Credit Party shall fail to file any report or application or pay any regulatory, filing or franchise fee pertaining to the business which is required to be filed with or paid to the FCC or any other Governmental Authority, such as a PUC.  No Credit Party shall take any action that would or could cause the FCC or any other Governmental Authority, such as a PUC, to institute any proceedings for the cancellation, revocation, non-renewal, short-term renewal or adverse modification of any of the FCC Licenses or take or permit to be taken any other action within its control that would or could result in non-compliance with the requirements of the Communications Laws if, in either case, to take or permit to be taken any such action would reasonably be expected to have a Material Adverse Effect.

        (b)    No Credit Party shall permit or suffer the suspension or interruption of regular broadcast operations by a main Station, or a failure by any such main Station to broadcast with its FCC-licensed facilities, which suspension, interruption, or failure persists for three (3) consecutive days, or five (5) days in any twenty (20) consecutive day period, if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

    5.22   <u>Local Marketing Agreements and SSAs</u>.  Without the prior written consent of the Required DIP Noteholders, no Credit Party shall enter into any LMA or SSA following the Effective Date under which any Station is the brokered station (i.e., the station whose time is sold or the station which receives, rather than provides, programming, management, technical or other services under such LMA or SSA).  Such written consent shall not be required for a Credit Party to enter into an LMA or SSA under which such Credit Party acts as the broker, provides programming, sells time on or provides management, technical or other services to a radio station not owned by any Credit Party.

    5.23   <u>Budget Permitted Variance</u>.  Commencing with the Budget Test Date occurring during the fifth full week after the Effective Date, without the written consent of the Agent and the Required DIP Noteholders, no Credit Party shall permit on any such Budget Test Date and any Budget Test Date occurring thereafter, (i) the actual total cash disbursements (excluding professional fees and other exclusions consistent with the Initial Approved Budget) for the applicable Budget Test Period to exceed the aggregate amount forecasted therefor in the Approved Budget in effect for such Budget Test Period by more than 15% of such forecasted amount and (ii) the actual total cash receipts for the applicable Budget Test Period to be less than the aggregate amount forecasted therefor in the Approved Budget in effect for such Budget Test Period by more than 20% (the variances described in clauses (i) and (ii) above being referred to herein as the "<u>Budget Permitted Variances</u>").  In the event of a conflict between the foregoing budget-related provisions and those in the DIP Order the provisions in the DIP Order shall govern.

49

5.24    Certain Bankruptcy Matters.

(a)    No Credit Party shall use any portion or proceeds of the DIP Notes or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes other than (i) as provided for in the Approved Budget, (ii) as required under the DIP Orders, or (iii) for a purpose that would violate the Bankruptcy Code or the terms of the DIP Interim Order or the DIP Final Order.

(b)    No Credit Party shall propose, file, or otherwise support, or permit any of its Subsidiaries to propose, file or otherwise support, any chapter 11 plan other than the Plan of Reorganization that does not contain releases in favor of the Agent, the DIP Noteholders and their respective Affiliates and advisors.

(c)    Except as expressly set forth in the DIP Interim Order or DIP Final Order, as applicable, no Credit Party shall create or permit to exist, or permit any of its Subsidiaries to create or permit to exist, any administrative expense or claim of the kind specified in, ordered pursuant to, or arising under or in connection with section 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 552, 726, 1113 or 1114 or any other provision of the Bankruptcy Code that is pari passu with or senior to the Obligations.

## ARTICLE VI

## [RESERVED]

## ARTICLE VII

## EVENTS OF DEFAULT

7.1    Event of Default.  Any of the following shall constitute an "Event of Default":

(a)    Non-Payment.  Any Credit Party fails (i) to pay when and as required to be paid herein, any amount of principal of any DIP Note, including after maturity of the DIP Notes, or (ii) to pay within three (3) Business Days after the same shall become due, any interest on any DIP Note or any fee or any other amount payable hereunder or pursuant to any other DIP Note Document; or

(b)    Representation or Warranty.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made in any DIP Note Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under any DIP Note Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(c)      <u>Specific Defaults</u>.  Any Credit Party fails to perform or observe any (i) term, covenant or agreement contained in any of Section <u>4.10</u> or <u>Article V</u>; or (ii) term, covenant or agreement contained in <u>Section 4.1</u>, <u>4.2(a)</u>, <u>4.2(b)</u>, <u>4.2(k)</u>, <u>4.2(l)</u>, <u>4.3(a)</u>, <u>4.4(a)</u>, <u>4.19(a)</u>, <u>4.19(b)</u> or <u>4.19(d)</u> and in the case of this clause (ii) such failure to perform or observe shall continue unremedied for a period of two (2) Business Days following the occurrence thereof; or

(d)      <u>Other Defaults</u>.  Any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other DIP Note Document, and such default shall continue unremedied for a period of fifteen (15) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by the Agent or Required DIP Noteholders; or

(e)      <u>Cross-Default</u>.  Any Credit Party or any Subsidiary of any Credit Party (in each case, as applicable, unless permitted or required by the DIP Orders) (i) fails to make any payment in respect of any post-petition Indebtedness (other than the Obligations) or post-petition Contingent Obligation (other than the Obligations) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $300,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness or Contingent Obligation (other than Contingent Obligations owing by one Credit Party with respect to the obligations of another Credit Party permitted hereunder), if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable prior to its stated maturity (without regard to any subordination terms with respect thereto), or such Contingent Obligation to become payable or cash collateral in respect thereof to be demanded; <u>provided</u> that this clause (e) shall not apply to any Prepetition Debt as long as remedial action by the holder of such Indebtedness is subject to the automatic stay of the Bankruptcy Code imposed in the Chapter 11 Cases; <u>provided</u>, <u>further</u> that this clause (e) shall not apply to any failure by any Credit Party or any Subsidiary of any Credit Party to pay any amount that may become due under any Prepetition Debt; or

(f)      [reserved]; or

(g)      [reserved]; or

(h)      <u>Monetary Judgments</u>.  One or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability of $300,000 or more (excluding amounts covered by insurance to the extent the relevant

51

independent third-party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof; or

(i)     <u>Non-Monetary Judgments</u>.  One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal, operation of the automatic stay in the Chapter 11 Cases, or otherwise, shall not be in effect; or

(j)     <u>FCC Matters</u>.  (i) Any Credit Party shall lose, fail to keep in force, suffer the termination, suspension or revocation of, or terminate, forfeit or suffer a material adverse amendment to, any main station FCC License, which could reasonably be expected to have a Material Adverse Effect; or (ii) the FCC shall schedule or conduct a formal hearing on the revocation of any main station FCC License held by a Credit Party, which could reasonably be expected to have a Material Adverse Effect; or

(k)     <u>Leased Property</u>.  Any lease of Real Estate used or to be used by any Credit Party as a studio, tower or transmitter site (i) shall not be renewed by the applicable Credit Party or the landlord thereunder at least ninety (90) days prior to its scheduled expiration or termination date, unless such failure could not reasonably be expected to have a Material Adverse Effect or the Required DIP Noteholders consent thereto after having received from the Issuers evidence and assurances acceptable to the Required DIP Noteholders that (x) such Credit Party has obtained a replacement location which is not materially less favorable to such Credit Party and its business operations pursuant to a signed written lease acceptable to the Required DIP Noteholders and (y) such Credit Party will be able to relocate to such replacement premises without materially adversely affecting its continued business operations or Station signal, (ii) shall be in default as a result of such Credit Party's failure to observe or abide by all terms, conditions and covenants contained therein (unless cured within the applicable grace period or the continuance of such default could not reasonably be expected to have a Material Adverse Effect) or (iii) shall be the subject of an eviction notice initiated or sent by the landlord thereof to such Credit Party or the Agent (unless the eviction could not reasonably be expected to have a Material Adverse Effect); or

(l)     <u>Collateral</u>.  Any material provision of any DIP Note Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party thereto or any Credit Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any DIP Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in any material portion of the Collateral purported to be covered thereby or such security interest shall for any reason (other than the failure of the Agent to take any action within its control) cease to be a perfected and first priority security interest subject only to Permitted Liens and such failure continues beyond any grace period provided in the DIP Collateral Documents; or

(m)    <u>Change of Control</u>.  Any Change of Control shall occur; or

(n)    <u>FCC Consents</u>.  The FCC shall issue an order (i) dismissing or denying the FCC Short Form Application or the FCC Interim Long Form Application (unless such dismissal or denial results from a Foreign Ownership Impediment), (ii) rescinding any FCC Consent, (iii) requiring the reversal of any transaction for which FCC Consent was required or (iv) directing the divestiture of any main station FCC License acquired in connection with any transaction for which FCC Consent was required (unless such divestiture was contemplated by the underlying transaction documentation (other than a rescission, unwind or similar provision thereof)) which, in the case of this clause (iv), could reasonably be expected to have a Material Adverse Effect; or

(o)    [reserved]; or

(p)    <u>Termination or Modification of LMA or SSA</u>. Any LMA, SSA or similar agreement, arrangement or understanding whereby a Credit Party provides services to, and receives compensation from, a station other than one licensed by the FCC to such Credit Party or its Affiliate, is terminated, expires or is substantially and adversely modified, and not replaced by a similar agreement, arrangement or understanding, and such termination, expiration or modification could reasonably be expected to have a Material Adverse Effect; or

(q)    [reserved]; or

(r)    <u>ERISA Default</u>.  One or more ERISA Events shall have occurred and such event, together with all other such events, if any, would reasonably be expected to have a Material Adverse Effect; or

(s)    [reserved]; or

(t)    [reserved]; or

(u)    <u>Chapter 11 Case Related Events of Default</u>.  Unless otherwise agreed by the Credit Parties and the Required DIP Noteholders, the occurrence of any of the following events:

(i)    the entry of the DIP Interim Order shall not have occurred within three (3) days after the Petition Date or, once entered, the DIP Interim Order shall cease to be in full force and effect in accordance with its terms;

(ii)    the entry of the DIP Final Order shall not have occurred within forty-five (45) days after the Petition Date, or, once entered, the DIP Final Order shall cease to be in full force and effect in accordance with its terms;

(iii)    [reserved];

(iv)    without the prior written consent of the Required DIP Noteholders, entry of an order (other than the DIP Orders) requiring the Debtors

to make payments with respect to (A) any prepetition indebtedness (other than as set forth in the DIP Interim Order and DIP Final Order, respectively, and payment of estate professional fees and expenses in accordance with the Approved Budget) or (B) any other prepetition claims, except in each case as expressly provided for pursuant to "first day" or other orders entered upon pleadings by the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Noteholders;

(v)    the failure of any Credit Party to perform in any material respect its obligations under, or the occurrence of a default or an event of default under or as defined in, any of the DIP Interim Order, the DIP Final Order, or the Confirmation Order;

(vi)    the failure of the Credit Parties to satisfy any of the Milestones in accordance with the terms relating to such Milestone;

(vii)    the entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(viii)    a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code is appointed in the Chapter 11 Cases, or the Debtors apply for, consent to or acquiesce in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such an appointment;

(ix)    the Restructuring Support Agreement shall have ceased to be in full force and effect in accordance with its terms;

(x)    the entry of an order in any of the Chapter 11 Cases approving financing under section 364 of the Bankruptcy Code or the filing of a motion by the Debtors seeking such relief, in each case;

(xi)    except as otherwise provided for in the DIP Orders, the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than as permitted under the DIP Note Documents, entitled to Superpriority Claim priority under Section 364(c)(1) of the Bankruptcy Code pari passu or senior to the DIP Facility, or there shall arise or be granted by the Bankruptcy Court (x) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out) or (y) any lien on the Collateral having a priority senior to or pari passu with the liens and security interests granted herein, except as expressly provided in the DIP Note Documents, including the DIP Interim Order or the DIP Final Order, whichever is in effect;

KL2 3199266.14

(xii)     the filing or support of any pleading by any Credit Party or Affiliate thereof seeking, or otherwise consenting to, any of the matters set forth in clauses (vi) through (x) above;

(xiii)    the entry of an order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Agent or the DIP Noteholders or, except to the extent provided for in the DIP Orders, the filing of a motion or adversary proceeding by any Credit Party or Affiliate thereof that challenges the rights and remedies of any of the Agent or the DIP Noteholders under the DIP Note Documents in any of the Chapter 11 Cases;

(xiv)    any expiration or termination of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code; unless such exclusivity periods expire after the Debtors have filed a motion for an extension of exclusivity which has been denied and are otherwise proceeding in good faith toward confirmation and consummation of the Plan of Reorganization;

(xv)     the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization other than the Plan of Reorganization;

(xvi)    except as otherwise provided for in the DIP Orders, the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) against any other asset of the Debtors in excess of $500,000 in the aggregate;

(xvii)   the payment of or grant of adequate protection with respect to any prepetition claims (other than as permitted by the DIP Interim Order, other "first day" orders, or the DIP Final Order);

(xviii)  the entry of an order in any of the Chapter 11 Cases denying or terminating the use of cash collateral by the Credit Parties;

(xix)    any Credit Party or Affiliate thereof, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the DIP Noteholders relating to the DIP Note Documents or the DIP Orders;

(xx)     an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Agent or any of the DIP Noteholders of any amounts received in respect of the DIP Notes; or

(xxi)    except as otherwise consented to by the Required DIP Noteholders, any Credit Party shall have sold or otherwise disposed any portion of the Collateral other than as permitted herein or pursuant to the DIP Orders.

7.2    Remedies.  Subject to the terms of the DIP Order, and when applicable, the DIP Final Order, upon the occurrence and during the continuance of any Event of Default, and notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court but subject to any notice or other requirements set forth in the DIP Order), the Required DIP Noteholders may (and the Agent, at the written direction of the Required DIP Noteholders, shall):

(a)    declare all or any portion of any one or more of the DIP Commitments of each DIP Noteholder to purchase Notes to be suspended or terminated, whereupon all or such portion of such Commitments shall forthwith be suspended or terminated, other than, for the avoidance of doubt, to fund or reserve for the Carve Out;

(b)    declare all or any portion of the unpaid principal amount of all outstanding DIP Notes, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other DIP Note Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party; and/or

(c)    exercise on behalf of itself and the DIP Noteholders all rights and remedies available to it and the DIP Noteholders under the DIP Note Documents, the DIP Orders or applicable law.

7.3    Rights Not Exclusive.  The rights provided for in this Agreement and the other DIP Note Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7.4    Governmental.  Notwithstanding anything to the contrary contained herein or in any other DIP Note Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Credit Party or affect the ownership of the FCC Licenses shall be pursuant to the Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC and any other applicable Governmental Authority. Notwithstanding anything to the contrary contained herein, neither the Agent nor any DIP Noteholder shall take any action pursuant hereto that would constitute or result in any assignment of the FCC Licenses or transfer of control of any Credit Party if such assignment or transfer of control would require, under then existing law (including the Communications Laws), the prior approval of the FCC, without first obtaining such approval of the FCC and notifying the FCC of the consummation of such assignment or transfer of control (to the extent required to do so).  Each Credit Party agrees to take any lawful action which the Agent or the Required DIP Noteholders may request in order to obtain and enjoy the full rights and benefits granted to the Agent and DIP Noteholders by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Credit Party's reasonable best efforts to assist in obtaining any approval of the FCC and any other Governmental Authority that is then required under the Communications Laws or under any other law for any action or transaction contemplated by this Agreement, including, without limitation, the sale or transfer of Collateral.  Such efforts shall include, without limitation, sharing with the Agent and the Required DIP Noteholders any

FCC registration numbers, account numbers and passwords for the FCC's electronic databases and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC any portion of any application or applications for consent to the assignment of the FCC Licenses or transfer of control of any Credit Party required to be filed under the Communications Laws for approval of any sale or transfer of Collateral and/or the FCC Licenses.

## ARTICLE VIII

## THE AGENT

8.1    Appointment and Duties.

(a)    Appointment of the Agent.  Each Secured Party appoints ICG Debt Admin (together with any successor Agent pursuant to Section 8.9) as the Agent hereunder and authorizes the Agent to (i) execute and deliver the DIP Note Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Agent under such DIP Note Documents and (iii) exercise such powers as are reasonably incidental thereto.

(b)    Duties as Collateral and Disbursing Agent.  Without limiting the generality of clause (a) above, the Agent shall have the right and authority, and is hereby authorized, to (i) act as the disbursing and collecting agent for the DIP Noteholders with respect to all payments and collections arising in connection with the enforcement of the DIP Note Documents (including in any bankruptcy, insolvency or similar proceeding), and each Person making any such payment in connection with any DIP Note Document to any Secured Party is hereby authorized to make such payment to the Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the DIP Note Documents, (vi) except as may be otherwise specified in any DIP Note Document, exercise all remedies given to the Agent and the other Secured Parties with respect to the Credit Parties and/or the Collateral, whether under the DIP Note Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the DIP Note Documents on behalf of any DIP Noteholder that has consented in writing to such amendment, consent or waiver; provided, however, that the Agent hereby appoints, authorizes and directs each Secured Party to act as collateral sub-agent for the Agent and the other Secured Parties for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Cash Equivalents held by, such Secured Party, and may further authorize and direct such Secured Parties to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Agent

57

and each Secured Party hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)    <u>Limited Duties</u>.  Under the DIP Note Documents, the Agent (i) is acting solely on behalf of the DIP Noteholders and the other Secured Parties (except to the limited extent provided in <u>Section 1.4(b)</u> with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent" or the terms "agent" and "collateral agent" and similar terms in any DIP Note Document to refer to the Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any DIP Note Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any DIP Noteholder or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any DIP Note Document, and each Secured Party by accepting the benefits of the DIP Note Documents hereby waives and agrees not to assert any claim against the Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2    <u>Binding Effect</u>.  Each Secured Party, by accepting the benefits of the DIP Note Documents, agrees that (i) any action taken (or omitted to be taken) by the Agent or the Required DIP Noteholders (or, if expressly required hereby, a greater proportion of the DIP Noteholders) in accordance with the provisions of the DIP Note Documents, (ii) any action taken (or omitted to be taken) by the Agent in reliance upon the instructions of the Required DIP Noteholders (or, where so required, such greater proportion) and (iii) the exercise by the Agent or the Required DIP Noteholders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3    <u>Use of Discretion</u>.

(a)    <u>No Action without Instructions</u>.  The Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any DIP Note Document or (ii) pursuant to instructions from the Required DIP Noteholders (or, where expressly required by the terms of this Agreement, a greater proportion of the DIP Noteholders).

(b)    <u>Right Not to Follow Certain Instructions</u>.  Notwithstanding clause (a) above, the Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Agent receives an indemnification satisfactory to it from the DIP Noteholders (or, to the extent applicable and acceptable to the Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Agent or any Related Person thereof or (ii) that is, in the opinion of the Agent or its counsel, contrary to any DIP Note Document or applicable Requirement of Law.

(c)    <u>Right to Enforce Rights and Remedies</u>.  The authority to enforce rights and remedies hereunder and under the other DIP Note Documents against the Credit

Parties or any of them that are vested in the Agent (and all actions and proceedings in connection with such enforcement that may be instituted and maintained by the Agent in accordance with the DIP Note Documents for the benefit of all the Secured Parties) shall, in each case, be at the written direction of the Required DIP Noteholders; provided, that for the avoidance of doubt the foregoing shall not prohibit (i) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Agent) hereunder and under the other DIP Note Documents, (ii) any DIP Noteholder from exercising setoff rights in accordance with Section 9.11 or (iii) any Secured Party from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other debtor relief law; and provided further that if at any time there is no Person acting as the Agent hereunder and under the other DIP Note Documents, then (A) the Required DIP Noteholders shall have the rights otherwise ascribed to the Agent pursuant to Section 7.2 and (B) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Section 9.11, any DIP Noteholder may, with the written consent of the Required DIP Noteholders, enforce any rights and remedies available to it and as authorized in writing by the Required DIP Noteholders.

8.4     Delegation of Rights and Duties.  The Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any DIP Note Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article VIII to the extent provided by the Agent.

8.5     Reliance and Liability.

(a)     The Agent may, without incurring any liability hereunder, (i) treat the payee of any DIP Note as its holder until such DIP Note has been assigned in accordance with Section 9.9, (ii) rely on the Register to the extent set forth in Section 1.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)     None of the Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any DIP Note Document, and each Secured Party, the Parent, each Issuer and each other Credit Party hereby waive and shall not assert (and the Parent and each Issuer shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of the Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, the Agent and its Related Parties:

59

(i)        shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required DIP Noteholders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Agent, when acting on behalf of the Agent);

(ii)        shall not be responsible to any DIP Noteholder or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any DIP Note Document;

(iii)        makes no warranty or representation, and shall not be responsible, to any DIP Noteholder or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any DIP Note Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any DIP Note Document to be transmitted to the DIP Noteholders) omitted to be transmitted by the Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Agent in connection with the DIP Note Documents; and

(iv)        shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any DIP Note Document, whether any condition set forth in any DIP Note Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Issuer Representative, any DIP Noteholder describing such Default or Event of Default clearly labeled "notice of default" (in which case the Agent shall promptly give notice of such receipt to all DIP Noteholders).

For each of the items set forth in clauses (i) through (iv) above, each Secured Party, the Parent and each Issuer hereby waives and agrees not to assert (and the Parent and each Issuer shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against the Agent based thereon.

8.6    The Agent Individually.  The Agent and its Affiliates may purchase debt securities, make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as the Agent, and may receive separate fees and other payments therefor.  To the extent the Agent or any of its Affiliates purchases any DIP Note or otherwise becomes a DIP Noteholder hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other DIP Noteholder and the terms "DIP Noteholder", "Required

DIP Noteholder" and any similar terms shall, except where otherwise expressly provided in any DIP Note Document, include the Agent or such Affiliate, as the case may be, in its individual capacity as DIP Noteholder, or as one of the Required DIP Noteholders.

8.7    DIP Noteholder Credit Decision. Each Secured Party acknowledges that it shall, independently and without reliance upon the Agent, any other Secured Party or any of their Related Persons or upon any document solely or in part because such document was transmitted by the Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any DIP Note Document or with respect to any transaction contemplated in any DIP Note Document, in each case based on such documents and information as it shall deem appropriate.  The Agent shall not have any duty or responsibility to provide any Secured Party with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of the Agent or any of its Related Persons.

8.8    Expenses; Indemnities; Withholding.

(a)    Each DIP Noteholder agrees to reimburse the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally (but not jointly) and ratably, for any reasonable and documented costs and expenses (including fees, charges and disbursements of financial, legal and other advisors (including the DIP Noteholder Professionals) and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by the Agent or any of its Related Persons in connection with (i) the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to its rights or responsibilities under, (A) any DIP Note Document, (B) the DIP Orders or any other motion or order in the Chapter 11 Cases, and (C) its involvement and participation in the Chapter 11 Cases.

(b)    Each DIP Noteholder further agrees to indemnify the Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) severally (but not jointly) and ratably, from and against Liabilities (including, to the extent not indemnified pursuant to Section 8.8(c), Taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any DIP Noteholder) that may be imposed on, incurred by or asserted against the Agent or any of their respective Related Persons in any matter relating to or arising out of, in connection with or as a result of any DIP Note Document, any Related Document, or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Agent or any of its Related Persons under or with respect to any of the foregoing; provided, that no DIP Noteholder shall be liable to the Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Agent or, as the

case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)    To the extent required by any Requirement of Law, the Agent may withhold from any payment to any DIP Noteholder under a DIP Note Document an amount equal to any applicable withholding Tax (including withholding Taxes imposed under Chapters 3 and 4 of Subtitle A of the Code).  If the IRS or any other Governmental Authority asserts a claim that the Agent did not properly withhold Tax from amounts paid to or for the account of any DIP Noteholder (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding Tax with respect to a particular type of payment, or because such DIP Noteholder failed to notify the Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding Tax ineffective, failed to maintain a Participant Register or for any other reason), or the Agent reasonably determines that it was required to withhold Taxes from a prior payment but failed to do so, such DIP Noteholder shall promptly indemnify the Agent fully for all amounts paid, directly or indirectly, by the Agent as Tax or otherwise, including penalties and interest, and together with all expenses incurred by the Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  The Agent may offset against any payment to any DIP Noteholder under a DIP Note Document, any applicable withholding Tax that was required to be withheld from any prior payment to such DIP Noteholder but which was not so withheld, as well as any other amounts for which the Agent is entitled to indemnification from such DIP Noteholder under this Section 8.8(c).

8.9    Resignation of the Agent.

(a)    The Agent may resign at any time by delivering notice of such resignation to the DIP Noteholders and the Issuer Representative, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date of such notice.  If the Agent delivers any such notice, the Required DIP Noteholders shall have the right to appoint a successor Agent at the cost and expense of the Issuers (including, without limitation, any costs, expenses and fees of such successor Agent).  If, after 30 days after the date of the retiring Agent's notice of resignation, no successor Agent has been appointed by the Required DIP Noteholders that has accepted such appointment, then the retiring Agent may, on behalf of the DIP Noteholders, appoint a successor Agent.  Each appointment under this clause (a) shall be subject to the prior consent of the Issuer Representative, which may not be unreasonably withheld; provided, however, no such consent  shall be required (i) during the continuance of an Event of Default or (ii) if such successor Agent is a DIP Noteholder or an Affiliate of a DIP Noteholder.

(b)    Effective immediately upon resignation of the Agent, (i) the retiring Agent shall be discharged from its duties and obligations under the DIP Note Documents, (ii) the Required DIP Noteholders shall assume and perform all of the duties of the retiring Agent (and, in such capacity, the Required DIP Noteholders shall have the benefit of all rights and protections of the Agent under and relating to this Agreement and the other DIP Note Documents) until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit

KL2 3199266.14

of any provision of any DIP Note Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such retiring Agent had been, validly acting as the Agent under the DIP Note Documents and (iv) subject to its rights under <u>Section 8.3</u>, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the DIP Note Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, the successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the DIP Note Documents.

8.10    <u>Release of Collateral or Guarantors</u>.  Each Secured Party hereby consents to the release and hereby directs the Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)    any Subsidiary of an Issuer from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the DIP Note Documents (including pursuant to a waiver or consent) and the DIP Orders, to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to <u>Section 4.14</u>; <u>provided</u>, that no such release shall occur if such Guarantor continues to be a guarantor in respect of the First Lien Credit Facility Documents or Second Lien Note Purchase Documents; and

(b)    any Lien held by the Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the DIP Note Documents (including pursuant to a valid waiver or consent) and the DIP Orders, to the extent all Liens required to be granted in such Collateral pursuant to <u>Section 4.14</u> after giving effect to such transaction have been granted; (ii) any Property subject to a Lien permitted hereunder in reliance upon <u>Section 5.1(h)</u> or <u>(i)</u>; and (iii) all of the Collateral and all Credit Parties, upon (A) the occurrence of the DIP Facility Discharge Date and (B) to the extent requested by the Agent, receipt by the Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to the Agent.

Each Secured Party hereby directs the Agent, and the Agent hereby agrees, upon receipt of reasonable advance notice from the Issuer Representative, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this <u>Section 8.10</u>, in each case, at the Issuers' expense.

8.11    <u>Additional Secured Parties</u>.  The benefit of the provisions of the DIP Note Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a DIP Noteholder party hereto as long as, by accepting such benefits, such Secured Party agrees, as among the Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Agent shall confirm such agreement in a writing in form and substance acceptable to the Agent) this Article VIII, <u>Section 9.3</u>, <u>Section 9.9</u>, <u>Section 9.10</u>, <u>Section 9.11</u>, <u>Section 9.17</u>, <u>Section 9.18</u>, <u>Section 9.19</u>, <u>Section 9.24</u> and <u>Section 10.1</u>) and the decisions and actions of the Agent and the Required DIP Noteholders (or, where expressly required by the terms of this Agreement, a greater proportion of the DIP Noteholders or other

parties hereto as required herein) to the same extent a DIP Noteholder is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 8.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of the Agent and the DIP Noteholders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any DIP Note Document.

ARTICLE IX

MISCELLANEOUS

9.1    <u>Amendments and Waivers</u>.

(a)    Subject to the provisions of <u>Sections 9.1(c)</u> and <u>10.5(b)</u> hereof, no amendment or waiver of, or supplement (including any additional DIP Note Document) or other modification to any provision of this Agreement or any other DIP Note Document or any provision thereof, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by the Agent, the Required DIP Noteholders (or by the Agent with the consent of the Required DIP Noteholders), and the Issuers, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, supplement (including any additional DIP Note Document) or consent shall, unless in writing and signed by all the DIP Noteholders directly affected thereby (or by the Agent with the consent of all the DIP Noteholders directly affected thereby), in addition to the Agent, the Required DIP Noteholders (or by the Agent with the consent of the Required DIP Noteholders), and the Issuers, do any of the following:

(i)    increase or extend the DIP Commitment of such DIP Noteholder (or reinstate any DIP Commitment terminated pursuant to <u>Section 7.2(a)</u>);

(ii)    postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the DIP Noteholders (or any of them) hereunder or under any other DIP Note Document (for the avoidance of doubt, mandatory prepayments pursuant to <u>Sections 1.8(b)</u> and <u>1.8(c)</u> may be postponed, delayed, reduced, waived or modified with the consent of Required DIP Noteholders and waivers of any condition precedent under <u>Section 2</u>, Default or Event of Default shall not constitute a postponement or delay under this <u>Section 9.1(a)(ii)</u>);

64

(iii)    reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of Required DIP Noteholders) or the amount of interest payable in cash specified herein on any DIP Note, or of any fees or other amounts payable hereunder or under any other DIP Note Document;

(iv)    (A) change or have the effect of changing the priority or pro rata treatment of any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in DIP Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement or otherwise, of new notes or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for Obligations or otherwise) or (B) advance the date fixed for, or increase, any scheduled installment of principal due to any of the DIP Noteholders under any DIP Note Document;

(v)    change the percentage of the DIP Commitments or of the aggregate unpaid principal amount of the DIP Notes which shall be required for the DIP Noteholders or any of them to take any action hereunder;

(vi)    amend this <u>Section 9.1</u> or, subject to the terms of this Agreement, the definition of Required DIP Noteholders or any provision providing for consent or other action by all DIP Noteholders;

(vii)    subordinate the DIP Notes to any other Indebtedness; or

(viii)    release either Issuer or discharge any Credit Party from its respective payment Obligations under the DIP Note Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other DIP Note Documents;

it being agreed that all DIP Noteholders shall be deemed to be directly affected by an amendment, waiver or supplement described in the preceding clauses (iv), (v), (vi), (vii) or (viii).

