Justin Bernbrock (admitted *pro hac vice*)
Bryan Uelk (admitted *pro hac vice*)
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Telephone:     (312) 499-6300
Facsimile:     (312) 499-6301

-and-

Colin Davidson
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York 10112
Telephone:     (212) 653-8700
Facsimile:     (212) 653-8701

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:     (804) 644-1700
Facsimile:     (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ALPHA MEDIA HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-30209 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' BRIEF IN OPPOSITION TO THE FORTRESS FEE CLAIMS

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") file

this brief in opposition to DBD AMAC LLC's ("<u>Fortress</u>") fee applications (Doc. Nos. 197 & 198)

and Fortress's brief requesting the (I) Allowance of Fees and Costs Pursuant to section 506(b) of

the Bankruptcy Code and (II) Allowance of Prepetition First Lien (Doc. No. 206 or the "<u>Brief</u>").

The Debtors respectfully state as follows:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Alpha Media Holdings LLC (3634), Alpha Media USA LLC (9105), Alpha 3E Corporation (0912), Alpha Media LLC (5950), Alpha 3E Holding Corporation (9792), Alpha Media Licensee LLC (0894), Alpha Media Communications Inc. (5838), Alpha 3E Licensee LLC (6446), Alpha Media of Brookings Inc. (7149), Alpha Media of Columbus Inc. (7140), Alpha Media of Fort Dodge Inc. (2022), Alpha Media of Joliet Inc. (7142), Alpha Media of Lincoln Inc. (7141), Alpha Media of Luverne Inc. (7154), and Alpha Media of Mason City Inc. (3996).  Alpha Media Communications LLC does not have a federal employee identification number.  The mailing address for the Debtors is 1211 SW 5th Avenue, Suite 750, Portland, OR 97204.

## PRELIMINARY STATEMENT

1.      Fortress comes before the Court under the guise of a white knight, seeking fees it claims it incurred while acting to help the Debtors emerge from bankruptcy with the most favorable outcome.  But Fortress was far from a force for good in these chapter 11 cases.  Fortress purchased the majority of the Debtors' first lien indebtedness at par plus accrued interest, then refused to step into the Debtors' pending pre-packaged chapter 11 plan that was fully supported by the remaining first lien and second lien prepetition lenders.  Thinking it had trapped the Debtors, Fortress offered the Debtors a one-sided, fee-bloated refinancing proposal.  But the Debtors did not capitulate to Fortress's demands.

2.      Instead, the Debtors entered chapter 11 proceedings with far more favorable financing package in the form of a senior priming DIP facility provided by ICG Debt Administration LLC ("ICG").  Following the Court's interim approval of the ICG financing, Fortress engaged in an unsuccessful two-week-long process of presenting "alternative" refinancing proposals to the Debtors in an effort to salvage their expected profits from DIP and exit financing.  Ultimately, the Debtors were able to find value-maximizing financing provided by Brigade Capital ("Brigade"), and used the proceeds to take out Fortress on February 25, 2021.

3.      Fortress's overly aggressive brinkmanship and threats of litigation both pre- and postpetition were never aimed at protecting its oversecured investment.  As evidenced by its purchase of the first lien debt at par plus accrued on the eve of the Debtors' bankruptcy, and its later stipulation to the Debtors' valuation for purposes of the Final DIP Hearing (Doc. No. 127)—Fortress always knew it would be paid in full.  In the end, Fortress's participation only served to inject hostility into what otherwise should have been highly consensual, efficient chapter 11 cases.

4. The dispute at issue represents Fortress's last gasp to extract value from the Debtors and their stakeholders, typifying Fortress's value-destructive approach. Rather than accept payment in full on account of its secured claim, Fortress now seeks to exploit its position by seeking approximately $5.5 million of professional fees under section 506(b). Among the fees sought are:

- An unearned and previously undisclosed $2 million "Transaction Fee," which ultimately amounts to a "participation trophy" for its financial advisor, Jefferies LLC ("Jefferies"), whose work in these chapter 11 cases since being retained on February 11, 2021, has been minimal and in no way responsible for the financing the Debtors now seek to implement through confirmation of their chapter 11 plan;

- Approximately $2 million of professional fees that the Debtors fully paid prepetition and which were not due when Antares Capital LP ("Antares"), the prior administrative agent, assigned its rights to Fortress—plainly, Antares could not sell more than it owned;

- After Antares sold all of its rights to Fortress, waived any post-closing rights under the First Lien Credit Agreement, and resigned as agent: the prepetition professionals themselves (not Antares or Fortress) voluntarily refunded the Debtors back these disputed fees—and none of those professional firms are before the Court seeking reimbursement;

- Approximately $1.2 million of legal fees incurred by Fortress's lead counsel, Proskauer, in pursuit of its scorched-earth litigation strategy designed to yolk the Debtors and their stakeholders with the increased cost of administration of these cases through over-lawyering—meanwhile, Fortress's claims were never in jeopardy.

5. In effect, Fortress has asked this Court to write it a blank check on account of outsized and inappropriate fee payments that—if actually incurred—were incurred unnecessarily and unreasonably and that, if approved, will only serve to line Fortress's pockets at the Debtors' detriment. For these reasons and the others described herein, Fortress should not be allowed the fees and costs it seeks.

6. As discussed more fully below, the Debtors request the Court disallow ***entirely*** Fortress's application for reimbursement of (i) the Jefferies' $2,000,000 "Transaction Fee," (ii)

the "Antares Reimbursement Claim" ($1,970,426.02); and (iii) the 2021 annual agent's fee ($250,000) that Antares appropriately refunded and was not due before Fortress's first lien debt was taken out in full.  The Debtors further request the Court disallow Fortress's application for reimbursement of its unreasonable outside counsel legal fees as determined by the Court.

## BACKGROUND

**A.    Fortress's Failed Attempt to Finance the Purchase of the Debtors' Assets.**

7.    In October 2020, Stephens Capital Partners LLC ("Stephens") and Breakwater Management LP ("Breakwater"), each an equity owner of the Debtors and collectively holders of approximately 35% of Alpha Media Holding LLC's ("Alpha Holdings") existing equity, made a stalking horse bid to acquire substantially all the Debtors' assets.  The sale proposal contemplated financing by Antares, the administrative agent for the then holders of the Debtors' prepetition first lien debt.  Several weeks later, the Debtors' prepetition second lien agent, ICG, provided the Debtors with a proposal to provide a $37.5 million new money commitment in connection with a prepackaged bankruptcy in which the Debtors' existing second lien debt and unsecured notes would be converted to equity.  In early December 2020, following further negotiations with Antares and ICG, among others, Antares indicated its desire to support the ICG prepack proposal in lieu of the sale proposal provided by Stephens and Breakwater.  Given Antares's support for the prepack proposal, the Debtors' boards of directors, following the recommendation from the Special Independent Committee ("SIC"), determined the best way to maximize value for the Debtors' stakeholders was to pursue prepackaged chapter 11 cases.  (*See* March 9, 2021 Declaration of John S. Dubel at ¶ 6 (the "Dubel Decl.")).

8.    In late December 2020, after the Debtors' advisors communicated to Stephens and Breakwater that the Debtors had decided to pursue prepackaged chapter 11 cases in lieu of a sale

process, Stephens and Breakwater submitted a revised sale proposal to acquire the Debtors' assets for $120 million supported by $110 million of postpetition liquidity ***provided by Fortress***. The SIC rejected this offer because the purchase price was too low and the proposed DIP too expensive. The Debtors' advisors communicated this decision to Stephens and Breakwater—who communicated it to Fortress—and continued to prepare the documentation necessary to commence the prepack. (Doc. 207, Declaration of Marimuthu Subburathinam at ¶ 5 (the "<u>Fortress Decl.</u>")); Dubel Decl. at ¶ 7).

**B.     Fortress Purchases the Debtors' First Lien Debt at Full Price and Promptly Dismantles the Debtors' Fully-Negotiated Prepackaged Deal.**

9.      On January 8, 2021, having prepared substantially final documentation, the Debtors formally commenced solicitation of votes on the prepackaged plan. On January 13, 2021, relying on Antares' and its advisors' statements of support, the Debtors prepaid Antares the anticipated 2021 administrative agent's fee—more than one month in advance of the February 25, 2021 due date under the First Lien Credit Agreement. (Dubel Decl. at ¶ 8).

10.     Yet, two days later, the Debtors learned Antares had sold its first lien debt holdings at par value plus accrued interest to affiliates of Fortress. Antares did not "balk" at the terms of the prepack; *it endorsed them before walking away entirely at the eleventh hour*. At the time of the sale on January 15, 2021, the Debtors had already commenced prepetition solicitation of the prepackaged plan, the voting deadline was set to expire later that day, and Antares never indicated to the SIC that it was not willing to move forward with supporting prepackaged chapter 11 cases. (Dubel Decl. at ¶ 9).

