**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| In re:  **ALPHA MEDIA HOLDINGS LLC**, *et al.*, | **Chapter 11** |
| | **Case No. 21-30209-KRH** |
| **Debtors.** | **Jointly Administered** |

## <u>MEMORANDUM OPINION</u>

The discrete issue before the Court concerns the reasonable amount of fees and expenses payable to an oversecured lender in connection with the satisfaction of its secured claim. Resolution of this question requires a full examination of the convoluted history between the parties in these jointly administered bankruptcy cases (the "Bankruptcy Cases") that otherwise involve a fully consensual, straightforward plan of reorganization.  This Memorandum Opinion sets forth the Court's findings of facts and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[1]  The Court has subject-matter jurisdiction over the Bankruptcy Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (D), and (O). Venue is appropriate pursuant to 28 U.S.C. § 1409.

On or about February 25, 2016, Alpha Media LLC and certain of its affiliates (together, the "Debtors") entered into a first priority lien credit agreement (the "First Lien Credit Agreement" and the obligations due thereunder, the "First Lien Obligations") with Antares Capital LP ("Antares") as administrative agent.  Fortress Ex. 4, ECF No. 210-1 at 8.  The Debtors have debt in addition to the First Lien Obligations.  The Debtors issued second priority lien notes (the

---

[1]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

"Second Lien Notes") in the aggregate principal amount of $65 million due in 2022 for which ICG

Debt Administration LLC ("ICG")[2] acts as administrative agent.   Final Order (I) Authorizing

Postpetition Financing, (II) Granting Liens & Superpriority Administrative Expense Claims,

(III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying

Automatic Stay, & (VI) Granting Related Relief ¶ E(i)-(ii), ECF No. 168 at 7 (the "Final DIP

Order").   The Debtors also issued unsecured notes in the aggregate principal amount of

$103,931,487.68 due in 2023.  *Id.* ¶ E(iv)-(v), ECF No. 168 at 7-8.

On or about May 18, 2020, the Debtors and Antares entered into a *Forbearance Agreement

and Third Amendment to Credit Agreement* (the "Forbearance Agreement").   Fortress Ex. 8, ECF

No. 210-3.   At that time, the outstanding principal balance on the First Lien Obligations totaled

not less than $92,102,981.40.  *Id*. § 2, ECF No. 210-3 at 2.   Among other things, the Forbearance

Agreement provided that Antares could "engage or have its counsel engage, a financial

advisor . . . to advise and assist [Antares] with [its] on-going assessment of [the Debtors'] financial

performance and their ability to repay the Obligations."  *Id*. § 5(b), ECF No. 210-3 at 5.   The

Forbearance Agreement further provided that the Debtors would reimburse Antares for "any and

all fees and any and all reasonable and out-of-pocket expenses incurred by the Financial Advisor."

*Id.*, ECF No. 210-3 at 5-6.   To that end, Antares employed Alvarez & Marsal as its financial

advisor.  *See* Fortress Ex. 1, ECF No. 207-1 at 2.

In   October   2020,   Stephens   Capital   Partners   LLC   ("Stephens")   and   Breakwater

Management LP ("Breakwater"), each an equity owner of the Debtors, made a stalking horse bid

---

[2]   A complicating factor in these Bankruptcy Cases is that certain affiliates of Fortress, as defined herein, and ICG
are involved in different roles with different obligations associated therewith, none of which are germane to the
dispute presently before the Court.   For ease of reference, the Court uses the phrase "Fortress" and "ICG"
inclusively, but such should not be construed as disregarding corporate forms or otherwise attributing actions of
one affiliate on another.

to acquire substantially all of the Debtors' assets. Dubel Decl. ¶ 6, ECF No. 244 at 3. The bid was premised on a bankruptcy filing with debtor-in-possession ("DIP") financing to be provided by Antares. *Id*. After the Debtors' receipt of the Stephens-Breakwater stalking horse bid, ICG submitted to the Debtors a competing proposal to provide $37.5 million in new money in connection with a prepackaged bankruptcy, which would ultimately convert the Debtors' existing second lien debt and unsecured notes into equity. *Id*. Although Antares initially agreed to provide financing for the Stephens-Breakwater sale, in December 2020, Antares supported the ICG financing transaction and the prepackaged bankruptcy filing associated therewith. *Id*.

Stephens and Breakwater countered with a revised sale proposal to acquire the Debtors' assets for $120 million, with $110 million in DIP financing to be funded by Fortress Investment Group LLC (and together with its affiliate, DBD AMAC LLC, "Fortress"). *Id*. ¶ 7, ECF No. 244 at 4; *see* Subburathinam Decl. ¶ 4, ECF No. 207 at 2. The Debtors' Special Independent Committee[3] rejected the second Stephens and Breakwater sale proposal because it deemed the purchase price to be inadequate and the proposed financing too expensive. Dubel Decl. ¶ 7, ECF No. 244 at 4. The Debtors moved forward with the ICG proposal. On January 8, 2021, the Debtors commenced a prepetition solicitation of votes for the accompanying prepackaged plan. *Id*. ¶ 8, ECF No. 244 at 4.

In contemplation of the upcoming prepack and in reliance on Antares's support for the plan, the Debtors made a number of payments to Antares. On January 11, 2021, the Debtors paid $884,055.00 on account of professional fees incurred by Antares. Fortress Ex. 7 at 5-6, ECF No. 210-2 at 27. On January 13, 2021, the Debtors prepaid to Antares the anticipated 2021

---

[3]    The Debtors' board of directors formed a committee (the "Special Independent Committee") comprised of independent board members who were tasked with evaluating acquisition offers for the company. *See* Dubel Decl. ¶ 6, ECF No. 244 at 3-4.

administrative agent's fee of $250,000, more than one month in advance of its due date.  Dubel

Decl. ¶ 8, ECF No. 244 at 4.