(b)    No amendment, waiver or consent shall, unless in writing and signed by the Agent, in addition to the Required DIP Noteholders or all DIP Noteholders directly affected thereby (or by the Agent with the consent of the Required DIP Noteholders or all the DIP Noteholders directly affected thereby, as the case may be), affect the rights or duties of the Agent under this Agreement or any other DIP Note Document.

(c)    Notwithstanding anything to the contrary contained in this Section 9.1, (i) the Issuers may amend <u>Schedules 3.19</u> and <u>3.21</u> upon notice to the Agent, and (ii) the Agent and the Issuers may amend or modify this Agreement and any other DIP Note Document to (1) cure any ambiguity, omission, defect or inconsistency therein, and (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over

65

additional Property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

9.2    <u>Notices</u>.

(a)    <u>Addresses</u>.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to Intralinks (to the extent such system is available and set up by or at the direction of the Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com or using such other means of posting to Intralinks as may be available and reasonably acceptable to the Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of the Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of the Issuers and the Agent, to the other parties hereto and (B) in the case of all other parties, to the Issuer Representative and the Agent.  Transmissions made by Electronic Transmission to the Agent shall be effective only (x) for notices where such Electronic Transmission is specifically authorized by this Agreement, (y) if such Electronic Transmission is delivered in compliance with procedures of the Agent applicable at the time and previously communicated to the Issuer Representative, and (z) if receipt of such Electronic Transmission is acknowledged by the Agent.

(b)    <u>Effectiveness</u>.

(i)    All communications described in <u>clause (a)</u> above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; <u>provided</u>, <u>that</u> if any communication is delivered by electronic mail or facsimile on a day that is not a Business Day or after 5:00 p.m. (local time at the location of the recipient) on a Business Day, such electronic mail or facsimile shall be deemed received at 9:00 a.m. (local time at the location of the recipient) on the next succeeding Business Day; <u>provided</u>, <u>further</u>, <u>however</u>, that no communications to the Agent or any DIP Noteholder pursuant to Article I shall be effective until received by the Agent or such DIP Noteholder (as applicable).

(ii)    The posting, completion and/or submission by any Credit Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Credit Parties that any representation,

warranty, certification or other similar statement required by the DIP Note Documents to be provided, given or made by a Credit Party that is included in such posted communication in connection is true, correct and complete in all material respects except as expressly noted in such communication or E-System.

(c)     Each DIP Noteholder shall notify the Agent and Issuer Representative in writing of any changes in the address to which notices to such DIP Noteholder should be directed, of addresses of its DIP Noteholder Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as the Agent or Issuer Representative shall reasonably request.

9.3     Electronic Transmissions.

(a)     Authorization.  Subject to the provisions of Section 9.2(a), each of the Agent, DIP Noteholders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any DIP Note Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     Signatures.  Subject to the provisions of Section 9.2(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any DIP Note Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which the Agent, each other Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)     Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms,

67

conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by the Agent and Credit Parties in connection with the use of such E-System.

(d)     LIMITATION OF LIABILITY.     ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".   NONE OF THE AGENT, ANY DIP NOTEHOLDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.   NO WARRANTY OF ANY KIND IS MADE BY THE AGENT, ANY DIP NOTEHOLDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.   Each of each Issuer, each other Credit Party executing this Agreement and each Secured Party agrees that the Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4     No Waiver; Cumulative Remedies.   No failure to exercise and no delay in exercising, on the part of the Agent or any DIP Noteholder, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.   No course of dealing between any Credit Party, any Affiliate of any Credit Party, the Agent or any DIP Noteholder shall be effective to amend, modify or discharge any provision of this Agreement or any of the other DIP Note Documents

9.5     Costs and Expenses.   Any action taken by any Credit Party under or with respect to any DIP Note Document, even if required under any DIP Note Document or at the request of the Agent or Required DIP Noteholders, shall be at the expense of such Credit Party, and neither the Agent nor any other Secured Party shall be required under any DIP Note Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor.   In addition, the Issuers agree to pay or reimburse upon demand (a) the Agent and each DIP Noteholder for all reasonable and documented costs and out-of-pocket expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any DIP Note Document, any commitment or proposal letter therefor, the DIP Orders or any other motion or order in the Chapter 11 Cases, any other document prepared in connection therewith, the consummation and administration of any transaction contemplated therein, or its involvement and participation in the Chapter 11 Cases, in each case including the reasonable and documented out-of-pocket fees, disbursements and other charges of the DIP Noteholder Professionals and other Attorney Costs, and the cost of environmental audits, background checks and similar reasonable out-of-pocket expenses, to the extent permitted hereunder, and (b) the Agent and each DIP Noteholder for reasonable and documented out-of-pocket costs and out-of-pocket expenses (including the reasonable and documented out-of-pocket fees, disbursements and other charges of the DIP Noteholder Professionals and other Attorney Costs) incurred in connection with (i) its

KL2 3199266.14

involvement and participation in the Chapter 11 Cases, (ii) any refinancing or restructuring of the financing arrangements provided hereunder, (iii) the enforcement or preservation of any right or remedy under applicable law or under or with respect to any DIP Note Document, the DIP Orders, the Plan of Reorganization, any other motion or order in the Chapter 11 Cases, any Obligation, or the Collateral or (iv) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including the Chapter 11 Cases and any other bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, DIP Note Document, or Obligation; provided, that the Attorney Costs incurred by the Agent and the DIP Noteholders to be reimbursed hereunder shall be limited to the reasonable and documented out-of-pocket fees, disbursements and other charges of one legal counsel, one local counsel in each relevant jurisdiction, and one regulatory counsel, in each case, to the Agent and the DIP Noteholders, taken as a whole, and in the case of an actual or perceived conflict of interest, one additional legal counsel, one additional local counsel in each relevant jurisdiction and one additional regulatory counsel, in each case, to each group of affected DIP Noteholders, taken as a whole. For the avoidance of doubt, the Agent, the DIP Noteholders and their respective Related Persons shall only be entitled to reimbursement pursuant to this Section 9.5 of costs and expenses described above which are incurred by the Agent, the DIP Noteholders and their respective Related Persons in their capacities as such and not in their capacities as agent, noteholder or otherwise under the Second Lien Note Purchase Documents

     9.6    Indemnity.

        (a)    Each Credit Party agrees to indemnify, hold harmless and defend the Agent, each DIP Noteholder  and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all Liabilities (including brokerage commissions, fees and other compensation and Attorney Costs) that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person) in any matter relating to or arising out of, in connection with or as a result of (i) any DIP Note Document, the DIP Orders, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any DIP Note or other financial accommodation, any securities filing of, or with respect to, any Credit Party, or the Chapter 11 Cases, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors, whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise with respect to any DIP Note Document, the DIP Orders, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any DIP Note, any securities filing of, or with respect to, any Credit Party, any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation,

KL2 3199266.14

arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iv) the Chapter 11 Cases and the involvement and participation of any Indemnitee in the Chapter 11 Cases, and (v) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); provided, however, that no Credit Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted directly from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order; provided, further, that the Attorney Costs incurred by the Indemnitees and indemnified hereunder shall be limited to the reasonable and documented out-of-pocket fees, disbursements and other charges of one legal counsel, one local counsel in each relevant jurisdiction, and one regulatory counsel, in each case to the Indemnitees, taken as a whole, and in the case of an actual or perceived conflict of interest, one additional legal counsel, one additional local counsel in each relevant jurisdiction and one additional regulatory counsel, in each case to each group of affected Indemnitees, taken as a whole.  Furthermore, each Issuer and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.  This Section 9.6(a) shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.  No Credit Party shall be liable for any special, indirect, punitive, exemplary or consequential damages (other than in respect of any such damages of an Indemnitee required to be indemnified pursuant to the foregoing terms of this clause (a) or pursuant to the terms of any of the other DIP Note Documents). For the avoidance of doubt, each Indemnitee shall only be entitled to indemnification pursuant to this Section 9.6 in its capacities as agent, noteholder, and otherwise under this Agreement and not in its capacities as agent, noteholder or otherwise under the Second Lien Note Purchase Documents

(b)    Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any Property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Property or natural resource or any Property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by the Agent or following the Agent or any DIP Noteholder

70

having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

9.7     <u>Marshaling; Payments Set Aside</u>.  Except as provided in the DIP Orders, no Secured Party shall be under any obligation to marshal any Property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from an Issuer, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u> that any assignment by any DIP Noteholder shall be subject to the provisions of <u>Section 9.9</u>, and provided further that no Issuer may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agent and each DIP Noteholder.

9.9     <u>Binding Effect; Assignments and Participations</u>.

(a)     <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Parent, the Issuers, the other Credit Parties signatory hereto and the Agent and when the Agent shall have been notified by each DIP Noteholder that such DIP Noteholder has executed it.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, the Parent, the Issuers, the other Credit Parties hereto (in each case except for <u>Article VIII</u>), the Agent, each DIP Noteholder and, to the extent provided in <u>Section 8.11</u> or <u>Section 9.6</u>, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any DIP Note Document (including in <u>Section 8.9</u>), none of the Parent, any Issuer, any other Credit Party, or the Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)     <u>Right to Assign</u>.  Each DIP Noteholder may sell, transfer, negotiate or assign (a "<u>Sale</u>") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Notes) to:

(i)     any existing DIP Noteholder;

(ii)     any Affiliate or Approved Fund of any existing DIP Noteholder (other than a natural Person).

Any purported assignment or transfer by a DIP Noteholder of its rights or obligations under this Agreement and the other DIP Note Documents that does not comply with the terms hereof shall be treated for purposes of this Agreement as a sale by such DIP Noteholder of a participation of such rights and obligations in accordance with <u>Section 9.9(f)</u>, <u>provided</u> that such treatment shall not relieve any assigning DIP Noteholder from Liabilities arising as a consequence of its breach of this Agreement.

71

(c)    Procedure.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to the Agent an Assignment via an electronic settlement system designated by the Agent (or, if previously agreed with the Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing DIP Note subject to such Sale (or any affidavit of loss therefor acceptable to the Agent), any Tax forms required to be delivered pursuant to Section 10.1 and payment by the assigning DIP Noteholder of an assignment fee in the amount of $3,500 to the Agent, unless waived or reduced by the Agent, provided that (1) if a Sale by a DIP Noteholder is made to an Affiliate or an Approved Fund of such assigning DIP Noteholder, then no assignment fee shall be due in connection with such Sale, and (2) if a Sale by a DIP Noteholder is made to an assignee that is not an Affiliate or Approved Fund of such assignor DIP Noteholder, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one assignment fee of $3,500 (unless waived or reduced by the Agent) shall be due in connection with such Sale.  Upon receipt of all the foregoing, and conditioned upon such receipt, from and after the effective date specified in such Assignment, the Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)    Effectiveness.  Subject to the recording of an Assignment by the Agent in the Register pursuant to Section 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the DIP Note Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a DIP Noteholder, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the DIP Commitments and the payment in full of the Obligations) and be released from its obligations under the DIP Note Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning DIP Noteholder's rights and obligations under the DIP Note Documents, such DIP Noteholder shall cease to be a party hereto).

(e)    Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each DIP Noteholder may directly or indirectly grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the DIP Notes), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to the Agent or (B) any holder of, or trustee or agent for the benefit of the holders of, such DIP Noteholder's Indebtedness or equity securities, by notice to the Agent; provided, however, that no such holder, trustee or agent, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such DIP Noteholder hereunder and no such DIP Noteholder shall be relieved of any of its obligations hereunder.

(f)    Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each DIP Noteholder may, (x) with notice to the Agent, grant to an SPV the option to purchase all or any part of any DIP Note that such DIP Noteholder would otherwise be required to purchase hereunder (and the exercise of such option by such SPV and the purchasing of DIP Notes pursuant thereto shall satisfy the obligation of such DIP Noteholder to purchase such DIP

Notes hereunder) and such SPV may assign to such DIP Noteholder the right to receive payment with respect to any Obligation and (y) without notice to or consent from the Agent or the Issuers, sell participations to one or more Persons (other than a Credit Party or an Affiliate of a Credit Party or any other  Person that, directly or indirectly, owns Stock or Stock Equivalents of a Credit Party or an Affiliate of such a Person) all its rights and obligations with respect to the DIP Notes); provided, however, that, whether as a result of any term of any DIP Note Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to purchase the DIP Notes hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such DIP Noteholder hereunder, (ii) such DIP Noteholder's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such DIP Noteholder, under any DIP Note Document shall remain unchanged and each other party hereto shall continue to deal solely with such DIP Noteholder, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the tax forms such DIP Noteholder is required to collect pursuant to Section 10.1(g) and then only to the extent of any amount to which such DIP Noteholder would be entitled in the absence of any such grant or participation except to the extent such entitlement to receive a greater amount results from any change in, or in the interpretation of, any Requirement of Law that occurs after the date such grant or participation is made and (B) each such SPV may receive other payments that would otherwise be made to such DIP Noteholder with respect to Notes funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to the Agent by such SPV and such DIP Noteholder, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any DIP Note Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such DIP Noteholder's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any DIP Note Document or to exercise or refrain from exercising any powers or rights such DIP Noteholder may have under or in respect of the DIP Note Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of Section 9.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vi) of Section 9.1(a).  No party hereto shall institute (and each Issuer and the Parent shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each DIP Noteholder having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to be reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the termination of the DIP Commitments and the payment in full of the Obligations.  Each DIP Noteholder that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Issuers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the DIP Notes or other obligations under the DIP Note Documents (the "Participant Register"); provided that no DIP Noteholder shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any

73

information relating to a participant's interest in any commitments, Notes or its other obligations under any DIP Note Document) to any Person other than the Agent except to the extent that such disclosure is necessary to establish that such commitment, Note or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such DIP Noteholder shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Agent shall have no responsibility for maintaining a Participant Register.

       9.10    Non-Public Information; Confidentiality.

       (a)    Non-Public Information.  Each of the Agent and each DIP Noteholder acknowledges and agrees that it may receive material non-public information ("MNPI") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Law (including United States federal and state securities laws and regulations).

       (b)    Confidential Information.  Each of the Agent and each DIP Noteholder agrees to use commercially reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to or in connection with any DIP Note Document, except that such information may be disclosed (i) with the Issuer Representative's consent, (ii) to Related Persons of such DIP Noteholder or the Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 (including in the Chapter 11 Cases) or (B) available to such DIP Noteholder or the Agent or any of their Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority (including, without limitation, public disclosures by the Agent, DIP Noteholder or any of their Related Persons required by law, legal process (including, without limitation, subpoenas, requests for information, interrogatories and other similar process), the United States Securities and Exchange Commission, the Bankruptcy Court, or any other Governmental Authority) and, in such circumstances, the Agent, DIP Noteholder or Related Person shall use commercially reasonable efforts to limit such disclosure to that so requested or demanded, (v) to the extent necessary or customary for inclusion in league table measurements or other marketing or fund raising materials, (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees, financing sources, investors, SPVs (including the investors and prospective investors therein and financing sources therefor) or participants, Persons that hold a security interest in any DIP Noteholder's rights under this Agreement in accordance with Section 9.9(e) (and those Persons for whose benefit such holder of a security interest is acting), direct or contractual counterparties to any Rate Contract and to their respective Related Persons, in each case to the extent such assignees, investors, financing sources, participants, secured parties (and such benefited Persons), counterparties or Related Persons are advised of the confidential nature of such information and agree to be bound by provisions

KL2 3199266.14

substantially similar to the provisions of this <u>Section 9.10</u> (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto and any party to a First Lien Credit Facility Document, Second Lien Note Purchase Document or TopCo Note Purchase Document, and (ix) in connection with the exercise or enforcement of any right or remedy under any DIP Note Document, in connection with any litigation or other proceeding to which such DIP Noteholder or the Agent or any of their Related Persons is a party or bound (including the Chapter 11 Cases), or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a DIP Noteholder or the Agent or any of their Related Persons.  In addition, the Agent and the DIP Noteholders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agent and the DIP Noteholders in connection with the administration of this Agreement, the other DIP Note Documents, and the DIP Commitments.  In the event of any conflict between the terms of this <u>Section 9.10</u> and those of any other Contractual Obligation entered into with any Credit Party (whether or not a DIP Note Document), the terms of this <u>Section 9.10</u> shall govern.

(c)     <u>Tombstones</u>.  Each Credit Party consents to the publication by the Agent or any DIP Noteholder of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark.  The Agent or such DIP Noteholder shall provide a draft of any such press release, advertising or other promotional materials to the Issuer Representative for review and comment prior to the publication thereof.

(d)     <u>Press Release and Related Matters</u>.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party or the filing of this Agreement with the FCC (so long as information reflecting pricing is redacted) using the name, logo or otherwise referring to the Agent or of any of its Affiliates, the DIP Note Documents or any transaction contemplated herein or therein to which the Agent or any of its Affiliates is party without the prior written consent of the Agent or such Affiliate except to the extent required to do so under applicable Requirements of Law and then, only after consulting with the Agent or such Affiliate.

(e)     <u>Distribution of Materials to DIP Noteholders</u>.  The Credit Parties acknowledge and agree that the DIP Note Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "<u>Issuer Materials</u>") may be disseminated by, or on behalf of, the Agent, and made available, to the DIP Noteholders by posting such Issuer Materials on an E-System.  The Credit Parties authorize the Agent to download copies of their logos from its website and post copies thereof on an E-System.

9.11    <u>Set-off; Sharing of Payments</u>.

(a)     <u>Right of Setoff</u>.  To the extent permitted under the DIP Order, each of the Agent, each DIP Noteholder, and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by

each Credit Party), at any time and from time to time during the continuance of any Event of Default, to the fullest extent permitted by applicable Requirements of Law and notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by the Agent, such DIP Noteholder or any of their respective Affiliates to or for the credit or the account of the Issuers or any other Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any DIP Note Document with respect to such Obligation and even though such Obligation may be unmatured.  No DIP Noteholder shall exercise any such right of set off without the prior written consent of the Agent or Required DIP Noteholders.  Each of the Agent and each DIP Noteholder agrees promptly to notify the Issuer Representative and the Agent after any such setoff and application made by such DIP Noteholder or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that the Agent, the DIP Noteholders, their Affiliates and the other Secured Parties, may have.

(b)     Sharing of Payments, Etc.  If any DIP Noteholder, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such DIP Noteholder would have been entitled to receive if all payments had gone to, and been distributed by, the Agent in accordance with the provisions of the DIP Note Documents, such DIP Noteholder shall purchase for cash from other DIP Noteholders such participations in their Obligations as necessary for such DIP Noteholder to share such excess payment with such DIP Noteholders to ensure such payment is applied as though it had been received by the Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Issuers, applied to repay the Obligations in accordance herewith); provided, however, that (i) if such payment is rescinded or otherwise recovered from such DIP Noteholder in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such DIP Noteholder without interest and (ii) such DIP Noteholder shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such DIP Noteholder were the direct creditor of the applicable Credit Party in the amount of such participation.

9.12     Counterparts; Electronic Transmission.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13     Severability.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality

or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14    <u>Captions</u>.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    <u>Independence of Provisions</u>.  The parties hereto acknowledge that this Agreement and the other DIP Note Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    <u>Interpretation</u>.  This Agreement is the result of negotiations among and has been reviewed by counsel to the Credit Parties, the Agent, each DIP Noteholder and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other DIP Note Documents shall not be construed against the DIP Noteholders or the Agent merely because of the Agent's or DIP Noteholders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to the negotiation, execution and delivery of the DIP Note Documents.

9.17    <u>No Third Parties Benefited</u>.  This Agreement is made and entered into for the sole protection and legal benefit of the Issuers, the other Credit Parties, the Issuer Representative, the DIP Noteholders, the Agent and, subject to the provisions of <u>Section 8.11</u> and Section 9.6, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other DIP Note Documents.  Neither the Agent nor any DIP Noteholder shall have any obligation to any Person not a party to this Agreement or the other DIP Note Documents.

9.18    <u>Governing Law and Jurisdiction</u>.

(a)    <u>Governing Law</u>.  The laws of the State of New York (and to the extent applicable, the Bankruptcy Code) shall govern all matters arising out of, in connection with or relating to this Agreement, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

(b)    <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to any DIP Note Document shall be brought exclusively in the Bankruptcy Court, or to the extent that the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America sitting in the Southern District of New York and, by execution and delivery of this Agreement, each Issuer and each other Credit Party executing this Agreement hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts; <u>provided</u> that nothing in this Agreement shall limit the right of the Agent or the Required DIP

77

Noteholders, to the extent not prohibited by the Bankruptcy Court, to commence any proceeding in the federal or state courts of any other jurisdiction to the extent the Agent or the Required DIP Noteholders determines that such action is necessary or appropriate to exercise its rights or remedies under the DIP Note Documents. The parties hereto (and, to the extent set forth in any other DIP Note Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process. Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States with respect to or otherwise arising out of or in connection with any DIP Note Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Issuers specified herein (and shall be effective when such mailing shall be effective, as provided therein). Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Non-Exclusive Jurisdiction. Nothing contained in this Section 9.18 shall affect the right of the Agent or any DIP Noteholder to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

9.19    Waiver of Jury Trial. THE PARTIES HERETO, TO THE FULLEST EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER DIP NOTE DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20    Entire Agreement; Release; Survival.

(a)    THE DIP NOTE DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY DIP NOTEHOLDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER DIP NOTE DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER DIP NOTE DOCUMENTS OR SUCH TERMS OF SUCH OTHER DIP NOTE DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH

TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)      In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). Each Issuer and each other Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)      (i) Any indemnification or other protection provided to any Indemnitee pursuant to Article VIII (The Agent), Section 9.5 (Costs and Expenses), Section 9.6 (Indemnity), this Section 9.20, and Article X (Taxes, Yield Protection and Illegality) and (ii) the provisions of Section 8.1 of the Guaranty and Security Agreement, in each case, shall (x) survive the DIP Facility Discharge Date and (y) with respect to clause (i) above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    Patriot Act.  Each DIP Noteholder that is subject to the Patriot Act (and the Agent (for itself and not on behalf of any DIP Noteholder)) hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such DIP Noteholder or the Agent to identify each Credit Party in accordance with the Patriot Act.

9.22    Inconsistency.  To the extent of any direct conflict between the terms and conditions of this Agreement or any other DIP Note Document and any DIP Order, including, without limitation, the terms and conditions with respect to the payment of any amounts hereunder, the provisions of each such DIP Order shall govern and control.

9.23    Joint and Several.  The Obligations of the Credit Parties hereunder and under the other DIP Note Documents are joint and several.  Without limiting the generality of the foregoing, reference is hereby made to Article II of the Guaranty and Security Agreement, to which the obligations of the Issuers and the other Credit Parties are subject.

9.24    Creditor-Debtor Relationship.  The relationship between the Agent and each DIP Noteholder, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor.  No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any DIP Note Document or any transaction contemplated therein.

KL2 3199266.14

## ARTICLE X

## TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    <u>Taxes</u>.

(a)    Except as required by a Requirement of Law, each payment by any Credit Party under any DIP Note Document shall be made free and clear of all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or other Liabilities) with respect thereto (collectively, "<u>Taxes</u>").

(b)    If any Taxes shall be required by any Requirement of Law to be deducted from or in respect of any amount payable under any DIP Note Document to any Secured Party (i) if such Tax is an Indemnified Tax, such amount payable shall be increased as necessary to ensure that, after all required deductions for Indemnified Taxes are made (including deductions applicable to any increases to any amount under this <u>Section 10.1</u>), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Credit Party shall deliver to the Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to the Agent.

(c)    In addition, the Issuers agree to pay, and authorize the Agent to pay in their name, any stamp, documentary, excise or property Tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any DIP Note Document or any transaction contemplated therein (collectively, "<u>Other Taxes</u>").  Within 30 days after the date of any payment of Other Taxes by any Credit Party, the Issuers shall furnish to the Agent, at its address referred to in <u>Section 9.2</u>, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to the Agent.

(d)    [reserved].

(e)    The Issuers shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to the Agent), each Secured Party for all Indemnified Taxes (including any Indemnified Taxes imposed by any jurisdiction on amounts payable under this <u>Section 10.1</u>) paid or payable by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of the Agent on behalf of such Secured Party) claiming any compensation under this clause (e), setting forth the amounts to be paid thereunder and delivered to the Issuer Representative with copy to the Agent,

80

shall be conclusive, binding and final for all purposes, absent manifest error.   In determining such amount, the Agent and such Secured Party may use any reasonable averaging and attribution methods.

(f)       Any DIP Noteholder claiming any additional amounts payable pursuant to this Section 10.1 shall use its reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its DIP Noteholder Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such DIP Noteholder, be otherwise disadvantageous to such DIP Noteholder.

(g)       (i)       Each Non-U.S. DIP Noteholder Party that, at any of the following times, is entitled to an exemption from United States withholding Tax or, after a change in any Requirement of Law, is subject to such withholding Tax at a reduced rate under an applicable Tax treaty, shall (w) on or prior to the date such Non-U.S. DIP Noteholder Party becomes a "Non-U.S. DIP Noteholder Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by the Issuer Representative or the Agent (or, in the case of a participant or SPV, the relevant DIP Noteholder), provide the Agent and the Issuer Representative (or, in the case of a participant or SPV, the relevant DIP Noteholder) with two completed copies of each of the following, as applicable: (A) Forms W-8ECI (claiming exemption from U.S. withholding Tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (claiming exemption from, or a reduction of, U.S. withholding Tax) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. DIP Noteholder Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN or W-8BEN-E (claiming exemption from U.S. withholding Tax) or any successor form and a certificate in form and substance acceptable to the Agent that such Non-U.S. DIP Noteholder Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Issuers within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. DIP Noteholder Party to such exemption from United States withholding Tax or reduced rate with respect to all payments to be made to such Non-U.S. DIP Noteholder Party under the DIP Note Documents.  Unless the Issuer Representative and the Agent have received forms or other documents satisfactory to them indicating that payments under any DIP Note Document to or for a Non-U.S. DIP Noteholder Party are not subject to United States withholding Tax or are subject to such Tax at a rate reduced by an applicable Tax treaty, the Credit Parties and the Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(ii)       Each U.S. DIP Noteholder Party shall (A) on or prior to the date such U.S. DIP Noteholder Party becomes a "U.S. DIP Noteholder Party" hereunder, (B) on or prior to the date on which any such form or certification

81

expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (g) and (D) from time to time if requested by the Issuer Representative or the Agent (or, in the case of a participant or SPV, the relevant DIP Noteholder), provide the Agent and the Issuer Representative (or, in the case of a participant or SPV, the relevant DIP Noteholder) with two completed copies of Form W-9 (certifying that such U.S. DIP Noteholder Party is entitled to an exemption from U.S. backup withholding Tax) or any successor form.

(iii)    Each DIP Noteholder having sold a participation in any of its Obligations or identified an SPV as such to the Agent shall collect from such participant or SPV the documents described in this clause (g) and provide them to the Agent.

(iv)    If a payment made to a Non-U.S. DIP Noteholder Party would be subject to United States federal withholding Tax imposed by FATCA if such Non-U.S. DIP Noteholder Party fails to comply with the applicable reporting requirements of FATCA, such Non-U.S. DIP Noteholder Party shall deliver to the Agent and the Issuer Representative any documentation under any Requirement of Law or reasonably requested by the Agent or the Issuer Representative sufficient for the Agent or the Issuers to comply with their obligations under FATCA and to determine that such Non-U.S. DIP Noteholder Party has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for the purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    If any Secured Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 10.1 (including by the payment of additional amounts pursuant to Section 10.1(b)), it shall pay to the relevant Credit Party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 10.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Secured Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such Credit Party, upon the request of such Secured Party, shall repay to such Secured Party the amount paid over pursuant to this Section 10.1(h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Secured Party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 10.1(h), in no event shall the Secured Party be required to pay any amount to a Credit Party pursuant to this Section 10.1(h) the payment of which would place the Secured Party in a less favorable net after-Tax position than the Secured Party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 10.1(h) shall not be construed to require any Secured Party to make available its Tax returns (or

82

any other information relating to its Taxes that it deems confidential) to the Credit Parties or any other Person.

10.2    <u>Illegality</u>.

(a)    If after the date hereof any DIP Noteholder shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental Authority has asserted that it is unlawful, for any DIP Noteholder or its DIP Noteholder Office to purchase LIBOR Rate DIP Notes, then, on notice thereof by such DIP Noteholder to the Issuers through the Agent, the obligation of that DIP Noteholder to purchase LIBOR Rate DIP Notes shall be suspended until such DIP Noteholder shall have notified the Agent and the Issuer Representative that the circumstances giving rise to such determination no longer exists.

(b)    Subject to clause (d) below, if any DIP Noteholder shall determine that it is unlawful to maintain any LIBOR Rate DIP Notes, the Issuers shall prepay in full all LIBOR Rate DIP Notes of such DIP Noteholder then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such DIP Noteholder may lawfully continue to maintain such LIBOR Rate DIP Notes to such day, or immediately, if such DIP Noteholder may not lawfully continue to maintain such LIBOR Rate DIP Notes, together with any amounts required to be paid in connection therewith pursuant to <u>Section 10.4</u>.

(c)    If the obligation of any DIP Noteholder to make or maintain LIBOR Rate DIP Notes has been terminated, the Issuer Representative may elect, by giving notice to such DIP Noteholder and the Agent that all DIP Notes which would otherwise be LIBOR Rate DIP Notes shall be instead Base Rate DIP Notes.

(d)    Before giving any notice to the Agent pursuant to this <u>Section 10.2</u>, the affected DIP Noteholder shall designate a different DIP Noteholder Office with respect to its LIBOR Rate DIP Notes if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the DIP Noteholder, be illegal or otherwise disadvantageous to the DIP Noteholder.

10.3    <u>Increased Costs and Reduction of Return</u>.