11.     By notice dated January 15, 2021, the last day on which creditors entitled to vote on the prepackaged plan were permitted to cast their votes, Antares resigned as the administrative agent under the First Lien Credit Agreement and "for all purposes." (*See* March 9, 2021

Declaration of Jeremy Williams (the "Williams Decl."), and Ex. B thereto, Bates-label Doc. No. ALPHA0007369).  That same day, Fortress's counsel (Proskauer) emailed Mr. John Grossi, Alpha Media's CFO, "on behalf of DBD AMAC LLC," with a "partially executed consent to successor [administrative] agent."  (*See* Williams Decl. and Ex. C thereto, Bates-label Doc. No. ALPHA0007860-ALPHA0007877).  The draft consent referred to "that certain Agency Transfer Agreement dated as of January 14, 2021" between Fortress and Antares, claiming Antares, as the administrative agent, "has assigned all of its rights, remedies, duties, and other obligations under the Credit Agreement …."  *See id*.  Despite request, Proskauer did not provide the Debtors with a copy of the Transfer Agreement until February 20, 2021—one business day before the Final DIP hearing.  (Dubel Decl. at ¶ 10).  A copy of the Transfer Agreement is before the Court at Docket No. 207-1 at 5-40.

12.    Under the Transfer Agreement, Fortress *only* succeeded to Antares's rights as first lien agent *from and after* the "Effective Time"—i.e., January 15, 2021.  (*See* Transfer Agreement, Doc. No. 207-1, § (1)(b), § 3).  As discussed below, Antares could not and did not transfer and assign more than it owned as of January 15, 2021.

13.    From the moment Fortress purchased its first lien debt claims, it has only frustrated the Debtors' efforts to obtain financing on value-maximizing terms.  It was quite a surprise to the Debtors' advisors, ICG's advisors, and the SIC when Fortress indicated soon after purchasing the Debtors' first lien debt that it had no intention of supporting the prepack construct.  During the week of January 18, 2021, Fortress submitted a proposal to the Debtors for senior postpetition financing predicated upon a bankruptcy sale process without a stalking horse, and which provided for a "roll up" of all the Debtors' existing first lien indebtedness into new postpetition financing at *an amount four times greater than the proposed new money component*.  Fortress attempted to

pressure the Debtors into accepting the proposal by threatening to retract it if not accepted that same week. (Dubel Decl. ¶ 11).

14.     Unbeknownst to Fortress, however, ICG had submitted a superior proposal for senior, priming DIP financing, which contemplated prearranged chapter 11 cases through which the Debtors' prepetition second lien lenders would have their prepetition claims equitized under the plan of reorganization.  With this proposal in hand, and the Debtors' efforts to negotiate better terms with Fortress meeting no meaningful response, the Debtors commenced prearranged chapter 11 cases predicated on ICG's priming DIP proposal and without Fortress's support.  (Dubel Decl. ¶ 12).

15.     Importantly, when Antares walked away from the long-negotiated deal with the Debtors on the precipice of a chapter 11 filing, the Debtors were forced to expend significant costs to secure a viable financing proposal.  In fact, the Debtors spent an average of $484,859 in unnecessary and unanticipated professionals' fees and expenses in their efforts to secure financing. (Dubel Decl. ¶ 13).

**C.     Fortress Scrambles to Preserve Its Expected Profits After the First Day Hearing.**

16.     At the First Day Hearing on January 25, 2021, the Debtors presented ICG's senior, priming DIP financing to the Court for approval.  In support thereof, the Debtors presented overwhelming evidence that Fortress's first lien debt was oversecured with a 60 to 90% equity cushion. (*See* Jan. 25, 2021 Declaration of Zul Jamal, Doc. No. 19 and Exh. A thereto).  Based in part on the evidence demonstrating this significant cushion, the Court authorized the Debtors to immediately obtain $5 million of the proposed ICG senior priming DIP financing.  (Doc. No. 44).

17.     After realizing it had not successfully trapped the Debtors into a one-sided DIP and exit financing arrangement, Fortress scrambled to preserve the future profits it had expected to earn by doing so when it purchased the first lien debt from Antares at full price.  Fortress ultimately

submitted three alternative financing proposals to the Debtors post-petition. (Dubel Decl. ¶ 14). In the end, Fortress could not sufficiently curb its appetite to profit off the Debtors' tenuous position and found itself without a seat at the table.

18.     On January 29, 2021, Fortress submitted its first postpetition financing proposal to the Debtors, which was woefully inadequate. Among other things, the proposal would have left the Debtors with negative liquidity upon their emergence from bankruptcy, which the Debtors' advisors promptly pointed out with the hope of inspiring Fortress to submit a revised proposal. Notably, Fortress's January 29 proposal made no mention of the excessive professionals' fees that Fortress would later seek from the estate—which would have increased the funding gap. Disregarding the urgency of the situation, Fortress waited over a week before submitting an incrementally improved but still noncompetitive proposal. (Dubel Decl. ¶ 15).

19.     While Fortress idled, the Debtors received a superior proposal from Brigade to provide an alternative senior DIP facility and exit financing on January 30, 2021. As part of this proposal, the Debtors would receive sufficient cash financing to pay off the first lien debt held by Fortress in full. After identifying this proposal as the best path forward, the Debtors diligently worked to finalize terms with Brigade. (Dubel Decl. ¶ 16).

20.     Fortress finally provided a revised proposal to the Debtors on February 6, 2021. The revised proposal contemplated a $20 million senior secured DIP loan on substantially the same terms as the Senior ICG DIP and the refinancing of Fortress's $90 million first lien debt with a $128 million first lien exit credit facility to be provided by Fortress. While Fortress's second offer no longer resulted in negative liquidity for the Debtors upon emergence, it represented only a slight improvement and was not competitive with Brigade's January 30, 2021 proposal. (Dubel Decl. ¶ 17).

21.     On or around February 7, 2021, the Debtors' SIC made it known to Fortress that it had a competing exit financing proposal in hand and asked Fortress to again improve its offer. (Ex. 1, March 8, 2021 Deposition of Robert White (the "White Depo. Tr.") (excerpts), at 74:17-76:18; Dubel Decl. at ¶18). In response, Fortress submitted a slightly revised proposal on February 11, 2021. It, too, failed to beat the Brigade proposal, which more adequately addressed the Debtors' liquidity concerns and otherwise generally offered more favorable terms. (Ex. 1, White Depo. Tr., 76:13-77:2; Dubel Decl. ¶ 18).

22.     And, contrary to Fortress's insistence, none of its post-petition proposals had any impact on or relevance to the Brigade proposal the Debtors ultimately selected. To the contrary, the Debtors attempted to use the existence of this alternative proposal to attempt to extract a palatable offer from Fortress. (Ex. 1, White Depo. Tr., 75:10-23). In fact, the Debtors' deal with Brigade, which was ultimately approved by the Court at the Final DIP Hearing, was substantially documented well before Fortress made its best and last offer on February 11, 2021. (Dubel Decl. ¶ 19).

23.     Despite knowing the first lien debt it held was fully secured and would not be impaired and that it would be paid in full, Fortress, through its legal counsel, allegedly retained Jefferies Group LLC ("Jefferies") to help it formulate post-petition refinancing proposals acceptable to the Debtors in order to protect its future profits—not its secured position. In other words, Fortress's legal counsel engaged Jefferies as a financial advisor for the purpose of protecting Fortress's first lien debt from the "risk" that it would be paid in full upon plan confirmation. (*See* Declaration of Robert J. White In Support of DBD AMAC LLC's Brief In Support of (I) Allowance of Fees and Costs Pursuant to Section 506(b) of the Bankruptcy Code and (II) Allowance of Prepetition First Lien Claims (Docket No. 211) (the "White Decl.") ¶ 8).

24.     As part of its retention of Jefferies, Fortress claims it agreed to pay Jefferies a $2 million "transaction fee" if the Debtors closed any financing transaction, regardless of whether Fortress was a party to the transaction.  Even more unbelievable, Fortress—and Jefferies—now claim Jefferies was entitled to this $2 million transaction fee if the Debtors merely prepaid the first lien debt in full with cash.  (Ex. 1, White Depo. Tr., 88:2-89:23).  Fortress apparently could have increased the term loan liquidity of its proposals by $2 million but instead sought to siphon that cash to a third party advisor whether its proposals were accepted or not.