Contemporaneously therewith and unbeknownst to the Debtors, Fortress began negotiating

with Antares the terms under which it could purchase the First Lien Obligations so that Fortress

could become the administrative agent under the First Lien Credit Agreement.  *See* Subburathinam

Decl. ¶ 5, ECF No. 207 at 3.  By the *Assignment and Acceptance* dated January 14, 2021, the

lender group for which Antares acted as administrative agent sold the First Lien Obligations to

Fortress and certain other lenders,[4] Fortress Ex. 3, ECF No. 207-1 at 42, for par plus interest, *id.*,

ECF No. 207-1 at 76, (the foregoing, the "First Lien Sale").  As a consequence of the First Lien

Sale, Antares resigned as administrative agent and Fortress succeeded as the new administrative

agent for the First Lien Obligations in accordance with an *Agency Transfer Agreement* dated

January 14, 2021 (the "Agency Transfer Agreement").  Fortress Ex. 2, ECF No. 207-1 at 5.

Antares is alleged to have expressed concern at some point during the sale process that

certain of the Debtors' payments to Antares, including the January payments, could be avoided

and recovered as preferential transfers.  Subburathinam Decl. ¶¶ 7-8, ECF No. 207 at 3-4.

Accordingly, Fortress agreed to pay Antares the additional sum of $1,970,426.02.  In exchange,

Antares assigned rights to the expense reimbursements to Fortress.  *Id*. ¶¶ 10-11, ECF No. 207 at

4-5.  The Agency Transfer Agreement provided, in pertinent part:

> Effective as of the Effective Time,[5] Former Agent [meaning
> Antares] hereby irrevocably sells and assigns to New Agent
> [meaning Fortress], and New Agent hereby irrevocably purchases
> and assumes from Former Agent, Former Agent's right, title and

---

[4]    A complete list of the lenders included in the Fortress syndicate is included as Schedule 2 to the Assignment and
Acceptance.  Fortress Ex. 3 sched. 2, ECF No. 207-1 at 78-79.

[5]    Capitalized terms in quoted material not otherwise defined herein shall have the meanings ascribed to such terms
in the respective underlying document(s).

> interest to existing and hereafter-arising claims against the Credit
> Parties under Section 9.5 and 9.6 of the Credit Agreement for
> reimbursement of $1,970,426.02 of fees, costs and expenses
> incurred by Former Agent or its Related Persons prior to the
> Effective Time . . . which claims shall be comprised of, for the
> avoidance of doubt, (i) $1,819,920.01 on account of fees, costs and
> expenses incurred by Former Agent's advisors, including Latham &
> Watkins LLP, Alvarez & Marsal and LimNexis LLP, in accordance
> with the terms of the Credit Agreement that were paid by the
> Borrowers within the ninety (90) day period immediately prior to
> the date hereof . . . and that shall be returned to the Borrowers in
> accordance with this Section 5, (ii) $750.00 on account of costs and
> expenses incurred by the Former Agent in 2020 in connection with
> a review of the Credit Parties' insurance coverage and
> (iii) $149,756.01 on account of fees, costs and expenses incurred by
> Former Agent's advisors, including Latham & Watkins LLP,
> Alvarez & Marsal and LimNexis LLP, in accordance with the terms
> of the Credit Agreement that have not been paid by the Borrowers.

(the foregoing $1,970,426.02, the "Expense Reimbursement"),[6] Fortress Ex. 2 at § 5, ECF No.

207-1 at 8.  On January 21, 2021, one week after the Agency Transfer Agreement was executed,

Antares returned $2,069,920.01 to the Debtors.   The returned sum was composed of:

(i) $250,000.00 on account of prepayment of the 2021 annual administrative agency fee;

(ii) $431,623.34 on account of fees and expenses incurred Antares's financial advisor;

(iii) $1,384,336.67 on account of fees and expenses incurred by Antares's counsel; and

(iv) $3,960.00 on account of fees and expenses incurred by Antares's local counsel.  Fortress Ex.

1, ECF 207-1 at 2-3.

In the meantime, the Debtors learned on January 15, 2021, the voting deadline for the

prepackaged plan, that Antares had sold its debt at par value plus accrued interest to Fortress.

Dubel Decl. ¶ 9, ECF No. 244 at 4.  Fortress advised the Debtors that it would not support the

solicited prepackaged plan.  *Id*. ¶ 11, ECF No. 244 at 5.  Fortress proposed in the alternative a

---

[6]   Fortress provided no evidence substantiating the fees and expenses described in romanettes (ii) and (iii).  Without
any proof of these fees and expenses, let alone their reasonableness, the Court must disallow these fees.

private sale of substantially all of the Debtors' assets to Fortress to be funded through a roll-up of the First Lien Obligations at an amount four times greater than the new money component of the sale. *Id*. ¶ 11, ECF No. 244 at 5.

Although the arranged prepackaged Chapter 11 had to be scuttled when Fortress withdrew its support for the plan, ICG proposed a new balance sheet restructuring plan, whereunder the Second Lien Notes would be equitized, and the bankruptcy funded by ICG through a new priming DIP financing facility. *Id*. ¶ 12, ECF No. 244 at 5. The Debtors' Special Independent Committee determined that the revised ICG proposal was superior to the private sale proposed by Fortress. *See id*. ¶ 12, ECF No. 244 at 5.