(a)    If any DIP Noteholder shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any Requirement of Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, (x) there shall be any increase in the cost to such DIP Noteholder of agreeing to purchase or purchasing or maintaining any LIBOR Rate DIP Notes or (y) the DIP Noteholder shall be subject to any Taxes (other than (A) Indemnified Taxes governed by <u>Section 10.1</u>, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Notes principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital or liquidity attributable thereto, then the Issuers shall be liable for, and shall from time to time, within five (5) days of demand therefor by such DIP Noteholder (with a

copy of such demand to the Agent), pay to such DIP Noteholder, additional amounts as are sufficient to compensate such DIP Noteholder for such increased costs or such Taxes; provided, that the Issuers shall not be required to compensate any DIP Noteholder pursuant to this Section 10.3(a) for any increased costs incurred more than 180 days prior to the date that such DIP Noteholder notifies the Issuer Representative, in writing of the increased costs and of such DIP Noteholder's intention to claim compensation thereof; provided, further, that if the circumstance giving rise to such increased costs is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)    If any DIP Noteholder shall have determined that:

(i)    the introduction of any Capital Adequacy Regulation;

(ii)    any change in any Capital Adequacy Regulation;

(iii)    any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)    compliance by such DIP Noteholder (or its DIP Noteholder Office) or any entity controlling the DIP Noteholder, with any Capital Adequacy Regulation;

affects the amount of capital or liquidity required or expected to be maintained by such DIP Noteholder or any entity controlling such DIP Noteholder and (taking into consideration such DIP Noteholder's or such entities' policies with respect to capital adequacy and liquidity and such DIP Noteholder's desired return on capital) determines that the amount of such capital or liquidity is increased as a consequence of its Commitment(s), Note(s), credits or obligations under this Agreement, then, within five (5) days of demand of such DIP Noteholder (with a copy to the Agent), the Issuers shall pay to such DIP Noteholder, from time to time as specified by such DIP Noteholder, additional amounts sufficient to compensate such DIP Noteholder (or the entity controlling the DIP Noteholder) for such increase; provided, that the Issuers shall not be required to compensate any DIP Noteholder pursuant to this Section 10.3(b) for any amounts incurred more than 180 days prior to the date that such DIP Noteholder notifies the Issuer Representative, in writing of the amounts and of such DIP Noteholder's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)    Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case in respect of this clause (ii) pursuant to Basel III, shall, in each case, be deemed to be a change in a Requirement of Law under Section 10.3(a) above and/or a change in a Capital Adequacy Regulation under Section 10.3(b) above, as applicable, regardless of the date enacted, adopted or issued.

10.4     Funding Losses.  The Issuers agree to reimburse each DIP Noteholder and to hold each DIP Noteholder harmless from any loss or expense which such DIP Noteholder may sustain or incur as a consequence of:

(a)     the failure of the Issuers to make any payment or mandatory prepayment of principal of any LIBOR Rate DIP Note (including payments made after any acceleration thereof) when due;

(b)     the failure of the Issuers to issue, continue or convert a DIP Note after the Issuer Representative has given (or is deemed to have given) a Notice of Issuance or a Notice of Conversion/Continuation;

(c)     the prepayment (including pursuant to Section 1.8) of a LIBOR Rate DIP Note on a day which is not the last day of the Interest Period with respect thereto; or

(d)     the conversion pursuant to Section 1.1(c) or Section 1.5 of any LIBOR Rate DIP Note to a Base Rate DIP Note on a day that is not the last day of the applicable Interest Period;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain its LIBOR Rate DIP Notes hereunder or from fees payable to terminate the deposits from which such funds were obtained; provided that, with respect to the expenses described in clauses (d) and (e) above, such DIP Noteholder shall have notified the Agent of any such expense within two (2) Business Days of the date on which such expense was incurred.  Solely for purposes of calculating amounts payable by the Issuers to the DIP Noteholders under this Section 10.4 and under Section 10.3(a): each LIBOR Rate DIP Note purchased by a DIP Noteholder (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at the LIBOR rate used in determining the interest rate for such LIBOR Rate DIP Note by a matching deposit or other borrowing in the interbank Eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate DIP Note is in fact so funded.

10.5     Inability to Determine Rates.

(a)     If the Agent shall have determined in good faith that for any reason adequate and reasonable means do not exist for ascertaining LIBOR for any requested Interest Period with respect to a proposed LIBOR Rate DIP Note or that LIBOR applicable pursuant to Section 1.3(a) for any requested Interest Period with respect to a proposed LIBOR Rate DIP Notes does not adequately and fairly reflect the cost to the DIP Noteholders of funding or maintaining such DIP Note, the Agent will forthwith give notice of such determination to the Issuer Representative and each DIP Noteholder.  Thereafter, the obligation of the DIP Noteholders to purchase or hold LIBOR Rate DIP Notes hereunder shall be suspended until the Agent revokes such notice in writing.  Upon receipt of such notice, the Issuer Representative may revoke any Notice of Issuance or Notice of Conversion/Continuation then submitted by it.  If the Issuer Representative does not revoke such notice, the DIP Noteholders shall make, convert or continue the DIP Notes, as proposed by the Issuer Representative, in the amount specified in the applicable

85

notice submitted by the Issuer Representative, but such DIP Notes shall be made, converted or continued as Base Rate DIP Notes.

(b)    If at any time the Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in subparagraph (a) of this Section 10.5 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in subparagraph (a) of this Section 10.5 have not arisen but the supervisor for the administrator of LIBOR or a Governmental Authority having jurisdiction over the Agent has made a public statement identifying a specific date after which LIBOR shall no longer be used for determining interest rates for loans (in the case of either such clause (i) or (ii), an "Alternative Interest Rate Election Event"), the Agent and the Issuer Representative shall endeavor to establish an alternate rate of interest to LIBOR that gives due consideration to the then prevailing market convention for determining a rate of interest for leveraged syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable.  Notwithstanding anything to the contrary in Section 9.1, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Agent and the Issuer Representative shall not have received, within five (5) Business Days after the date notice of such alternate rate of interest is provided to the DIP Noteholders, a written notice from Required DIP Noteholders stating that they object to such amendment (which amendment shall not be effective prior to the end of such five (5) Business Day notice period).  To the extent an alternate rate of interest is adopted as contemplated hereby, the approved rate shall be applied in a manner consistent with prevailing market convention as reasonably determined by the Agent and the Issuer Representative; provided that, to the extent such prevailing market convention is not administratively feasible for the Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Agent and the Issuer Representative.  From such time as an Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of interest has been determined in accordance with the terms and conditions of this paragraph, (x) any Notice of Conversion/Continuation that requests the conversion of any DIP Notes to, or continuation of any DIP Note as, a LIBOR Rate DIP Note shall be ineffective, and (y) if any Notice of Issuance requests a LIBOR Rate DIP Note, such DIP Note shall be issued as a Base Rate DIP Note; provided that, to the extent such Alternative Interest Rate Election Event is as a result of clause (ii) above in this subparagraph (b), then clauses (x) and (y) of this sentence shall  apply during such period only if LIBOR for such Interest Period is not available or published at such time on a current basis.  Notwithstanding anything contained herein to the contrary, if such alternate rate of interest as determined in this subparagraph (b) is determined to be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

10.6    Reserves on LIBOR Rate DIP Notes.  The Issuers shall pay to each DIP Noteholder, as long as such DIP Noteholder shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional costs on the unpaid principal amount of each LIBOR Rate DIP Notes equal to actual costs of such reserves allocated to such DIP Note by such DIP Noteholder (as determined by such DIP Noteholder in good faith, which determination shall be conclusive absent manifest error), payable on each date on which interest is payable on such DIP Note provided the Issuer Representative shall have received at least

five (5) days' prior written notice (with a copy to the Agent) of such additional interest from the DIP Noteholder. If a DIP Noteholder fails to give notice five (5) days prior to the relevant Interest Payment Date, such additional interest shall be payable five (5) days from receipt of such notice.

10.7   <u>Certificates of DIP Noteholders</u>. Any DIP Noteholder claiming reimbursement or compensation pursuant to this Article X shall deliver to the Issuer Representative (with a copy to the Agent) a certificate setting forth in reasonable detail the amount payable to such DIP Noteholder hereunder and such certificate shall be conclusive and binding on the Issuers in the absence of manifest error.

ARTICLE XI

DEFINITIONS

11.1   <u>Defined Terms</u>. The following terms have the following meanings:

"<u>Acquisition</u>" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Target, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of an Issuer, or (c) a merger or consolidation or any other combination with another Person.

"<u>Agent</u>" means ICG Debt Admin, in its capacity as agent for the DIP Noteholders hereunder, and any successor agent for the DIP Noteholders hereunder.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; <u>provided</u>, <u>however</u>, that no Secured Party nor any of its Affiliates shall be considered an Affiliate of any Credit Party or of any Subsidiary of any Credit Party under any of the DIP Note Documents. For purposes of this definition, "control" means the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the voting Stock of such Person (either directly or through the ownership of Stock Equivalents) or (b) the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Aggregate DIP Commitment</u>" means the combined DIP Commitments of the DIP Noteholders, which shall initially be in the amount of $20,000,000.

"<u>Alpha LLC</u>" shall have the meaning provided in the Preamble.

"<u>Alpha 3E</u>" shall have the meaning provided in the Preamble.

"<u>Alternative Interest Rate Election Event</u>" shall have the meaning provided in <u>Section 10.5</u>.

87

"<u>Applicable Margin</u>" means for (i) each Base Rate DIP Note, 5.00% per annum and (ii) each LIBOR Rate DIP Note, 6.00% per annum.

"<u>Approved Budget</u>" has the meaning specified in <u>Section 4.2(k)</u>.

"<u>Approved Budget Update</u>" has the meaning specified in <u>Section 4.2(k)</u>.

"<u>Approved Fund</u>" means, with respect to any DIP Noteholder, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans, debt securities and other similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any DIP Noteholder or any Person described in clause (i) above, (b) is advised or managed by (i) such DIP Noteholder, (ii) any Affiliate of such DIP Noteholder or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such DIP Noteholder and (c) any limited partner of, or investor in, such DIP Noteholder or any Affiliate of such limited partner or investor.

"<u>Assignment</u>" means an assignment agreement entered into by a DIP Noteholder, as assignor, and any Person, as assignee, pursuant to the terms and provisions of <u>Section 9.9</u> (with the consent of any party whose consent is required by <u>Section 9.9</u>), accepted by the Agent, substantially in the form of <u>Exhibit 9.9</u> or any other form approved by the Agent.

"<u>Attorney Costs</u>" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"<u>Authorized Officers</u>" means the Responsible Officers set forth on <u>Schedule 3.31</u>.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom,  Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as now and hereafter in effect, or any successor statute, as applicable to the Chapter 11 Cases.

"<u>Bankruptcy Court</u>" shall have the meaning provided in the Recitals and also shall include any appellate court having jurisdiction over the Chapter 11 Cases from time to time.

"<u>Bankruptcy Events</u>" means (a) the filing of the Chapter 11 Cases (and any defaults under the First Lien Credit Facility Documents, the Second Lien Note Purchase Documents, or the TopCo Note Purchase Documents, so long as the exercise of remedies as a result of such defaults

are stayed under the Bankruptcy Code), (b) the events and conditions that occurred prior to the Petition Date and that were the direct cause of the bankruptcy filings by the Debtors, or (c) the actions required to be taken by the Credit Parties pursuant to the DIP Note Documents, the DIP Order or any other order of the Bankruptcy Court.

"Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the sum of (i) LIBOR (as determined pursuant to the definition of LIBOR), for an Interest Period of one (1) month commencing on such day plus (ii) 1.00%, in each instance as of such date of determination.  For purposes hereof: "Prime Rate" means, at any time, the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. If multiple Prime Rates are quoted in the Money Rates Section of the Wall Street Journal, then the highest Prime Rate will be the Prime Rate hereunder; and "Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published on the next succeeding Business Day, the average of the quotations for the day of such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.  If for any reason the Agent shall have determined (which determination shall be conclusive in the absence of manifest error) (A) that it is unable to ascertain the Federal Funds Effective Rate, for any reason, including the inability or failure of the Agent to obtain sufficient quotations in accordance with the terms above or (B) that the Prime Rate or LIBOR no longer accurately reflects an accurate determination of the prevailing Prime Rate or LIBOR, the Agent may select a reasonably comparable index or source to use as the basis for the Base Rate, until the circumstances giving rise to such inability no longer exist.  Any change in the Base Rate due to a change in any of the foregoing will become effective on the effective date of such change in the Federal Funds Effective Rate, the Prime Rate or LIBOR for an Interest Period of one (1) month.  Notwithstanding anything contained herein to the contrary, to the extent that the provisions of Section 10.5 shall be in effect in determining LIBOR pursuant to clause (c) hereof, the Base Rate shall be the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%.  In no event, shall the Base Rate be less than 2.00%.

"Base Rate DIP Note" means a DIP Note that bears interest based on the Base Rate.

"Benefit Plan" means any employee benefit plan (other than a Multiemployer Plan) as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"Budget Permitted Variances" has the meaning specified in Section 5.23.

"Budget Test Date" means each day on which a Budget Variance Report is delivered or required to be delivered in accordance with Section 4.2(l).

"Budget Test Period" has the meaning specified in Section 4.2(k).

"Budget Update" has the meaning specified in Section 4.2(k).

"Budget Variance Report" has the meaning specified in Section 4.2(l).

"Business" means the radio broadcasting and media business of the Credit Parties.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts or New York, New York are authorized or required by law to close; provided, however, that when used in connection with a rate determination, Issuance or payment in respect of a LIBOR Rate DIP Note, the term "Business Day" shall also exclude any day on which banks in London, England are not open for dealings in Dollar deposits in the London interbank market.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy or liquidity of any DIP Noteholder or of any corporation controlling a DIP Noteholder.

"Capital Expenditures" means all expenditures of the Credit Parties and their Subsidiaries on a consolidated basis for such period that in accordance with GAAP would be classified as capital expenditures, including, without limitation, Capital Lease Obligations. The term "Capital Expenditures" shall not include (a) Net Proceeds from Dispositions applied toward the purchase of any Property or expenditures made in accordance with Section 1.8(b) and (b) all insurance proceeds and condemnation awards received on account of any Event of Loss to the extent any such amounts are actually applied to replace, repair or reconstruct the damaged Property or Property affected by the condemnation or taking in connection with such Event of Loss in accordance with Section 1.8(b).

"Capital Lease" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, any Property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"Capital Lease Obligations" means, at any time, with respect to any Capital Lease, any lease entered into as part of any sale leaseback transaction of any Person or any synthetic lease, the amount of all obligations of such Person that is (or that would be, if such synthetic lease or other lease were accounted for as a Capital Lease) capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"Carve-Out" has the meaning specified for such term in the DIP Interim Order or, when applicable, the DIP Final Order.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government,

KL2 3199266.14

any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any DIP Noteholder or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"Cash Management Order" means an order entered by the Bankruptcy Court, which shall be in form and substance acceptable to the Agent and the Required DIP Noteholders and consistent in all respects with the Restructuring Support Agreement and the Plan of Reorganization, and which, among other things, (a) authorizes and approves the Debtors' use of its existing cash management systems, (b) authorizes the Debtors to use existing bank accounts, (c) authorizes the payment of fees, expenses and other charges in connection with Cash Management Services, whether arising pre-petition or post-petition, in the ordinary course, and (d) waives certain requirements of Section 345(b) of the Bankruptcy Code.

"Cash Shortfall" means, as of any date of determination, an amount (if positive) equal to $5,000,000 minus the aggregate amount of all Unrestricted Cash of the Credit Parties as of such date.

"Cash Shortfall Trigger" means any date after the Effective Date on which a Cash Shortfall exists.

"CFO Certificate" shall have the meaning provided in Section 4.2(j).

"Change of Control" means the occurrence of any of the following:

       (a)     [reserved];

       (b)     TopCo ceases to own one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of the Parent; or

       (c)     the Parent ceases to own one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of Alpha LLC; or

       (d)     the Parent ceases to own one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of Alpha 3E; or

91

(e)      one hundred percent (100%) of the issued and outstanding Stock and Stock Equivalents of any License Subsidiary ceases to be owned by an Issuer;

in each case, free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, other than Liens in favor of the Agent, for the benefit of the Secured Parties.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means the "DIP Collateral" (as defined in the DIP Interim Order and, when applicable, the DIP Final Order).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Communications Laws" means the Communications Act of 1934, as amended (the "Communications Act"), and the rules, orders, regulations and other applicable requirements of the FCC (including without limitation the FCC's rules, regulations and policies relating to the operation of radio broadcasting stations).

"Compliance Certificate" shall have the meaning provided in Section 4.2.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan of Reorganization for each of the Debtors, which shall be in form and substance satisfactory to the Agent and the Required DIP Noteholders in their sole discretion and shall be consistent in all material respects with the Restructuring Support Agreement and the Plan of Reorganization.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes.

"Contingent Obligation" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person:  (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guarantied or otherwise supported or, if not a fixed and determined amount, the maximum amount so guarantied or supported.

"Contractual Obligations" means, as to any Person, any provision of any security (whether in the nature of Stock, Stock Equivalents or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or

agreement (other than a DIP Note Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"Conversion Date" means any date on which the Issuers convert a Base Rate DIP Note to a LIBOR Rate DIP Note or a LIBOR Rate DIP Note to a Base Rate DIP Note.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"COVID-19" means SARS-CoV-2 or COVID-19, any evolutions or mutations thereof or related or associated epidemics, pandemics or disease outbreaks and any future epidemics, pandemics or disease outbreaks.

"Credit Parties" means TopCo, the Parent, each Issuer and each other Person (a) which executes a guaranty of the Obligations and (b) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations.

"Default" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"DIP Budget" means a rolling 13-week cash flow forecast setting forth all forecasted receipts and disbursements of the Issuers and their consolidated Subsidiaries on a consolidated basis for such period, reflecting such cash flow forecasts on a weekly basis.

"DIP Collateral Documents" means, collectively, the DIP Interim Order and, when applicable, the DIP Final Order, the Guaranty and Security Agreement, and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party or any other Person pledging or granting a lien on Collateral or guarantying the payment and performance of the Obligations, and any DIP Noteholder or the Agent for the benefit of the Agent, the DIP Noteholders and other Secured Parties now or hereafter delivered to the DIP Noteholders or the Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any DIP Noteholder or the Agent for the benefit of the Agent, the DIP Noteholders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"DIP Commitment" shall have the meaning provided in Section 1.1(a).

"DIP Commitment Percentage" means, as to any DIP Noteholder, the percentage equivalent of such DIP Noteholder's DIP Commitment divided by the Aggregate DIP Commitment; provided that following acceleration of the DIP Notes, such term means, as to any DIP Noteholder, the percentage equivalent of the principal amount of the DIP Notes held by such

DIP Noteholder, divided by the aggregate principal amount of the DIP Notes held by all DIP Noteholders.

"DIP Facility" has the meaning provided in the Recitals.

"DIP Facility Discharge Date" means the date on which (a) all DIP Notes and all other Obligations (other than contingent Obligations as to which no claim has been asserted) under the DIP Note Documents and all Obligations that the Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable have been paid and satisfied in full in cash and (b) there shall have been deposited cash collateral with respect to all contingent Obligations in amounts and on terms and conditions and with parties satisfactory to the Agent, and each Indemnitee that is, or may be, owed such Obligations (excluding contingent Obligations as to which no claim has been asserted).

"DIP Facility Termination Date" shall mean the earliest to occur of (a) the DIP Maturity Date, (b) the consummation of a sale of all or substantially all of the Credit Parties' assets, (c) the effective date of the Plan of Reorganization or any other plan of reorganization in respect of the Debtors, (d) the date that is forty-five (45) days after the Petition Date if the DIP Final Order and the Confirmation Order have not been entered by the Bankruptcy Court by such date, and (e) the date the Obligations are accelerated pursuant to Section 7.2.

"DIP Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent and the Required DIP Noteholders in all respects in their reasonable discretion, and which shall be  substantially in the form of the DIP Interim Order with such changes approved by the Agent and the Required DIP Noteholders in their reasonable discretion, and which shall be consistent with the Restructuring Support Agreement in all respects, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Agent in its sole discretion, which, among other matters but not by way of limitation, authorizes the Credit Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other DIP Note Documents, as the case may be, and provides for the super-priority of the Agent's and the DIP Note Holder's claims.

"DIP Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Agent and each DIP Noteholder in its reasonable discretion, and which shall be substantially in the form attached hereto as Exhibit 11.1(a), and shall be consistent in all material respects with the Restructuring Support Agreement and the Plan of Reorganization.

"DIP Maturity Date" means the nine month anniversary of the Petition Date; provided that if the FCC has failed to approve (and has not disapproved or rejected) the change of ownership

described in the FCC Interim Long Form Application by such date, the DIP Maturity Date shall be automatically extended until thirty (30) days after the earlier of (i) the date the FCC approves such change of ownership or (ii) the date the FCC denies or rejects such change of ownership; provided further, that in no event shall the DIP Maturity Date be extended past December 31, 2021.

"DIP Note" means the promissory note of the Issuers payable to a DIP Noteholder referred to in Section 1.1(a), in substantially the form of Exhibit 1.2(a) hereto, evidencing the Indebtedness of the Issuers to such DIP Noteholder resulting from the financial accommodations made to the Issuers by such DIP Noteholder or its predecessor(s) and "DIP Notes" means all such notes.

"DIP Note Documents" means this Agreement, the DIP Notes, the DIP Collateral Documents, the DIP Orders, and all documents delivered to the Agent and/or any DIP Noteholder in connection with any of the foregoing.

"DIP Note Purchase Date" has the meaning provided in Section 1.1(c).

"DIP Noteholder" means, at any time, each Person that is a holder of a DIP Note or a DIP Commitment at such time.

"DIP Noteholder Office" means, with respect to any DIP Noteholder, the office or offices of such DIP Noteholder as it may from time to time notify the Issuer.

"DIP Noteholder Professionals" means Kramer Levin Naftalis & Frankel LLP, McGuire Woods LLP, Fletcher Heald & Hildreth, PLC, and GLC Advisors & Co., and, to the extent the Required DIP Noteholders deem it necessary or advisable, one local counsel to the DIP Noteholders and the Agent, taken as a whole, in each relevant jurisdiction.

"DIP Order" means, as applicable, and as the context may require, (i) either the DIP Interim Order or the DIP Final Order, whichever is then in effect or (ii) both the DIP Interim Order and the DIP Final Order.

"Disclosure Statement" shall mean a disclosure statement for the Plan of Reorganization acceptable to the DIP Noteholders (and with respect to those provisions thereof that affect the rights and duties of the Agent, to the Agent) which shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion and shall be consistent in all material respects with the Restructuring Support Agreement and the Plan of Reorganization.

"Disposition" means (a) the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under Section 5.2(a), 5.2(c), 5.2(d) or 5.2(g), and (b) the sale or transfer by an Issuer or any Subsidiary of an Issuer of any Stock or Stock Equivalent issued by any Subsidiary of an Issuer and held by such transferor Person.

"Disqualified Stock" means any Stock or Stock Equivalent which, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days following the latest maturity date of any Indebtedness under this Agreement or the TopCo Note Purchase Documents

(excluding any provisions requiring redemption upon a "change of control" or similar event; provided that such "change of control" or similar event results in the prior payment in full in cash of the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted), the termination of all commitments to lend hereunder and the termination of this Agreement), (b) is convertible into or exchangeable for (i) debt securities or (ii) any Stock or Stock Equivalents referred to in (a) above, in each case, at any time on or prior to the date that is ninety-one (91) days following the DIP Maturity Date, or (c) is entitled to receive scheduled dividends or distributions in cash prior to the time that the Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) are paid in full in cash.

"Division" means, in reference to any Person which is an entity, the division of such Person into two (2) or more separate Persons, with the dividing Person either continuing or terminating its existence as part of such division, including as contemplated under Section 18-217 of the Delaware Limited Liability Company Act for limited liability companies formed under Delaware law, or any analogous action taken pursuant to any other applicable law with respect to any corporation, limited liability company, partnership or other entity.

"Dollars", "dollars" and "$" each mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" shall mean the date on which the conditions specified in Section 2.1 shall have been satisfied or waived by the DIP Noteholders.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System.

"Environmental Laws" means all Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the

workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"Environmental Liabilities" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and Attorneys' Costs) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means any of the following:  (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation 4043, Section 4043(c) of ERISA) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a Lien under Section 430 of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; (j) a Title IV plan is in "at risk" status within the meaning of Code Section 430(i); (k) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; (l) a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA involving a Benefit Plan; (m) there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or the filing of any request for, or receipt of, a minimum funding waiver under Section 412 of the Code with respect to any Title IV Plan or Multiemployer Plan, or that such filing may be made; and (n) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or

97

Multiemployer Plan or for the imposition of any liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 7.1.

"Event of Loss" means, with respect to any Property, any of the following:  (a) any loss, destruction or damage of such Property; or (b) any condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"Excluded Property" means, collectively, (i) any "intent to use" Trademark applications for which a statement of use has not been filed and accepted with the U.S. Patent and Trademark Office or any Intellectual Property to the extent, if any, that, and solely during the period, if any, in which, the grant of a Lien on or security interest in such Intellectual Property would impair the validity or enforceability of such trademark and intent-to-use trademark application under applicable federal law, (ii) FCC Licenses to the extent not permitted to be encumbered as a matter of any applicable Requirements of Law, and (iii) any other asset if the pledge of such asset or the grant of  a security interest therein is prohibited by applicable Requirements of Law other than to the extent such prohibition is rendered ineffective under or by virtue of the UCC, the DIP Order or other applicable Requirements of Law.  The term "Excluded Property" shall not include any proceeds, products, substitutions or replacements of Excluded Property (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Property).

"Excluded Tax" means with respect to any Secured Party:  (a) Taxes measured by net income (including branch profit Taxes) and franchise Taxes imposed in lieu of net income Taxes, in each case (i) imposed on any Secured Party as a result of being organized under the laws of, or having its principal office or, in the case of any DIP Noteholder, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision  thereof) or (ii) that are Other Connection Taxes; (b) withholding Taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a Secured Party under this Agreement in the capacity under which such Person makes a claim under Section 10.1(b) or designates a new DIP Noteholder Office, except in each case to the extent such Person is a direct or indirect assignee of any other Secured Party that was or, in the case of a designation of new DIP Noteholder Office, such Person was entitled, at the time the assignment to such Person became effective or at the time of such designation, as applicable, to receive additional amounts under Section 10.1(b); (c) Taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by any Secured Party to deliver the documentation required to be delivered pursuant to Section 10.1(g); and (d) any United States federal withholding Taxes imposed under FATCA.

"Exit Note Purchase Agreement" means the $37,500,000 Note Purchase Agreement to be entered into on the Plan Effective Date by and among the Issuers, as issuers, the other Credit Parties, ICG Debt Administration LLC, as agent, and the DIP Noteholders, as noteholders, consistent with the terms and conditions of the term sheet attached as Exhibit E to the Restructuring

Support Agreement or such other terms and conditions mutually acceptable to the Issuers and ICG Debt Administration LLC, as agent.

"E-Fax" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system approved by the Agent, including Syndtrak®, Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"FATCA" means Sections 1471, 1472, 1473 and 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury Regulations promulgated thereunder and published guidance with respect thereto, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements with respect thereto.

"FCC" means the Federal Communications Commission, and any successor agency of the United States Government exercising substantially equivalent powers.

"FCC Consent" means, with respect to any Acquisition  pursuant to which a Credit Party intends to acquire one or more FCC Licenses or control of a Person holding one or more FCC Licenses, the consent of the FCC to the assignment or transfer of control of each such FCC License to the applicable Credit Party.

"FCC Interim Long Form Application" shall have the meaning provided in Section 4.19(d).

 "FCC Licenses" means any permit, license, authorization, approval, entitlement or accreditation granted or issued by the FCC that may be used by any Credit Party pursuant to the Communications Laws including, without limitation, for the operation of the Stations operated by the Issuers and their Subsidiaries.

"FCC Rules" means the Communications Act, the rules and regulations established by the FCC and codified in Title 47 of the Code of Federal Regulations, as the same may be modified or amended from time to time hereafter, and effective orders, rulings, written policies and public notices of the FCC.

"FCC Short Form Application" shall have the meaning provided in Section 4.19(b).

"Federal Flood Insurance" means federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"FEMA" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"First Lien Adequate Protection" means, collectively, the First Lien Adequate Protection Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Payments, and any other adequate protection granted to the First Lien Lenders pursuant to the DIP Orders.

"First Lien Adequate Protection Claims" has the meaning provided in the applicable DIP Order.

"First Lien Adequate Protection Liens" has the meaning provided in the applicable DIP Order.

"First Lien Adequate Protection Payments" mean the interest, fees, costs and expenses specified in the DIP Order to be paid at the times specified in the DIP Order to the First Lien Agent and the First Lien Lenders during the pendency of the Chapter 11 Cases.

"First Lien Agent" means DBD AMAC LLC (as successor to Antares Capital LP), together with its successors and permitted assigns.

"First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of February 25, 2016, by and among Issuers, First Lien Agent and the other financial institutions from time to time party thereto, as may be amended, restated, replaced, refinanced and/or modified from time to time in accordance with the terms of the Second Lien Intercreditor Agreement.

"First Lien Credit Facility Documents" means the First Lien Credit Agreement and the "Loan Documents" (or equivalent successor term) as defined in the First Lien Credit Agreement, as any of the foregoing may be amended, restated and/or modified from time to time in accordance with the terms of the Second Lien Intercreditor Agreement.

"First Lien Lenders" means the lenders party to the First Lien Credit Agreement.

"First Lien Prepetition Obligations" shall mean the "Obligations" (as defined in the First Lien Credit Agreement) incurred under the First Lien Credit Facility Documents prior to the Petition Date.

"Fiscal Quarter" means any of the quarterly accounting periods of the Credit Parties ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Credit Parties ending on December 31 of each year.

"Flood Insurance" means, for any Material Real Property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance reasonably satisfactory to the Agent, in either case, that (a) meets the requirements set forth by FEMA in its *Mandatory Purchase of Flood*

*Insurance Guidelines*, (b) shall include a deductible not to exceed $50,000 and (c) shall have a coverage amount equal to the lesser of (i) the "replacement cost value" of the buildings and any personal property Collateral located on the Real Estate as determined under the National Flood Insurance Program or (ii) the maximum policy limits set under the National Flood Insurance Program.

"Foreign Ownership Impediment" has the meaning ascribed thereto in the Restructuring Support Agreement.

"Foreign Subsidiary" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the  statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination.  Subject to Section 11.3, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements described in Section 3.11(a).

"Governmental Authority" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Guarantor" means any Person that has guaranteed any Obligations, which shall include as of the Effective Date, the Parent.