25.     Tellingly, Fortress never disclosed the more than $5 million of professional fees, including Jefferies' $2 million transaction fee, it planned to seek under § 506(b) in any of its post-petition financing proposals or through any other means—despite knowing the Debtors' main concern was exit liquidity.  (Ex. 1, White Depo Tr. 35:17-36:3; 45:4-46:4; 51:5-13).  Neither Fortress nor Jefferies ever disclosed Jefferies' fee structure until after the Debtors' filed their Final DIP Motion on February 18, 2021.  (Dubel Decl. at ¶ 20).  Regrettably, Fortress's lack of candor regarding the Jefferies transaction fee does not end there.

26.     In seeking reimbursement of the Jefferies' transaction fee under § 506(b), Fortress has represented to the Court that Proskauer, its external counsel, retained Jefferies on February 1, 2021.  In support thereof, Fortress offered the White Declaration and attached thereto an engagement letter, printed with "February 1, 2021," between Proskauer and Jefferies (the "Jefferies EL").  (Doc. No. 211-1, White Decl. at Ex. F).  On the date of this filing, Proskauer told Debtors' counsel for the first time that the Jefferies EL was executed on February 11, 2021.

27.     Still more, Mr. White was not forthcoming during his deposition about whether Jefferies understood its receipt of this $2 million windfall was contingent on it being paid by the Debtors via a § 506(b) fee claim.  In fact, Mr. White was specifically instructed by a Proskauer

attorney not to answer (i) whether Jefferies and Proskauer ever discussed if Fortress would seek payment of the transaction fee under § 506(b) or (ii) if Jefferies would be paid by the first lien lenders were Fortress's 506(b) claim denied by the Court.  (Ex. 1, White Depo. Tr. 102:4-104:8). Mr. White was directed not to answer the question on the objection that it is "trial preparation material" protected under "Rule 26."  (*Id.*[2]).

**D.    Fortress's Scorched Earth Tactics Destroy Value**

28.    Contrary to Fortress's representation that it did not engage in "scorched earth litigation" (Doc. No. 26 ¶¶ 4, 31), Proskauer's fee application demonstrates that Fortress pushed a litigious agenda in lieu of the constructive approach suggested by the Debtors.  For example, one of Proskauer's litigators billed 159 hours in the span of 27 days, which was higher than any other Proskauer attorney.   (Doc. No. 197, p. 25).   Additionally, the Debtors were forced to incur the cost of reviewing and producing thousands of documents in order to comply with Fortress's overreaching and irrelevant document requests.  And Fortress served additional unnecessary and irrelevant document requests and interrogatories related to this fee hearing.  In stark contrast, and Fortress produced a meager 22 documents prior to their fee applications submission.  The litigation fees Fortress incurred were purely offensive and were incurred with the aim of blocking the Debtors from paying off the Fortress's first lien debt in full.  Indeed, Fortress's own witness—Mr. White—testified in his sworn declaration that a benefit of the Debtors selecting the Brigade proposal was that it would end the expensive fight with Fortress.  (Doc. No. 211, White Decl. at ¶ 19).

---

[2] Of course any verbal or written understanding between Proskauer, Jefferies, and/or Fortress concerning the recoverability of the transaction fee or the division of fees recovered is discoverable.  As the parties with the burden of proof, they also have an obligation to make a full and frank disclosure to the Court concerning their "fee agreements.

29.     Consistent with its behavior throughout, rather than accept payment in full, Fortress has sought to siphon further value by seeking unreasonable fees and expenses to which it and its advisors are not entitled.

## ARGUMENT AND AUTHORITY

**A.     Standard of Review under § 506(b) of the Bankruptcy Code**

30.     Fortress seeks fees and costs pursuant to § 506(b) of the Bankruptcy Code.[3]  To recover under § 506(b), the creditor must establish: "(1) that its claim is oversecured in excess of the fees requested; (2) that the fees are reasonable; and (3) that the agreement giving rise to the claim provides for attorneys' fees."  *In re Enron Corp.*, 306 B.R. 33, 43 (S.D.N.Y. 2004), *aff'd sub nom. Enter. Prods. Operating L.P. v. Enron Gas Liquids Inc.*, 119 Fed. Appx. 344 (2d Cir. 2005); *In re Gwyn*, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993).

31.     The reasonableness of fees and expenses ultimately depends on the particular facts and circumstances of a case.  *In re Amherst Orthopedic Assocs., P.C.*, 355 B.R. 420, 422 (Bankr. W.D.N.Y. 2006).  While the underlying contract serves as the initial focal point, courts must also consider reasonableness within the general policies and provisions of the Bankruptcy Code, and bankruptcy courts have inherent discretion to review fee claims for potential abuse.  *In re Wonder Corp. of Am.*, 72 B.R. 580, 588 (Bankr. D. Conn. 1987); *In re Mills*, 77 B.R. 413, 419 (Bankr. S.D.N.Y. 1987).

32.     To be considered "reasonable" under section 506(b), the fee amount must not only be reasonable for the services provided, but the services themselves must have been "necessary to the collection and protection of a creditor's claim."  *In re Ward*, 190 B.R. 242, 245 (Bankr. D. Md. 1995) (citations omitted).  For example, if a "creditor's secured position is jeopardized, it may be

---

[3]     *See, e.g.*, the Brief at 1-2.

necessary to participate broadly in the bankruptcy process.  But ***when the creditor is minimally at***

***risk, circumstances will generally require that counsel respond only to issues of material***

***concern, such as the establishment of a process for monitoring current levels of collateral***."

*Amherst Orthopedic*, 355 B.R. at 424 (emphasis added).  Therefore, in considering whether the

fees are reasonable under § 506(b), the Court must determine whether the creditor "took the kind

of actions that similarly situated creditors might reasonably conclude should be taken . . . ."  *In re*

*Valdez*, 324 B.R. 296, 300 (Bankr. S.D. Tex. 2005) (citing *In re Univ. Towers Owners' Corp.*, 278

B.R. 302, 305-06 (D. Conn. 2002)).

33.     Section 506(b)'s reasonableness standard "prevent[s] squandering of estate assets

by oversecured creditors who 'fail to exercise restraint in the . . . fees and expenses they incur,

perhaps exhibiting excessive caution, overzealous advocacy and hyperactive legal efforts.'"  *In re*

*Bate Land & Timber, LLC*, 541 B.R. 601, 607 (Bankr. E.D.N.C. 2015) (citation omitted).[4]  Where,

as here, the oversecured creditor "fail[ed] to exercise restraint in the attorneys' fees and expenses

they incur, perhaps exhibiting excessive caution, overzealous advocacy and hyperactive legal

efforts"—the request for fees should be disallowed.  *In re Gwyn*, 150 B.R. at 155-56 (disallowing

the vast majority of the oversecured creditor's attorneys' fees that were not necessary to protect its

secured claims) (Doc. No. 206 ¶ 22).

34.     In sum, a finding that the fees charged were reasonable is not enough; the *action*

underlying the fees must itself be reasonable, and in this light, the reasonableness of Fortress's

fees and expense request fails miserably.  Fortress is entitled to engage counsel and pay for

---

[4]     *See also In re PCH Assocs.*, 122 B.R. 181, 204 (Bankr. S.D.N.Y. 1990) (Courts attempt to "determine whether
the creditor reasonably believed the services were necessary to protect its interest in the debtor's property."); *In
re Dalessio*, 74 B.R. 721, 723 (9th Cir. BAP 1987); *In re Brunel*, 54 B.R. 462, 464 (Bankr. D. Colo. 1985); *In re
Cushard*, 235 B.R. 902, 906-07 (Bankr. W.D. Mo. 1999); *In re West Elec., Inc.*, 158 B.R. 37, 41 (Bankr. D.N.J.
1993).

constant and aggressive representation, but "where services are not reasonably necessary or action is taken because of an attorney's excessive caution or overzealous advocacy, courts have the right and duty, in the exercise of discretion, to *disallow* fees under [section] 506(b)." *In re Latshaw Drilling, LLC*, 481 B.R. 765, 805 (Bankr. N.D. Okla. 2012) (emphasis added).

**B.    Fortress' Claim for Reimbursement of a $2 Million Transaction Fee Is Not an Allowed Claim Under Section 506(b).**

35.    As an initial matter, Fortress knew at all times that it was oversecured and not at risk of having its claim impaired.  Fortress would have only purchased the first lien debt at par-plus-accrued on the eve of bankruptcy if it knew there was little or no risk that it would not be fully collectible.  Indeed, there was but one hour in this entire case before Fortress's first-lien debt was adequately protected by an Order from the Bankruptcy Court. (Doc. No. 44).  And, on February 10, 2021, Fortress stipulated to the Debtors' valuation.  (Doc. No. 127).  In light of these facts alone, it was unnecessary and unreasonable to incur millions of fees to protect its secured position.