Accordingly, on January 24 and 25, 2021, as applicable (the "Petition Date") the Debtors[7] filed voluntary petitions under Chapter 11 of Title 11 of the United State Code (the "Bankruptcy Code"), thereby commencing these Bankruptcy Cases. On January 25, 2021, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 18] (the "Original DIP Motion"), seeking this Court's approval of the ICG financing. The first iteration of the DIP financing motion

---

[7]    A complete list of the Debtors is as follows: *In re Alpha Media Holdings LLC*, Case No. 21-30209-KRH; *In re Alpha Media LLC*, Case No. 21-30208-KRH; *In re Alpha 3E Corporation*, Case No. 21-30210-KRH; *In re Alpha 3E Holding Corporation*, Case No. 21-30211-KRH; *In re Alpha 3E Licensee LLC*, Case No. 21-30212-KRH; *In re Alpha Media Communications Inc.*, Case No. 21-30213-KRH; *In re Alpha Media Communications LLC*, Case No. 21-30214-KRH; *In re Alpha Media Licensee LLC*, Case No. 21-30215-KRH; *In re Alpha Media of Columbus Inc.*, Case No. 21-30216-KRH; *In re Alpha Media of Brookings Inc*., Case No. 21-30217-KRH; *In re Alpha Media of Fort Dodge Inc.*, Case No. 21-30218-KRH; *In re Alpha Media of Lincoln Inc.*, Case No. 21-30219-KRH; *In re Alpha Media of Luverne Inc.*, Case No. 21-30220-KRH; *In re Alpha Media of Mason City Inc.*, Case No. 21-30221-KRH; *In re Alpha Media USA LLC*, Case No. 21-30222-KRH; *In re Alpha Media of Joliet Inc.*, Case No. 21-30223-KRH.

contemplated that ICG as administrative agent would make $20 million in new money available to the Debtors over the initial thirteen weeks of the Bankruptcy Cases. Five million would be drawn on an interim basis. Original DIP Mot. ¶ 13, ECF No. 18 at 9. The new money would be secured by a senior priming lien on substantially all of the Debtors' assets, thereby jumping ahead of the first lien position held by Fortress.[8]  *Id*. ¶ 37, ECF No. 18 at 40-41.

On the Petition Date, the Debtors also filed their *Joint Plan of Reorganization of Alpha Media Holdings LLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [ECF No. 25] (the "Original Plan"). The Original Plan proposed the debt-to-equity swap for the Second Lien Notes advanced by ICG. Original Plan art. III.C.3, ECF No. 25 at 24-25. The First Lien Obligations were to be paid either in full in cash or their pro rata share of "First Lien Recovery Notes," at the option of the Debtors and the holders of the Second Lien Notes. *Id.* art. I.A.139, art. III.C.2, ECF No. 25 at 17, 24. While "First Lien Recovery Notes" was a defined term to mean notes with deferred cash payments, *see id.* art. I.A.76, ECF No. 25 at 12, all other details regarding the terms of the notes was to be included in a plan supplement to be filed at an unspecified later date in advance of confirmation of the Original Plan, *see id.* art I.A.114, ECF No. 25 at 15.

In light of the priming DIP and the vagaries associated with the treatment of the First Lien Obligations under the Plan, Fortress objected to the Original DIP Motion. Overruling Fortress's objection, the Court approved the Original DIP Motion on an interim basis, thereby allowing the Debtors to immediately access $5 million in new money provided by ICG pending a final hearing on the Original DIP Motion. *See* Interim Order (I) Authorizing Postpetition Financing, (II) Granting Liens & Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash

---

[8]    Section 364(d) authorizes courts to approve the incurring of debt secured by a senior lien on property of the estate that is subject to a lien.

Collateral; (IV) Granting Adequate Protection; (V) Modifying Automatic Stay, (VI) Scheduling

Final Hr'g, & (VII) Granting Related Relief, ECF No. 44.  The Court specifically found that

Fortress was adequately protected within the meaning of section 361 of the Bankruptcy Code by

an equity cushion that would more than cover the $5 million to be loaned on a priming interim

basis pending final Court approval.

    After the Court approved the Original DIP Motion, Fortress began making a series of

unsuccessful alternative financing proposals.  First, on January 29, 2021, Fortress proposed a

wholly inadequate DIP financing facility – even in the absence of any fees and costs paid to

Fortress, the financing would have left the Debtors with negative liquidity upon emergence from

Chapter 11.  Dubel Decl. ¶ 15, ECF No. 244 at 6.  The Debtors' Special Independent Committee

rejected this first proposal due to its concerns regarding exit liquidity.  *Id*. ¶ 16, ECF No. 244 at 6.

    On January 30, 2021, Brigade Capital Management ("Brigade") – a new money lender with

no existing indebtedness – and ICG collectively provided the Debtors with a term sheet for a

modified DIP financing facility and exit financing facility.  *Id*.; Debtor's Ex. 1, ECF No. 267 at 6-

8.  The Brigade-ICG proposal was ultimately accepted by the Debtors' Special Independent

Committee.  Dubel Decl. ¶¶ 16, 19, ECF No. 244 at 6, 7.

    After Fortress had made its initial post-bankruptcy financing offer and after the Debtors

had received the ultimately successful Brigade-ICG proposal, Fortress engaged Jefferies LLC

("Jefferies") on February 1, 2021, as its investment banker.  Fortress Ex. F, ECF No. 211-1 at 249-

57.  Jefferies agreed to provide, inter alia, the "following investment banking services":

> analyzing, structuring, negotiating and effecting . . . and acting as
> exclusive financial advisor to Proskauer in connection with any
> restructuring of the [Debtors'] outstanding indebtedness through
> any offer by the Debtors with respect to any outstanding [Debtors']
> indebtedness, through any offer by the [Debtors] with respect to any
> outstanding Company indebtedness, a solicitation of votes,

> approvals, or consents giving effect thereto (including with respect to a prepackaged or prenegotiated plan of reorganization pursuant to chapter 11, Title 11 of the United States Code, the execution of any agreement giving effect thereto, an offer by any party to convert, exchange or acquire any outstanding Company indebtedness, or any similar balance sheet restructuring involving the Company (any such transaction considered in this paragraph is hereinafter referred to as a "Transaction").

*Id*. at 1, ECF No. 211-1 at 249.  In exchange for its investment banking services, Fortress agreed to compensate Jefferies by paying a monthly fee of $125,000 and by paying "upon the closing of a Transaction, a fee equal to $2 million ('Transaction Fee')."  *Id*. at 3, ECF No. 211-1 at 251.