"Guaranty and Security Agreement" means that certain Guaranty and Security Agreement, dated as of even date herewith, in form and substance reasonably acceptable to the Agent and the Issuers, made by the Credit Parties in favor of the Agent, for the benefit of the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"Hazardous Material" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"Indebtedness" of any Person means, without duplication: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services, including earnouts (other than trade payables entered into in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment

obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations (excluding all obligations of such Person required under GAAP to be booked as liabilities on the balance sheet of such Person arising from either the amount of the leases relative to the value of the underlying assets, the term of the underlying ground leases relative to the term of the tower lease, or rent amounts in excess of "market" rents under lease agreements entered into in connection with the sale leaseback transactions consummated as part of the Vertical Bridge Transaction, which such obligations (and corresponding lease agreements) are specifically set forth in that certain Master Site Use Agreement dated November 3, 2015, by and among VBA II, LLC, a Delaware limited liability company, and VBA II, LLC, a Florida limited liability company, and Alpha LLC and Alpha 3E and certain of its Subsidiaries (as amended prior to and on the Effective Date and in effect on the Effective Date), but solely to the extent such Person has elected to treat the corresponding leases as operating leases and, accordingly, has not capitalized any amounts related to such leases and has treated all expenses related to such leases as operating expenses; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations of such Person, whether or not contingent, in respect of Disqualified Stock, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) obligations under any Rate Contract; (j) all indebtedness referred to in clauses (a) through (i) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (k) all Contingent Obligations described in clause (a) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above.

"ICG Debt Admin" shall have the meaning provided in the Preamble.

"Indemnified Matters" shall have the meaning provided in Section 9.6.

"Indemnified Tax" means (a) any Tax other than an Excluded Tax and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" shall have the meaning provided in Section 9.6.

"Initial Approved Budget" has the meaning specified in Section 2.1(g)(i).

"Insolvency Proceeding" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement

in respect of its creditors generally or any substantial portion of its creditors; in each case in (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"<u>Intellectual Property</u>" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Software, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"<u>Interest Payment Date</u>" means, (a) with respect to any LIBOR Rate DIP Note, the last day of each Interest Period applicable to such DIP Note, and (b) with respect to any Base Rate DIP Note, the last day of each calendar month.

"<u>Interest Period</u>" means, with respect to any LIBOR Rate DIP Note, the period commencing on the Business Day such DIP Note is disbursed or continued or on the Conversion Date on which a Base Rate DIP Note is converted to a LIBOR Rate DIP Note and ending on the date one month thereafter; <u>provided</u> that:

(a)     if any Interest Period pertaining to a LIBOR Rate DIP Note would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period pertaining to a LIBOR Rate DIP Note that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     no Interest Period for a DIP Note or any portion thereof shall extend beyond the last scheduled payment date therefor; and

(d)     no Interest Period applicable to a DIP Note or portion thereof shall extend beyond any date upon which is due any scheduled principal payment in respect of the DIP Notes unless the aggregate principal amount of DIP Notes represented by Base Rate DIP Notes or by LIBOR Rate DIP Notes having Interest Periods that will expire on or before such date is equal to or in excess of the amount of such principal payment.

"<u>Internet Domain Name</u>" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"<u>Investments</u>" shall have the meaning provided in <u>Section 5.4</u>.

"<u>IP Ancillary Rights</u>" means, with respect to any Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation,

103

dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"IP License" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"IRS" means the Internal Revenue Service of the United States and any successor thereto.

"Issuance" means an issuance hereunder consisting of DIP Notes purchased from the Issuers on the same day by the DIP Noteholders pursuant to Article I.

"Issuer" and "Issuers" shall have the meaning provided in the Preamble.

"Issuer Representative" shall have the meaning provided in Section 1.12.

"Junior Financing" shall have the meaning provided in Section 5.15(a).

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses  (including those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and reasonable fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"LIBOR" means, for any LIBOR Rate DIP Note for any Interest Period therefor, the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR01 Page (or the applicable successor page) as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period.  If no such offered rate exists, such rate will be the rate of interest per annum, as determined by the Agent at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to the Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.  Notwithstanding the foregoing, for purposes of this Agreement for any DIP Note, LIBOR shall in no event be less than 1.00% at any time.

"LIBOR Rate DIP Note" means a DIP Note (or any one or more portions thereof) that bears interest based on LIBOR.

"License Subsidiary" means any special purpose Subsidiary of an Issuer that (i) observes all corporate formalities, maintains separate books and records, does not commingle assets with any affiliate, holds no assets other than the FCC Licenses, and has no financial obligations other than to (A) the Agent and DIP Noteholders as a guarantor, (B) the First Lien Agent and the First Lien Lenders as a guarantor, and (C) the Second Lien Agent and the Second Lien Noteholders as a guarantor, (ii) is a guarantor upon or prior to the time of acquiring any FCC License or is a

104

guarantor on the Effective Date or becomes a guarantor thereafter and (iii) has granted a Lien in its assets to (A) the Agent pursuant to the DIP Note Documents, (B) the First Lien Agent pursuant to the First Lien Credit Facility Documents, and (C) the Second Lien Agent pursuant to the Second Lien Note Purchase Documents, in each case, to the extent permitted under the Communications Laws.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease or any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"LMA" means any joint sales agreement, time brokerage agreement, local marketing or management agreement or similar arrangement, agreement or understanding for substantially all of the time on a broadcast station to which an Issuer or any Subsidiary thereof is a party.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse effect on (a) the condition (financial or otherwise), business, liabilities (actual and contingent), results of operations, operations or Property of the Credit Parties, taken as a whole; (b) the ability of any Credit Party to perform its obligations under any DIP Note Document to which it is a party; or (c) the validity or enforceability of any DIP Note Document or the rights and remedies of the Administrative Agent, the Lenders and the other Secured Parties under any DIP Note Document; provided that none of (i) the Bankruptcy Events or (ii) the effects of COVID-19 prior to or after the Petition Date or the impacts thereof prior to or after the Petition Date on the business, financial condition or results of operations of the Credit Parties, taken as a whole, shall constitute a "Material Adverse Effect" for any purpose.

"Material Environmental Liabilities" means Environmental Liabilities exceeding $300,000 in the aggregate.

"Material Real Property" means all fee-owned real property having a fair market value equal to or greater than $3,000,000.

"Maximum Lawful Rate" shall have the meaning provided in Section 1.3(d).

"Milestones" shall have the meaning provided in Section 4.19.

"Modifying Agreement" shall have the meaning provided in Section 4.19.

"Moody's" means Moody's Investors Service, Inc.

"Most Recent Pro Forma Financial Statements" shall have the meaning provided in Section 2.1(n).

"<u>Multiemployer Plan</u>" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"<u>National Flood Insurance Program</u>" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"<u>Net Issuance Proceeds</u>" means, in respect of any issuance of equity or incurrence of Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of customary underwriting discounts and other reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of an Issuer.

"<u>Net Proceeds</u>" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition (including, without limitation, reasonable legal, accounting and investment banking fees reasonably incurred but excluding amounts payable to an Issuer or any Affiliate of an Issuer), (ii) sale, use or other transaction Taxes paid or payable as a result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness (other than the Obligations, Indebtedness under the First Lien Credit Facility Documents, obligations under the TopCo Note Purchase Documents and Indebtedness owing to any Credit Party) secured by a Permitted Lien ranking senior to any Lien of the Agent on the asset which is the subject of such Disposition, and (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the direct costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments, including amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness (other than the Obligations, Indebtedness under the First Lien Credit Facility Documents, obligations under the TopCo Note Purchase Documents and Indebtedness owing to any Credit Party) secured by a Permitted Lien ranking senior to any Lien of the Agent on the asset which is the subject of such Event of Loss.

"<u>Non-U.S. DIP Noteholder Party</u>" means each of the Agent, each DIP Noteholder, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"<u>Notice of Conversion / Continuation</u>" means a notice given by the Issuer Representative to the Agent and each DIP Noteholder pursuant to <u>Section 1.5</u>, in substantially the form of <u>Exhibit 1.5</u> hereto.

"Notice of Issuance" means a notice given by the Issuer Representative to the Agent and each DIP Noteholder pursuant to Section 1.1(c), in substantially the form of Exhibit 1.5 hereto.

"Obligations" means all DIP Notes, principal, interest and fees (including interest and fees that accrue after the commencement by or against any Credit Party of any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding), expenses and indemnities and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any DIP Noteholder, the Agent, or any other Person required to be indemnified, that arises under any DIP Note Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. For the avoidance of doubt, the "Obligations" do not include any Obligations (as defined in the Second Lien Note Purchase Agreement).

"OFAC" shall have the meaning provided in Section 3.27.

"Ordinary Course of Business" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any DIP Note Document.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Other Connection Taxes" means, with respect to any Secured Party, Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Tax, other than any such connection arising solely from the Secured Party having executed, delivered, become a party to, performed its obligations or received a payment under, received or perfected as a security interest under, engaged in any other transaction pursuant to or enforced any DIP Note Document, or sold or assigned an interest in any DIP Note or Note Document.

"Other Taxes" shall have the meaning provided in Section 10.1(c).

"Parent" shall have the meaning provided in the Recitals.

"Participant Register" shall have the meaning provided in Section 9.9(f).

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"<u>Patriot Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"<u>PBGC</u>" means the United States Pension Benefit Guaranty Corporation or any successor thereto.

"<u>Permits</u>" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, including, without limitation, the FCC, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Permitted Investors</u>" means Stephens Radio LLC, Endeavour Associates Fund V, L.P., Endeavour Capital Fund V AIV, L.P., Breakwater Broadcasting Funding, LLC, MCC Radio, LLC, Lawrence R. Wilson and Rio Bravo Enterprise Associates, L.P.

"<u>Permitted Liens</u>" shall have the meaning provided in <u>Section 5.1</u>.

"<u>Permitted Reinvestment</u>" means, with respect to the Net Proceeds of any Disposition or Event of Loss, to acquire (or make Capital Expenditures to finance the acquisition, repair, improvement or construction of), to the extent otherwise permitted hereunder, capital assets useful in the business of an Issuer or any Credit Party (other than the Parent) (including through a permitted Investment) or, in the case of an Event of Loss that involves loss or damage to property, to repair such loss or damage.

"<u>Person</u>" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"<u>Petition Date</u>" shall have the meaning provided in the Recitals.

"<u>Plan Effective Date</u>" means the date on which all of the conditions precedent to the effectiveness of the Plan of Reorganization are satisfied or waived pursuant to the terms thereof.

"<u>Plan of Reorganization</u>" shall mean the chapter 11 plan of reorganization for each of the Debtors, substantially in the form attached as an Exhibit to the Restructuring Support Agreement, and which shall otherwise be (i) in form and substance satisfactory to the Agent and the Required DIP Noteholders in their reasonable discretion and (ii) consistent in all material respects with the Restructuring Support Agreement.

"<u>PPP Loans</u>" means loans provided to any Credit Party pursuant to the Small Business Administration's Paycheck Protection Program established pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act signed into law on March 27, 2020, as amended, or any substantially similar program sponsored by any Governmental Authority, including, without limitation, the Consolidated Appropriations Act, 2021 which was signed into law of December 27, 2020.

"Prepetition Debt" means any secured or unsecured Indebtedness incurred by any Debtor prior to the Petition Date.

"Prepetition Permitted Liens" means valid, properly perfected, enforceable and unavoidable Liens on Collateral existing as of the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code.

"Prepetition Prior Liens" shall have the meaning set forth in the DIP Orders.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"PUC" means any public utility commission, public service commission or similar regulatory body with jurisdiction over the Business.

"Rate Contracts" means, with respect to any Person, any agreement entered into to protect such Person against fluctuations in interest rates, or currency or raw materials values, including, without limitation, any interest rate swap, cap or collar agreement or similar arrangement between such Person and one or more counterparties, any foreign currency exchange agreement, currency protection agreements, commodity purchase or option agreements or other interest or exchange rate hedging agreements.

"Real Estate" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"Register" shall have the meaning provided in Section 1.4.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each partner (general and limited), member, equity owner, director, officer, employee, agent, trustee, representative, attorney, accountant and other consultants of such Person or any of its Affiliates.

"Releases" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"Remedial Action" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"Required DIP Noteholders" means at any time either (i) Intermediate Capital Group PLC and the DIP Noteholders that are Affiliates of Intermediate Capital Group PLC, taken as a whole or (ii) DIP Noteholders (which must include those referred to in clause (i)) then holding more than fifty percent (50%) of the sum of the Aggregate DIP Commitments then in effect plus the aggregate unpaid principal balance of the DIP Notes then outstanding.

KL2 3199266.14

"<u>Requirement of Law</u>" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, chairman, chief financial officer or the president of an Issuer or the Issuer Representative, as applicable, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of an Issuer or the Issuer Representative, as applicable, or any other officer having substantially the same authority and responsibility.

"<u>Restricted Cash</u>" means any cash of the Credit Parties that is contractually required to be set aside, segregated or otherwise reserved, including all cash posted to support letters of credit, performance bonds or other similar obligations, provided that any cash and Cash Equivalents that is set aside, segregated or otherwise reserved for the benefit of, or is subject to any Lien in favor of, any of the Agent, the First Lien Agent, the Second Lien Agent, the Secured Parties (as defined in the First Lien Credit Facility Documents), the Secured Parties (as defined in the Second Lien Note Purchase Agreement), or the Secured Parties shall not be Restricted Cash.

"<u>Restricted Payments</u>" shall have the meaning provided in <u>Section 5.11</u>.

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement, dated as of January [__], 2021, among the Debtors, the Second Lien Agent, the Second Lien Noteholders party thereto, and the TopCo Noteholders party thereto.

"<u>S&P</u>" means Standard & Poor's Rating Services.

"<u>Sale</u>" shall have the meaning provided in <u>Section 9.9(b)</u>.

"<u>SDN List</u>" shall have the meaning provided in <u>Section 3.27</u>.

"<u>Second Lien Adequate Protection</u>" means, collectively, the Second Lien Adequate Protection Claims, the Second Lien Adequate Protection Liens, and the Second Lien Adequate Protection Payments.

"<u>Second Lien Adequate Protection Claims</u>" has the meaning provided in the applicable DIP Order.

"<u>Second Lien Adequate Protection Liens</u>" has the meaning provided in the applicable DIP Order.

"Second Lien Adequate Protection Payments" mean the fees, costs and expenses specified in the DIP Order to be paid at the times specified in the DIP Order to the Second Lien Agent and the Second Lien Noteholders during the pendency of the Chapter 11 Cases.

"Second Lien Agent" means ICG Debt Administration LLC in its capacity as agent under the Second Lien Note Purchase Agreement.

"Second Lien Intercreditor Agreement" means that certain Second Lien Intercreditor Agreement, dated as of February 25, 2016, by and among the First Lien Agent, the Second Lien Agent and the Credit Parties, as may be amended, restated and/or modified from time to time in accordance with the terms thereof.

"Second Lien Noteholders" means the holders of the notes issued under the Second Lien Note Purchase Agreement.

"Second Lien Note Purchase Agreement" means that certain Second Lien Note Purchase Agreement, dated as of February 25, 2016, by and among the Issuers, the Second Lien Agent, and the other financial institutions from time to time party thereto, as amended, restated, replaced, refinanced and/or modified from time to time.

"Second Lien Note Purchase Documents" means the Second Lien Note Purchase Agreement and the "Note Documents" (or equivalent successor term) as defined in the Second Lien Note  Purchase Agreement, as any of the foregoing may be amended, restated and/or modified from time to time.

"Second Lien Prepetition Obligations" shall mean the "Obligations" (as defined in the Second Lien Note Purchase Agreement) incurred under the Second Lien Note Purchase Documents prior to the Petition Date.

"Secured Party" means the Agent, each DIP Noteholder, each other Indemnitee and each other holder of any Obligation of a Credit Party.

"Software" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"SPV" means any special purpose funding vehicle identified as such in a writing by any DIP Noteholder to the Agent.

"SSA" means a shared services agreement or similar arrangement or understanding whereby a station's programming time and/or advertising availabilities, in each case up to but not exceeding fifteen percent (15%) of such programming time and/or advertising time, are made available to a party unaffiliated with the owner of such station or its Affiliates, in exchange for compensation. SSAs may also involve the provision to such station of non-programming services

111

including technical, general and administrative, sales, facilities, promotion, marketing, legal and engineering.

"Station" means any broadcasting station now or hereafter owned or operated by a Credit Party.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Subordinated Indebtedness" means the Indebtedness of any Credit Party or any Subsidiary of any Credit Party which is subordinated to the Obligations as to right and time of payment, and having such subordination and other terms as are, in each case, reasonably satisfactory to the Agent and the Required DIP Noteholders.

"Subsidiary" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than fifty percent (50%) of the voting Stock is, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"Superpriority Claim" shall mean a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against a Debtor in any of the Chapter 11 Cases having priority over any or all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against a Debtor or its estate, including claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546, 552(b), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.  Superpriority Claims shall, at all times, be junior to the Carve Out.

"Target" means any Person or business unit, asset group, segment, line of business of division of, or assets constituting any business unit, asset group, segment, line of business or division of any Person acquired or proposed to be acquired in an Acquisition.

"Taxes" shall have the meaning provided in Section 10.1(a).

"Tax Affiliate" means, (a) the Issuers and their respective Subsidiaries, (b) each other Credit Party and (c) any Affiliate of an Issuer with which such Issuer files or is eligible to file consolidated, combined or unitary Tax returns.

"Title IV Plan" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"TopCo" shall have the meaning provided in the Recitals.

"TopCo Note Purchase Agreement" means that certain Note and Warrant Purchase Agreement, dated as of February 25, 2016, by and among TopCo, and the financial institutions from time to time party thereto, as amended, restated, replaced, refinanced and/or modified from time to time.

"TopCo Note Purchase Documents" means the TopCo Note Purchase Agreement and the "Note Documents" (or equivalent successor term) as defined in the TopCo Note Purchase Agreement, as any of the foregoing may be amended, restated and/or modified from time to time.

"TopCo Noteholders" means the noteholders party to the TopCo Note Purchase Agreement.

"Trade Secrets" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"Trademark" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"UCC" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" and "U.S." each means the United States of America.

"Unrestricted Cash" means, as of any date of measurement, cash and Cash Equivalents (other than Restricted Cash) of the Credit Parties on deposit that is readily available to the Credit Parties for expenditure in accordance with or as permitted by the DIP Orders without causing any material adverse tax consequences.

"U.S. DIP Noteholder Party" means each of the Agent, each DIP Noteholder, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"Vertical Bridge Transaction" means the Disposition by a Credit Party or any of its Subsidiaries of one or more towers and/or transmitters and owned or leased Real Estate associated with the towers and/or transmitters pursuant to the Vertical Bridge Transaction Documents.

"Vertical Bridge Transaction Documents" means (a) that certain Asset Purchase Agreement, dated October 14, 2015, between VBA II, LLC, a Delaware limited liability company, and Alpha LLC with respect to the 64 sites described therein and (b) the Asset Purchase Agreement, dated February 25, 2016, between VBA II, LLC, a Florida limited liability company, and Alpha LLC with respect to the 50 sites described therein, as in effect on the Effective Date.[2]

"Weekly Reporting Date" shall have the meaning provided in Section 4.2(i).

"Wholly-Owned Subsidiary" of a Person means any Subsidiary of such Person, all of the Stock and Stock Equivalents of which (other than directors' qualifying shares required by law) are owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

"Working Capital" means, as of any date of measurement, the excess of (a) current assets (excluding cash and Cash Equivalents) of the Credit Parties and their Subsidiaries on a consolidated basis as of such date, minus (b) current liabilities (excluding the current portion of long term Indebtedness) of the Credit Parties and their Subsidiaries on a consolidated basis as of such date of determination, all as determined in accordance with GAAP.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

11.2    Other Interpretive Provisions.

(a)    Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other DIP Note Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural

---

[2] NTD: Issuers to confirm if this continues to be relevant

forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)      <u>The Agreement</u>.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other DIP Note Document shall refer to this Agreement or such other DIP Note Document as a whole and not to any particular provision of this Agreement or such other DIP Note Document; and subsection, section, schedule and exhibit references are to this Agreement or such other DIP Note Documents unless otherwise specified.

(c)      <u>Certain Common Terms</u>.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)      <u>Performance; Time</u>.      Whenever any performance obligation hereunder or under any other DIP Note Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."  All references to the time of day shall be a reference to New York City time.  If any provision of this Agreement or any other DIP Note Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)      <u>Contracts</u>.  Unless otherwise expressly provided herein or in any other DIP Note Document, references to agreements and other contractual instruments, including this Agreement and the other DIP Note Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any DIP Note Document.

(f)      <u>Laws</u>.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation

(g)      <u>Recitals</u>.  The Recitals are incorporated into and shall be considered part of this Agreement.

11.3    <u>Accounting Terms and Principles</u>.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial

statement hereafter adopted by the Parent or any Subsidiary of Parent shall be given effect for purposes of measuring compliance with any provision of <u>Article IV</u>, <u>Article V</u> or <u>Article VI</u> unless the Issuers, the Agent and the Required DIP Noteholders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in <u>Article IV</u>, <u>Article V</u> and <u>Article VI</u> shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other Liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value." A breach of a financial covenant contained in Article VI shall be deemed to have occurred as of any date of determination by the Agent or the Required DIP Noteholders or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to the Agent and the DIP Noteholders.

11.4    <u>Payments</u>. The Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party. Any such determination or redetermination by the Agent shall be conclusive and binding for all purposes, absent manifest error. No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than the Agent and its Related Persons) under any DIP Note Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted. The Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

11.5    <u>Divisions</u>. For all purposes under the DIP Note Documents, in connection with any Division: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Stock at such time.

11.6    <u>Bail-In</u>. Notwithstanding anything to the contrary in any DIP Note Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any DIP Note Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

116

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

11.7      Certain Representations of the DIP Noteholders.  Each DIP Noteholder represents and warrants on the Effective Date that it:

(a)      is a sophisticated investor with respect to the transactions contemplated by this Agreement with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in the DIP Notes, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement;

(b)      is an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended);

(c)      is acquiring the DIP Notes for its own account and not with a view to the distribution thereof in violation of applicable securities laws;

(d)      is able to bear the economic risk of holding the DIP Notes for an indefinite period and is able to afford the complete loss of its investment in any or all the DIP Notes;

(e)      has received and reviewed all information and documents about or pertaining to the Credit Parties and their respective organizational documents, the business and prospects and the issuance of the DIP Notes, as it deems necessary or desirable;

(f)      has been given the opportunity to obtain any additional information or documents and to ask questions and receive answers about any or all of the foregoing, as applicable, as it deems necessary or desirable to evaluate the merits and risks related to its investment in the DIP Notes;

(g)      is not relying on the Credit Parties or any of their Affiliates, employees, agents or advisors for legal, regulatory, tax, financial, accounting or other advice with respect to an investment in the DIP Notes and as made its own independent decision that the investment in the DIP Notes is suitable and appropriate;

(h)      acknowledges that the DIP Notes will be "restricted securities" under applicable federal securities laws and may be disposed of only pursuant to an effective registration statement or an exemption therefrom and understands the limitations on transfer of the DIP Notes imposed by United States federal and state securities laws;

(i)      acknowledges that none of the Credit Parties or any of their Affiliates will have any obligation to register any of the DIP Notes for resale under applicable securities laws; and

(j)      acknowledges that any certificate representing the DIP Notes may bear customary restrictive legends, and that a notation may be made in the appropriate books and records of the Issuers indicating that the DIP Notes are subject to restrictions on transfer.

[Balance of page intentionally left blank; signature pages follow]

118

## **Exhibit B**

**DIP Guaranty Agreement**

*SUBJECT TO FRE 408 AND SIMILAR RULES*
*KL NOTEHOLDER DRAFT*
*JANUARY 22, 2020*

DIP FACILITY

GUARANTY AND SECURITY AGREEMENT

Dated as of January [__], 2021

among

ALPHA MEDIA LLC,

ALPHA 3E CORPORATION,

ALPHA MEDIA HOLDINGS LLC,

each other Grantor
from time to time party hereto

and

ICG DEBT ADMINISTRATION LLC,
as the Agent for all DIP Noteholders

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS ................................................................................. 1

    Section 1.1    Definitions.................................................................................. 1
    Section 1.2    Certain Other Terms ................................................................. 3
    Section 1.3    Interpretation............................................................................ 3

ARTICLE II GUARANTY........................................................................................ 4

    Section 2.1    Guaranty.................................................................................... 4
    Section 2.2    Limitation of Guaranty ............................................................ 4
    Section 2.3    Contribution ............................................................................. 4
    Section 2.4    Authorization; Other Agreements ............................................ 4
    Section 2.5    Guaranty Absolute and Unconditional..................................... 5
    Section 2.6    Waivers ..................................................................................... 6
    Section 2.7    Reliance .................................................................................... 6

ARTICLE III GRANT OF SECURITY INTEREST ................................................ 7

    Section 3.1    Collateral................................................................................... 7
    Section 3.2    Grant of Security Interest in Collateral .................................... 7

ARTICLE IV REPRESENTATIONS AND WARRANTIES ................................... 8

    Section 4.1    Title; No Other Liens ............................................................... 8
    Section 4.2    Perfection and Priority ............................................................. 8
    Section 4.3    Locations of Inventory, Equipment and Books and Records ................... 9
    Section 4.4    Pledged Collateral.................................................................... 9
    Section 4.5    Instruments and Tangible Chattel Paper Formerly Accounts .................. 9
    Section 4.6    Intellectual Property................................................................. 9
    Section 4.7    Commercial Tort Claims......................................................... 10
    Section 4.8    Specific Collateral.................................................................. 10
    Section 4.9    Enforcement............................................................................ 10

ARTICLE V COVENANTS..................................................................................... 10

    Section 5.1    Maintenance of Perfected Security Interest; Further Documentation
                and Consents ........................................................................... 10
    Section 5.2    Changes in Locations, Name, Etc. .......................................... 11
    Section 5.3    Pledged Collateral.................................................................. 11
    Section 5.4    Accounts ................................................................................. 12
    Section 5.5    Commodity Contracts ............................................................. 12
    Section 5.6    Delivery of Instruments and Tangible Chattel Paper and Control of
                Investment Property, Letter-of-Credit Rights and Electronic
                Chattel Paper .......................................................................... 12
    Section 5.7    Intellectual Property............................................................... 13
    Section 5.8    Notices .................................................................................... 14
    Section 5.9    Notice of Commercial Tort Claims......................................... 14

ARTICLE VI REMEDIAL PROVISIONS ................................................................ 15

    Section 6.1    Code and Other Remedies ....................................................... 15
    Section 6.2    Accounts and Payments in Respect of General Intangibles...................... 18
    Section 6.3    Pledged Collateral .................................................................. 19
    Section 6.4    Proceeds to be Turned over to and Held by Agent .................................. 20
    Section 6.5    Sale of Pledged Collateral......................................................... 20
    Section 6.6    FCC Licenses ........................................................................ 21
    Section 6.7    Deficiency ............................................................................ 23

ARTICLE VII AGENT.............................................................................................. 23

    Section 7.1    Agent's Appointment as Attorney-in-Fact............................................ 23
    Section 7.2    Authorization to File Financing Statements ............................. 25
    Section 7.3    Authority of Agent................................................................. 25
    Section 7.4    Duty; Obligations and Liabilities............................................. 25

ARTICLE VIII MISCELLANEOUS .......................................................................... 26

    Section 8.1    Reinstatement........................................................................ 26
    Section 8.2    Release of Collateral ............................................................. 26
    Section 8.3    Independent Obligations ......................................................... 27
    Section 8.4    No Waiver by Course of Conduct............................................ 27
    Section 8.5    Amendments in Writing.......................................................... 27
    Section 8.6    Additional Grantors; Additional Pledged Collateral................................ 28
    Section 8.7    Notices ................................................................................ 28
    Section 8.8    Successors and Assigns.......................................................... 28
    Section 8.9    Counterparts ......................................................................... 28
    Section 8.10    Severability ......................................................................... 28
    Section 8.11    Governing Law .................................................................... 28
    Section 8.12    Waiver of Jury Trial............................................................. 28
    Section 8.13    Subordination of Intercompany Debt........................................ 29

KL2 3201551.4

ANNEXES AND SCHEDULES

Annex 1          Form of Pledge Amendment
Annex 2          Form of Joinder Agreement
Annex 3          Form of Intellectual Property Security Agreement

Schedule 1       Commercial Tort Claims
Schedule 2       Filings
Schedule 3       Location of Inventory and Equipment
Schedule 4       Pledged Collateral
Schedule 5       Intellectual Property

KL2 3201551.4

**DIP FACILITY GUARANTY AND SECURITY AGREEMENT**, dated as of January [__], 2021 (this "<u>Agreement</u>"), by Alpha Media LLC ("<u>Alpha LLC</u>"), Alpha 3E Corporation ("<u>Alpha 3E</u>" and, together with Alpha LLC, the "<u>Issuers</u>"), Alpha Media Holdings LLC ("<u>TopCo</u>"),  and each of the other entities listed on the signature pages hereof or that becomes a party hereto pursuant to <u>Section 8.6</u> (together with the Issuers, the "<u>Grantors</u>" and each, a "<u>Grantor</u>"), in favor of ICG Debt Administration LLC, a Delaware limited liability company ("<u>ICG Debt Admin</u>"), as the Agent for the DIP Noteholders and each other Secured Party (as defined in the DIP Note Purchase Agreement defined below) (in such capacity, together with its successors and permitted assigns, "<u>Agent</u>").

W I T N E S S E T H :

WHEREAS, pursuant to the $20,000,000 Senior Secured Priming Superpriority Debtor-In-Possession Note Purchase Agreement, dated as of the date hereof (as the same may be amended, restated, supplemented and/or modified from time to time, the "<u>DIP Note Purchase Agreement</u>"), by and among the Issuers, Alpha LLC, as Issuer Representative, the other Credit Parties party thereto, Agent and the DIP Noteholders from time to time party thereto, the DIP Noteholders have severally agreed to purchase certain note securities issued by the Issuers upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor that is a Guarantor has agreed to guarantee the Obligations of the Issuers;

WHEREAS, each Grantor has agreed to grant security interests in the Collateral to secure the Obligations;

WHEREAS, each Grantor will derive substantial direct and indirect benefits from the DIP Noteholders' purchase of the DIP Notes issued by the Issuers under the DIP Note Purchase Agreement; and

WHEREAS, it is a condition precedent to the effectiveness of the DIP Note Purchase Agreement and to the obligation of the DIP Noteholders to purchase DIP Notes under the DIP Note Purchase Agreement that the Grantors shall have executed and delivered this Agreement to Agent.