36.    It is telling that Fortress represents to the Court that it had "near daily" conversations with the Debtors' advisors but never once disclosed the $2.125 million fees that Fortress would later contend must be paid regardless of the success or failure of Fortress's efforts to restructure the first lien debt.  Fortress's silence is deafening.  Fortress hid its alleged side-agreement with Jefferies because it knew an investment banker was not needed to adequately protect its oversecured claim—much less an investment banker that would earn $2.125 million in less than two weeks of work.

37.    Moreover, Fortress engaged Jefferies *after* Fortress had already made several financing proposals.  None of those prior proposals required a $2-million-investment-banker participation.  Any suggestion by Fortress that Jefferies added 'value' to its later proposals by

helping Fortress determine the Debtors' needs is specious for the simple reason that the take-back

debt in the ICG prepack proposal had already established what worked for the Debtor and ICG.

While it was unreasonable to engage an investment banker at all to protect its position, the idea

that Fortress needed one to figure out what worked for the Debtors from a financing standpoint is

unreasonable.  Fortress only made *slightly revised* proposals to the Debtors, culminating with

Fortress's February 11, 2021 so-called "Second Enhanced Alternative Proposal"—where the

"enhanced" terms were made in response to information provided by the  Debtors—not on any

information or unique work by Jefferies.

38.     Fortress seeks to use the Bankruptcy Code to recover from the Debtors' estate what

amounts to a $2 million *participation trophy* it claims it now owes Jefferies even though it has

been and was always going to be made whole.  Section 506(b) of the Bankruptcy Code allows no

such thing.  While Fortress, as an oversecured creditor, may recover certain fees it incurred post-

petition under § 506(b), such fees are only recoverable if they are both (i) provided for under the

agreement pursuant to which its secured claim arose, i.e., the First Lien Credit Agreement, and (ii)

are "reasonable." 11 U.S.C. § 506(b).  As the movant, Fortress bears the burden of establishing

that Jefferies' $2 million transaction fee is not only reimbursable under the First Lien Credit

Agreement but also reasonable.  *See In re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr.

W.D. Va. 1984).  Fortress has not established either of these elements—or that it even actually

"incurred" Jefferies' $2 million transaction fee in the first place.  It is therefore not an allowed

claim under § 506(b), and the Court should deny Fortress' reimbursement claim for it.

**i.  Reimbursement of the Jefferies "Transaction Fee" is not allowed under section 506(b) because it is not provided for in the First Lien Credit Agreement.**

39.     Nothing in the First Lien Credit Agreement contemplates that Debtors will ever be

obligated to pay a participation fee to Fortress—or anyone else—in this or any other similar

circumstance, whether as part of or outside the bankruptcy process.  With wide eyes agaze at its

significant equity cushion, Fortress argues that, as the administrative agent under the First Lien

Credit Agreement, it is entitled to reimbursement of the Jefferies' $2.125 million fee under § 9.5

and/or indemnification under § 9.6.  But neither section would ever obligate the Debtors to pay a

fee to the administrative agent if and when it completely pays off the first lien debt in spite of the

administrative agent's best efforts to prevent a payoff.

40.     Relying on Section 9.5 of the First Lien Credit Agreement, Fortress argues that the

Jefferies fees are a reasonable cost it "incurred in connection with the investigation, development,

preparation . . . [or] any modification of any term of, any Loan Document."  (Doc. No. 206 ¶ 23).

Alternatively, Fortress argues the Jefferies fees are reasonable documented cost or out-of-pocket

expense it incurred as the administrative agent "in connection with (i)any refinancing or

restructuring of the credit arrangements provided hereunder in the nature of a 'work-out' [or] the

enforcement or preservation if any right or remedy under any Loan Document."  *Id.*

41.     But the plain language of the First Lien Credit Agreement, read as a whole,

precludes Fortress from reading a right to reimbursement for the Jefferies fees which, here, are

tantamount to a signing bonus or mere participation fee award. Section 11.1 of the First Lien Credit

Agreement defines "Loan Document" to mean "this Agreement, the Notes, the Antares Fee Letter,

the Citizens Fee Letter, the Collateral Documents, the Intercreditor Agreement and all documents

delivered to the administrative agent Lender in connection with any of the foregoing, other than

any agreement, document, certificate or instrument related to a Bank Product."  So defined,

Jefferies never provided any services or work in connection with any Loan Document.  Nor did its

work relate to refinancing or restructuring the credit provided under the First Lien Credit

Agreement.  Rather, its work wholly related to advising Fortress about two completely separate

proposed financing packages ultimately offered to completely replace the First Lien Credit Agreement and other Loan Documents. The transaction fee Fortress claims Jefferies is now owed is thus not a reimbursable expense under § 9.5.

42.     Even if circumstances were different and the Jefferies transaction fee was owed in connection with activities performed in connection to the Loan Documents and enumerated in § 9.5, it would still ***not*** be a reimbursable cost or expense. Section 9.5 specifically limits reimbursement to costs or expenses "incurred" by the administrative agent or its Related Persons, and specifies that such expenses include Attorney Costs. As used in § 9.5, the term Related Persons "means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and other consultants of such Person or any of its Affiliates," and the term Attorney Costs "mean[s] and includes all reasonable fees and disbursements of any law firm or other external counsel." First Lien Credit Agreement § 11.1. Since Jefferies is neither a law firm nor external counsel, and since the Jefferies transaction fee is to be paid and thus disbursed by Fortress and not its external law firm, *see* Proskauer EL § 4, the Jefferies transaction fee does not qualify as an Attorney Cost. While Fortress argues "external counsel" also means external consultants, (Doc. No. 206 ¶ 34), the definition of Related Persons precludes such an interpretation. If counsel meant both attorneys and consultants, then the definition of Related Persons would not need to separately enumerate them. The Court should reject Fortress' attempt to wash its consultant fees through its external counsel in order to recover them from the Debtors.

43.     Fortress' assertion that Jefferies "certainly qualifies as a Related Person, (Doc. No. 206 ¶ 27), similarly fails. If Related Persons, which is defined to include attorneys and consultants, was intended to include external legal counsel or other external consultants, there would be no

need to specify that Attorney Costs were also reimbursable costs.  Moreover, unlike the definition of Attorney Costs, which refers to *external counsel*, the definition of Related Persons refers only to "attorneys" and "consultants" and not external attorneys or external consultants.  Fortress' assertion that Debtors must also indemnify it for the Jefferies transaction fee under § 9.6 fails for similar reasons.

44.    Critically, even if the Court finds the transaction fees or success fees similar to the Jefferies' are included within the scope of §§ 9.5 and/or 9.6, it would still not be recoverable from Debtors because Fortress has not "***incurred***" and is not otherwise liable to pay the Jefferies "transaction fee."  Pursuant to its retention agreement, Jefferies is only entitled to its "transaction fee" "upon the closing of a transaction."  (Doc. No. 211-1, White Decl. Ex. F ¶ 4).  Jefferies' unilaterally defined in its retention agreement the term "transaction" to mean "any restructuring of the [Debtor's] outstanding indebtedness, a solicitation of votes, approvals, or consents giving effect thereto (including with respect to a prepackaged or prenegotiated plan of reorganization or other plan pursuant to chapter 11, Title 11 of the United States Code, the execution of any agreement giving effect thereto, an offer by any party to convert, exchange or acquire any outstanding Company indebtedness, or any similar balance sheet restructuring involving the Company."  *Id.* ¶ 1(b)).  No such event has occurred.

45.    The Jefferies EL was not executed until February 11, 2021.  Between February 11–25, 2021 (i.e., Debtors' Final DIP Motion) the first lien debt held by Fortress and governed by the First Lien Credit Agreement was not restructured, converted, exchanged, or acquired.  Rather, Debtors obtained a completely separate credit facility independent of and apart from the First Lien Credit Agreement, which it then used to fully pay off the first lien debt.  The terms of the First Lien Credit Agreement were never altered in any regard.  Per the plain language of *Jefferies*

retention agreement, payment in full of the first lien debt does not qualify as the type of event, or transaction, that triggers its entitlement to a $2 million transaction fee.  Since Jefferies never became entitled to the $2 million transaction fee, Fortress never incurred it or became obligated to pay it, and there is nothing to reimburse or indemnify.   Accordingly, Fortress is not entitled to it under § 506(b).

46.     Yet, Fortress' claim that First Lien Credit Agreement provides for reimbursement of Jefferies' transaction fee fails for yet another reason:  it is unreasonable.  In order for fees to be reimbursable under § 9.5 of the First Lien Credit Agreement and § 506(b) the fees must be "reasonable."  Credit Agreement § 9.5; 11 U.S.C. § 506(b).  As detailed in the next section, since Jefferies $2 million transaction fee is not reasonable, it is should be disallowed.