After hiring Jefferies (and, notably, after the Debtors had received the ICG-Brigade proposal), Fortress made two subsequent financing proposals.  Dubel Decl. ¶¶ 17-18, ECF No. 244 at 5-6.  Neither proposal was competitive with the ICG-Brigade proposal. Neither of the subsequent Fortress proposals had any impact on or relevance to the ICG-Brigade proposal ultimately selected by the Debtors.  *Id*. ¶ 19, ECF No. 244 at 7.  Rather the Debtors used the ICG-Brigade proposal as an incentive for Fortress to provide a more attractive offer, which it ultimately was unable to do.  *Id*. ¶¶ 18-19, ECF No. 244 at 6-7.

On February 11, 2021, certain parties, including Fortress, and the Debtors entered into the *Stipulation and Order Regarding Final Hearing on Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No.127] (the "DIP Stipulation"), whereby the foregoing parties stipulated that Fortress was oversecured and adequately protected within the meaning of section 361 of the Bankruptcy Code by the equity cushion the Court had found to exist when it approved the Original DIP Motion.

On February 18, 2021, the Debtors filed the *Debtors' Amended Motion for Entry of a Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 144] (the "Amended DIP Motion").  The Amended DIP Motion sought court approval of the ICG-Brigade proposal which would provide DIP financing in the aggregate principal amount of up to $115 million.  The financing arrangement included (a) a $95 million senior facility (the "Senior DIP Facility") supplied by Brigade to be used to satisfy the existing first lien indebtedness and (b) a $20 million junior facility (the "Junior DIP Facility") provided by ICG to be used (i) to satisfy the $5 million supplied through the Interim DIP Facility and (ii) to provide $12.5 million in new liquidity during the pendency of the Bankruptcy Cases and $2.5 million in new liquidity upon consummation of a confirmed plan.  Amended DIP Motion ¶ 12, ECF No. 144 at 6.  Upon emergence from bankruptcy, the Junior DIP Facility will convert into a second lien delayed draw note facility.  *Id.*

In response to the Amended DIP Motion, on February 22, 2021, Fortress filed the *DBD AMAC LLC's Objection to the Debtors' Amended Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 148] (the "DIP Objection").  Fortress objected to the Amended DIP Motion on the grounds, inter alia, that the Senior DIP Facility was insufficient to repay the First Lien Obligations in full as there

was a dispute over the payoff amount of the existing first lien indebtedness. *See* DIP Obj. ¶ 6, ECF No. 148 at 4-5. While there was no contest regarding the outstanding amount of principal or interest due on the First Lien Obligations, the parties disagreed over the amount of fees and expenses payable to Fortress in connection with the First Lien Obligations.

On February 23, 2021, the Court conducted a hearing on the Amended DIP Motion. The parties represented that the only outstanding issue in dispute was the amount of fees and expenses payable by the Debtors to Fortress. The parties agreed to allow the DIP financing to be funded in full, with an escrowed reserve to be set aside pending the Court's resolution of Fortress's reimbursement claims. At the conclusion of the February 23, 2021 hearing, the Court granted the Amended DIP Motion on a final basis. On February 24, 2021, the Court entered the Final DIP Order,[9] which provides, in pertinent part:

> Pursuant to the terms of the Senior DIP Facility and this Final Order, the Prepetition First Lien Obligations constituting the unpaid principal under the Prepetition First Lien Credit Documents and accrued interest thereon at the default rate of interest under the Prepetition First Lien Credit Agreement shall be paid with the proceeds of the Senior DIP Facility (such payment, the "Prepetition First Lien Refinancing") and the Prepetition First Liens shall be released and the Prepetition First Lien Credit Documents shall be deemed to have been surrendered and shall be canceled as of the date that the Prepetition First Lien Refinancing occurs. The Debtors shall hold $5 million in a segregated account for the payment of any unpaid Prepetition First Lien Obligations constituting reimbursement obligations for fees, expenses and disbursements that the Prepetition First Lien Secured Parties are entitled to receive under the Prepetition First Lien Credit Documents and under section 506(b) of the Bankruptcy Code (collectively, the "Prepetition First Lien Reimbursement Obligations"). An evidentiary hearing to determine the allowed amount of the Prepetition First Lien Reimbursement Obligations shall be held by the Court on March 11, 2021 at 1:00 p.m. (prevailing Eastern Time). In advance of the

---

[9]   Competing orders were submitted by the Debtors and by Fortress for the Court's consideration. The proposed form of order submitted by Fortress was not entirely consistent with the Court's ruling, and, consequently, the Court entered the proposed order submitted by the Debtors.

hearing and on a schedule to be agreed-to among the parties, the
Prepetition First Lien Secured Parties shall file an attorney fee
application as well as the supporting documentation for all
professional fees and other charges or expenses for which it seeks to
be reimbursed.   The Prepetition First Lien Refinancing shall
constitute the "Discharge of Senior Obligations" under the
Intercreditor Agreement and the Intercreditor Agreement shall have
no further force or effect.

Final DIP Order ¶ F, ECF No. 168 at 9-10.

In accordance with the Final DIP Order, on March 3, 2021, Proskauer Rose LLP, as lead
counsel for Fortress, ("Lead Counsel") filed its *Fee Application of Proskauer Rose LLP, Attorneys
for DBD AMAC LLC, for the Period [of] January 16, 2021 Through February 23, 2021* [ECF No.
197] (the "Proskauer Fee Application"), seeking allowance of compensation in the total amount of
$1,180,930.00 and expenses in the amount of $18,151.10.[10]   At the same time, Tavenner & Beran,
PLC, as local counsel for Fortress, ("Local Counsel") filed its *Application of Tavenner & Beran,
PLC for Allowance and Payment of Fees and Expenses as Co-Counsel to DBD AMAC, LLC* [ECF
No. 198] (the "Tavenner Fee Application"), seeking allowance of compensation in the total amount
of $50,734.50 and expenses in the amount of $55.01.   Fortress submitted *DBD AMAC LLC's Brief
in Support of (I) Allowance of Fees and Costs Pursuant to Section 506(b) of the Bankruptcy Code
and (II) Allowance of Prepetition First Lien Claims* [ECF No. 206] (the "Fortress Fee Brief").
Declining to file additional fee applications as required by the Final DIP Order, the Fortress Fee
Brief, nevertheless, included requests for compensation of two additional categories of fees and

---

[10]   The Court notes that Lead Counsel did not include any billing entries for February 24, 2021 or February 25, 2021
in the Proskauer Fee Application.  The Final DIP Order required Fortress to "file an attorney fee application" in
advance of the hearing to fix the amount to which Fortress claimed it was entitled under the First Lien Credit
Agreement and under section 506(b) of the Bankruptcy Code.  As such, the Court finds that Fortress has waived
any rights to repayment of fees and expenses pursuant to section 506(b) incurred by Lead Counsel on February
24, 2021 or February 25, 2021 – when the Prepetition First Lien Refinancing paid Fortress the full payoff amount
of the First Lien Obligations.

expenses: (i) $2.125 million (representing one monthly fee of $125,000 and the Transaction Fee)
payable to Jefferies; and (ii) repayment of the Expense Reimbursement.