NOW, THEREFORE, in consideration of the premises and to induce the DIP Noteholders and Agent to enter into the DIP Note Purchase Agreement and to induce the DIP Noteholders to purchase the DIP Notes thereunder, each Grantor hereby agrees with Agent as follows:

ARTICLE I

DEFINED TERMS

Section 1.1     Definitions.

(a)     Capitalized terms used herein without definition are used as defined in the DIP Note Purchase Agreement.

(b)      The following terms have the meanings given to them in the UCC and terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC (such meanings to be equally applicable to both the singular and plural forms of the terms defined): "account", "account debtor", "as-extracted collateral", "certificated security", "chattel paper", "commercial tort claim", "commodity contract", "deposit account", "electronic chattel paper", "equipment", "farm products", "fixture", "general intangible", "goods", "health-care-insurance receivable", "instruments", "inventory", "investment property", "letter-of-credit right", "money", "proceeds", "record", "securities account", "security", "supporting obligation" and "tangible chattel paper".

(c)      The following terms shall have the following meanings:

"Agreement" means this DIP Facility Guaranty and Security Agreement.

"Applicable IP Office" means the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency within or outside the United States.

"Collateral" has the meaning set forth in Section 3.1.

"Excluded Property" has the meaning ascribed thereto in the DIP Note Purchase Agreement.

"Fraudulent Transfer Laws" has the meaning set forth in Section 2.2.

"Guaranteed Obligations" has the meaning set forth in Section 2.1.

"Guarantor" means each Grantor, including each Issuer with respect to the obligations of the other Issuer.

"Guaranty" means the guarantee of the Guaranteed Obligations made by the Guarantors as set forth in this Agreement.

"Intercompany Debt" has the meaning set forth in Section 8.13.

"Material Intellectual Property" means Intellectual Property that is owned by or licensed to a Grantor and material to the conduct of the Grantors' collective business.

"Pledge Amendment" has the meaning set forth in Section 8.6(b).

"Pledged Certificated Stock" means all certificated securities owned by any Grantor, including all Stock and Stock Equivalents listed on Schedule 4.

"Pledged Collateral" means, collectively, the Pledged Stock and the Pledged Debt Instruments.

"Pledged Debt Instruments" means all right, title and interest of any Grantor in instruments evidencing any Indebtedness owed to such Grantor or other obligations owed to such Grantor, including all Indebtedness described on Schedule 4, issued by the obligors named therein.

2

"<u>Pledged Investment Property</u>" means any investment property of any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, other than any Pledged Stock or Pledged Debt Instruments.

"<u>Pledged Stock</u>" means all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"<u>Pledged Uncertificated Stock</u>" means any Stock or Stock Equivalent of any Person that is not Pledged Certificated Stock, including all right, title and interest of any Grantor as a limited or general partner in any partnership not constituting Pledged Certificated Stock or as a member of any limited liability company, all right, title and interest of any Grantor in, to and under any Organization Document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including in each case those interests set forth on <u>Schedule 4</u>, to the extent such interests are not certificated securities.

"<u>Secured Obligations</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Software</u>" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"<u>UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York; <u>provided</u>, <u>however</u>, that, in the event that, by reason of mandatory provisions of any applicable Requirement of Law, any of the attachment, perfection or priority of Agent's or any other Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "<u>UCC</u>" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

"<u>Vehicles</u>" means all vehicles covered by a certificate of title law of any state.

Section 1.2    <u>Certain Other Terms</u>.

References herein to an Annex, Schedule, Article, Section or clause refer to the appropriate Annex or Schedule to, or Article, Section or clause in this Agreement. Where the context requires, provisions relating to any Collateral when used in relation to a Grantor shall refer to such Grantor's Collateral or any relevant part thereof.

Section 1.3    <u>Interpretation</u>.

<u>Section 11.2</u> of the DIP Note Purchase Agreement is incorporated herein *mutatis mutandis*.

## ARTICLE II

## GUARANTY

Section 2.1    Guaranty.   To induce the DIP Noteholders to purchase the DIP Notes and each other Secured Party to make financial accommodations available to or for the benefit of the Issuers, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any DIP Note Document, of all the Obligations whether existing on the Effective Date or hereinafter incurred or created (the "Guaranteed Obligations"). Each Guarantor will also pay to the Agent, as applicable, any and all expenses (including without limitation, reasonable and documented out-of-pocket legal fees and expenses) incurred by the Agent, any DIP Noteholder and/or any other Secured Party in enforcing its rights under this Guaranty or any other DIP Note Document in accordance with and to the extent provided in Section 9.5 of the DIP Note Purchase Agreement. This Guaranty by each Guarantor is a continuing guaranty and applies to all Obligations whenever arising hereunder.  This Guaranty constitutes a guaranty of payment and not of collection.

Section 2.2    Limitation of Guaranty. Any term or provision of this Guaranty or any other DIP Note Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable hereunder shall not exceed the maximum amount for which such Guarantor can be liable without rendering this Guaranty or any other DIP Note Document, as it relates to such Guarantor, subject to avoidance under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of title 11 of the United States Code or any applicable provisions of comparable Requirements of Law) (collectively, "Fraudulent Transfer Laws"). Any analysis of the provisions of this Guaranty for purposes of Fraudulent Transfer Laws shall take into account the right of contribution established in Section 2.3 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under the Guaranty.

Section 2.3    Contribution. To the extent that any Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the DIP Notes and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by an Issuer that received the benefit of the funds advanced that constituted Guaranteed Obligations) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Guarantors on such date.

Section 2.4    Authorization; Other Agreements. The Secured Parties are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)      (i) subject to compliance, if applicable, with <u>Section 9.1</u> of the DIP Note Purchase Agreement, modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any DIP Note Document;

(b)      apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the DIP Note Documents;

(c)      refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)      (i) sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with an Issuer or any other Guarantor, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)      settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

<u>Section 2.5</u>      <u>Guaranty Absolute and Unconditional</u>. Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guaranty are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guaranty, in each case except as otherwise agreed in writing by Agent):

(a)      the invalidity or unenforceability of any obligation of an Issuer or any other Guarantor under any DIP Note Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)      the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from an Issuer or any other Guarantor or other action to enforce the same or (ii) any action to enforce any DIP Note Document or any Lien thereunder;

(c)      the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)      any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against an Issuer, any other Guarantor or any of an Issuer's other Subsidiaries (including the Chapter 11 Cases) or any procedure, agreement, order,

stipulation, election, action or omission thereunder (including in the Chapter 11 Cases), including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)     any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law or the DIP Orders; or

(f)     any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of an Issuer, any other Guarantor or any other Subsidiary of an Issuer, in each case other than the occurrence of the DIP Facility Discharge Date.

Without limiting the generality of the foregoing, each Guarantor guarantees that it shall pay the Agent (or as otherwise directed by the Required DIP Noteholders), as applicable, strictly in accordance with the terms of the DIP Order and the other DIP Note Documents, including in the amounts and in the currency expressly agreed to thereunder, irrespective of and without giving effect to any laws of the jurisdiction where any Issuer or any Guarantor is principally located in effect from time to time, or any order, decree or regulation in the jurisdiction where any Issuer or any Guarantor is principally located.

Section 2.6     Waivers. Each Guarantor hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense, setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following: (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of an Issuer or any other Guarantor. Each Guarantor further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against an Issuer or any other Guarantor by reason of any DIP Note Document or any payment made thereunder or (y) assert any claim, defense, setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Guarantor in each case, prior to the DIP Facility Discharge Date. No obligation of any Guarantor hereunder shall be discharged other than upon the occurrence of the DIP Facility Discharge Date. Each Guarantor further waives any right such Guarantor may have under any applicable Requirement of Law to require any Secured Party to seek recourse first against any Issuer or any other Person, or to realize upon any Collateral for any of the Obligations, as a condition precedent to enforcing such Guarantor's liability and obligations under this Guaranty.

Section 2.7     Reliance. Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of each Issuer, each other Guarantor and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Guarantor hereby agrees that no Secured Party

KL2 3201551.4

shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances. In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Guarantor.

## ARTICLE III

## GRANT OF SECURITY INTEREST

Section 3.1    Collateral. For the purposes of this Agreement, all of the following property now owned or at any time hereafter acquired by a Grantor or in which a Grantor now has or at any time in the future may acquire any right, title or interests is collectively referred to as the "Collateral":

(a)    all accounts, chattel paper, deposit accounts, documents (as defined in the UCC), equipment, general intangibles (including Intellectual Property), goods, instruments, inventory, investment property, letter of credit rights, money and any supporting obligations related to any of the foregoing;

(b)    the commercial tort claims described on Schedule 1 and on any supplement thereto received by Agent pursuant to Section 5.9;

(c)    all books and records pertaining to the other property described in this Section 3.1;

(d)    all DIP Collateral (as referred to in the DIP Order);

(e)    all personal property of such Grantor held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power, including but not limited to cash;

(f)    all other goods (including but not limited to fixtures) and personal property of such Grantor, whether tangible or intangible and wherever located;

(g)    each Grantor's rights under Sections 506(c) and 550 of the Bankruptcy Code; and

(h)    to the extent not otherwise included, all proceeds of the foregoing.

Section 3.2    Grant of Security Interest in Collateral. Subject to the entry of the DIP Order and in accordance with the terms therein, each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations (the "Secured Obligations"), hereby mortgages, pledges and hypothecates to Agent, for the benefit of the Secured Parties, and grants to Agent, for

7

the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Grantor; provided, however, notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property; provided, further, that if and when any property shall cease to constitute Excluded Property, a Lien on and security interest in such property shall be deemed granted therein.

The security interest provided for herein has also been granted pursuant to the DIP Order. This Agreement supplements the DIP Orders without in any way diminishing or limiting the effects of the DIP Orders or any Lien, claim or security interest granted thereunder. In the event of a direct conflict between the terms of this Agreement and any DIP Order, the terms of such DIP Order shall control.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

To induce the DIP Noteholders and the Agent to enter into the DIP Note Documents, each Grantor hereby represents and warrants each of the following to the Agent, the DIP Noteholders and the other Secured Parties, on and as of the Effective Date and each other date applicable pursuant to the DIP Note Purchase Agreement:

Section 4.1    Title; No Other Liens.  Except for the Lien granted to the Agent pursuant to this Agreement, the DIP Order, and other Permitted Liens, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others. Such Grantor (a) is the record and beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) subject to the terms of the DIP Order, has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien (other than Permitted Liens). No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement, and/or to evidence Permitted Liens.

Section 4.2    Perfection and Priority.  When the DIP Order has been entered, the Agent will have a valid and continuing fully perfected security interest having the priority specified in the DIP Order in the Collateral, subject only to Permitted Liens having priority over Agent's Lien by operation of law or the DIP Order.  Without in any way limiting the foregoing, each Grantor hereby acknowledges that any and all financing statements filed under the UCC in connection with the Second Lien Note Purchase Documents, naming ICG Debt Administration LLC, as agent, as secured party, and such Grantor, as debtor, shall be effective to perfect further the Agent's security interest granted by such Grantor pursuant to this Agreement to the extent such security interest may be perfected by the filing of financing statements under the UCC for the purposes of so perfecting the security interests granted by such Grantor hereunder and such pre-filings of financing statements are hereby ratified in all respects. The provisions of this sentence shall continue to be effective and not subject to any right of termination in respect of the security interests granted herein.  Except as set forth in this Section 4.2, all actions by each Grantor necessary or reasonably requested by the Agent to perfect the Lien granted hereunder on the Collateral have been duly taken to the extent required by the DIP Note Documents.

KL2 3201551.4

Section 4.3    Locations of Inventory, Equipment and Books and Records. On the Effective Date, such Grantor's inventory and equipment (other than inventory or equipment in transit) and books and records concerning the Collateral are kept at the locations listed on Schedule 3.

Section 4.4    Pledged Collateral.

(a)    The Pledged Stock pledged by such Grantor hereunder (i) is listed on Schedule 4 and constitutes that percentage of the issued and outstanding equity of all classes of each issuer thereof, as set forth on Schedule 4, (ii) has been duly authorized, validly issued and is fully paid and non-assessable (other than Pledged Stock in limited liability companies and partnerships) and (iii) constitutes the legal, valid and binding obligation of the issuer thereof, enforceable against such issuer in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws affecting creditors' rights generally or by general equitable principles relating to enforceability.

(b)    On or prior to the Effective Date, all Pledged Certificated Stock and all Pledged Debt Instruments have been delivered to Agent (or First Lien Agent as bailee for the Agent for perfection purposes) in accordance with and to the extent required by Section 5.3(a).

(c)    Upon the occurrence and during the continuance of an Event of Default, subject to the terms of the DIP Order and Section 6.6, Agent shall be entitled to exercise all of the rights of such Grantor granting the security interest in any Pledged Stock, and a transferee or assignee of such Pledged Stock shall become a holder of such Pledged Stock to the same extent as such Grantor and be entitled to participate in the management of the issuer of such Pledged Stock and, upon the transfer of the entire interest of such Grantor, such Grantor shall, by operation of law, cease to be a holder of such Pledged Stock.

Section 4.5    Instruments and Tangible Chattel Paper Formerly Accounts. On or prior to the Effective Date, no amount payable to such Grantor under or in connection with any account is evidenced by any instrument or tangible chattel paper that has not been delivered to Agent (or First Lien Agent as bailee for the Agent for perfection purposes), properly endorsed for transfer, to the extent delivery is required by Section 5.6(a).

Section 4.6    Intellectual Property. Schedule 5 sets forth a true and complete list of the Intellectual Property such Grantor owns or has an exclusive license to use that is registered or subject to applications for registration with the United States Patent and Trademark Office or Copyright Office (but not any state Applicable IP Office), separately identifying those that are owned and licensed to such Grantor and including (1) the owner, (2) the Trademark, Patent, Copyright or IP License thereof, as applicable, and (3) the registration or application number and registration or application date. On the Effective Date, no other Material Intellectual Property is owned by a Grantor except as set forth on Schedule 5.

(b)    On the Effective Date, all Material Intellectual Property owned by such Grantor is valid, in full force and effect, subsisting, unexpired and in compliance in all material respects with all legal requirements with respect to maintenance fees, affidavits of use, and the like, and no Material Intellectual Property has been abandoned. No breach or default of any

9

material IP License shall be caused by any of the following, and none of the following shall limit or impair the ownership, use, validity or enforceability of, or any rights of such Grantor in, any Material Intellectual Property: (i) the consummation of the transactions contemplated by any DIP Note Document or (ii) any holding, decision, judgment or order rendered by any Governmental Authority. There are no pending (or, to the knowledge of such Grantor, threatened in writing) actions, suits, proceedings, or orders challenging the ownership, use, validity, enforceability of, or such Grantor's rights in, any Material Intellectual Property of such Grantor. To such Grantor's knowledge, no Person has been or is infringing, misappropriating, diluting, violating or otherwise materially impairing any Material Intellectual Property of such Grantor. Such Grantor, and to such Grantor's knowledge each other party thereto, is not in material breach or default of any material IP License.

Section 4.7    Commercial Tort Claims. The only commercial tort claims of any Grantor existing on the Effective Date (regardless of whether the amount, defendant or other material facts can be determined and regardless of whether such commercial tort claim has been asserted, threatened or has otherwise been made known to the obligee thereof or whether litigation has been commenced for such claims) are those listed on Schedule 1, which sets forth such information separately for each Grantor.

Section 4.8    Specific Collateral. On the Effective Date, none of the Collateral is or is proceeds or products of farm products, as-extracted collateral, health-care-insurance receivables or timber to be cut.

Section 4.9    Enforcement. Other than (i) the entry of the DIP Order and (ii) any required approvals, consents, certificates and other authorizations from, and any required notices or other filings to, the FCC as are required by the Communications Laws with respect to the transfer of operational, voting or other control of any Credit Party or the transfer of any Collateral, no Permit, notice to or filing with any Governmental Authority or any other Person or any consent from any Person (other than any notice to Grantors required by a non waivable provision of the UCC) is required for the exercise by Agent of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except as may be required in connection with the disposition of any portion of the Pledged Collateral by laws affecting the offering and sale of securities generally or any approvals that may be required to be obtained from any bailees or landlords to collect the Collateral or by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, agreements and similar assignments entered into in the ordinary course of business.

ARTICLE V

COVENANTS

Each Grantor agrees with Agent to the following, until the occurrence of the DIP Facility Discharge Date:

Section 5.1    Maintenance of Perfected Security Interest; Further Documentation and Consents.

10

(a)     Such Grantor shall (i) not use or permit any Collateral to be used unlawfully or in violation of any provision of any DIP Note Document, any Requirement of Law, the DIP Order or any policy of insurance covering the Collateral and (ii) not enter into any Contractual Obligation or undertaking restricting the right or ability of such Grantor or Agent to sell, assign, convey or transfer any Collateral.

(b)     Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 4.2</u> and shall defend such security interest and such priority against the claims and demands of all Persons.

(c)     Such Grantor shall furnish to Agent from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as Agent may reasonably request, all in reasonable detail and in form and substance reasonably satisfactory to Agent.

(d)     At any time and from time to time, upon the written request of Agent and subject to the terms of the DIP Order, such Grantor shall, except with respect to Excluded Property, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as Agent may reasonably request, including using its commercially reasonable efforts to secure all approvals necessary or appropriate for the assignment to or for the benefit of Agent of any Contractual Obligation, including any IP License, held by such Grantor and to enforce the security interests granted hereunder.

<u>Section 5.2</u>     <u>Changes in Locations, Name, Etc.</u> Except upon twenty (20) days' prior written notice to Agent (or such lesser notice as may be agreed by Agent in its reasonable discretion) and delivery to Agent of all documents reasonably requested by Agent to maintain the validity, perfection and priority of the security interests provided for herein, such Grantor shall not do any of the following:

(i)     permit any equipment with a value in excess of $250,000, individually, or $500,000 in the aggregate, to be kept at a location other than those listed on <u>Schedule 3</u>, except for equipment in transit; or

(ii)     change its legal name or organizational identification number, if any, jurisdiction of organization, location of its principal place of business or corporate, limited liability company, partnership or other organizational structure to such an extent that any financing statement filed in connection with this Agreement would become misleading.

<u>Section 5.3</u>     <u>Pledged Collateral</u>.

(a)     <u>Delivery of Pledged Collateral</u>. After the Effective Date, such Grantor shall deliver to Agent, in suitable form for transfer and in form and substance reasonably satisfactory to Agent, (A) all Pledged Certificated Stock, (B) all Pledged Debt Instruments with a value in excess

11

of $250,000, individually, or $500,000, in the aggregate, and (C) all certificates and instruments evidencing Pledged Investment Property with a value in excess of $250,000, individually, or $500,000, in the aggregate.

(b)    Event of Default. During the continuance of an Event of Default, subject to the terms of the DIP Order and Section 6.6, Agent shall have the right, at any time in its discretion and without notice to the Grantor, to (i) transfer to or to register in its name or in the name of its nominees any Pledged Collateral or any Pledged Investment Property and (ii) exchange any certificate or instrument representing or evidencing any Pledged Collateral or any Pledged Investment Property for certificates or instruments of smaller or larger denominations.

(c)    Cash Distributions with respect to Pledged Collateral. Except as provided in Article VI and subject to the limitations set forth in the DIP Note Purchase Agreement and the DIP Order, such Grantor shall be entitled to receive all cash distributions paid in respect of the Pledged Collateral.

(d)    Voting Rights. Except as provided in Article VI and subject to the limitations set forth in the DIP Order, such Grantor shall be entitled to exercise all voting, consent and corporate, partnership, limited liability company and similar rights with respect to the Pledged Collateral; provided, however, that no vote shall be cast, consent given or right exercised or other action taken by such Grantor that would impair the Collateral (except Permitted Liens) or be inconsistent with, or result in any violation of, any provision of any DIP Note Document or the DIP Order.

Section 5.4    Accounts. Upon Agent's reasonable request of any Grantor, (i) Agent shall have the right to make test verifications of the Accounts in a reasonable manner and through any generally acceptable medium that it reasonably considers advisable, and such Grantor shall furnish all such assistance and information as Agent may reasonably require in connection therewith and (ii) upon Agent's reasonable request, such Grantor shall cause independent public accountants or others reasonably satisfactory to Agent to furnish to Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the accounts.

Section 5.5    Commodity Contracts. Such Grantor shall not have any commodity contract unless subject to a Control Agreement.

Section 5.6    Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper.

(a)    If, after the Effective Date, any amount in excess of $250,000, individually, or $500,000, in the aggregate, payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by an instrument or tangible chattel paper other than such instrument required to be delivered in accordance with Section 5.3(a) and in the possession of Agent, such Grantor shall notify Agent and upon the reasonable request of Agent mark all such instruments and tangible chattel paper with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the security interest of ICG Debt Admin LLC, as Agent" and promptly (but in any event, within ten (10) Business Days of such request) deliver such

12

instrument or tangible chattel paper to Agent, duly indorsed in a manner reasonably satisfactory to Agent.

(b)     After the Effective Date, such Grantor shall not grant "<u>control</u>" (within the meaning of such term under Article 9-106 of the UCC) over any investment property to any Person other than Agent.

(c)     If such Grantor is or becomes the beneficiary of a letter of credit that is not a supporting obligation of any Collateral, such Grantor shall promptly, and in any event within ten (10) Business Days (or such longer period as Agent may agree in its reasonable discretion) after becoming a beneficiary, notify Agent thereof and, at the request of Agent, use commercially reasonable efforts to assign such letter-of-credit rights to Agent and such assignment shall be sufficient to grant control to Agent for the purposes of Section 9-107 of the UCC (or any similar section under any equivalent UCC) and/or enter into a Contractual Obligation with Agent, the issuer of such letter of credit or any nominated person with respect to the letter of credit rights thereunder, which Contractual Obligation shall direct all payments thereunder to an account subject to a Control Agreement and be otherwise in form and substance reasonably satisfactory to Agent.

(d)     If any amount in excess of $250,000 individually, or $500,000 in the aggregate, payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by electronic chattel paper, such Grantor shall, upon the request of Agent, take all steps reasonably necessary to grant Agent control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

Section 5.7     <u>Intellectual Property</u>.

(a)     Within thirty (30) days after any change to <u>Schedule 5</u> for such Grantor, such Grantor shall provide Agent notification thereof and any documents that Agent reasonably requests with respect thereto.

(b)     Such Grantor shall (and shall use commercially reasonable efforts to cause all its licensees to) (i) (1) continue to use each Trademark included in the Material Intellectual Property in order to maintain such Trademark in full force and effect with respect to each class of goods for which such Trademark is currently used, free from any claim of abandonment for non-use, (2) maintain at least the same standards of quality of products and services offered under such Trademark included in the Material Intellectual Property as are currently maintained, (3) use such Trademark included in the Material Intellectual Property with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law, (4) not adopt or use any other Trademark that is confusingly similar or a colorable imitation of such Trademark included in the Material Intellectual Property unless Agent shall obtain a perfected security interest in such other Trademark pursuant to this Agreement and (ii) not do any act or omit to do any act whereby (w) such Trademark included in the Material Intellectual Property (or any goodwill associated therewith) may become destroyed, invalidated, impaired or harmed in any material way, (x) any Patent included in the Material Intellectual Property may become forfeited, misused,

unenforceable, abandoned or dedicated to the public, (y) any portion of the Copyrights included in the Material Intellectual Property may become invalidated, otherwise impaired or fall into the public domain or (z) any Trade Secret that is Material Intellectual Property may become publicly available or otherwise unprotectable.

(c)    Such Grantor shall notify Agent promptly if it knows, or has reason to know, that any application or registration relating to any Material Intellectual Property may become forfeited, misused, unenforceable, abandoned or dedicated to the public, or of any material adverse determination or development regarding the validity or enforceability or such Grantor's ownership of, interest in, right to use, register, own or maintain any Material Intellectual Property (including the institution of, or any such determination or development in, any proceeding relating to the foregoing in any Applicable IP Office), other than proceedings of general applicability). Unless otherwise deemed prudent in the reasonable business judgment of such Grantor and as could not reasonably be expected to have a Materially Adverse Effect, such Grantor shall take all actions that are reasonably necessary or reasonably requested by Agent to maintain and pursue each application (and to obtain the relevant registration or recordation) and to maintain each registration and recordation included in the Material Intellectual Property.

(d)    Such Grantor shall not knowingly do any act or omit to do any act to infringe, misappropriate, dilute, violate or otherwise materially impair the Intellectual Property of any other Person. In the event that any Material Intellectual Property of such Grantor is or has been infringed, misappropriated, violated, diluted or otherwise materially impaired by a third party in any material respect, such Grantor shall take such action as it reasonably deems appropriate under the circumstances in response thereto, including promptly bringing suit and recovering all damages therefor.

(e)    Upon the request of the Agent following the occurrence of a Default or Event of Default, such Grantor shall execute and deliver to Agent in form and substance reasonably acceptable to Agent and suitable for filing in the Applicable IP Office the short-form intellectual property security agreements in the form attached hereto as Annex 3 for all federally-registered Copyrights, Trademarks and Patents of such Grantor.

(f)    Except as could not reasonably be expected to have a Material Adverse Effect, nothing in this Agreement shall prevent any Grantor from discontinuing the use or maintenance of any Collateral consisting of a Patent, Trademark or Copyright if such Grantor determines, in its reasonable business judgment, that the pursuit or maintenance of such Patent, Trademark or Copyright is no longer necessary in the conduct of such Grantor's business.

Section 5.8    Notices. Such Grantor shall promptly notify Agent in writing of its acquisition of any interest hereafter in Collateral (other than any Collateral constituting Excluded Property) of a value in excess of $250,000 that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

Section 5.9    Notice of Commercial Tort Claims. Such Grantor agrees that, if it shall acquire any interest in any commercial tort claim with a potential value in excess of $250,000 (whether from another Person or because such commercial tort claim shall have come into

14

existence), (i) such Grantor shall, within twenty (20) days (or such later date as may be agreed by Agent in its reasonable discretion) upon such acquisition, deliver to Agent, in each case in form and substance reasonably satisfactory to Agent, a notice of the existence and nature of such commercial tort claim and a supplement to Schedule 1 containing a specific description of such commercial tort claim, (ii) Section 3.1 shall apply to such commercial tort claim and (iii) such Grantor shall execute and deliver to Agent, in each case in form and substance reasonably satisfactory to Agent, any document, and take all other action, deemed by Agent to be reasonably necessary or appropriate for Agent to obtain, for the benefit of the Secured Parties, a perfected security interest having at least the priority set forth in Section 4.2 in all such commercial tort claims. Any supplement to Schedule 1 delivered pursuant to this Section 5.9 shall, after the receipt thereof by Agent, become part of Schedule 1 for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

ARTICLE VI

REMEDIAL PROVISIONS

Section 6.1    Code and Other Remedies.

(a)    UCC Remedies. During the continuance of an Event of Default and subject to the terms of the DIP Order, Agent may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation and in the DIP Order, all rights and remedies of a secured party under the UCC or any other applicable law.

(b)    Disposition of Collateral. Without limiting the generality of the foregoing, Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), during the continuance of any Event of Default (personally or through its agents or attorneys), subject to the terms of the DIP Order and Section 6.6, (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Grantor or any other Person notice or opportunity for a hearing on Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) sell, assign, convey, transfer, grant option or options to purchase and deliver any Collateral (or enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. Agent shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable Requirements of Law and subject to the terms of the DIP Order, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of any Grantor, which right or equity is hereby waived and released.

(c)    Management of the Collateral. Each Grantor further agrees, that, during the continuance of any Event of Default and subject to the terms of the DIP Order, (i) at Agent's

15

request, it shall assemble the Collateral and make it available to Agent at places that Agent shall reasonably select, whether at such Grantor's premises or elsewhere, (ii) without limiting the foregoing, Agent also has the right to require that each Grantor store and keep any Collateral pending further action by Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be reasonably necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until Agent is able to sell, assign, convey or transfer any Collateral, Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by Agent and (iv) Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment, subject to <u>Section 6.6</u>. Agent shall not have any obligation to any Grantor to maintain or preserve the rights of any Grantor as against third parties with respect to any Collateral while such Collateral is in the possession of Agent.

(d)    <u>Application of Proceeds</u>. Subject to the terms of the DIP Order, Agent shall apply the cash proceeds of any action taken by it pursuant to this <u>Section 6.1</u>, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of Agent and any other Secured Party hereunder, including reasonable attorneys' fees and disbursements, to the payment of the Obligations as set forth in the DIP Note Purchase Agreement.

(e)    <u>Direct Obligation</u>. Neither Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Grantor, any other Credit Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof. All of the rights and remedies of Agent and any other Secured Party under any DIP Note Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirement of Law. To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Agent or any other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(f)    <u>Commercially Reasonable</u>. To the extent that applicable Requirements of Law impose duties on Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for Agent to do any of the following:

(i)    fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)     fail to obtain Permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)    fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature, or to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring any such Collateral;

(v)      exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)     dispose of assets in wholesale rather than retail markets;

(vii)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)   purchase insurance or credit enhancements to insure Agent against risks of loss, collection or disposition of any Collateral or to provide to Agent a guaranteed return from the collection or disposition of any Collateral.

Each Grantor acknowledges that the purpose of this <u>Section 6.1</u> is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by any Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 6.1</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 6.1</u> shall be construed to grant any rights to any Grantor or to impose any duties on Agent that would not have been granted or imposed by this Agreement, the other DIP Note Documents or by applicable Requirements of Law in the absence of this <u>Section 6.1</u>.

(g)      <u>IP Licenses</u>. For the purpose of enabling Agent to exercise rights and remedies under this <u>Section 6.1</u> (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral) at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to Agent, for the benefit of the Secured Parties, (i) an irrevocable, nonexclusive, worldwide license (exercisable without payment of royalty or other

compensation to such Grantor), including in such license the right to sublicense, use and practice any Intellectual Property now owned or hereafter acquired by such Grantor and access to all media in which any of the licensed items may be recorded or stored and to all Software and programs used for the compilation or printout thereof and (ii) except to the extent, if any, prohibited by any applicable Contractual Obligation, an irrevocable license (without payment of rent or other compensation to such Grantor) to use, operate and occupy all real property owned, operated, leased, subleased or otherwise occupied by such Grantor.