**ii.   Fortress' reimbursement claim for the $2 million Jefferies Transaction Fee is not an allowed claim under § 506(b) because it is patently unreasonable.**

47.     Even if fees sought by an oversecured creditor are provided for in the agreement giving rise to its claim, that is merely the starting point of the § 506(b) analysis.  Such fees must also be reasonable.  The reasonableness of fees and expenses ultimately depends on the particular facts and circumstances of a case.  Fortress's claim for reimbursement of the $2 million Jefferies transaction fee fails both prongs of the reasonableness test given the circumstances of this case.

48.     By the time Jefferies was retained on February 11, 2021, Fortress was well aware that it was oversecured.  Fortress hired Jefferies to negotiate DIP and exit financing.  Fortress' claim that its retention of Jefferies helped the Debtors obtain better terms on its exit financing than it otherwise would have is belied by the facts. Brigade was never aware of Fortress' financing proposals. And Brigade's proposal was made on January 30, 2021—before Jefferies' retention.

49.     Regardless, Fortress's claim that its retention of Jefferies helped Debtors obtain improved financing terms is irrelevant to the Court's § 506(b) analysis.  Whether Debtors obtained

lesser or better terms had no impact on the value and collectability of Fortress' claim. Spending $2 million to maintain the status quo of its claim when its status was never in jeopardy was wholly unnecessary.

50.    The Court should deny Jefferies' $2 million transaction fee as entirely unreasonable under § 506(b). Jefferies' $125,000 monthly fee more than exceeds any reasonable fee to compensate Jefferies for its participation in these cases.

**C.    Fortress is Also Not Entitled to the Antares Professionals' Fees.**

      **i.    No reimbursement claims existed when Antares sold the 1L debt to Fortress.**

51.    Fortress seeks to recover nearly $2 million of allegedly "*unpaid*" professional fees incurred by Antares (the prior administrative agent), which Fortress claims it purchased on January 15, 2021. (Doc. No. 206 ¶ 43) (emphasis added) (referred to herein as the "Antares Reimbursement Claims"). These alleged costs are as follows:[5]

| | | | |
|---|---|---|---|
| $1,819,920.01 | Previously paid fees | | |
| $       750.00 | Previously paid costs and expenses | | |
| $  149,756.01 | Allegedly unpaid fees, costs and expenses | | |
| $1,970,426.02 | | | |

52.    Fortress admits under oath that as of January 15, 2021, however, the Debtors *had paid* Antares "for expenses it had incurred to Latham & Watkins and Alvarez & Marsal (among others)…." (*Id.* ¶ 44; *see also* March 5, 2021 Declaration of Mari Subburanthinam (the "Subburanthinam Decl.") (Doc. No. 207), Fortress's Managing Director at ¶ 7 (admitting "certain payments the Debtors had already made to the Former First Lien Agent")). In fact,

---

[5]    Fortress's submission offers no invoice or evidence of the supposed "$149,756.01" unpaid fees listed above. There is no proof of whose fees those are, for what services, when such services were provided, for what purpose, or at what rate. The Debtors object to and ask the Court to disallow entirely the $149,756.01 claim for the absolute lack of proof. This is Fortress's burden of proof—which it has not even attempted to establish.

Fortress admits that at least $2,069,920.01 had been paid by the Debtors to discharge Antares' professionals' fees.  (Doc. No. 206 ¶ 48 & n.13).

53.     Those undisputed prior payments break down as follows:

| $ | 3,960.00 | LimNexus |
|---|---|---|
| $1,384,336.67 | | L&W |
| $ | 431,623.34 | A&M |
| $ | 250,000.00 | Antares |
| $2,069,920.01 | | Total |

54.     In other words, not one penny of the alleged $1,970,426.02 Antares Reimbursement Claims was "due and payable" when Antares sold its rights and interests in the first-lien debt to Fortress.[6]

55.     Under the Transfer Agreement, Fortress succeeded to all of Antares's rights as first lien agent *from and after* the "Effective Time"—i.e.,  January 15, 2021.  *See* Transfer Agreement, (Doc. No. 207-1) § (1)(b), § 3. There is no assignment or transfer instrument before the Court providing Fortress with rights to claims arising *before* January 15, 2021.  And Antares agrees.  On January 26, 2021, Latham & Watkins, as counsel for Antares, wrote to the Debtors: "In addition, please be advised that Antares and the other predecessor first lien lenders <u>did not assign</u>, and continue to maintain, all of their respective indemnification, expense reimbursement and other claims, rights, privileges and immunities against the Company under Article VII, ***Section 9.5 and Section 9.6*** of the First Lien Credit Agreement, all of which are hereby reserved for themselves and their respective indemnitees." (Emphasis added.) (*See* Williams Decl. and Ex. A thereto,

---

[6]   Fortress has not offered any proof that it actually paid Antares $1,970,426.02.  Even if Fortress actually paid Antares $1,970,426.02 in cash as part of the January 15, 2021 transfer, it was not protecting any existing legal or economic interest (i.e., the Debtors had no obligation to pay Antares) and now Fortress has no basis to recover *its* voluntary payment to Antares from the Debtors who were not a party to the Transfer Agreement.

Bates-label Doc. No. ALPHA0005090-ALPHA0005091).  Plainly, there was no intent to assign reimbursement claims from *on or before* January 15, 2021.  (*Id*.).

56.     Moreover, in the conveyance instrument upon which Fortress relies, Antares expressly "***waive[ed], from and after [January 15, 2021], its right under the Antares Fee Letter*** (as defined in the Credit Agreement) and Section 1.10 of the Credit Agreement ***to receive any payments in respect of the fees set forth in the Antares Fee Letter payable at any time after the Effective Date***."  Transfer Agreement § 4 (emphasis added).  The section 4 waiver is clear and unambiguous, and the Court must give it its plain meaning.  In sum, Antares voluntarily waived any right to *future* (i.e., post-January 15, 2021) fee reimbursement claims in the very nature now asserted by Fortress. The Transfer Agreement was signed by Antares' "duly authorized representative" and clearly satisfies the legal requirement that the waiver be intentionally and knowingly made.  (Doc. No. 206 ¶ 54).

     **ii.     Antares could not assign to Fortress more than it owned.**

57.     It is axiomatic that an assignee cannot acquire from an assignor rights the assignor does not hold. *Hammond v. Antwerp Light & Power Co.*, 230 N.Y.S. 621, 627 (N.Y. Sup. Ct. 1928) ("A grantor can only convey what he owns."). Similarly, an assignee cannot acquire rights waived by the assignor prior to assignment. *See, e.g.*, *Adams-Flanigan Co. v. Kling*, 198 A.D. 717, 720 (N.Y. App. Div. 1921) (holding that assignee of landlord could not terminate lease asserting that premises were being used for purposes unauthorized by lease agreement, because landlord waived the right to terminate lease on those grounds and assignee takes subject to assignor's waiver); *M. Homes, LLC v. Southern Structural, Inc.*, 636 S.E.2d 99, 102 (Ga. App. 2006) (assignee of contract could not invoke arbitration clause in contract because assignor previously waived that right).

58.    Where, as here, Antares had no existing legal right to seek payment of $1,970,426.02 from the Debtors, its transfer of such putative right to Fortress means nothing, and gives to Fortress no such privilege.  Furthermore, Fortress has not provided any instrument with present tense words of grant and conveyance whereby Antares transferred an existing "unpaid" claim.

### iii.    None of the professionals seek reimbursement from the Debtors.

59.    Only after Antares made the purported assignment—monies were transferred back to the Debtors.  Notably, Latham & Watkins, Alvarez & Marsal, and LimNexus wired money directly back to the Debtors—not Antares or Fortress.  And none of those three firms are asserting a claim against the Debtors in these cases. None have intervened in this proceeding or told the Court they have unpaid invoices.

60.    As admitted in Fortress's Brief, Latham & Watkins formally wrote to the debtors on January 20, 2021, which letter gave no notice that the refunded monies would be demanded back.  (Doc. No. 206 ¶ 48).  The next day, the Debtors' received Fortress's Agency Transfer Letter; and at that time there was no reason to believe that that funds returned the day before (i.e., January 21) were really en route for a round-trip reimbursement.  To the contrary, the unwinding of the pre-packaged bankruptcy caused significant damage to the Debtors, and it was only equitable that Antares cause to be returned fees and expenses associated with negotiation of a deal that did not go through, because debt was bought out at par plus accrued.

### iv.    The Voluntary Payment Doctrine bars these claims.

61.    This is not a case of mistaken payment.  Antares caused its lawyers and professionals to voluntarily transfer the monies back with full knowledge of all material facts—as reflected in the Transfer Agreement and subsequent correspondence cited in Fortress's Brief.