Pursuant to section 506(b) of the Bankruptcy Code, an oversecured creditor is entitled to
"reasonable fees, costs, or charges provided for under the agreement . . . under which such claim
arose." 11 U.S.C. § 506(b). "Recovery of fees, costs, and charges [for an oversecured creditor],
however, is allowed only if they are reasonable and provided for in the agreement under which the
claim arose." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). "To
substantiate a claim for fees pursuant to Section 506(b), the creditor must show that: (a) the creditor
is oversecured; (b) the underlying agreement provides for such fees and costs; and (c) the fees and
costs are reasonable." *In re Gwyn*, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993); *Enter. Prod.*
*Operating L.P. v. Enron Gas Liquids Inc.* (*In re Enron Corp.*), 306 B.R. 33, 43 (S.D.N.Y. 2004),
*aff'd* 119 F. App'x 344 (2d Cir. 2005). The creditor "has the burden of proof to establish an
entitlement to fees, including the burden of showing that the relevant loan documents impose an
express and specific obligation on the part of the Debtor to pay the attorneys' fees and costs for
which [the creditor] seeks reimbursement." *In re Gwyn*, 150 B.R. at 154.

The parties agree that Fortress is oversecured. *See* DIP Stipulation, ECF No. 127 at 2. As
such, Fortress is entitled to recover any fees, costs, or charges provided for under its loan
documents to the extent that such fees, costs, and charges are reasonable. Section 9.5 of the First
Lien Credit Agreement provides for the "fees, costs, and expenses" which Fortress is entitled to
recover:

> [T]he Borrowers agree to pay or reimburse upon demand (a) the
> Administrative Agent . . . for all reasonable and documented costs
> and out-of-pocket expenses incurred by either of them or any of their
> Related Persons, in connection with the investigation, development,
> preparation, negotiation, syndication, execution, interpretation or
> administration of, any modification of any term of or termination of,

any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs to the Administrative Agent . . . (but limited to the reasonable and documented out-of-pocket fees, disbursements and other charges of one legal counsel to the Administrative Agent and the Lenders, taken as a whole . . . and, if reasonably necessary, one local counsel in any relevant material local jurisdiction) . . . (b) within thirty (30) days after demand therefor, each of the Administrative Agent, its Related Persons, and the L/C Issuer, taken as a whole, for reasonable and documented out-of-pocket costs and out-of-pocket expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation or Related Transaction, including Attorney Costs and (c) fees and disbursements of Attorney Costs of one (1) primary law firm and one (1) FCC counsel on behalf of all Lenders (other than Citizens (in its capacity as a Joint Lead Arranger) and the Administrative Agent) incurred in connection with any of the matters referred to in clause (b) above.

Fortress Ex. 4 § 9.5, ECF No. 210-1 at 89. "Attorney Costs" is a defined term under the First Lien Credit Agreement. It "means and includes all reasonable fees and disbursements of any law firm or other external counsel." Fortress Ex. 4 § 11.1, ECF No. 210-1 at 113.

As a preliminary matter, the Debtors did not contest that Fortress was entitled to recover the amount of the reasonable attorney's fees and expenses incurred by its Lead Counsel and Local Counsel. Rather, the Debtors objected to the reasonableness of the fees incurred by Fortress's Lead Counsel. At the March 11, 2021, hearing, this issue was further narrowed as the Debtors withdrew their objection to the hourly rates charged by Lead Counsel. This left as the only unresolved issue whether the tasks performed by Lead Counsel were reasonable.

"Bankruptcy courts have broad discretion to determine whether certain charges to the debtor are reasonable under [section] 506(b)." *In re Latshaw Drilling, LLC*, 481 B.R. 765, 798 (Bankr. N.D. Okla. 2012). "Reasonableness will always depend upon circumstances." *In re Amherst Orthopedic Assocs.*, P.C., 355 B.R. 420, 422 (Bankr. W.D.N.Y. 2006). Particularly in the context of a section 506(b) claim,

> [t]he key determinant is whether the creditor incurred expenses and fees that fall within the scope of the fees provision in the agreement, and took the kinds of actions that similarly situated creditors might reasonably conclude should be taken, or whether such actions and fees were so clearly outside the range as to be deemed unreasonable. The bankruptcy court should inquire whether, considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interests in the debtor's property.

*In re F.B.F. Indus., Inc.*, Bankruptcy No. 91-24613DWS, 1995 WL 691893, at *4, 1995 Bankr. LEXIS 1645, at *13 (Bankr. E.D. Pa. Nov. 15, 1995) (quoting *Dalessio v. Pauchon* (*In re Dalessio*), 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987)).