(h)    Upon the occurrence and during the continuance of an Event of Default, any or all rights, powers, or privileges which the Agent may exercise, pursuant to this Agreement, under the UCC, in accordance with any other Requirement of Law, or otherwise, may be exercised by any Person nominated for that purpose by the Agent, upon giving written notice thereof to the Issuer Representative.

(i)    Notwithstanding the foregoing, any rights and remedies provided in this Section 6.1 shall be subject to the terms of the DIP Order.

Section 6.2    Accounts and Payments in Respect of General Intangibles.

(a) In addition to, and not in substitution for, any similar requirement in the DIP Note Agreement, if required by Agent at any time during the continuance of an Event of Default and subject to the terms of the DIP Order, any payment of accounts or payment in respect of general intangibles, when collected by any Grantor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to Agent, in a Cash Collateral Account, subject to withdrawal by Agent as provided in Section 6.4. Until so turned over, such payment shall be held by such Grantor in trust for Agent, segregated from other funds of such Grantor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)    At any time during the continuance of an Event of Default and subject to the terms of the DIP Order:

(i)    each Grantor shall, upon Agent's request, deliver to Agent all original and other documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to Agent and that payments in respect thereof shall be made directly to Agent; and

(ii)    Agent may, without notice, limit or terminate the authority of a Grantor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to Agent's satisfaction the existence, amount and terms of any account or amounts due under any general intangible. In addition, Agent may at any time enforce such Grantor's rights against such account debtors and obligors of general intangibles.

18

(c)     Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any DIP Note Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Grantor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

Section 6.3     Pledged Collateral.

(a)     Voting Rights. During the continuance of an Event of Default, upon notice by Agent to the relevant Grantor or Grantors, and subject to the terms of the DIP Order and Section 6.6, Agent or its nominee may exercise (A) any voting, consent, corporate and other right pertaining to the Pledged Collateral at any meeting of shareholders, partners or members, as the case may be, of the relevant issuer or issuers of Pledged Collateral or otherwise and (B) any right of conversion, exchange and subscription and any other right, privilege or option pertaining to the Pledged Collateral as if it were the absolute owner thereof (including the right to exchange at its discretion any Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization or other fundamental change in the corporate or equivalent structure of any issuer of Pledged Stock, the right to deposit and deliver any Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as Agent may determine), all without liability except to account for property actually received by it, except in the case of gross negligence or willful misconduct as determined in a final nonappealable judgment by a court of competent jurisdiction; provided, however, that Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)     Proxies. In order to permit Agent to exercise the voting and other consensual rights that it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions that it may be entitled to receive hereunder subject to Section 6.6, (i) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to Agent all such proxies, dividend payment orders and other instruments as Agent may from time to time reasonably request and (ii) without limiting the effect of clause (i) above, such Grantor hereby grants to Agent an irrevocable proxy to vote all or any part of the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Collateral on the record books of the issuer thereof) by any other Person (including the issuer of such Pledged Collateral or any

19

officer or agent thereof) during the continuance of an Event of Default and which proxy shall only terminate upon the DIP Facility Discharge Date.

(c) <u>Authorization of Issuers; Dividends and Distributions</u>. Each Grantor hereby expressly and irrevocably authorizes and instructs, without any further instructions from such Grantor, each issuer of any Pledged Collateral pledged hereunder by such Grantor to (i) comply with any instruction received by it from Agent in writing that states that an Event of Default is continuing and is otherwise in accordance with the terms of this Agreement and each Grantor agrees that such issuer shall be fully protected from Liabilities to such Grantor in so complying and (ii) unless otherwise expressly permitted hereby or the DIP Note Purchase Agreement, pay any dividend or make any other payment with respect to the Pledged Collateral directly to Agent.

<u>Section 6.4</u>      <u>Proceeds to be Turned over to and Held by Agent</u>. During the continuance of an Event of Default and subject to the terms of the DIP Order, unless otherwise expressly provided in the DIP Note Purchase Agreement or this Agreement, all proceeds of any Collateral received by any Grantor hereunder in cash or Cash Equivalents shall be held by such Grantor in trust for Agent and the other Secured Parties, segregated from other funds of such Grantor, and shall, promptly upon receipt by any Grantor, be turned over to Agent in the exact form received (with any necessary endorsement). All such proceeds of Collateral and any other proceeds of any Collateral received by Agent in cash or Cash Equivalents shall be held by Agent in a Cash Collateral Account. All proceeds being held by Agent in a Cash Collateral Account (or by such Grantor in trust for Agent) shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in the DIP Note Purchase Agreement.

<u>Section 6.5</u>      <u>Sale of Pledged Collateral</u>.

(a) If, in the opinion of Agent and subject to the terms of the DIP Order, it is necessary or advisable to Sell any portion of the Pledged Collateral following the occurrence and during the continuance of an Event of Default by registering such Pledged Collateral under the provisions of the Securities Act of 1933, each relevant Grantor shall cause the issuer thereof to do or cause to be done all acts as may be, in the opinion of Agent, necessary or advisable to register such Pledged Collateral or that portion thereof to be Sold under the provisions of the Securities Act of 1933, all as directed by Agent in conformity with the requirements of the Securities Act of 1933 and the rules and regulations of the Securities and Exchange Commission applicable thereto and in compliance with the securities or "Blue Sky" laws of any jurisdiction that Agent shall designate and in compliance with the Communications Laws.

(b) Each Grantor recognizes that Agent may be unable to effect a public sale of any Pledged Collateral by reason of certain prohibitions contained in the Securities Act of 1933 and applicable state or foreign securities laws or otherwise or may determine that a public sale is impracticable, not desirable or not commercially reasonable and, accordingly, may resort to one or more private sales thereof to a restricted group of purchasers that shall be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have

20

been made in a commercially reasonable manner. Agent shall be under no obligation to delay a sale of any Pledged Collateral for the period of time necessary to permit the issuer thereof to register such securities for public sale under the Securities Act of 1933 or under applicable state securities laws even if such issuer would agree to do so.

(c)     Each Grantor agrees to use all commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make such sale or sales of any portion of the Pledged Collateral pursuant to Section 6.1 and this Section 6.5 valid and binding and in compliance with all applicable Requirements of Law. Each Grantor further agrees that a breach of any covenant contained herein will cause irreparable injury to Agent and other Secured Parties, that Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained herein shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defense against an action for specific performance of such covenants except for a defense that no Event of Default has occurred or the DIP Facility Discharge Date has occurred under the DIP Note Purchase Agreement. Each Grantor waives any and all rights of contribution or subrogation upon the sale or disposition of all or any portion of the Pledged Collateral by Agent.

Section 6.6     FCC Licenses.

(a) Notwithstanding anything herein to the contrary, to the extent this Agreement or any other DIP Note Document purports to require any Grantor to grant to Agent, on behalf of itself and the other Secured Parties, a Lien on any of the FCC Licenses of such Grantor, Agent, for the benefit of itself and the other Secured Parties, shall only have a Lien on such FCC Licenses at such times and to the extent that a Lien or Liens, as the case may be, on such FCC Licenses is permitted under applicable Requirements of Law, but Agent, for the benefit of itself and the other Secured Parties, shall have Liens, to the maximum extent permitted by law, on all rights incident or appurtenant to such FCC Licenses and the right to receive all proceeds derived from or in connection with the Sale of such FCC Licenses, to the extent such a sale is permitted under applicable Communications Laws, and the facilities and business operations authorized by such FCC Licenses. Notwithstanding anything to the contrary set forth herein, Agent, for the benefit of itself and the other Secured Parties, agrees that to the extent prior FCC approval, as applicable, is required pursuant to the Communications Laws for (a) the operation and effectiveness of any grant, right or remedy hereunder or under any DIP Note Document or (b) taking any action that may be taken by Agent hereunder or under any DIP Note Document, such grant, right, remedy or actions will be subject to such prior FCC approval, as applicable, having been obtained by or in favor of Agent, for the benefit of itself and the other Secured Parties. Each of the Grantors executing this Agreement agrees that, upon the occurrence and during the continuance of an Event of Default and the acceleration of all or any portion of the Obligations pursuant to the provisions of the applicable DIP Note Documents, and at Agent's request, such Grantor shall promptly file, or cause to be filed, such applications for approval and shall take all other and further actions reasonably required by Agent on behalf of and for the benefit of itself and the other Secured Parties, to obtain such FCC approvals, authorizations or consents, as applicable, as are necessary to transfer ownership and control to Agent or trustee or other fiduciary acting in lieu of Agent in order to ensure compliance with Section 310(b) and 310(d) of the Communications Act and any other provision of the Communications Laws, on behalf of and for the benefit of Agent and the other Secured Parties, or their successors or assigns, of the FCC Licenses held by it.

(a)      If an Event of Default shall have occurred and be continuing, each Grantor shall, and, if applicable, shall cause each of its Subsidiaries to, take any action which Agent may reasonably request in the exercise of its rights and remedies under this Agreement and the other DIP Note Documents in order to transfer or assign any Collateral to Agent for the benefit of itself and the other Secured Parties or to such one or more third parties as Agent may designate, or to a combination of the foregoing.

(b)      To enforce the provisions of this Section 6.6, Agent is empowered to seek from the FCC or any other Governmental Authority, to the extent required, consent to or approval of any involuntary transfer of control of any entity whose Collateral is subject to this Agreement for the purpose of seeking a bona fide purchaser to whom control ultimately will be transferred. Each Grantor agrees to, and, if applicable, shall cause each of its Subsidiaries to agree to, cooperate with any such purchaser and with Agent in the preparation, execution and filing of any forms and providing any information that may be necessary in obtaining the consent of the FCC or any other Governmental Authority to the assignment to such purchaser of the Collateral, provided that no such filing of any application with the FCC shall be made unless and until an Event of Default has occurred and is continuing. Each Grantor agrees to, and, if applicable, shall cause each of its Subsidiaries to, consent to any such voluntary or involuntary transfer after and during the continuation of an Event of Default and without limiting any rights of Agent or any other Secured Party under any DIP Note Document, to authorize Agent to nominate a trustee or receiver selected by Agent to assume control of the Collateral, subject only to required judicial, FCC or other consents required by any Governmental Authority, in order to effectuate the transactions contemplated by this Section 6.6. Such trustee or receiver shall have all the rights and powers as provided to it by law or court order, or to Agent, as applicable, under this Agreement. Each Grantor agrees to, and, if applicable, shall cause each of its Subsidiaries to, cooperate to the extent necessary to obtain the consent of the FCC and the approval or consent of each other Governmental Authority required to effectuate the foregoing. Each Grantor agrees to, and, if applicable, shall use commercially reasonable efforts to cause each of its Subsidiaries to take all actions reasonably necessary to obtain all approvals, authorizations, amendments, consents or waivers necessary to transfer ownership and control of the FCC Licenses to any trustee, receiver or bona fide purchaser on behalf of Agent or the Secured Parties, including (i) the prompt filing of all applications with the FCC or the other applicable Governmental Authorities following the occurrence and during the continuance of an Event of Default and the acceleration of all or any portion of the Obligations, and (ii) assist in obtaining all approvals, authorizations, amendments, consents or waivers necessary for the transactions contemplated by this Agreement. Such actions shall include, without limitation, providing to Agent any FCC registration numbers, tax identification numbers, account numbers and passwords for the FCC's electronic filing system.

(c)      Without limiting the obligations of any Grantor hereunder in any respect, each Grantor further agrees that if it, or any of its Subsidiaries, upon the occurrence and during the continuation of an Event of Default, should fail or refuse for any reason whatsoever, without limitation, including any refusal to execute and file any completed application necessary or appropriate to obtain any governmental consent necessary or appropriate for the exercise of any right of Agent or any other Secured Party hereunder or under any DIP Note Document, such application may be executed and filed on such Grantor's behalf by the clerk of any court of competent jurisdiction without notice to such Grantor pursuant to court order, provided that no

22

such filing of any application with the FCC shall be made unless and until an Event of Default has occurred and is continuing.

(d)      Agent and the Grantors agree that, in the event of any changes in law (including, without limitation, changes in the Communications Law or any Grantor becoming subject to the jurisdiction of the FCC or other applicable Governmental Authority) occurring after the date hereof that affect in any manner Agent's rights of access to, or use or sale of, the FCC Licenses, or the procedures necessary to enable Agent to obtain such rights of access, use or sale (including, without limitation, changes allowing greater access), Agent and the Grantors, upon request of Agent, shall amend this Agreement and the other DIP Note Documents in such manner as Agent shall reasonably request, in order to provide the Agent with such rights to the greatest extent possible consistent with then applicable law.

(e)      In connection with this Section 6.6, each of Agent and the other Secured Parties shall be entitled to rely in good faith upon an opinion of outside regulatory counsel of Agent's choice with respect to any such assignment or transfer, whether or not such advice rendered is ultimately determined to have been accurate.

(f)      Each Grantor acknowledges that the assignment or transfer of FCC Licenses is integral to the Secured Parties' realization of the value of the Collateral, that there is no adequate remedy at law for failure by such Grantor to comply with the provisions of this Section 6.6 and that such failure would not be adequately compensable in damages, and therefore agrees that the agreements contained in this Section 6.6 may be specifically enforced.

(g)      Notwithstanding the foregoing, any rights and remedies provided in this Section 6.6 shall be subject to the terms of the DIP Order.

Section 6.7      Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of any attorney employed by Agent or any other Secured Party to collect such deficiency.

ARTICLE VII

AGENT

Section 7.1      Agent's Appointment as Attorney-in-Fact.

(a)      Each Grantor hereby irrevocably constitutes and appoints Agent and any Related Person thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of the DIP Note Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the DIP Note Documents, and, without limiting the generality of the foregoing, each Grantor hereby gives Agent and its Related Persons the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any of the following when an Event of Default shall be continuing, subject to the terms of the DIP Order:

(i)     in the name of such Grantor, in its own name or otherwise, take possession of and indorse and collect any check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Agent for the purpose of collecting any such moneys due under any account or general intangible or with respect to any other Collateral whenever payable;

(ii)    in the case of any Intellectual Property owned by or licensed to such Grantor, execute, deliver and have recorded any document that Agent may request to evidence, effect, publicize or record Agent's security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)    pay or discharge taxes and Liens levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of the DIP Note Purchase Agreement (including all or any part of the premiums therefor and the costs thereof);

(iv)    execute, in connection with any sale provided for in Section 6.1 or Section 6.5, any document to effect or otherwise necessary or appropriate in relation to evidence the sale of any Collateral;

(v)    (A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to Agent or as Agent shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against such Grantor with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as Agent may deem appropriate, (G) assign any Intellectual Property owned by such Grantor or any IP Licenses of such Grantor throughout the world on such terms and conditions and in such manner as Agent shall in its sole discretion determine, including the execution and filing of any document necessary to effectuate or record such assignment and (H) subject to Section 6.6 generally, sell, assign, convey, transfer or grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though Agent were the absolute owner thereof for all purposes and do, at Agent's option, at any time or from time to time, all acts and things that Agent deems necessary to protect, preserve or realize upon any Collateral and the Secured Parties' security interests therein and to effect the intent of the DIP Note Documents, all as fully and effectively as such Grantor might do; or

24

(vi)     If any Grantor fails to perform or comply with any Contractual Obligation contained herein, Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(b)     Subject to <u>Section 9.5</u> of the DIP Note Purchase Agreement, the out-of-pocket expenses of Agent incurred in connection with actions undertaken as provided in this <u>Section 7.1</u>, together with interest thereon at the rate set forth in <u>Section 1.3(c)</u> of the DIP Note Purchase Agreement, from the date of payment by Agent to the date reimbursed by a Grantor, shall be payable by the Grantors, jointly and severally, to Agent on demand.

(c)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this <u>Section 7.1</u>. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

<u>Section 7.2     Authorization to File Financing Statements</u>. Each Grantor authorizes Agent and its Related Persons, at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as Agent reasonably determines appropriate to perfect, or continue or maintain perfection of, the security interests of Agent under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "<u>all assets of the debtor</u>" or words of similar import. To the extent permitted by applicable law, a photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction. To the extent permitted by applicable Requirements of Law, each Grantor hereby (i) waives any right under the UCC or any other Requirement of Law to receive notice and/or copies of any filed or recorded financing statements, amendments thereto, continuations thereof or termination statements and (ii) releases and excuses each Secured Party from any obligation under the UCC or any other Requirement of Law to provide notice or a copy of any such filed or recorded documents.

<u>Section 7.3     Authority of Agent</u>. Each Grantor acknowledges that the rights and responsibilities of Agent under this Agreement with respect to any action taken by Agent or the exercise or non-exercise by Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between Agent and the other Secured Parties, be governed by the DIP Note Purchase Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between Agent and any Grantor, Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation or entitlement to make any inquiry respecting such authority.

<u>Section 7.4     Duty; Obligations and Liabilities</u>.

(a)     <u>Duty of Agent</u>. Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as Agent deals with similar property for its own account. The powers conferred on Agent

hereunder are solely to protect Agent's interest in the Collateral and shall not impose any duty upon Agent to exercise any such powers. Agent shall be accountable only for amounts that it receives as a result of the exercise of such powers, and neither it nor any of its Related Persons shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. In addition, Agent shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by Agent in good faith, except for its own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(b)      Obligations and Liabilities with respect to Collateral. No Secured Party and no Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to any Collateral. The powers conferred on Agent hereunder shall not impose any duty upon any other Secured Party to exercise any such powers. The other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their respective officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

ARTICLE VIII

MISCELLANEOUS

Section 8.1      Reinstatement. Each Grantor agrees that, if any payment made by any Credit Party or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by any Secured Party to such Credit Party, its estate, trustee, receiver or any other party, including any Grantor, under any bankruptcy law, state or federal law, common law or equitable cause (including pursuant to a settlement entered into by Agent or any Secured Party in its discretion), then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, (a) any Lien or other Collateral securing such Grantor's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Grantor in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 8.2      Release of Collateral.

(a)      Upon the occurrence of the DIP Facility Discharge Date, the Collateral shall be released from the Lien created hereby and this Agreement and all obligations (other than those

26

expressly stated to survive such termination) of Agent and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors. Each Grantor is hereby authorized to file UCC termination statements and other documentation reasonably approved by Agent at such time evidencing the termination of the Liens so released. At the request of any Grantor following any such termination, Agent shall deliver to such Grantor any Collateral of such Grantor held by Agent hereunder and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

(b)     If Agent shall be directed or permitted pursuant to clause (i) or (ii) of subsection 8.10(b) of the DIP Note Purchase Agreement to release any Lien or any Collateral, such Collateral shall be released from the Lien created hereby to the extent provided under, and subject to the terms and conditions set forth in, such subsection. In connection therewith, Agent, at the request of any Grantor, shall execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such release.

(c)     At the time provided in subsection 8.10(b) of the DIP Note Purchase Agreement and at the request of the Issuer Representative, a Grantor shall be released from its obligations hereunder in the event that all the Stock and Stock Equivalents of such Grantor shall be sold to any Person that is not an Affiliate of any Group Member in a transaction permitted by the DIP Note Documents.

Section 8.3     Independent Obligations. The obligations of each Grantor hereunder are independent of and separate from the Secured Obligations and the Guaranteed Obligations. If any Secured Obligation or Guaranteed Obligation is not paid when due, or upon any Event of Default that is continuing, Agent may, at its sole election, proceed directly and at once, without notice, against any Grantor and any Collateral to collect and recover the full amount of any Secured Obligation or Guaranteed Obligation then due, without first proceeding against any other Grantor, any other Credit Party or any other Collateral and without first joining any other Grantor or any other Credit Party in any proceeding.

Section 8.4     No Waiver by Course of Conduct. No Secured Party shall by any act (except by a written instrument pursuant to Section 8.5 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that such Secured Party would otherwise have on any future occasion.

Section 8.5     Amendments in Writing. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 9.1 of the DIP Note Purchase Agreement; provided, however, that annexes and schedules, as applicable, to this Agreement may be supplemented (but no existing provisions may be modified and no Collateral may be released) through Pledge Amendments and Joinder

27

Agreements, in substantially the form of Annex 1 and Annex 2, respectively, in each case duly executed by Agent and each Grantor directly affected thereby.

Section 8.6    Additional Grantors; Additional Pledged Collateral.

(a) Joinder Agreements. If, at the option of any Issuer or as required pursuant to Section 4.14 of the DIP Note Purchase Agreement, such Issuer shall cause any Subsidiary that is not a Grantor to become a Grantor hereunder, such Subsidiary shall execute and deliver to Agent a Joinder Agreement substantially in the form of Annex 2 and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Grantor party hereto on the Effective Date.

(b)    Pledge Amendments. To the extent any Pledged Collateral has not been delivered as of the Effective Date, such Grantor shall deliver a pledge amendment duly executed by the Grantor in substantially the form of Annex 1 (each, a "Pledge Amendment"). Such Grantor authorizes Agent to attach each Pledge Amendment to this Agreement.

Section 8.7    Notices. All notices, requests and demands to or upon Agent or any Grantor hereunder shall be effected in the manner provided for in Section 9.2 of the DIP Note Purchase Agreement; provided, however, that any such notice, request or demand to or upon any Grantor shall be addressed to the Issuers' notice address set forth in such Section 9.2.

Section 8.8    Successors and Assigns. This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of each Secured Party and their successors and assigns; provided, however, that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of Agent.

Section 8.9    Counterparts. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or by Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 8.10    Severability. Any provision of this Agreement being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Agreement or any part of such provision in any other jurisdiction.

Section 8.11    Governing Law. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

Section 8.12    Waiver of Jury Trial. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER DIP NOTE DOCUMENTS AND ANY OTHER TRANSACTION

CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

EACH GRANTOR AGREES TO BE BOUND BY THE PROVISIONS OF SECTIONS 9.18(a), (b) AND (c) OF THE DIP NOTE PURCHASE AGREEMENT.

Section 8.13    Subordination of Intercompany Debt.

(a)    Each Grantor agrees that any intercompany Indebtedness directly or indirectly made by or owed to such Grantor by another Credit Party (collectively, "Intercompany Debt"), of whatever nature at any time outstanding shall be subordinate in right of payment to the prior payment in full in cash of the Obligations. Each Grantor hereby agrees that it will not after receipt of a written notice from Agent of the occurrence of any Event of Default (and in any case without notice following the occurrence and during the continuance of any Event of Default under Section 7.1(a)(i) of the DIP Note Purchase Agreement), and so long as such Event of Default is continuing, accept any payment, including by way of any offset, on any Intercompany Debt until the DIP Facility Discharge Date.

(b)    In the event that any payment on any Intercompany Debt shall be received by a Grantor other than as permitted by this Section 8.13 prior to the DIP Facility Discharge Date, such Grantor shall receive such payments and hold the same in trust for, and shall promptly pay over to, Agent for the benefit of the Secured Parties, all such sums to the extent necessary so that the Secured Parties shall have been paid in full, in cash, all Obligations to the extent required by the DIP Note Purchase Agreement (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) owed or which may become owing by such Grantor.

(c)    Upon any payment or distribution of any assets of any Credit Party of any kind or character, whether in cash, property or securities by set-off, recoupment or otherwise, to creditors in any liquidation, administration, examinership or other winding-up of such Credit Party or in the event of any proceeding under the Bankruptcy Code or any similar bankruptcy laws, in which any Credit Party is a debtor, Agent and the Secured Parties shall first be entitled to receive payment in full in cash, in accordance with the terms of the DIP Note Purchase Agreement, of all amounts payable under or in respect of such Obligations owing by such Credit Party, before any payment or distribution is made on, or in respect of, any Intercompany Debt, in any such proceeding under the Bankruptcy Code or any similar bankruptcy laws, any distribution or payment, to which Agent (for the benefit of Agent and the DIP Noteholders) to the extent necessary to pay all such Obligations owing by such Credit Party in full in cash, after giving effect to any concurrent payment or distribution to Agent and the DIP Noteholders (or to Agent for the Secured Parties).

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the undersigned has caused this DIP Facility Guaranty and Security Agreement to be duly executed and delivered as of the date first above written.

ALPHA MEDIA COMMUNICATIONS LLC,
as a Grantor

By: _____

Name: _____

Title: _____


ALPHA MEDIA LLC,
as a Grantor

By: _____

Name: _____

Title: _____


ALPHA 3E CORPORATION,
as a Grantor

By: _____

Name: _____

Title: _____


ALPHA MEDIA HOLDINGS LLC,
as a Grantor

By: _____

Name: _____

Title: _____


ALPHA MEDIA USA LLC,
as a Grantor

By: _____

Name: _____

Title: _____


[Signature Page to DIP Facility Guaranty and Security Agreement]

ALPHA MEDIA LICENSEE LLC,
    as a Grantor


By:_____
Name:_____
Title:_____


ALPHA 3E HOLDING CORPORATION,
    as a Grantor


By:_____
Name:_____
Title:_____


ALPHA MEDIA COMMUNICATIONS, INC.,
    as a Grantor


By:_____
Name:_____
Title:_____


ALPHA 3E LICENSEE, LLC,
    as a Grantor


By:_____
Name:_____
Title:_____


ALPHA MEDIA OF BROOKINGS INC.,
    as a Grantor


By:_____
Name:_____
Title:_____


ALPHA MEDIA OF COLUMBUS INC.,
    as a Grantor


By:_____
Name:_____
Title:_____


[Signature Page to DIP Facility Guaranty and Security Agreement]

ALPHA MEDIA OF LINCOLN INC.,
        as a Grantor

By:_____
Name:_____
Title:_____


ALPHA MEDIA OF JOLIET INC.,
        as a Grantor

By:_____
Name:_____
Title:_____


ALPHA MEDIA OF LUVERNE INC.,
        as a Grantor

By:_____
Name:_____
Title:_____


ALPHA MEDIA OF FORT DODGE INC.,
        as a Grantor

By:_____
Name:_____
Title:_____


ALPHA MEDIA OF MASON CITY INC.,
        as a Grantor

By:_____
Name:_____
Title:_____


[Signature Page to DIP Facility Guaranty and Security Agreement]

ACCEPTED AND AGREED
as of the date first above written:


ICG DEBT ADMINISTRATION LLC,
    as Agent


By:_____
    Name:
    Title:

[Signature Page to DIP Facility Guaranty and Security Agreement]

## Exhibit C

**DIP Note**

*SUBJECT TO FRE 408 AND SIMILAR RULES*
*KL NOTEHOLDER DRAFT*
*SUBJECT TO REVISION*
*January 22, 2021*

EXHIBIT 1.2(a)

TO

SENIOR SECURED PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT


FORM OF DIP NOTE


New York, New York

Principal Amount: $ _____                                 _____, 20__

FOR VALUE RECEIVED, each of the undersigned, Alpha Media LLC, a Delaware limited liability company ("Alpha LLC"), and Alpha 3E Corporation, a Delaware corporation ("Alpha 3E" and, together with Alpha LLC, collectively, the "Issuers" and each, an "Issuer"), hereby, jointly and severally, promises to pay to _____ (together with any successors and/or assigns, the "DIP Noteholder") the principal amount of _____ and ___/100 Dollars ($_____) or, if less, the aggregate principal amount of DIP Notes purchased by the DIP Noteholder under the DIP Note Purchase Agreement, payable at such times and in such amounts as are specified in the DIP Note Purchase Agreement.

The Issuers, jointly and severally, promise to pay interest on the unpaid principal amount of this DIP Note from the date made until such principal amount is paid in full, payable at such times and at such interest rates as are specified in the DIP Note Purchase Agreement. Demand, diligence, presentment, protest and notice of non-payment and protest are hereby waived by each Issuer, for itself and its successors and assigns.

Both principal and interest are payable in Dollars in immediately available funds to the DIP Noteholder, at the DIP Noteholder's address set forth in the DIP Note Purchase Agreement or as otherwise directed by the DIP Noteholder to the Issuers from time to time.

This DIP Note is one of the DIP Notes referred to in, and is entitled to the benefits of, the $20,000,000 Senior Secured Priming Superpriority Debtor-In-Possession Note Purchase Agreement, dated as of January [____], 2021 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Note Purchase Agreement"), among the Issuers, the other Persons party thereto that are designated as a "Credit Party", ICG Debt Administration LLC, a Delaware limited liability company, as agent, and the several financial institutions and Persons from time to time party thereto as a noteholder. This DIP Note is also entitled to the benefits of the DIP Collateral Documents and the other DIP Note Documents and the security provided for thereby or referred to therein. Capitalized terms used herein without definition are used as defined in the DIP Note Purchase Agreement.

The DIP Note Purchase Agreement, among other things, (a) provides for the purchase of this DIP Note by the DIP Noteholder from the Issuers, (b) contains provisions for acceleration of the maturity of the unpaid balance of the principal amount of this DIP Note, together with all

accrued and unpaid interest thereon and any costs, expenses, fees or similar amounts owing, in the manner, upon the conditions and with the effect provided in the DIP Note Purchase Agreement and the other DIP Note Documents upon the happening of certain stated events and (c) provides for prepayments on account of the principal hereof prior to the maturity of this DIP Note upon the terms and conditions specified in the DIP Note Purchase Agreement.

This DIP Note is a DIP Note Document, is entitled to the benefits of the DIP Note Documents and is subject to certain provisions of the DIP Note Purchase Agreement, including Sections 9.18(b) (Submission to Jurisdiction), 9.19 (Waiver of Jury Trial), 9.23 (Joint and Several) and 11.2 (Other Interpretive Provisions) thereof.

This DIP Note is a registered obligation, transferable only upon notation in the Register, and no assignment hereof shall be effective until recorded therein.

This DIP Note shall be governed by, and construed and interpreted in accordance with, the law of the State of New York without giving effect to the conflict of law principles thereof except for Sections 5-1401 and 5-1402 of the New York General Obligations Law.