Therefore, even if it were and overpayment to the Debtors, the Voluntary Payment Doctrine prevents Antares from recovering the refunded money where it had full knowledge of the facts, and in the absence of fraud or mistake of material fact or law. *Hedley's, Inc. v. Airwaves Global Logistics, LLC*, 130 A.D.3d 872, 873, 15 N.Y.S.3d 84 (2d Dep't 2015) (voluntary payment doctrine barred recovery of payments made by plaintiff to defendant above the established contractual limitation of liability).

### v. Fortress seeks to commit fraud on the bankruptcy process.

62.     The Antares payment was not based on any mistake in fact or law—*but to intentionally circumvent the law*. Fortress pleads that Antares refunded the Debtors certain professional fees because of a perceived preference risk. (Doc. No. 206 ¶ 44). As set out in explicit detail in their Transfer Agreement, Antares and Fortress colluded together to cleanse Antares' professional fees from the bankruptcy estate's potential preference claims. Fortress was not a bystander but a bad actor attempting to facilitate fraud on the bankruptcy process. In order "to ensure that Fortress could include these amounts in its claim under the First Lien Credit Agreement," Antares was to give money back to the Debtors (again, after it had sold its position and relinquished its rights) and be made whole with purchase money from Fortress. (Doc. No. 206 ¶ 44). This was intended to cut off an essential element of a preference claim, i.e., it eliminated the Debtors' prepetition transfers to Antares.

### vi. In any event, the Antares Reimbursement Claims are unreasonable.

63.     Even if Fortress had standing or capacity to sue to recover the prior administrative agent's professionals' fees incurred prior to January 15, 2021 (it does not), Fortress has not provided the Court any information or evidence regarding those fees and costs. Accordingly, the

Court has no basis upon which to determine the reasonableness of those fee claims under Rule 506(b).

64.     Fortress's claim for the Antares Reimbursement Claims is wholly unsupported because any such proof or support would only demonstrate that Fortress is seeking reimbursement for fees Antares incurred in pursuit of a consensual, prepack filing that Antares, and later Fortress, refused to consummate. Fortress likely withheld Latham & Watkins or Alvarez & Marsal's invoices from its submission because they would show that at some point, Antares was incurring professional fees not for the purpose of the consensual prepack filing or for the benefit of the Debtors, but instead in the interest of intentionally delaying consummation of the prepack to create time to close the sale to Fortress. And, supporting documentation and communications would likely show these professional fees included time negotiating the Fortress sale, as opposed to finalizing the prepack. As a matter of fundamental fairness, neither Antares (much less Fortress) should be permitted to recoup Antares' professional fees incurred to work against the interests of the Debtors.

65.     The Debtors anticipate that Fortress will argue that the prepetition payment of such invoices in the first instance is an admission of "reasonableness." That the professionals returned the monies is the more probative evidence. They knew the fees were unreasonable under the circumstances after Antares walked away from months' of work (and fees) to arrive at substantially final documentation on a consensual prepack.

66.     Moreover, Alvarez & Marsal holds approximately $100,000 of unearned retainer funded by the Debtors prior to January 15, 2021. (Dubel Decl. at ¶ 8). That unearned retainer is property of the estate under the Bankruptcy Court's jurisdiction. That Fortress's fee applications and briefing make no mention of this retainer suggests that Fortress is trying to 'double-bill' the

Debtors. For this additional reason, Fortress's claim for supposed Antares Reimbursement Claims lacks credibility and should be disallowed.

**D.      Fortress is Not Entitled to the 2021 $250,000 Agent's Fee.**

67.      Under the guise of section 506(b), Fortress effectively moves the Bankruptcy Court to compel a turnover an unearned annual administrative agency fee in the amount of $250,000. *Accord* Docket No. 206 ¶ 48.  The Debtor had prepaid Antares the anticipated 2021 administrative agent's fee on or about January 13, 2021—more than one month in advance of the anniversary of the First Lien Credit Agreement.  The annual fee was due on February 25, 2021.[7]  (Dubel Decl. at ¶ 8).

68.      Antares refunded the 2021 Agent's Fee on January 13, 2021—before the February 25, 2021 due date.  Antares voluntarily returned the unearned 2021 fees because it knew it must.

69.      More significantly, Brigade bought Fortress out of the first-lien debt position on February 25, 2021. Fortress is not entitled to the annual agent's fee due on February 25, 2021 and its claim for $250,000 should be disallowed.

**D.      Fortress Inappropriately Seeks Far More than the Reasonable Attorneys' Fees.**

70.      Fortress should not be reimbursed for all of its legal fees and expenses because its secured position was never objectively in jeopardy, and it did not need to police the case at all.  In fact, Fortress does not dispute the Debtors' valuation or its equity cushion for purposes of this Final Order.[8]  As such, the size of Fortresses equity cushion substantially limited the range of actions for which it could seek reimbursement in these chapter 11 cases.

---

[7]    This administrative agent's fee was for the time period of February 25, 2021-February 25, 2022.

[8]    *See Stipulation and Order Regarding Final Hearing on Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Doc. No. 127).

71.     Furthermore, the January 25, 2021 priming DIP Order did not give Fortress payment of its fees in connection with its adequate protection package—putting it on notice to exercise appropriate restraint.  Failing to heed this signal, Fortress chose to pursue an overly aggressive agenda, not because its secured position was in jeopardy, but merely because it sought to increase the cost of the administration of these cases and otherwise frustrate the Debtors' reorganization efforts to the detriment of all other parties in interest.  Fortress's lead outside counsel (Proskauer) had 21 people billing to the file over 38 days for a total of nearly 1,000 hours and $1,199,081.10.  Proskauer's "blended" attorney rate was $1,268.39—more than the Debtors' lead restructuring attorney Mr. Bernbrock's hourly rate.  The Debtors' apex should not be the metric for Proskauer's average.  Nor is there justification for Proskauer's total-hours billed to be equivalent to the Debtors' counsel's.  Accordingly, the Debtors request the Court make a reasonableness determination and disallow any unreasonable fees under section 506(b).  (*See* Doc. No. 206 ¶ 26).

## Conclusion

For the foregoing reasons, the Debtors request the Court disallow ***entirely*** Fortress's application for reimbursement of  (i) the Jefferies' $2,000,000 "Transaction Fee," (ii) the "Antares Reimbursement Claim" ($1,970,426.02); and (iii) the 2021 annual agent's fee ($250,000).  The Debtors further request the Court disallow Fortress's application for reimbursement of its unreasonable outside counsel legal fees as determined by the Court.

[*Remainder of Page Intentionally Left Blank*]

Dated: March 9, 2021

/s/ Jeremy S. Williams

| | |
|---|---|
| **KUTAK ROCK LLP** | **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP** |
| Michael A. Condyles (VA 27807) | Justin Bernbrock (admitted *pro hac vice*) |
| Peter J. Barrett (VA 46179) | Bryan Uelk (admitted *pro hac vice*) |
| Jeremy S. Williams (VA 77469) | 70 West Madison Street, 48th Floor |
| Brian H. Richardson (VA 92477) | Chicago, Illinois 60602 |
| 901 East Byrd Street, Suite 1000 | Telephone:     (312) 499-6300 |
| Richmond, Virginia 23219-4071 | Facsimile:     (312) 499-6301 |
| Telephone:     (804) 644-1700 | Email:  jbernbrock@sheppardmullin.com |
| Facsimile:     (804) 783-6192 |         buelk@sheppardmullin.com |
| Email:  michael.condyles@kutakrock.com | |
|         peter.barrett@kutakrock.com | -and- |
|         jeremy.williams@kutakrock.com | |
|         brian.richardson@kutakrock.com | **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP** |
| | Colin Davidson |
| *Proposed Co-Counsel to the Debtors and* | 30 Rockefeller Plaza |
| *Debtors-in-Possession* | New York, New York 10112 |
| | Telephone:     (212) 653-8700 |
| | Facsimile:     (212) 653-8701 |
| | Email:  cdavidson@sheppardmullin.com |
| | |
| | -and- |
| | |
| | **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP** |
| | Amanda Cottrell (admitted *pro hac vice*) |
| | Steven Gersten |
| | 2200 Ross Ave., 24th Floor |
| | Dallas, Texas 75201 |
| | Telephone:     (469) 391-4700 |
| | Facsimile:     (469) 391-7577 |
| | Email:  acottrell@sheppardmullin.com |
| | sgersten@sheppardmullin.com |
| | |
| | *Proposed Co-Counsel to the Debtors and* |
| | *Debtors-in-Possession* |