The Court finds that the fees incurred by both Lead Counsel and Local Counsel were reasonable and necessary for Fortress to protect its interest in these Bankruptcy Cases. On the Petition Date, Fortress was faced with a priming DIP and a proposed plan of reorganization that crammed up the First Lien Obligations without fully identifying repayment terms. The work performed by Lead Counsel and Local Counsel was a part of its global effort to protect the rights and claims of Fortress, by first analyzing the Debtors' initial plan of reorganization and initial DIP financing proposal, by next investigating possible alternative transactions, and by finally ensuring that the First Lien Obligations were paid in full under the ICG-Brigade proposal. *See* White Decl. ¶ 9, ECF No. 211 at 5 ("In my experience, this was the prudent course for a senior secured lender facing both a proposed priming DIP and a 'cram up' fight at confirmation to take."). While the

Debtors alleged that not all of the work performed by Lead Counsel was reasonable or necessary to accomplish such ends, the Debtors did not provide any evidence concerning what the Debtors believe a reasonable fee would be.  The Court finds that Lead Counsel and Local Counsel have met their burden of proof and, in the exercise of its discretion, the Court declines to disallow any of the requested fees.[11]  *See In re Latshaw Drilling, LLC*, 481 B.R. at 805.

Fortress also seeks to recover $2.125 million on account of Jefferies's monthly fee of $125,000; and the Transaction Fee of $2 million.  Fortress may only recover such fees under section 506(b) of the Bankruptcy Code if both (i) the First Lien Credit Agreement, as modified by the Forbearance Agreement, provides for such fees and (ii) if such fees are reasonable.  *See In re Gwyn*, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993); *Enter. Prod. Operating L.P. v. Enron Gas Liquids Inc.* (*In re Enron Corp.*), 306 B.R. 33, 43 (S.D.N.Y. 2004), *aff'd* 119 F. App'x 344 (2d Cir. 2005).  The Court finds that neither element is met and, as such, will disallow the Jefferies fees in full.

Section 9.5 of the First Lien Credit Agreement provides that the Debtors shall reimburse Fortress for certain enumerated fees and expenses, none of which apply here.  First, section 9.5 of the First Lien Credit Agreement limits the Debtors' reimbursement obligation to "reasonable and documented costs and out-of-pocket expenses incurred by [Fortress] or [its] Related Persons." Fortress Ex. 4 § 9.5, ECF No. 210-1 at 89.  "Related Persons" does not include Jefferies.  "Related Persons" is a defined term under the First Lien Credit Agreement.  It means "with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee,

---

[11]    While the Debtors complain that Fortress employed scorched earth tactics to frustrate the Debtors' efforts to obtain alternative financing on value-maximizing terms, the Court remains mindful that Fortress did not seek to recover the fees incurred by its Lead Counsel for work performed on February 24 and February 25.  Nor did Lead Counsel seek recovery for any fees it incurred in either preparing or defending its fee application.  The Court took all of this into consideration in determining in its discretion the fees requested in the Proskauer Fee Application and the Tavenner Fee Application to be reasonable.

representative, attorney, accountant and other consultants of such Person or any of its Affiliates." *Id.* § 11.1, ECF No. 210-1 at 138. Jefferies cannot be shoe-horned into any one of these enumerated categories.

The Court rejects the argument that Jefferies was either an "accountant" or "other consultant[ ]" within the meaning of the First Lien Credit Agreement. "Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous."[12] *S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005). "Such agreements should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007). "Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms." *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) (internal citations omitted).

The First Lien Credit Agreement identifies "financial, legal, and other advisors" separately from "consultants." *See* Fortress Ex. 4 § 11.1, ECF No. 210-1 at 130. Moreover, the First Lien Credit Agreement also notes the difference between "accountants" and investment bankers. *See id.* § 5.11(d) (authorizing the Debtors to pay certain "out-of-pocket legal, accounting, and filing costs . . . and customary transaction-based fees and expenses of third-party investment bankers and advisers for services rendered" to the Debtors); § 11.1 (defining "net proceeds" to exclude, inter alia, "reasonable legal, accounting and investment banking fees"), ECF No. 210-1 at 64, 132. Indeed, the interpretation of the term "Related Person" advanced by Fortress belies all reason as to why "Attorney Costs" would need to be a separately defined term. "Related Persons" is defined

---

[12] The First Lien Credit Agreement contains a New York choice of law provision and, as such, the Court will apply New York substantive law for contract interpretation. *See* Fortress Ex. 4 § 9.18(a), ECF No. 210-1 at 101.

to include "attorney[s]." *Id*. § 11.1, ECF No. 210-1 at 138.  In contrast, "Attorney Costs" is defined

to mean "all reasonable fees and disbursements of any law firm or other external counsel."  *Id.*,

ECF No. 210-1 at 113.  In order to give meaning to the use of the term "attorney" in both of these

provisions, "attorney" must refer to internal professionals at Fortress, e.g., in-house counsel, as

opposed to external professionals hired by Fortress, e.g., Lead Counsel or Local Counsel.

Similarly, as such, the Court finds that the only reasonable interpretation of "accountants" and

"consultants" must mean professional persons within Fortress's organizational structure.

This interpretation is further buttressed by the Forbearance Agreement.  "While courts may

not consider extrinsic evidence to evince parties' intentions with regard to an unambiguous

contract, in interpreting agreements, courts afford great weight to a party's practical interpretation

of its own agreement." *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*),

336 B.R. 39, 60 (Bankr. S.D.N.Y. 2006).  If the term "Related Persons" had the broad definition

that Fortress ascribes to it, it would undoubtedly include an external "financial advisor."  However,

section 5(b) of the Forbearance Agreement provided that, "notwithstanding any provision to the

contrary set forth in . . . the [First Lien] Credit Agreement," Fortress "could engage or have its

counsel engage, a financial advisor."  Fortress Ex. 8 § 5(b), ECF No. 210-3 at 5.  If "Related

Persons" meant external professionals providing financial advice, there would have been no need

to separately provide for such in the Forbearance Agreement.

Finding no basis within the First Lien Credit Agreement for the inclusion of Jefferies's

fees, the question then becomes whether Fortress may be reimbursed for Jefferies's fees pursuant

to section 5(b) of the Forbearance Agreement.  That hinges on whether Jefferies is a "financial

advisor" within the meaning of the Forbearance Agreement.  The Court finds Jefferies is not.