IN WITNESS WHEREOF, each Issuer has caused this DIP Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

ALPHA MEDIA LLC


By: _____
Name: _____
Title: _____


ALPHA 3E CORPORATION


By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO DIP NOTE]

## Exhibit D

**Restructuring Support Agreement**

**Alpha Draft 1/22/2021**
*Confidential*
**Subject to FRE 408**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACTOR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

---

**ALPHA MEDIA HOLDINGS LLC , ET AL.**
**RESTRUCTURING SUPPORT AGREEMENT**

**As of January [●], 2021**

---

This RESTRUCTURING SUPPORT AGREEMENT (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of January [●], 2021, is entered into by and among:

   i.   Alpha Media Holdings LLC ("<u>Alpha</u>"), a limited liability company organized under the laws of Delaware, and each of its direct and indirect subsidiaries and Affiliates listed on **Exhibit A** to this Agreement (each a "<u>Company Party</u>" and collectively with Alpha, the "<u>Company Parties</u>");

   ii.  the undersigned holders of Second Lien Notes Claims (collectively with holders of Second Lien Notes Claims that may become signatories to this Agreement in accordance with <u>Section 12</u> hereof, the "<u>Supporting Second Lien Noteholders</u>");

   iii. the undersigned holders of Holdco Notes Claims (collectively with holders of Holdco Notes Claims that may become signatories to this Agreement in accordance with <u>Section 12</u> hereof, the "<u>Supporting Holdco Noteholders</u>"); and

   iv.  ICG Debt Administration LLC (individually, "<u>ICG</u>"), in its capacity as administrative agent and collateral agent for the holders of Second Lien Notes Claims (in such capacity, the "<u>Prepetition Second Lien Agent</u>," and together with the Supporting Second Lien Noteholders and the Supporting Holdco Noteholders the "<u>RSA Parties</u>") under the Prepetition Second Lien Note Purchase Agreement.

This Agreement collectively refers to the Company Parties and the RSA Parties as the "<u>Parties</u>" and each individually as a "<u>Party</u>."

## RECITALS

**WHEREAS**, reference is made to that certain Second Lien Note Purchase Agreement dated as of February 25, 2016 (as amended on October 2, 2018 and as has been and may be further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Second Lien Note Purchase Agreement"), by and among the Prepetition Second Lien Agent, as agent, the noteholders party from time to time thereto (such noteholders and the Prepetition Second Lien Agent, collectively, the "Prepetition Second Lien Noteholders"), Alpha Media LLC ("Alpha Media") and Alpha 3E Corporation ("Alpha 3E") as issuers, and the guarantors party from time to time thereto, pursuant to which there are certain existing and continuing events of default as of the date of this Agreement;

**WHEREAS**, reference is made to that certain Note and Warrant Purchase Agreement dated as of February 25, 2016 (as amended on October 2, 2018 and as has been, and may be further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Holdco Note Purchase Agreement"), by and among Alpha, as issuer, ICG North America Holdings Ltd. ("ICG North America") and Intermediate Capital Group plc ("ICG PLC"), as noteholders (ICG North America and ICG PLC in their respective capacities as noteholders under the Prepetition Holdco Note Purchase Agreement, together, collectively, the "ICG Holdco Noteholders"), and each of the other persons who are party from time to time thereto as noteholders (together with the ICG Holdco Noteholders, collectively, the "Prepetition Holdco Noteholders"), and each of the Persons who are party from time to time thereto as warrant holders (the "Prepetition Holdco Warrant Holders");

**WHEREAS**, the Company Parties and the RSA Parties have in good faith and at arm's length negotiated certain restructuring transactions pursuant to the terms and conditions set forth in this Agreement (collectively, the "Restructuring Transactions"), including a joint prepackaged plan of reorganization for the Company Parties attached hereto as **Exhibit B** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and this Agreement, the "Plan")[1];

**WHEREAS**, the Company Parties will implement the Plan and Restructuring Transactions through jointly administered, prepackaged, voluntary cases commenced by the Company Parties (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court");

**WHEREAS**, subject to the terms and conditions set forth herein, the Supporting Second Lien Noteholders and the Supporting Holdco Noteholders (collectively, the "Supporting Claim Holders") have each agreed to vote all of their respective Second Lien Notes Claims and Holdco Notes Claims (collectively, the "RSA Claims") to accept the Plan in accordance with the instructions in the Solicitation Materials (as defined below);

---

[1]    Unless otherwise noted, capitalized terms used but not previously defined have the meanings given to such terms elsewhere in this Agreement or in the Plan (including any exhibits thereto), as applicable. **[NTD: Definitions subject to review of the Plan.]**

**WHEREAS**, ICG, as administrative agent and collateral agent (in such agent capacities, the "DIP Agent"), and certain noteholders (the "DIP Noteholders") have committed to provide a debtor-in-possession financing in the form of a senior secured priming note purchase agreement in an aggregate principal amount of $20 million (the "DIP Facility") to extend credit to the Company Parties during the Chapter 11 Cases, and (ii) the RSA Parties have agreed to the Company Parties' use of cash collateral, which DIP Facility and use of cash collateral shall be authorized pursuant to, and subject to, the terms and conditions of (i) the form of interim order approving the DIP Facility attached hereto as **Exhibit C**, as may be modified as required by the Bankruptcy Court for entry with the consent of each of the Second Lien Agent and DIP Agent, and as may be subsequently amended, restated or otherwise modified after its entry in accordance with its terms (the "Interim DIP Order"), (ii) the postpetition debtor-in-possession note purchase agreement for the DIP Facility in the form attached hereto as **Exhibit D**, as may be modified as required by the Bankruptcy Court as a condition to entering the Interim DIP Order with the consent of each of the Prepetition Second Lien Agent, DIP Agent, and the Company Parties, and as may be subsequently amended, restated or otherwise modified after entry of the Interim DIP Order in accordance with its terms (the "DIP Note Purchase Agreement"), and (iii) the DIP Orders and the applicable Definitive Documentation;

**WHEREAS**, the DIP Noteholders (in their capacities as such, the "Exit Noteholders") and ICG, in its capacity as administrative agent and collateral agent for the Exit Noteholders (in such capacity, the "Exit Agent") have committed, as set forth in the Plan, to provide the reorganized Company Parties with a new $37.5 million secured credit facility[2] pursuant to a secured note purchase agreement (the "Exit Note Purchase Agreement," and the credit facility provided therein, the "Exit Credit Facility"), that is consistent with the terms and conditions of the term sheet attached hereto as **Exhibit E** (the "Exit Note Purchase Agreement Term Sheet") and otherwise acceptable in form and substance to the Exit Noteholders and the Company Parties, which shall provide for the conversion of amounts outstanding under the DIP Facility as of the Plan Effective Date into indebtedness under the Exit Credit Facility, on terms consistent with the terms set forth in the Plan and otherwise pursuant to the applicable Definitive Documentation.

**NOW**, **THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.    <u>RSA Effective Date</u>.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "RSA Effective Date") that the following have occurred:

(a)    This Agreement has been executed by all of the following:

(i)    each Company Party;

---

[2] KL NTD: Priority of the Exit Note Purchase Agreement is TBD.

KL2 3201113.13

(ii) Supporting Holdco Noteholders holding, in the aggregate as of the RSA Effective Date, at least 66.7% in principal amount of all outstanding Holdco Notes Claims and more than half in number of such Holdco Notes Claims; and

(iii) Supporting Second Lien Noteholders holding, in the aggregate as of the RSA Effective Date, at least 66.7% in principal amount of all outstanding Second Lien Notes Claims and more than half in number of such Second Lien Notes Claims.

2.  <u>Exhibits and Schedules Incorporated by Reference</u>.  Each of the exhibits and schedules attached hereto, including any schedules, exhibits and other attachments to such exhibits and schedules (collectively, the "<u>Exhibits and Schedules</u>"), are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any direct conflict between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (excluding the Exhibits and Schedules) shall govern.  In the event of any direct conflict between the terms of this Agreement (including the Exhibits and Schedules) and the Plan, the terms of the Plan shall govern.

3.  <u>Definitive Documentation</u>.

(a) The definitive documents and agreements governing the Restructuring Transactions (collectively, the "<u>Definitive Documentation</u>"), which shall include, without limitation:

(i) the Plan (and all exhibits thereto) and any supplement to the Plan (the "<u>Plan Supplement</u>"), which shall include, for the avoidance of doubt and without limitation, (A) a shareholders' agreement, or other similar agreement, setting forth the rights and obligations of the holders of the Reorganized Equity (the "<u>New Shareholders Agreement</u>"), (B) the amended organizational and governance documents of Reorganized Alpha (the "<u>New Governance Documents</u>"), (C) a warrant agreement or similar agreement, setting forth the rights and obligations of the holders of the New Holdco Warrants (the "<u>Warrant Documents</u>"), (D) documents setting forth the summary terms of the Management Incentive Plan (the "<u>MIP Documents</u>"), and (E) the Exit Note Purchase Agreement Term Sheet;

(ii) the confirmation order with respect to the Plan (the "<u>Confirmation Order</u>") and any motion or other pleadings related to the Plan (and all exhibits thereto) or confirmation of the Plan;

(iii) the related disclosure statement (and all exhibits thereto) with respect to the Plan (the "<u>Disclosure Statement</u>");

(iv) the order of the Bankruptcy Court approving, the Disclosure Statement and solicitation materials with respect to the Plan

4

(collectively, the "Solicitation Materials" and such order, including to the extent combined with the Confirmation Order, the "Solicitation Order");

(v)     the DIP Note Purchase Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively with the DIP Note Purchase Agreement, the "DIP Documents");

(vi)    (A) the Interim DIP Order, and (B) the final order authorizing use of cash collateral and approving the DIP Facility on a final basis, which shall be in all material respects consistent with the Plan, the Interim DIP Order, and DIP Documents (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders");

(vii)   the Exit Note Purchase Agreement to be entered into in accordance with the Plan, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "Exit Documents"); and

(viii)  any orders related to the engagement, retention or compensation of Moelis & Company LLC in connection with the Restructuring Transactions, which orders shall provide that Moelis & Company LLC will not earn any flat monthly fees following the Bankruptcy Court's entry of the Confirmation Order other than on terms to be mutually agreeable among the Company Parties and the Required RSA Parties (defined below).

(b)     Except for the agreed forms of Definitive Documentation attached hereto as Exhibits (including as Exhibits to the Plan), the Definitive Documentation (and any modifications, restatements, supplements or amendments to any of them) will, from and after the RSA Effective Date until the earlier of the Plan Effective Date or the Termination Date (as defined below), remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be in form and substance satisfactory in all respects to each of: (i) the Company Parties; (ii) the Supporting Second Lien Noteholders who hold, in the aggregate at least 66.7% in principal amount outstanding of all Second Lien Notes Claims held by Supporting Second Lien Lenders (the "Required Supporting Second Lien Noteholders"); and (iii) the Supporting

5

Holdco Noteholders who hold, in the aggregate at least 66.7% in principal amount outstanding of all Holdco Notes Claims held by Supporting Holdco Noteholders (the "Required Supporting Holdco Noteholders," and, collectively, with the Required Supporting Second Lien Noteholders, the "Required RSA Parties").  Notwithstanding the foregoing, from and after the effectiveness of any Definitive Documentation (each, a "Effective Definitive Document"), the RSA Party consent rights or lack of consent rights (as applicable) of any Party with respect to such Effective Definitive Document provided for in such Effective Definitive Document shall control and supersede any applicable consent rights provided for herein.

4.    Milestones.  As provided in and subject to Sections 6 and 8 of this Agreement, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (the "Milestones"); provided, that the Company Parties may extend a Milestone only with the express prior written consent of the Required RSA Parties; provided, further, that the Milestones set forth in Sections 4(d), (e), (f), and (h) hereof may be extended by the Company Parties up to five (5) Business Days if the purpose of such extension is solely to accommodate scheduling with the Bankruptcy Court:

(a)    the Company Parties shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court no later than one (1) business day following the RSA Effective Date (the "Petition Date Deadline," and the date the Chapter 11 Cases are commenced, the "Petition Date");

(b)    on the Petition Date, the Company Parties shall file the Plan, the Disclosure Statement, and motions seeking approval of the DIP Facility on an interim and final basis, and requesting a hearing for approval of the Disclosure Statement and Solicitation Materials and a hearing for entry of the Confirmation Order;

(c)    the applicable Company Parties shall file FCC Forms 316 (collectively, the "Short Form Application") seeking approval of transfer of control of FCC licenses from those Company Parties to the corresponding debtors-in-possession no later than three (3) Business Days following the Petition Date;

(d)    the Bankruptcy Court shall enter the Interim DIP Order approving the DIP Facility on an interim basis no later than the date that is three (3) Business Days following the Petition Date;

(e)    the applicable Company Parties and the Supporting Second Lien Noteholders shall file FCC Forms 314 (collectively, the "Interim Long Form Application") seeking approval to issue new equity in a manner that complies with the foreign ownership limitations under Section 310(b)(4) of the Communications Act of 1934, as amended, and other applicable rules

6

and regulations of the FCC, without any declaratory ruling, waiver or other form of special relief, other than that which permits the holding of the New Holdco Warrants, under the Plan five (5) Business Days after the later of the date on which (i) the FCC approves the Short Form Application or (ii) the Company Parties determine in their discretion that they have received from the Supporting Second Lien Noteholders sufficient information required to file the Interim Long Form Application; provided however that, for the avoidance of doubt, on a mutually agreeable date to be determined following the Plan Effective Date, the applicable Company Parties and the Supporting Second Lien Noteholders shall jointly file FCC Forms 315 and a petition for declaratory ruling seeking FCC approval to permit the exercise of the New Holdco Warrants (the "Second Long Form Application");

(f)     the Bankruptcy Court shall enter the Final DIP Order no later than the date that is thirty-five (35) days following the Petition Date;

(g)     the Company Parties shall file the Plan Supplement no later than the date that is forty-five (45) days following the Petition Date;

(h)     the Bankruptcy Court shall enter the Confirmation Order no later than the date that is eighty (80) days following the Petition Date; and

(i)     the Plan Effective Date shall occur no later than the date that is three (3) Business Days following the FCC's approval of the Interim Long Form Application.

5.    Commitment of the RSA Parties. Each RSA Party shall (severally and not jointly) from the RSA Effective Date until the occurrence of a Termination Date (as defined in Section 10):

(a)     support and cooperate with each other and the Company Parties to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement (but without limiting the applicable consent and approval rights provided in this Agreement and the Definitive Documentation), by: (i) voting all of its RSA Claims, and any other claims against or interests in, as applicable, the Company Parties now or hereafter owned by such RSA Party to accept the Plan in accordance with the instructions in the Solicitation Materials and the Solicitation Order; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of any releases under the Plan;

(b)     not, directly or indirectly (including through its representatives and advisors), seek, solicit, encourage, negotiate, engage in any discussions or other communications relating to, or enter into any agreements or arrangements relating to, an Alternative Transaction (as defined below);

(c)     not, directly or indirectly (including through its representatives and advisors), and not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any Claims against, or

Interests in, the Company Parties ("Claims/Interests") except in a manner consistent with this Agreement, the DIP Orders, the Plan, or the Definitive Documentation;

(d)     except as provided for in the DIP Orders, not object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(e)     not withdraw, amend, or revoke (or seek to or cause to be withdrawn, amended, or revoked) its participation in the Restructuring Transactions or its tender, consent, or vote with respect to the Plan; provided however, that (i) upon the occurrence of a Termination Date all votes tendered by the RSA Parties to accept the Plan shall be immediately revoked and deemed void *ab initio* without (i) any further notice to or action of any party or (ii) order or approval of the Bankruptcy Court;

(f)     support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly, with the Restructuring Transactions;

(g)     support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly (including through its representatives and advisors), with the entry by the Bankruptcy Court of any of the DIP Orders, and shall not propose, file, support or file a pleading with the Bankruptcy Court seeking entry of an order authorizing, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in each of the DIP Orders;

(h)     cooperate with the Company Parties to ensure that the ownership structure of the reorganized Company Parties to be proposed in the Interim Long Form Application complies with the foreign ownership limitations under Section 310(b)(4) of the Communications Act of 1934, as amended, and other applicable rules, regulations, and policies of the FCC, including policies regarding waiver of the FCC's foreign ownership limitations, without any declaratory ruling, waiver or other form of special relief, and that the ownership structure of the Company Parties to be proposed in the Second Long Form Application complies with the terms of all applicable rules, regulations, and policies of the FCC, including policies regarding waiver of the FCC's foreign ownership limitations;

(i)     support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly (including through its representatives and advisors), with the filing, processing, and approval of the Short Form Application, the Interim Long Form Application and the Second Long Form Application;

(j)     promptly reply to any inquiries or requests from the Company Parties, FCC staff, or any other governmental authority related to the processing of the Short Form Application, the Interim Long Form Application and the Second Long Form Application, and use commercially reasonable efforts to promptly resolve any concerns raised by the FCC staff or any other governmental authority related to such applications;

(k)     assist the Company Parties in opposing any oppositions filed with the FCC opposing grant of the Short Form Application, the Interim Long Form Application, and the Second Long Form Application;

(l)     provide promptly upon request by the Company Parties or their advisors the aggregate principal amount of each of such RSA Party's Claims/Interests, on an issuance-by-issuance basis as of the date of such request;

(m)     not initiate, directly or indirectly (including through its representatives and advisors), or cause to be initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, the Plan or the other Restructuring Transactions against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement, the DIP Orders or the Plan;

(n)     other than in accordance with <u>Section 12</u> of this Agreement and any applicable order of the Bankruptcy Court pertaining to the preservation of tax attributes, pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its Interests in the Company Parties to the extent such pledge, encumbrance, assignment, sale or other transfer could reasonably be expected to impair any of the Company Parties' tax attributes;

(o)     not incur, directly or indirectly (including through its representatives and advisors), or cause to be incurred on its behalf, any flat monthly fees by its financial advisors or investment bankers following the Bankruptcy Court's entry of the Confirmation Order, and, notwithstanding anything to the contrary contained in the respective engagement letters, the RSA Parties' financial advisors and investment bankers shall not charge any success fee (or similar transaction fee) to the Company Parties prior to the occurrence of the Plan Effective Date; <u>provided</u>, <u>however</u>, the foregoing limitations shall not in any way limit the right of any RSA Party's legal counsel and accounting and other advisors to incur and be paid for services provided to or for the benefit of such RSA Party;

(p)     to the extent any legal or structural impediment would prevent, hinder, or delay the consummation of the Plan or the other Restructuring Transactions

(any such impediment, a "Specified Impediment"), negotiate in good faith appropriate additional or alternative provisions to address and resolve any such impediment; provided that the economic outcome for the RSA Parties, the anticipated timing of the closing and other material terms of this Agreement must be substantially preserved in any such alternate provisions; provided, further, that for the avoidance of doubt, the Supporting Second Lien Noteholders shall use their reasonable best efforts to resolve any Specified Impediment resulting from any RSA Parties failure to strictly comply with the commitment set forth in Section 5(h) (any such Specified Impediment, a "Foreign Ownership Impediment");

(q)  not to serve as a member of any statutory committee formed in the Chapter 11 Cases; and

(r)  negotiate in good faith with the Company Parties the forms of the Definitive Documentation (to the extent such RSA Party is a party thereto) and, subject to the consent requirements specified herein, execute the Definitive Documentation to the extent such RSA Party is a party thereto.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any RSA Party nor the acceptance of the Plan by any RSA Party shall (x) be construed to prohibit any RSA Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising its rights or remedies specifically reserved herein or in the Existing Debt Documents (as defined herein) or the Definitive Documentation; (y) be construed to prohibit or limit any RSA Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, are not prohibited by this Agreement and are not otherwise for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; or (z) limit the ability of any RSA Party to sell, assign, participate or enter into any other transfers of RSA Claims or any other claims against or interests in the Company Parties, subject to Section 12 of this Agreement and any other applicable restrictions in the Prepetition Second Lien Note Purchase Agreement or the Prepetition Holdco Note Purchase Agreement.

Notwithstanding any other provision of this Agreement to the contrary, including this Section 5, nothing in this Agreement shall require any RSA Party to incur, assume, become liable for any liabilities or other obligations, or to commence litigation or agree to any commitments, undertakings, concessions, indemnities, or other arrangements to such RSA Party that could result in liabilities or other obligations to such RSA Party other than as reasonably necessary to comply with the obligations under this Agreement and, upon their effectiveness, the Definitive Documentation to which such RSA Party is a party or is otherwise subject.

6.    Commitment of the Company Parties.

(a)  Subject to Sub-Clause (b) of this Section 6, the Company Parties shall, from the RSA Effective Date until the occurrence of a Termination Date:

10

(i)     diligently pursue and make all efforts to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and take no action that is inconsistent with this Agreement (including the Plan);

(ii)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(iii)   promptly file and take all reasonable steps within their control that are necessary to obtain approval of the Short Form Application, the Interim Long Form Application, and the Second Long Form Application from the FCC as expeditiously as possible, including (A) promptly replying to any inquiries or requests from the FCC staff related to the processing of such applications, and (B) opposing any oppositions filed with the FCC opposing grant of such applications;

(iv)    take all reasonable steps within their control to cooperate with the RSA Parties to ensure that (A) the ownership structure of the reorganized Company Parties to be proposed in the Interim Long Form Application complies with the foreign ownership limitations under Section 310(b)(4) of the Communications Act of 1934, as amended, and other applicable rules, regulations, and policies of the FCC, including policies regarding waiver of the FCC's foreign ownership limitations, without any declaratory ruling, waiver or other form of special relief, other than that which permits the holding of the New Holdco Warrants, and (B) the ownership structure of the Company Parties to be proposed in the Second Long Form Application complies with the terms of all applicable rules, regulations, and policies of the FCC including policies regarding waiver of the FCC's foreign ownership limitations;

(v)     negotiate in good faith the terms of, and use commercially reasonable efforts to execute and deliver, the Definitive Documentation and any other required agreements to effectuate and consummate the Plan and the Restructuring Transactions;

(vi)    provide draft copies of all Definitive Documentation to be filed in the Chapter 11 Cases to counsel to the Prepetition Second Lien Agent as soon as reasonably practicable, but in no event less than three (3) Business Days prior to the date when the Company Parties intend to file such documents. Notwithstanding the foregoing, in the event that not less than three (3) Business Days' notice is not reasonably practicable under the circumstances, the Company Parties shall provide draft copies of any such motions, documents, or pleadings to the counsel to the Prepetition Second Lien Agent as

soon as otherwise reasonably practicable before the date when the Company intends to file any such motion, documents, or other pleading and may file such motions, documents, or other pleadings on or before the applicable due date;

(vii)   provide draft copies of all other material motions, pleadings, and proposed orders (to the extent not Definitive Documentation) to be filed in the Chapter 11 Cases (including, for the avoidance of doubt, "first day" and "second day" motions and orders) to the counsel to the Prepetition Second Lien Agent as soon as reasonably practicable, but in no event less than three (3) Business Days prior to the date when the Company Parties intend to file such documents, the form and substance of which shall be subject to the consent of the Prepetition Second Lien Agent and DIP Agent (collectively, the "Agents") (in each case not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, in the event that not less than three (3) Business Days' notice is not reasonably practicable under the circumstances, the Company Parties shall provide draft copies of any such motions, documents, or the pleadings to the counsel to the Prepetition Second Lien Agent as soon as otherwise reasonably practicable before the date when the Company intends to file any such motion, documents, or other pleading and may file such motions, documents, or other pleadings on or before the applicable due date;

(viii)  timely comply with all Milestones;

(ix)    timely file a formal response in opposition to any objection filed with the Bankruptcy Court by any person with respect to the DIP Facility (or motion filed by such person that seeks to interfere with the DIP Facility) or any of the adequate protection granted pursuant to the DIP Orders or otherwise;

(x)     timely file a formal objection, in form and substance reasonably acceptable to each of the Agents, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (B) directing the appointment of an official committee of equity holders in the Chapter 11 Cases, (C) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (D) dismissing any of the Chapter 11 Cases;

(xi)    timely file a formal objection, in form and substance reasonably acceptable to each of the Agents, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying

12

or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(xii)    timely file a formal objection, in form and substance reasonably acceptable to each of the Agents, to any motion, application, or adversary proceeding (i) challenging, as applicable, the amount, validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, (a) any portion of the Second Lien Notes Claims, and/or the Holdco Notes Claims (such claims, collectively, the "<u>Prepetition Claims</u>") or (b) any liens securing or purportedly securing any such Prepetition Claims, (ii) asserting any other cause of action against and/or with respect or relating to the Prepetition Claims, or (iii) seeking standing to do either of (i) or (ii);

(xiii)    timely file a formal reply, in form and substance reasonably acceptable to each of the Agents, to any objection or other pleading opposing the entry of the Solicitation Order or the Confirmation Order or challenging any term or provision of the Plan;

(xiv)    to the extent that any Specified Impediment arises, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u>, that the economic outcome for the RSA Parties, the anticipated timing of confirmation and the Plan Effective Date, and other material terms as contemplated herein and in the Plan must be substantially preserved, as determined by each Agent in their reasonable discretions;

(xv)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(xvi)    promptly (and in any event within two (2) Business Days) notify the RSA Parties in writing of any material governmental or third party complaints, litigations, investigations, or hearings with respect to the Restructuring Transactions (or written communications indicating that the same may be contemplated or threatened), unless such notice is disclosed on the docket maintained in the Chapter 11 Cases;

(xvii)    if the Company Parties know of a breach by any Company Party in any respect of the obligations, representations, warranties, or covenants of the Company Parties set forth in this Agreement, furnish prompt written notice (and in any event within two (2) Business Days of such actual knowledge) to the RSA Parties and promptly take all remedial action necessary to cure such breach by any such Company Party;

(xviii)  not sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business, except with the prior written consent of the Required RSA Parties;

(xix)   as reasonably requested and subject to any applicable confidentiality agreements, confer with the Required RSA Parties and the advisors to the Prepetition Second Lien Agent (the "Crossover Advisors") to report on operational and financial performance matters, collateral matters, and the general status of ongoing operations;

(xx)    not (A) adopt any new executive compensation or retention plans, approve any executive bonuses, retention payments, in each case, other than the Management Incentive Plan, or (B) terminate any employees that would give rise to severance obligations except, in the case of both clause (A) and (B) above, (x) as provided for in the Approved Budget (as defined in the Interim DIP Order) then in effect or (y) with the prior written consent of the Required RSA Parties;

(xxi)   (A) prior to the Petition Date, pay in cash all reasonable and documented fees and out-of-pocket expenses accrued prior to the Petition Date for which invoices or receipts are furnished by the Crossover Advisors, (B) from and after the Petition Date, pay in cash all reasonable and documented fees and expenses incurred by the Crossover Advisors on and after the Petition Date from time to time, in each case subject to the terms for reimbursement set forth in the DIP Orders, and (C) on the Plan Effective Date, reimburse in cash the Crossover Advisors for all reasonable and documented fees and out-of-pocket expenses incurred and outstanding in connection with the Restructuring Transactions;

(xxii)  not incur, or cause to be incurred on its behalf, any flat monthly fees by its financial advisors or investment bankers following the Bankruptcy Court's entry of the Confirmation Order, and, notwithstanding anything to the contrary contained in the respective engagement letters, the Company Parties' financial advisors and investment bankers shall not charge any success fee (or similar transaction fee) prior to the occurrence of the Plan Effective Date; provided, however, that the foregoing limitations shall not in any way limit the right of any Company Party's counsel and other advisors (other than Moelis & Company LLC) to incur and be paid for services provided to or for the benefit of such Company Party;

(xxiii) provide, and direct their employees, officers, advisors and other representatives to provide, subject to confidentiality obligations in the Prepetition Second Lien Note Purchase Agreement, to the Crossover Advisors (i) reasonable access to the Company Parties'

14

books and records with reasonable advance notice, during normal business hours, and without undue disruption to the operation of the Company Parties' business, (ii) reasonable access to the management and advisors of the Company Parties during normal business hours on reasonable advance notice to such persons, without undue disruption to the operation of the Company Parties' business, and (iii) timely and reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs or entry into any of the Restructuring Transactions; provided, however, the Company Parties shall not be required to make any such responses to diligence public or otherwise cleanse the party requesting such diligence unless as otherwise agreed among the Company and the recipient(s) of such diligence;

(xxiv) in consultation with the Required RSA Parties, use commercially reasonable efforts to preserve or otherwise maximize any applicable net operating loss deductions, tax basis, and similar favorable tax attributes of the Company Parties (including as reorganized under the Restructuring Transactions) to the extent practicable, as determined by the Company Parties in good faith;

(xxv) not terminate the applicable engagement agreements of, and not breach the reimbursement obligations owed to, the Crossover Advisors; provided, however, that any such engagement agreements and reimbursement obligations shall terminate on the Plan Effective Date except as set forth in the Definitive Documentation;

(xxvi) not make any payment to any member or former member of Alpha, whether in the form of distributions on equity interests, indemnity payments or otherwise, for the purpose of enabling any such member or former member to pay, or to reimburse any such member or former member for payments made for, tax liabilities of any such member or former member except to the extent that (i) such payments are made only with respect to tax liabilities of such members and former members for the tax year(s) ending December 31, 2020 and/or December 31, 2021; (ii) such tax liabilities are attributable solely to such members' or former members' direct or indirect ownership of any Company Party or its subsidiaries; and (iii) the aggregate amount of such payments made to all members or former members of Alpha do not exceed $125,000 with respect to tax liabilities for the tax year ending December 31, 2020 and $125,000 with respect to tax liabilities for the tax year ending December 31, 2021;

15

(xxvii) solely until the Petition Date, (i) comply with the affirmative and negative covenants of the Company Parties (other than compliance with any financial covenants) under each of the Second Lien Notes Documents, and the Holdco Notes Documents (collectively, the "Existing Debt Documents"), and (ii) not take any actions (including the transfer of any assets) outside of the ordinary course of business, except in connection with the Restructuring Transactions; and

(xxviii) reasonably cooperate with the RSA Parties, including reasonably supporting any application or formal request for relief submitted to the United States Securities and Exchange Commission and other applicable governmental authorities, in order to seek to cause the issuance of the Specified Securities in connection with the Restructuring Transactions to be eligible for the federal securities law exemption set forth in section 1145 of the Bankruptcy Code.

(b)    The Company Parties shall not directly or indirectly (and shall not directly or indirectly encourage any other entity to) (i) object to, delay, impede, or take any other action or inaction that could interfere with or prevent acceptance, approval, implementation, or consummation of the Plan and Restructuring Transactions; (ii) take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Plan and Restructuring Transactions; (iii) modify the Plan, in whole or in part, in a manner that is inconsistent with this Agreement in any material respects; (iv) file any pleading, motion, declaration, supporting exhibit or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments of such documents) that, in whole or in part, is not consistent with this Agreement, the Plan, or other Definitive Documentation and is in contravention of the consent and approval rights of the RSA Parties provided in this Agreement and the respective Definitive Documentation; or (v) take any action or fail to take any action, which action or failure, as applicable, would cause a change to the tax status of the Company Parties.