**EXHIBIT 1**

```
 1    IN THE UNITED STATES BANKRUPTCY COURT

 2    FOR THE EASTERN DISTRICT OF VIRGINIA

 3          RICHMOND DIVISION

 4     - - - - - - - - - - - - - - - - - - -x

 5    IN RE:

                              Chapter 11

 6    ALPHA MEDIA HOLDINGS   Case No. 21-30209(KRH)

      LLC, et al.,           (Jointly Administered)

 7

 8                    Debtors.

 9     - - - - - - - - - - - - - - - - - - - x

10

11                    March 8, 2021

12                    2:01 p.m.

13

14     VIDEOTAPED REMOTE DEPOSITION of ROBERT

15    WHITE, in the above-entitled action, located

16    in New York, New York, taken before Dawn

17    Matera, a Shorthand Reporter and Notary

18    Public.

19

20              *     *     *

21

22

23

24

25

                                      Page 1
```

```
 1    APPEARANCES:
 2
      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
 3    Attorneys for Debtors and Debtors in Possession
              2200 Ross Avenue, 24th Floor
 4            Dallas, Texas 75201
              (469)391-7400
 5
         BY:  AMANDA COTTRELL, ESQ.
 6            acottrell@sheppardmullin.com
 7       BY:  MIKELA T. SUTRINA, ESQ.
              msutrina@sheppardmullin.com
 8
         BY:  STEVEN G. GERSTEN, ESQ.
 9            sgersten@sheppardmullin.com
10       BY:  JUSTIN BERNBROCK
                 jbernbrock@sheppardmullin.com
11
         BY:  CATHERINE JUN, ESQ.
12            cjun@sheppardmullin.com
13
         PROSKAUER ROSE LLP
14       Attorneys for Fortress as first lien agent
         and also the Witness
15            Eleven Times Square
              New York, New York 10036
16            (212)969-3000
17       BY:  MICHAEL T. MERVIS, ESQ.
              mmervis@proskauer.com
18
         BY:  JAMES ANDERSON, ESQ.
19               janderson@proskauer.com
20
         QUINN EMANUEL URQUHART & SULLIVAN LLP
21       Attorneys for ICG Debt Advisors,
         ICG Debt Administration and the
22       ad hoc crossover noteholder
              51 Madison Avenue, 22nd Floor
23            New York, New York 10010
24       BY:  JORDAN HARAP, ESQ.
                 jordanharap@quinnemanuel.com
25

                                          Page  2
```

```
 1    APPEARANCES: (Continued)
 2
         HAHN, LOESER & PARKS LLP
 3       Attorneys for Official Unsecured
         Creditors Committee
 4           200 Public Square Suite 2800
             Cleveland, Ohio 44114
 5
         BY:  DANIEL A. DEMARCO, ESQ.
 6           Dademarco@hahnlaw.com
 7
 8
 9
10
    Also Present:
11
         KEN WILLIAMSON, Videographer
12
         JINGZHI DAI, Jefferies
13
         KEVIN LISANTI, Jefferies
14
         ELAINE GONG, Jefferies
15
         DANIEL MOREFIELD, Jefferies
16
17
18
19                *       *       *
20
21
22
23
24
25
```

Page  3

```
 1    answer my question.
 2             Was the February 6th proposal
 3    accepted by the debtors at any time after
 4    it was made?
 5        A.    At that point in time, the
 6    feedback was we are going to continue to
 7    evaluate it, along with other
 8    alternatives.
 9        Q.    So would the record be correct
10    to reflect that the answer to my question
11    is no it was not accepted by the debtors?
12        A.    They did not accept that
13    proposal at that point in time.
14        Q.    Or ever, correct, Mr. White?
15        A.    Correct.
16        Q.    Thank you.
17             In the second proposal, now
18    that Fortress is involved and retained,
19    did the second proposal of February 6th
20    reveal that upon Jefferies' retention it
21    would be billing $125,000 per month in
22    professional fees?
23        A.    My recollection is it did not.
24        Q.    It did not.  Did the February
25    6th proposal by Fortress reveal that upon
```

Page 35

```
 1    Jefferies' retention that it would also
 2    bill a 2 million dollar transaction fee?
 3         A.    My recollection is it did not.
 4         Q.    Had the debtors accepted
 5    Fortress' February 6th proposal, would
 6    Jefferies have argued that it was
 7    entitled to a 2 million dollar
 8    transaction fee?
 9              MR. MERVIS:  Object to the form.
10              You can answer.
11         A.    Yes, in the terms of our
12    engagement.
13         Q.    In just five days into the
14    engagement, under an acceptance of the
15    February 6th proposal, it would be
16    Jefferies' position that it had earned
17    its transaction fee; is that correct?
18         A.    The debtors had accepted the
19    proposal, and if it was ultimately
20    approved by the Court under the terms of
21    our engagement letter it would have
22    triggered our transaction fee.
23         Q.    In paragraph 11, Mr. White, you
24    refer to a side-by-side comparison.  If
25    you look at the third line down; do you
```

Page 36

1              MR. MERVIS:  I do.

2         Q.    Mr. White, can you see it?

3         A.    I see it, yes.

4         Q.    And Mr. White, is the table we

5    have now marked as Exhibit 3 to your

6    deposition the side-by-side comparison

7    that you stated "Was included" in

8    Fortress' February 6th proposal to the

9    debtors?

10        A.    Yes.  That's the side-by-side

11   that I was thinking of previously.

12        Q.    Very good.  First of all, the

13   side-by-side comparison, what is it

14   comparing?  What proposals is it

15   comparing side-by-side?

16        A.    It is a comparison of the

17   Fortress-enhanced proposal relative to

18   its previous January 29th proposal, as

19   well as a comparison between Fortress'

20   enhanced proposal and ICG's proposal

21   under the RSA.

22        Q.    Does Exhibit 3 -- let's take a

23   step back.  Who prepared the side-by-side

24   comparison?

25        A.    The Jefferies team did.

```
 1        Q.    And Jefferies side-by-side
 2   comparison, does it refer to or address
 3   Fortress' professional fees?
 4        A.    It doesn't explicitly.
 5        Q.    How does it implicitly refer to
 6   Fortress' professional fees?
 7        A.    Again, the company's liquidity
 8   forecast included a 4 million dollar
 9   contingency or cushion in its estimate of
10   professional fees.
11        Q.    What was the time period that
12   those, that the 4 million dollar
13   contingency was forecasted to be spent
14   over in the company's liquidity analysis,
15   if you know, Mr. White?
16        A.    I don't recall specifically.
17   My recollection is that it was during the
18   pendency of the case.
19        Q.    Do you recall that that
20   analysis forecasted fees out into July
21   2021?
22        A.    My recollection was, again, it
23   was an estimate of professional fees
24   during the pendency of the case.
25        Q.    Did the debtors' estimate of 4
```

                                       Page 46

```
 1              MR. MERVIS:  Same objection.
 2        A.    It was the best estimate of the
 3   liquidity available under each proposal
 4   at that time.
 5        Q.    At any point in time after this
 6   proposal was made, did Fortress go back
 7   to the debtors and explain that Fortress'
 8   professional fees exceeded the forecasted
 9   contingency of 4 million dollars?
10              MR. MERVIS:  Objection to the
11        form.
12              But you can answer.
13        A.    No, we did not.
14        Q.    Beginning in paragraph 3 of
15   your declaration, Mr. White, you discuss
16   Jefferies' advisory services, correct?
17        A.    Correct.
18        Q.    Sir, I don't see anywhere in
19   your declaration a discussion of the
20   services that Jefferies had historically
21   provided to Alpha Media; do you?
22        A.    This is a description of
23   Jefferies, the general services that
24   Jefferies provides within its investment
25   banking practice.
```

Page 51

```
 1        proposals led directly to the debtors'

 2        ability to ultimately secure financing

 3        that is significantly superior to what

 4        ICG had offered at the start of these

 5        cases."

 6             Did I read that correctly?

 7        A.    That's correct.

 8        Q.    On what basis are you offering

 9   sworn testimony, Mr. White, that that is

10   likely to be true?  Are you just

11   guessing?

12        A.    I am not guessing.

13             MR. MERVIS:  Hold on.  I object

14        to the form.

15             You can answer.

16        A.    I am not guessing.

17        Q.    Did anyone representing the

18   debtors tell you that Brigade had

19   knowledge of Fortress' terms and,

20   therefore, Brigade adjusted its proposal?

21        A.    They did not.  We were called

22   to a call with the independent committee.

23   On that call, it was clear by the way

24   that the independent committee and the

25   debtors' advisors were communicating to
```

Page 74

1    us, that number one, they had a competing

2    proposal.  And they asked us to improve

3    upon our proposal.

4            Based on my experience, it was

5    clear that they were hoping we would make

6    an additional proposal because it was

7    creating the kind of competitive tension

8    that could further enhance the solutions

9    they were providing.