The Forbearance Agreement specifically permitted Antares to "engage or have its counsel engage, a financial advisor . . . to advise and assist [Antares] with [its] on-going assessment of [the Debtors'] financial performance and their ability to repay the Obligations." *Id*. § 5(b), ECF No. 210-3 at 5. A financial advisor performs a different role than does an investment banker, as specifically recognized in the Forbearance Agreement. In the immediately preceding section, the Forbearance Agreement prohibited the Debtors from engaging "any investment banking firm, crisis manager, chief restructuring officer, or restructuring related consultant, financial advisor, or other third-party professional" without consent. *Id*. § 5(a), ECF No. 210-3 at 5. Thus, the parties clearly contemplated that a "financial advisor" was not the same as an "investment banking firm."

The Court finds that Jefferies was an investment banker and not a financial advisor.[13] The Jefferies engagement letter specifically identified that Jefferies would provide "investment banking services." Fortress Ex. F at 1, ECF No. 211-1 at 249. In attempting to justify the fees and fee structure charged by Jefferies, Fortress compared the Jefferies fees to the fees charged by the Debtors' investment banker and investment bankers hired by other debtors in other recent Chapter 11 cases. *See* White Decl. ¶¶ 25-28, ECF No. 211 at 12-13; Fortress Ex. G, ECF No. 211-1 at 259. Given the admissions by Fortress and the terms of the engagement letter, the Court finds that

---

[13]   While the roles of a financial advisor and investment banker may seem similar, in the context of complex restructurings, they are different and distinct. Financial advisors are hired to provide general financial advice and are typically compensated on an hourly basis. For financial advisors hired by the estate, these professionals are retained under section 327 of the Bankruptcy Code. In contrast, investment bankers are hired to assist with the marketing and negotiation of a specific transaction and are typically compensated by a monthly flat fee and a "success fee" upon completion of the transaction. For investment bankers hired by the estate, these professionals are retained under section 328 of the Bankruptcy Code.

For example, in these Bankruptcy Cases, the Debtors engaged EY Turnaround Management Services LLC as its financial advisor and Moelis & Company, LLC as its investment banker. Order Authorizing Retention & Employment of EY Turnaround Mgmt. Servs. LLC, ECF No. 271; Order Authorizing Retention & Employment of Moelis & Co., LLC, ECF No. 270. The Official Committee of Unsecured Creditors engaged Dundon Advisers LLC as its financial adviser and Miller Buckfire & Co., LLC as its investment banker. Order Authorizing Committee to Employ Dundon Advisers LLC, ECF No. 335; Order Authorizing Committee to Employ Miller Buckfire & Co., LLC & Stifel, Nicolaus & Co., Inc., ECF No. 334.

Jefferies was an investment banker not included within the meaning of "financial advisor" and, as such, cannot be compensated pursuant to section 5(b) of the Forbearance Agreement.[14]

Even assuming arguendo that the First Lien Credit Agreement, as modified by the Forbearance Agreement, allowed for the payment of reasonable fees owed to Jefferies, the Court finds that $2.125 million is an unreasonable fee. Jefferies's engagement was for a total of twenty-five days from the date of engagement through payment of the First Lien Obligations. Before the commencement of that twenty-five-day engagement period, the Debtors had already received the ICG-Brigade proposal which was more than sufficient to pay the First Lien Obligations in full. While Jefferies may have assisted Fortress in offering two unsuccessful alternative DIP financing proposals, those rejected offers did not create any value to the Debtors' estates. There is no evidence before the Court to indicate that $2.125 million is a reasonable fee for twenty-five days' worth of work.[15] For all of the foregoing reasons, the Court will deny Fortress's request for reimbursement of the Jefferies fees in full.

The final category of fees for which Fortress sought payment was the Expense Reimbursement.[16] Fortress is seeking repayment of the allegedly "*unpaid*" professional fees incurred by Antares (the prior administrative agent). The claimed right to repayment of the

---

[14]    Notably, Antares had hired Alvarez & Marsal as its financial advisor pursuant to section 5(b) of the Forbearance Agreement. *See* Subburathinam Decl. ¶ 7, ECF No. 207 at 3-4.

[15]    The Court has no fee application as required by the Final DIP Order from which it can independently assess the reasonableness of the requested fees.

[16]    Fortress does not appear to seek reimbursement of the repaid 2021 administrative agent fee. To the extent that Fortress does seek such repayment, the Court finds that Fortress is not entitled to such. The administrative fee was a prospective fee. Fortress Ex. 11, ECF No. 210-4 at 9. The 2021 administrative agent fee was due on February 25, 2021. *See id.*; Dubel Decl. ¶ 8, ECF No. 244 at 4. As the First Lien Obligations were paid in full on February 25, 2021, the Court finds that Fortress was not entitled to repayment of the prospective administrative agency fee.

Expense Reimbursement is based on section 5 of the Agency Transfer Agreement which provided that:

> Effective as of the Effective Time, Former Agent [meaning Antares] hereby irrevocably sells and assigns to New Agent [meaning Fortress], and New Agent hereby irrevocably purchases and assumes from Former Agent, Former Agent's right, title and interest to existing and hereafter-arising claims against the Credit Parties under Section 9.5 and 9.6 of the Credit Agreement for reimbursement of $1,970,426.02 of fees, costs and expenses incurred by Former Agent or its Related Persons prior to the Effective Time.

Fortress Ex. 2 at § 5, ECF No. 207-1 at 8.[17]  By the express language of the Agency Transfer Agreement, Antares assigned to Fortress its rights to the Expense Reimbursement as of the Effective Time.  *See* Fortress Ex. 2 § 5, ECF No. 207-1.  The "Effective Time" of the Agency Transfer Agreement was on or about January 15, 2021.  *See id.* § 3, ECF No. 207-1 at 8.  That is the date on which Fortress claims it purchased the Expense Reimbursement claims from Antares. As of January 15, 2021, the Debtors had paid Antares for all the expenses it had incurred.  Antares had no claims for reimbursement under the Credit Agreement to sell on January 15, 2021.