(c)    The Company Parties shall not directly or indirectly (including through their representatives and advisors) seek, solicit, or support, encourage, negotiate, or enter into any agreements or arrangements relating to, any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, financing (debt or equity) or restructuring of the Company Parties, other than the Plan and the Restructuring Transactions (each, an "Alternative Transaction"); provided, however, that if any of the Company Parties receive a bona fide proposal or expression of interest regarding any Alternative Transaction from the RSA Effective Date until the occurrence of the Termination Date, the Company Parties shall promptly (and in any event within two (2) Business Days) (i) notify the Crossover Advisors of any such bona fide proposal or expression of interest,

16

with such notice to include, except solely as required for the Company to comply with any applicable confidentiality restrictions in existence as of the RSA Effective Date (after taking into account any agreements among the Parties with respect to the sharing of confidential information), the material terms thereof, including the identity of the person or group of persons involved, and (ii) except solely as required for the Company to comply with any applicable confidentiality restrictions in existence as of the RSA Effective Date (after taking into account any agreements among the Parties with respect to the sharing of confidential information), the Company Parties shall promptly furnish to the Crossover Advisors copies of any formal written offer or other written information that they receive related to the foregoing, and shall promptly offer to discuss any oral offer or any other material information that they receive relating to the foregoing, and shall promptly inform the Crossover Advisors of any material changes to such proposals.

7.      <u>RSA Parties Termination Events</u>.  The Required RSA Parties (as a group and not as individual Parties) shall have the right, but not the obligation, upon notice to the other Parties, to terminate this Agreement (in such capacity, the "<u>Terminating RSA Party Group</u>") as provided below upon the occurrence of any of the following events (each, a "<u>RSA Parties Termination Event</u>"), unless waived by such party, in writing, on a prospective or retroactive basis:

(a)      the failure of the Company Parties to meet any of the Milestones (as may be extended in accordance with <u>Section 4</u> of this Agreement), unless such failure is the result of (i) any act, omission, or delay on the part of the Terminating RSA Party Group in violation of their obligations under this Agreement or (ii) subject to the Company Parties' obligations pursuant to Sections 6(iii) and 6(iv) hereof, any Foreign Ownership Impediment;

(b)      other than as contemplated under this Agreement, if any Company Party takes any of the following actions: (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation or other substantially similar relief under any federal, state or foreign bankruptcy, insolvency, receivership or substantially similar law now or in effect after the date of this Agreement other than the Chapter 11 Cases to implement the Restructuring Transactions; (B) applying for or consenting to the appointment of a receiver, administrator, receiver, trustee, custodian, sequestrator, conservator or substantially similar official for any Company Party or for a substantial part of its assets; (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding referred to in clause (A) or (B); or (D) making a general assignment or arrangement for the benefit of creditors;

(c)      the occurrence of a material breach of this Agreement by any Company Party that has not been cured (if susceptible to cure) before the earlier of (i) five (5) business days after written notice to the Company Parties and the RSA Parties of such material breach from the Terminating RSA Party

17

Group asserting such termination and (ii) one (1) calendar day prior to any proposed Plan Effective Date;

(d)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(e)     the dismissal of one or more of the Chapter 11 Cases;

(f)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(g)     the Company Parties enter into, or file, any Definitive Documentation other than in accordance with Section 3(a)(viii) of this Agreement, or any other material document or agreement in connection with the Restructuring Transactions, that includes terms (by amendment or otherwise) that the Terminating RSA Party Group in good faith determines are inconsistent with this Agreement or the Plan;

(h)     any Company Party (i) amends, or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement or the terms of the Definitive Documentation, as applicable; (ii) suspends or revokes the Restructuring Transactions; or (iii) publicly announces its intention to take any such action listed in Sub-Clauses (i) or (ii) of this subsection;

(i)     any Company Party (i) files or announces that it will file any plan of reorganization other than the Plan or (ii) withdraws or announces its intention not to support the Plan;

(j)     any Company Party files any motion or application seeking authority to sell any assets with a fair market value in excess of $500,000 or other than in the ordinary course of business without the prior written consent of the Required RSA Parties;

(k)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Plan or any of the Restructuring Transactions; provided, however, that the Company Parties shall have five (5) Business Days after the issuance of such ruling or order to obtain relief that would allow consummation of the applicable Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, or (ii) is reasonably acceptable to the Required RSA Parties;

(l)     except as permitted under the DIP Orders, the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is

not substantially in the form of the applicable DIP Order or otherwise consented to by the Required RSA Parties;

(m)     the occurrence of any Event of Default under the DIP Note Purchase Agreement that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Noteholders in accordance with the terms of the DIP Note Purchase Agreement provided, however, the Terminating RSA Party Group must give five (5) Business Days' advance written notice to the other Parties prior to any termination pursuant to this <u>Section 7(m)</u>;

(n)     a failure of the Company Parties to timely make all required adequate protection payments as set forth in the DIP Orders; <u>provided</u>, <u>however</u>, that the Company Parties shall have five (5) Business Days after written notice to the Company Parties to cure any such nonpayment;

(o)     a breach by any Company Party of any representation, warranty, or covenant of such Company Party set forth in <u>Section 16</u> of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Plan or the Restructuring Transactions that (to the extent curable) has not been cured before the earlier of (i) five (5) Business Days after the receipt by the Company Parties of written notice and description of such breach from the applicable Terminating RSA Party Group and (ii) one (1) calendar day prior to any proposed Plan Effective Date;

(p)     any Company Party or RSA Party files a motion, application, or adversary proceeding (or any Company Party or RSA Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging, as applicable, the amount, validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Prepetition Claims or any liens securing such Prepetition Claims, or asserting any other cause of action against and/or with respect or relating to the Prepetition Claims or the prepetition liens securing the Second Lien Notes Claims;

(q)     the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order that is inconsistent with this Agreement, the Plan, or the Restructuring Transactions in any material respect;

(r)     any Company Party terminates its obligations under and in accordance with <u>Section 8</u> of this Agreement;

(s)     the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Company Parties' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(t)    (i) any of the DIP Orders, the Solicitation Order, or the Confirmation Order are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required RSA Parties, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties have failed to timely object to such motion;

(u)    the occurrence of the DIP Maturity Date (as defined in the DIP Note Purchase Agreement) without the Plan having been substantially consummated;

(v)    the dismissal or denial by the FCC of the Short Form Application or the Interim Long Form Application; and

(w)    any Company Party terminates its obligations under and in accordance with Section 8 of this Agreement.

8.    <u>Company Parties Termination Events</u>.  Each Company Party may, upon notice to the Required RSA Parties, terminate this Agreement upon the occurrence of any of the following events (each, a "<u>Company Termination Event</u>"), subject to the rights of the Company Parties to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a Company Termination Event:

(a)    a material breach by a RSA Party of any representation, warranty, or covenant of such RSA Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured before the earlier of (i) five (5) Business Days after notice to all Parties of such breach and a description thereof and (ii) one (1) calendar day prior to any proposed Plan Effective Date; <u>provided</u>, <u>however</u>, notwithstanding the foregoing but without limiting the breaching RSA Party's liability to the other Parties hereunder arising from such breach, it shall not be a Company Termination Event if the non-breaching RSA Parties collectively hold more than 50% in number and 66 2/3% in amount of each of the voted Holdco Notes Claims, and the Second Lien Notes Claims;

(b)    upon no less than three (3) Business Days' notice to the Crossover Advisors, if the board of directors of any Company Party determines, on the advice of its outside counsel, that (i) proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties, or (ii) an Alternative Transaction is more favorable than the Plan, taken as a whole, to the Company Parties and their estates and creditors taking into account the priority and required treatment of claims, and continued support of the Plan would be inconsistent with the exercise of its fiduciary duties;

20

(c)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; provided, however, that the Company Parties have made good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement; or

(d)     any RSA Party terminates its obligations under and in accordance with Section 7 of this Agreement.

9.     Mutual Termination; Automatic Termination.  This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among Alpha, on behalf of itself and each other Company Party, and the Required RSA Parties.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the earlier of the (i) DIP Maturity Date (as defined in the DIP Note Purchase Agreement), and (ii) the Plan Effective Date.  The Outside Termination Date may be extended by written agreement by and among Alpha, on behalf of itself and each other Company Party, and the Required RSA Parties.

10.     Effect of Termination.  The earliest date on which termination of this Agreement is effective in accordance with Sections 7, 8 or 9 (as applicable) shall be referred to as the "Termination Date" and the provisions of this Agreement shall terminate and all Parties' obligations (other than any breaching Party's obligations or damages or other remedies arising from the breach thereof) under this Agreement shall be terminated effectively immediately as of the Termination Date, and all non-breaching Parties shall be released from their commitments, undertakings, and agreements from and after the Termination Date; provided, however, that each of the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to the termination of this Agreement, and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) Sections 2, 10, 14 (for purposes of enforcement of obligations accrued through the Termination Date), 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, with respect to the second proviso of the third sentence and the fourth sentence of 31, 32, 33, 34 and 35.  The Parties agree that (i) the automatic stay imposed by section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of and otherwise enforce this Agreement pursuant to and in accordance with the terms hereof[; and (ii) upon the request of any non-breaching Party, the Company Parties shall seek an order of the Bankruptcy Court modifying the automatic stay to permit such termination.  The right to terminate this Agreement shall not be available to any Party whose failure to fulfill any of its obligations under this Agreement has been the cause of, or resulted in, the occurrence of the proposed termination event.  Nothing in this Agreement shall be construed as prohibiting any RSA Party or Company Party from contesting whether any such termination is in accordance with the terms hereof or seeking enforcement of any rights under this Agreement that arose or existed before any termination of this Agreement.

11.     Cooperation and Support.  The Parties agree, consistent with Sub-Clause (viii) of Section 3 hereof, (a) to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion after the RSA Effective Date and (b) that, notwithstanding anything herein to the contrary, the Definitive Documentation, including any motions or orders related

thereto, shall be consistent with this Agreement and otherwise subject to the applicable consent rights of the Required RSA Parties set forth in <u>Sub-Clause (viii)</u> of <u>Section 3</u> and in the Definitive Documentation upon their respective effectiveness.

12.    <u>Transfers of Claims and Interests</u>.

(a)    Each RSA Party shall not (i) sell, transfer, assign, pledge, hypothecate, grant a participation interest in or option on, or otherwise convey or dispose of, directly or indirectly, its right, title, or interest in respect of Claims/Interests (including the RSA Claims), in whole or in part (except in connection with the consummation of the Restructuring Transactions), or (ii) deposit any Claims/Interests into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such Claims/Interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "<u>Transfer</u>", the RSA Party making such Transfer is referred to herein as the "<u>Transferor,</u>" and a transferee receiving a Transfer pursuant to this <u>Section 12</u> is referred to as a "<u>Permitted Transferee</u>"), unless such Transfer is to another RSA Party, or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to Alpha, the Crossover Advisors, a Transferee Joinder substantially in the form attached hereto as **<u>Exhibit F</u>** (the "<u>Transferee Joinder</u>").

(b)    Upon compliance with the requirements of <u>Section 12(a)</u>, (i) with respect to RSA Claims held by the relevant Permitted Transferee upon consummation of a Transfer in accordance herewith, such Permitted Transferee is deemed to make all of the representations, warranties, and covenants of a Supporting Holdco Noteholder, or Supporting Second Lien Noteholder, as applicable, set forth in this Agreement as of the date of such Transfer and (ii) the Permitted Transferee shall be deemed a Supporting Holdco Noteholder or Supporting Second Lien Noteholder, as applicable. No Transferor shall have any liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement from and after the effective date of such Transfer made in compliance with this <u>Section 12</u>.

(c)    Any Transfer made in violation of this <u>Section 12</u> shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Company Parties and/or any RSA Party, and shall not create any obligation or liability of any Company Party or any other RSA Party to the purported transferee.

(d)    Notwithstanding the foregoing, no Transfer shall be allowed if the effectuation of such transfer would require any amendment of, or be reasonably likely to materially delay the approval of, the Interim Long Form Application or the Second Long Form Application.

(e)     This <u>Section 12</u> shall not impose any obligation on the Company Parties to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a RSA Party to transfer any of its RSA Claims. Notwithstanding anything to the contrary herein, (i) to the extent a Party is subject to a confidentiality agreement, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such confidentiality agreement; and (ii) any and all limitations, conditions or requirements relating to the transfer of RSA Claims under the Prepetition Second Lien Note Purchase Agreement (as it relates to the Second Lien Noteholder) shall remain in full force and effect and shall not be impaired, modified or otherwise affected by this Agreement.

(f)     Notwithstanding anything to the contrary herein, but subject to <u>Section 12(d)</u>, (i) this <u>Section 12</u> shall not preclude any RSA Party from transferring RSA Claims to Affiliates of such RSA Party (each, an "<u>Affiliate Transferee</u>"), which Affiliate Transferee shall be deemed a RSA Party bound by the terms hereof, and the RSA Party that transferred such RSA Claims to the Affiliate Transferee shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of its rights and obligations in respect of such transferred Claims; and (ii) the restrictions on Transfer set forth in this <u>Section 12</u> shall not apply to the grant of any liens or encumbrances on any RSA Claims in favor of a bank or broker-dealer holding custody of such RSA Claims in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such RSA Claims.

13.     <u>Further Acquisition of Claims or Interests</u>.  Except as set forth in <u>Section 12</u>, nothing in this Agreement shall be construed as precluding any RSA Party or any of its Affiliates from acquiring DIP Claims, Second Lien Notes Claims, or Holdco Notes Claims or interests in the instruments underlying the DIP Claims, Second Lien Notes Claims, or Holdco Notes Claims; <u>provided</u>, <u>however</u>, that any such additional DIP Claims, Second Lien Notes Claims, or Holdco Notes Claims acquired by any RSA Party or by any of its Affiliates shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition of such claims by a RSA Party or any of its Affiliates, such RSA Party shall promptly (but in no event later than three (3) Business Days following such acquisition) notify counsel to the Company Parties, who will then promptly notify the Crossover Advisors.

14.     <u>Fees and Expenses</u>.  In accordance with and subject to <u>Sections 5(o)</u> and <u>6(a)(xxii)</u> hereof and the terms and conditions of the DIP Orders and other Definitive Documentation (each, as applicable), the Company Parties shall pay or reimburse when due all reasonable and documented out-of-pocket fees and expenses of the Crossover Advisors, the DIP Agent, and the Prepetition Second Lien Agent (regardless of whether such fees and expenses were incurred before or after the Petition Date) incurred through and including the date on which a Termination Date has occurred.

15.    <u>Consents, Acknowledgments and Forbearance</u>.

(a)    Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of the Plan. The acceptance of the Plan by each of the RSA Parties will not be solicited until such RSA Party has received the Disclosure Statement and Solicitation Materials, in accordance with applicable law and, to the extent applicable, the Bankruptcy Code.

(b)    By executing this Agreement, but subject to the occurrence of the Termination Date and the terms of the DIP Orders, each RSA Party (including, for the avoidance of doubt, any Person that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) consents to the Company Parties' use of its cash collateral and incurrence of the DIP Facility expressly as authorized by, and subject to the terms of, the DIP Orders until the occurrence of a Termination Date.

(c)    By executing this Agreement, each RSA Party (including, for the avoidance of doubt, any Person that may execute this Agreement or a Transferee Joinder after the RSA Effective Date) forbears from exercising remedies with respect to any Default or Event of Default as defined under the Existing Debt Documents), as applicable, that exists as of the date hereof or hereafter. For the avoidance of doubt, the forbearance set forth in this <u>Section 15(c)</u> shall not constitute a waiver with respect to any Default or Event of Default under the Existing Debt Documents and shall not bar any RSA Party from filing a proof of claim or taking action to establish the amount of such claim. Except as expressly provided in this Agreement and the Existing Debt Documents, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any RSA Party or the ability of each RSA Party to protect and preserve any right, remedy, condition, or approval requirement under this Agreement or the Definitive Documentation. Upon the termination of this Agreement as to any RSA Party, the agreement of such RSA Party to forbear from exercising rights and remedies in accordance with this <u>Section 15(c)</u> shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Company Parties hereby waive.

(d)    The Supporting Holdco Noteholders agree not to exercise any default-related rights and remedies under the Prepetition Holdco Note Purchase Agreement or any of the other effectuating documents related thereto until seven (7) Business Days following the Termination Date hereunder, including, without limitation, commencing (or joining or supporting any other Person in the commencement of) an involuntary bankruptcy or other insolvency proceeding against any Company Party.

(e)    The Supporting Second Lien Noteholders, which collectively constitute "Required Noteholders" under, and as defined in, the Prepetition Second

24

Lien Note Purchase Agreement, hereby irrevocably authorize, consent to and direct the Prepetition Second Lien Agent to (i) execute, deliver and perform its obligations under this Agreement and the Definitive Documentation to which it is a party or otherwise subject, and (ii) otherwise exercise all of its rights, duties and obligations under this Agreement and the Definitive Documentation to which it is a party or otherwise subject.

16.   <u>Representations and Warranties</u>.

(a)   Each RSA Party hereby represents and warrants on a several and not joint basis for itself and not for any other Person that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)   it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)   the execution and delivery by it of this Agreement does not violate its certificates of incorporation, or bylaws, or other organizational documents or any provision of law, rule, or regulation applicable thereto or applicable to such RSA Party;

(iv)   the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (a) any of the foregoing as may be necessary and/or required for disclosure by the FCC or the United States Securities and Exchange Commission and applicable state securities or "blue sky" laws, (b) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (c) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company Parties, (d) any of the foregoing as may be necessary and/or required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder, and (e) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to

make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(v)     this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)    it is (a) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities of the Company Parties and Reorganized Alpha (including any securities that may be issued in connection with the Restructuring Transactions, including the Reorganized Equity) (collectively, the "Specified Securities"), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (b) an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended) and (c) acquiring any securities that may be issued in connection with the Restructuring Transactions for its own account and not with a view to the distribution thereof.  Each RSA Party hereby further confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient;

(vii)   it (a) fully understands that the issuance of certain of the Specified Securities (the "Restricted Specified Securities") may not qualify for the exemption from registration under section 1145 of the Bankruptcy Code, and that Specified Securities held by affiliates of the [Company Parties] that are not Restricted Specified Securities (the "Affiliate Specified Securities") will nevertheless be subject to section 1145(b)(1)(D) of the Bankruptcy Code, (b) fully understands the limitations on transfer of the Specified Securities and the Affiliate Specified Securities imposed by United States federal and state securities laws and the limitations on transfer of the Specified Securities generally that may be included in the Company Parties' organizational documents, (c) is able to bear the economic risk of holding the Specified Securities for an indefinite period and is able to afford the complete loss of its investment in any or all the

26

Specified Securities, (d) has received and reviewed all information and documents about or pertaining to the Company Parties and their respective organizational documents, the business and prospects of the Company Parties and the issuance of the Specified Securities, as such RSA Party deems necessary or desirable, (e) has been given the opportunity to obtain any additional information or documents and to ask questions and receive answers about any or all of the foregoing, as applicable, which such RSA Party deems necessary or desirable to evaluate the merits and risks related to its investment in the Specified Securities, (f) is not relying on (and will not at any time rely on) any communication (written or oral) of the Company Parties or any of their Affiliates, employees, agents or advisors as investment advice or as a recommendation to acquire the Specified Securities, (g) confirms that none of the Company Parties or any of their Affiliates, employees, agents or advisors has given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Specified Securities, (h) confirms that, in deciding to acquire the Specified Securities, such RSA Party is not relying on the advice or recommendations of the Company Parties or any of their Affiliates, employees, agents or advisors and such RSA Party has made its own independent decision that the investment in the Specified Securities is suitable and appropriate for such RSA Party;

(viii)    it acknowledges that the issuance of the Reorganized Equity pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D and/or Regulation S thereunder or pursuant to section 1145 of the Bankruptcy Code;

(ix)    it acknowledges that (a) the Specified Securities will be "restricted securities" under applicable federal securities laws and may be disposed of only pursuant to an effective registration statement or an exemption therefrom, (b) none of the Company Parties or any of their Affiliates will have any obligation to register any of the Specified Securities, (c) any certificate representing the Specified Securities will bear customary restrictive legends, and (d) a notation will be made in the appropriate books and records of the Company Parties indicating that the Specified Securities are subject to restrictions on transfer;

(x)    it (a) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the

27

power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement and (b) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests;

(xi)   it has not entered into any agreement to assign, sell, grant, pledge, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in its claims or its voting rights with respect thereto; and

(xii)   it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

(b)   Agent Representations and Warranties

(i)   The Prepetition Second Lien Agent represents and warrants that solely based on the register maintained by such Agent in accordance with the Prepetition Second Lien Note Purchase Agreement, the Supporting Second Lien Noteholders that are party to this Agreement hold, in the aggregate as of the date hereof, at least 66.7% in principal amount of all outstanding Second Lien Notes Claims and more than half in number of such Second Lien Notes Claims.

(ii)   The ICG Holdco Noteholders represent and warrant that solely based on the register maintained in accordance with the Prepetition Holdco Note Purchase Agreement, the Supporting Holdco Noteholders that are party to this Agreement hold, in the aggregate as of the date hereof, at least 66.7% in principal amount of all outstanding Holdco Notes Claims and more than half in number of such Holdco Notes Claims.

(c)   Each Company Party hereby represents and warrants on a joint and several basis (but not for any other Person other than the Company Parties) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)   it has the requisite limited liability company or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

28

(ii) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary limited liability company or other organizational action on its part, including, without limitation, approval of each of the independent directors of each of the entities that comprise the Company Parties;

(iii) the execution and delivery by it of this Agreement does not (A) violate its limited liability company agreement or other organizational documents, or those of any of its Affiliates in any material respect or any provision of law, rule, or regulation applicable thereto or otherwise to such Company Party, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases, any Company Party's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases and the existing Defaults and Events of Defaults under the Existing Debt Documents) under any material contractual obligation to which it or any of its Affiliates is a party;

(iv) as of the RSA Effective Date, there is no undisclosed agreement with respect to any Alternative Transaction;

(v) the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, (a) the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions and (b) the registrations, filings, consents, approvals and notices referred to in Section 16(a)(iv);

(vi) the issuance of and any resale of any securities issued pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code;

(vii) subject to the provisions of the Bankruptcy Code, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(viii)    no litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its legal right and authority to enter into this Agreement or perform its obligations hereunder; and

(ix)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

17.    Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Company Parties and in contemplation of possible chapter 11 filings by the Company Parties and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including, without limitation, the Bankruptcy Court. The Parties further agree that their obligations under Sections 5(h)-(k), Sections 6(a)(iii)-(iv), and Section 12(d) hereof with respect to the Second Long Form Application shall survive the Plan Effective Date.

18.    Waiver.  If the transactions contemplated herein are or are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation and shall be bound by Rule 408 of the Federal Rules of Evidence and any equivalent applicable state rules of evidence.

19.    Relationship Among Parties.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint (provided that the obligations of the Company Parties shall be joint and several); (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other Person; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company Parties and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) none of the RSA Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Company Parties or any of the Company Parties' other lenders or stakeholders, including as a result of this Agreement or the transactions contemplated here; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

30

20.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that, without limiting any rights or remedies available under applicable law or in equity, money damages may not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of a bond or other undertaking and without proof of actual damages) as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

21.  <u>Governing Law & Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code or the rules and regulations of the FCC.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of New York, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, upon the commencement of the Chapter 11 Cases, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

22.  <u>Waiver of Right to Trial by Jury</u>.  Each of the Parties waives, to the fullest extent permitted by applicable law, any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

23.  <u>Successors and Assigns</u>.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

24.  <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third-party beneficiary of this Agreement.

25.  <u>Notices</u>.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or

31

facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)     If to any Company Party:

c/o Alpha Media Holdings LLC
1211 SW 5th Avenue, Suite 750
Portland, OR 97204
Attention:     John Grossi
Email:         john.grossi@alphamediausa.com

*With a copy (which shall not constitute notice pursuant to this Section 25(a)) to:*

Sheppard, Mullin, Richter and Hampton LLP
333 South Hope Street
Forty-Third Floor
Los Angeles, California 90071
Attention:     Will Chuchawat and Justin Bernbrock
Email:         wchuchawat@sheppardmullin.com,
               JBernbrock@sheppardmullin.com

(b)     If to the Required RSA Parties:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:   Douglas Mannal
        Joseph A. Shifer
Email: dmannal@kramerlevin.com
       jshifer@kramerlevin.com

26.     <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

27.     <u>Amendments</u>.  Except as otherwise provided herein, this Agreement (including the Exhibits and Schedules) may not be modified, amended, or supplemented without the prior written consent of the Company Parties and the Required RSA Parties; *provided*, that solely with respect to amendments or modifications to the Milestones, the written consent required by this <u>Section 27</u> may be in the form of emails from (a) the Crossover Advisors to the Company Parties' counsel and (b) the Company Parties' counsel to the Crossover Advisors, in each case, confirming such amendment or modification.

32

28.    <u>Reservation of Rights</u>.

(a)    Except as expressly provided in this Agreement, the DIP Orders or the Plan, including, without limitation, <u>Section 5(a)</u>, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)    Without limiting <u>Sub-Clause (a)</u> of this <u>Section 28</u> in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to <u>Section 18</u>.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

29.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

30.    <u>Other Support Agreements</u>.  Until the Termination Date, no Company Party shall enter into any other restructuring support agreement related to a partial or total restructuring of the Company Parties' balance sheet unless such support agreement is consistent in all respects with the Plan and is acceptable to the Required RSA Parties.

31.    <u>Public Disclosure</u>.  The Company Parties shall submit drafts to the Crossover Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each a "<u>Public Disclosure</u>") at least three (3) calendar days before making any such disclosure or as promptly as reasonably practicable under the circumstances.  Any Public Disclosure shall be reasonably acceptable to the Prepetition Second Lien Agent before it is publicly disclosed, release, filed or published.  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; <u>provided</u>, <u>however</u>, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties; <u>provided</u>, <u>further</u>, <u>however</u>, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the Company Parties, the principal amount or percentage of any holdings of Claims/Interests held by any of the RSA Parties, in each case, without such RSA Party's prior written consent, as applicable. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall, to the extent permitted by applicable law, include

33

such signature pages only in redacted form with respect to the amount of RSA Claims held by each RSA Party, and, in the case of managed accounts, the specific name of the account managed (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

32.    Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

33.    Intentionally Omitted.

34.    Release.  In consideration of, among other things, the agreements provided for herein, the Company Parties forever waive, release and discharge any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff and recoupment), causes of action, demands, suits, costs, expenses and damages that they now have or hereafter may have, of whatsoever nature and kind, whether known or unknown (including, without limitation, a waiver of any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including the provisions of California Civil Code section 1542), matured or unmatured, concealed, suspected or unsuspected, fixed or contingent, secured or unsecured, disputed or undisputed, assertable directly or derivatively by class representative or individual, foreseen or unforeseen, whether now existing or hereafter arising, whether arising at law, tort or in equity (collectively, the "Released Claims"), against any RSA Party (in their respective capacities as such) and any of their respective subsidiaries and affiliates, and each of their respective successors, assigns, officers, directors, employees, agents, attorneys and other advisors or representatives (collectively, the "Released Parties"), in connection with the negotiation and execution of this Agreement; provided that in each case such Released Claim is based in whole or in part on facts, events or conditions, whether known or unknown, existing on or prior to the RSA Effective Date; and provided, further, that nothing herein will constitute a release or discharge of (x) this Agreement, (y) any agreement entered into among any Company Party, on the one hand, and any RSA Party, on the other hand, on or after the RSA Effective Date, or (z) the rights of any Company Party hereunder or thereunder and, for the avoidance of doubt, none of the foregoing in clauses (x) and (y) shall be deemed to be a Released Claim.  The Company Parties further agree to refrain from commencing, instituting or prosecuting, or supporting any Person that commences, institutes, or prosecutes any lawsuit, action or other proceeding against any and all Released Parties with respect to any and all Released Claims.

35.    Computation of Time. Rule 9006(a) of the Federal Rules of Bankruptcy Procedure applies in computing any period of time prescribed or allowed herein only to the extent such period of time governs a Milestone pertaining to the entry of an order by the Bankruptcy Court in the Chapter 11 Cases.

36.    No Strict Construction.  Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement and the exhibits attached hereto have been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement or the exhibits attached hereto nor any alleged ambiguity herein or therein shall be

34

interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement or the exhibits attached hereto, or based on any other rule of strict construction.

37.    Remedies Cumulative; No Waiver.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

38.    Severability.  If any portion of this Agreement or the exhibits attached hereto shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement and the exhibits attached hereto (as applicable) so far as they may practicably be performed shall remain in full force and effect and binding on the Parties hereto, provided that, this provision shall not operate to waive any condition precedent to any event set forth herein.

39.    Time of Essence.  Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

40.    Interpretation.

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein

35

which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(h)    the use of "include" or "including" is without limitation, whether stated or not.

[*Signatures and exhibits follow*]

36

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first written above.

**ALPHA MEDIA HOLDINGS LLC,**
**for itself and on behalf of its direct and**
**indirect subsidiaries and Affiliates set forth**
**on Exhibit A**

By: _____
Name:    [●]
Title:    [●]

[*Company Signature Page to Restructuirng Support Agreement*]

**Fill in this information to identify the case and this filing:**

Debtor Name   Alpha Media Holdings LLC

United States Bankruptcy Court for the:   _____ Eastern _____ District of  Virginia
                                                                        (State)

Case number (If known):   _____

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐   *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐   *Schedule H: Codebtors* (Official Form 206H)

☐   *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐   Amended *Schedule* _____

☑   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☑   Other document that requires a declaration  Corporate Ownership Statement & List of Equity Holders

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 01/24/2021_____          /s/ John Grossi_____
          MM / DD / YYYY              Signature of individual signing on behalf of debtor

                                      John Grossi_____
                                      Printed name

                                      Chief Financial Officer_____
                                      Position or relationship to debtor