10       Q.    So your testimony is that the

11   debtors used a competing proposal to try

12   to elicit better terms from Fortress,

13   correct?

14       A.    Repeat the question?

15            MR. MERVIS:  Objection.

16       Q.    Your testimony is that the

17   debtors used an existing competing

18   proposal to try to elicit better, or your

19   words, "enhanced terms" from Fortress,

20   correct?

21            MR. MERVIS:  Objection.

22       A.    There was no doubt about it,

23   yes.

24       Q.    Pardon?

25            THE REPORTER:  He said, "There

Page 75

```
 1        was no doubt about it, yes."
 2        Q.    No doubt about it.  So your
 3   testimony in paragraph 18, there is no
 4   doubt in your mind that the debtors used
 5   Brigade to elicit, quote, "a significant
 6   superior proposal" from Fortress than the
 7   prior proposals; was that a fair
 8   statement, sir?
 9        A.    At the time --
10             MR. MERVIS:  Hold on, hold on.
11   I object to the form.
12             But you can answer.
13        A.    At the time we didn't know
14   exactly what we were competing with.  The
15   independent committee made it clear that
16   they had a new competing proposal.  They
17   requested that we improve upon that
18   proposal.
19        Q.    And, in fact, Fortress did,
20   correct?
21        A.    We did.
22        Q.    And even Fortress' improved
23   proposal was not accepted at the end of
24   the day, right?
25        A.    At the end of the day the
```

Page 76

1    independent committee and the board chose

2    another proposal.

3         Q.     In paragraph 19, you write

4    about halfway down:

5              "Finally, as a result of paying

6         off Fortress' prepetition principal

7         and accrued interest, the ICG,

8         Brigade, DIP and exit financing have

9         eliminated the risk of a contested

10        priming DIP fight as well as an

11        expensive cram-up battle at

12        confirmation."

13             Did I read that correctly,

14        Mr. White?

15        A.     Yes.

16        Q.     Are you telling the Court that

17   unless someone -- well, let me start

18   over.

19             Had the debtors not paid

20   Fortress' 1 L debt, it was going to be

21   expensive for the estate to deal with

22   Fortress on a go-forward basis?

23        A.     The outset of the case, there

24   was an RSA filed with a priming DIP, as

25   well as a plan that proposed for the

                                   Page 77

1        A.      They did not.

2        Q.      You testified that the

3    definition of transaction has been

4    triggered.  What transaction does

5    Jefferies rely upon in point 2 for its

6    earning its 2 million dollar transaction

7    fee stated in this exhibit?

8        A.      I think it's pretty clear, you

9    know, it's triggered under any

10   restructuring of the company's

11   outstanding indebtedness.  It's also

12   triggered by an offer by any party to

13   convert, exchange or acquire any

14   outstanding company indebtedness or any

15   balance sheet restructuring.

16       Q.      Did the debtors take cash and

17   pay off Fortress' debt, principal and

18   interest in full?

19       A.      They paid off the principal and

20   accrued interest.

21       Q.      They wired that cash money to

22   Fortress; did they not?

23       A.      My understanding is that they

24   did.

25       Q.      So the first lien debt that

Page 88

1      Fortress held, it was just prepaid,

2      correct?

3               MR. MERVIS:  Objection to the

4         form.

5               You can answer.

6         A.    It was -- its principal and

7      accrued interest was paid.

8         Q.    So under your definition here,

9      Mr. White, when the borrower pays off the

10     debt, that's a transaction under your

11     engagement agreement?

12              MR. MERVIS:  I object to the

13        form.

14              But you can answer.

15        A.    It's clear to me that it would

16     fall under an offer by any party that

17     convert or exchange or acquire any

18     outstanding company indebtedness.

19        Q.    Well, hold on, does the first

20     lien debt still exist today that had been

21     held by Fortress?

22        A.    It was paid off.  Its principal

23     and accrued interest was paid off.

24        Q.    So it wasn't acquired by

25     anyone, correct?  Can we agree on that?

Page 89

1   testimony in this case is then,

2   therefore, the risk that you perceived to

3   Fortress warranted Fortress retaining an

4   investment banker and agreeing to pay the

5   investment bank a 2 million dollar

6   success fee and $125,000 a month?

7            MR. MERVIS:  Object to the form.

8            But you can answer.

9        A.   Again, under the circumstances

10  in the case, Fortress was faced with a

11  potential priming DIP, it was faced with

12  a potential contested cram-up and

13  confirmation fight.  Very easily, this

14  case could have lasted multiple months.

15       Q.   Mr. White, why did Jefferies

16  wait until March 5th to send an invoice

17  to collect its transaction fee?

18       A.   I can't recall why.

19       Q.   Did you ever discuss with

20  Proskauer after the final DIP hearing --

21  let me restart.

22            Prior to the final DIP hearing

23  -- let me start it again.

24            After the debtors filed their

25  final DIP motion on February 18th, and

                              Page 102

```
 1    before the final DIP hearing on February
 2    25th, did Jefferies have conversations
 3    with Proskauer about whether it would
 4    seek the 2 million dollar transaction fee
 5    in connection with the takeout of the
 6    first lien debt?
 7              MR. MERVIS:  That question I am
 8         going to direct him not to answer on
 9         the grounds that it's trial
10         preparation material and not
11         discoverable.
12              MS. COTTRELL:  Can you give me a
13         rule just for a record, so we can take
14         it up later, Mr. Mervis?
15              MR. MERVIS:  Well, it's Rule 26.
16         I don't know offhand the subsection.
17         But I can look at it on a break for
18         you.
19              MS. COTTRELL:  No problem.
20         Q.    Mr. White, are you going to
21    follow the advice of your counsel?
22         A.    Yes.
23         Q.    Mr. White, just for the record,
24    did Jefferies ever discuss with Proskauer
25    whether it would be paid by Fortress if
```

                                        Page 103

1    its transaction fee were denied under

2    506B by the Court?

3              MR. MERVIS:  Yes, that's the

4         same instruction.

5         Q.    Mr. White, do you have the same

6    answer?

7         A.    I am going to follow the advice

8    of my counsel.

9         Q.    Mr. White, you compare

10   Jefferies' fee structure with that of

11   Moelis, who is the investment banker for

12   all of the debtors, correct?

13        A.    I do.

14        Q.    When was Moelis retained?

15        A.    I don't know the exact date.

16        Q.    Approximately, when do you

17   believe Moelis was retained?

18        A.    Last summer.

19        Q.    Was it not important for you to

20   know in order to prepare this declaration

21   in comparison of yours when Moelis was

22   retained?

23        A.    No.

24        Q.    Are you familiar with the scope

25   of Moelis' work under its engagement for

Page 104

```
 1      ACKNOWLEDGMENT OF DEPONENT

 2

 3         I have read the foregoing

 4    transcript of my deposition and except

 5    for any corrections or changes noted on

 6    the errata sheet, I hereby subscribe to

 7    the transcript as an accurate record of

 8    the statements made by me.

 9

10

11            _____

12            ROBERT WHITE

13

14

15    SUBSCRIBED AND SWORN before

16    and to me this ____ day

17    of _____, 20__.

18

19

20                _____

21                    NOTARY PUBLIC

22    My Commission Expires:

23

24

25

                                Page 113
```

```
 1      ------------- I N D E X --------------

 2     WITNESS     EXAMINATION BY       PAGE

 3     ROBERT WHITE   Ms. Cottrell      9

 4

 5      -------- INFORMATION REQUESTS ---------

 6     DIRECTIONS:  103, 104

 7     RULINGS:  (None)

 8     REQUESTS:  59, 60, 84

 9     TO BE FURNISHED:  85

10      -------------- EXHIBITS ---------------

11     NUMBERS                         FOR ID

12      Exhibit 1, the Declaration dated  9

13      March 5th, 2021

14      Exhibit 2, document consisting    37

15      of Exhibit C to Mr. White's

16      declaration

17      Exhibit 3, document consisting    44

18      of Exhibit B to Robert white's

19      March 5th declaration in this

20      case

21      Exhibit 4, Jefferies' engagement  81

22      letter

23

24

25

                                    Page 114
```

1

2                       CERTIFICATION

3

4      I, DAWN MATERA, a Notary Public, do

5   hereby certify:

6      That the witness whose testimony as

7   herein set forth, was duly sworn by me;

8   and that the within transcript is a true

9   record of the testimony given by said

10  witness.

11     I further certify that I am not

12  related to any of the parties to this

13  action by blood or marriage, and that I

14  am in no way interested in the outcome of

15  this matter.

16     IN WITNESS WHEREOF, I have hereunto

17  set my hand this 9th day of March, 2021.

18

19

20                    DAWN MATERA

21

22                *       *       *

23

24

25

                                    Page 115