The Agency Transfer Agreement provided that "[w]ithin five (5) Business Days following the date on which the Effective Time occurs, the Former Agent [Antares] shall, or shall cause its advisors to, (i) return to the Borrowers an aggregate amount in immediately available funds equal to the [Expense Reimbursement]."  *Id.* § 5, ECF No. 207-1 at 8.  In accordance therewith, Antares

---

[17]   At the outset, the Court will disallow the full amount of the alleged Expense Reimbursement because the Court lacks the fee applications supporting the reimbursed professional expenses included in this category.  The Court required in its Final DIP Order that fee applications of professionals be filed.  Without the applications, the Court cannot assess the reasonableness of the fees allegedly reimbursed.  While it might be argued that the prepetition payment of these fees is an admission of reasonableness, the Court finds the return of the payments to the Debtors to be more probative of an attempt to avoid scrutiny of the reasonableness of the fees allegedly reimbursed.  Furthermore, no excuse was proffered at the March 11, 2021, evidentiary hearing as to why the Court's order was simply ignored.

returned the Expense Reimbursement to the Debtors on or about January 21, 2021.  Fortress Ex.

1, ECF 207-1 at 2-3.[18]

An assignee "stands in the shoes of its assignor, and takes neither more nor less than the

assignor had."  *In re 785 Partners LLC*, 470 B.R. 126, 133 (Bankr. S.D.N.Y. 2012) (citing *In re*

*Trans-United Indus., Inc.*, 351 F.2d 605, 606 (2d Cir. 1965)).  By operation of law, Fortress took

only what rights Antares had in the Expense Reimbursement as such rights existed as of the

Effective Time.  When the Effective Time occurred, Antares had already been paid the Expense

Reimbursement by the Debtors.   Antares had no existing legal right to seek payment of

$1,970,426.02 from the Debtors.  Fortress has not provided any instrument with present tense

words of conveyance whereby Antares transferred an existing "unpaid" claim.

As Antares no longer had any right to repayment under the Credit Agreement as of the

Effective Time, Antares had no such rights that it could convey to Fortress.  Accordingly, Fortress

did not acquire the Expense Reimbursement from Antares and it has no entitlement to recover

payment of such from the Debtors.[19]

---

[18]  The subsequent voluntary repayment by Antares of the claimed amounts did not create a retroactive claim to repayment.  This is not a case of mistaken payment.  Antares caused its lawyers and professionals to voluntarily transfer the monies back with full knowledge of all material facts.  The Voluntary Payment Doctrine prevents Antares from recovering the refunded money where it had full knowledge of the facts, and in the absence of fraud or mistake of material fact or law.  *Hedley's, Inc. v. Airwaves Glob. Logistics, LLC*, 15 N.Y.S.3d 84 (App. Div. 2015) (voluntary payment doctrine barred recovery of payments made by plaintiff to defendant above the established contractual limitation of liability).

[19]  The parties agree that the Expense Reimbursement was included to minimize Antares's and Antares's professionals' preference exposure.  While parties may engage in legitimate risk minimization efforts, the Court questions, but needs not determine, whether the Expense Reimbursement qualified as such or was, instead, one of the scorched earth tactics about which the Debtors complain that was allegedly implemented to needlessly inflate the payoff amount of the existing first lien indebtedness.  On one hand, the Court questions whether any preference exposure existed given that Fortress is oversecured, *see* DIP Stipulation, ECF No. 127 at 2, and there is nothing in the record to indicate that the collateral package supporting the First Lien Obligations changed in value in the approximately ten-day period between the date on which Fortress bought the debt at par plus interest from Antares and the Petition Date.  On the other hand, to the extent that preference exposure did exist, the causes of actions would have been assets of the Debtors' bankruptcy estates that would have inured to the benefit of the Debtors' unsecured creditors.  *See* 11 U.S.C. § 551.

Lastly, the Court rejects Fortress's argument that the Jefferies fees and the Expense Reimbursement are nonetheless recoverable under section 506(b) of the Bankruptcy Code as required indemnification obligations pursuant to section 9.6 of the First Lien Credit Agreement. Section 9.6 of the First Lien Credit Agreement provides, in pertinent part:

> [e]ach Credit Party agrees to indemnify, hold harmless and defend the Administrative Agent . . . and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person)

in certain enumerated matters.  Fortress Ex. 4 § 9.6, ECF No. 210-1 at 89-90.  To be recoverable under section 506(b), an oversecured creditor must not only establish that the fees "are . . . provided for in the agreement under which the claim arose" but also that they "are reasonable." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).  The Court has already found that the Jefferies fees and the Expense Reimbursement are not reasonable.  As such, Fortress is not entitled to payment of the Jefferies fees or the Expense Reimbursement under section 506(b) of the Bankruptcy Code, regardless of whether such fees are sought under section 9.5 or section 9.6 of the First Lien Credit Agreement.

While the Court need not necessarily address whether the First Lien Credit Agreement provides for the recovery of such fees and expenses as an indemnification obligation, New York law governing contract interpretation provides that specific contract provisions control over general provisions.  *See U.S. Bank. Tr. N.A., v. Am. Airlines, Inc.* (*In re AMR Corp.*), 485 B.R. 279, 301 (Bankr. S.D.N.Y.), *aff'd*, 730 F.3d 88 (2d Cir. 2013) (collecting cases).  As section 9.5

directly addresses the entitlement of Fortress to reimbursement of fees and expenses, the Court finds that it is the more specific and would control.[20]

For the foregoing reasons, the Court will approve reimbursement of the Lead Counsel and Local Counsel fees and disallow reimbursement of all other fees and expenses.  A separate Order shall issue.

Dated:   March 26, 2021 _____           /s/ Kevin R. Huennekens _____
                                             UNITED STATES BANKRUPTCY JUDGE

                                             Entered on Docket:  March 26, 2021 _____

---

[20]   The Court questions whether section 9.6 affords the relief requested by Fortress.  *See Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 255–56 (3d Cir. 2010) (applying similar rules of construction under New Jersey law to interpret indemnification provisions substantially similar to section 9.6 to apply only to third-party claims and not first-party claims).